UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____x

OUSSAMA EL OMARI,

      Plaintiff,         Case No.: 20-cv-2601 (   ) (   )

   v.            **COMPLAINT**

JAMES E. D. BUCHANAN,
DECHERT LLP,
ANDREW D. FRANK,
a/k/a ANDREW D. SOLOMON,
NEIL GERRARD,
AMIR ALI HANDJANI,
a/k/a AMIRALI HANDJANI,
KARV COMMUNICATIONS, INC.,
INTELLIGENCE ONLINE, and
LONGVIEW PARTNERS (GUERNSEY)
LTD,

      Defendants.

_____x

   OUSSAMA EL OMARI, Plaintiff in the above referenced action, by and through his

undersigned counsel, MOORE INTERNATIONAL LAW PLLC, as and for his Complaint, states

as follows:

## **INTRODUCTION**

   1)  Plaintiff, Oussama El Omari, a United States' citizen, brings the instant lawsuit

against the Defendants arising out of continuing, malicious, and serious defamatory attacks on

Plaintiff designed to destroy his life and liberty. These Defendants have crossed the line in their

respective businesses of publishing, public relations, law, and asset management, into acting as

propaganda agents advancing serious falsehoods who take their orders directly from the top, a

corrupt foreign dictator in the Middle East, Sheikh Saud Bin Saqr Al Qasimi, to protect and

further his political interests by attacking persons who worked in the UAE emirate of Ras Al Khaimah, such as Plaintiff, who got caught in his political rivalry and had gained knowledge of his illicit activities involving oil trade with Iran, contraband trade, and his spending and loss of billions of dollars of state funds.

2)     The defamatory attacks are ongoing and continuing. Sheikh Saud Bin Saqr Al Qasimi's grip on political power remains unstable due to simmering internal royal family conflict and the depth and breadth of his wrongdoing and cover-up. To gain his present position as Ruler of Ras Al Khaimah, Sheikh Saud Bin Saqr Al Qasimi had to depose his half-brother Khalid as legitimate Crown Prince and therefore future ruler, and other brothers and sisters in the royal family, with the most challenging being El Omari's prior boss, Sheikh Faisal, and since these royals cannot be tortured or imprisoned, their foreign workers, such as Plaintiff, are his scapegoats.

3)     Two parties in this case have been "backstopped," a term used to describe a person or entity whose true identity has been hidden by use of sophisticated tools typically only found within a government intelligence community. Those two parties are Defendant, Andrew D. Frank, a/k/a Andrew D. Solomon, and Defendant, Intelligence Online.

## THE PARTIES

4)     Plaintiff, OUSSAMA EL OMARI, ("Plaintiff" or "EL OMARI"), is a United States' citizen with residence in Raleigh, North Carolina, who worked as Director and CEO of the Ras Al Khaimah Free Trade Zone Authority, in Ras Al Khaimah, an emirate of the United Arab Emirates, from 1997 until being fired in 2012 by Sheikh Saud Bin Saqr Al Qasimi.

5)     Defendant, James Edward Dennison Buchanan, ("BUCHANAN"), is an individual of unknown citizenship with residence in Ras Al Khaimah. BUCHANAN is CEO of

Ras Al Khaimah Development LLC and is employed in charge of litigation for the Ras Al Khaimah Investment Authority, both in Ras Al Khaimah. From 2001 to 2014, BUCHANAN was an employee of Defendant, Longview Partners (Guernsey) Ltd., and is and has been a shareholder and member of its board of directors from 2014 to the present, and is believed to be an agent of Defendant, Longview Partners (Guernsey) Ltd. relating to its management of RAK state assets.

6)      Defendant, Dechert LLP, ("DECHERT"), is a law firm organized as a limited liability partnership under the laws of Pennsylvania, and is registered under the laws of New York as a foreign registered limited liability partnership. DECHERT is headquartered in Philadelphia, with offices in New York, London, United Kingdom, and Dubai, United Arab Emirates, and other locations. Outside of the United Arab Emirates, DECHERT represents a number of Ras Al Khaimah government institutions controlled by Sheikh Saud Bin Saqr Al Qasimi, including the Ras Al Khaimah Investment Authority at its New York and London offices, plus the Ras Al Khaimah Free Trade Zone Authority and Sheikh Saud Bin Saqr Al Qasimi at its New York office.

7)      Defendant, Andrew D. Frank, a/k/a Andrew D. Solomon, ("FRANK"), is an individual of United States' citizenship with residence in Manhattan, New York. FRANK founded public relations firm Defendant, KARV Communications, Inc. in 2013, and is its President and CEO. FRANK'S true name is Frank D. Solomon. Since 2013, FRANK has filed documents in Washington, D.C. on behalf of KARV Communications, Inc. and himself under the name Andrew D. Frank, under the Foreign Agents Registration Act, 22 U.S.C. § 612, *et seq.*, relating to Ras Al Khaimah.

8)      Defendant, Neil Gerrard, ("GERRARD"), is a citizen of the United Kingdom residing in London, and is an attorney and partner with Dechert LLP, stationed at its London office. GERRARD represents the Ras Al Khaimah Investment Authority.

9)      Defendant, Amir Ali Handjani, a/k/a Amirali Handjani, ("HANDJANI"), is a dual citizen of Iran and the United States with residence in Manhattan, New York. HANDJANI has been employed as a Senior Advisor by KARV Communications, Inc. since its founding in 2013, and is an employee/shareholder/director of Ras Al Khaimah Petroleum PLC in Ras Al Khaimah. HANDJANI is also an attorney licensed in New Jersey.

10)      Defendant, Karv Communications, Inc., ("KARV"), is a corporation organized by FRANK in 2013 under the laws of New York, with its office located in Manhattan, New York. Since 2013, KARV has filed documents in Washington, D.C. under the Foreign Agents Registration Act relating to Ras Al Khaimah.

11)      Defendant, Intelligence Online, ("INTELLIGENCE ONLINE"), is an online media publisher organized as a corporation under the laws of France, located in Paris, France. INTELLIGENCE ONLINE is a pay-to-play publisher with internet distributed articles angled at purported intelligence sensitive events in Ras Al Khaimah, the Middle East, and elsewhere. INTELLIGENCE ONLINE is backstopped.

12)      Defendant, Longview Partners (Guernsey) Ltd, ("LONGVIEW"), is an asset management company based in St. Peter Port, Guernsey. LONGVIEW is registered with the U.S. Securities and Exchange Commission in Washington, D.C., and on behalf of approximately 75 clients, including Sovereign Wealth Funds and High Net Worth Individuals, manages approximately $24.5 Billion in Regulatory Assets Under Management invested in approximately 24 stocks listed on the New York Stock Exchange in New York. LONGVIEW has controlled

affiliates, including Longview Partners LLP and Longview Partners USA LLP, located in London and Texas, respectively. The SEC registered custodians of LONGVIEW's books and records are Longview Partners LLP in London and The Northern Trust Company in Chicago, Illinois. Plaintiff has reason to believe LONGVIEW's managed assets include Ras Al Khaimah state assets.

## JURISDICTION AND VENUE

13)     This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a)(1).

14)     This court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 18 U.S.C.A. § 1964(c).

15)     Venue is proper in this court pursuant to 28 U.S.C. § 1391(b)(2) and 18 U.S.C.A. § 1965(a).

## STATEMENT OF FACTS

16)     During the month of October 2018, BUCHANAN met in London with Radha Stirling, ("STIRLING"), an expert witness on UAE illegitimate persecutions engaged by EL OMARI. BUCHANAN stated he was affiliated with the Ras Al Khaimah Investment Authority, ("RAKIA"), and came to London on behalf of Sheikh Saud Bin Saqr Al Qasimi, ("SAUD"), to speak about EL OMARI and three Georgians. Offering whisky and a visit to his mansion in RAK, which made STIRLING fear kidnapping, BUCHANAN unsuccessfully attempted to persuade STIRLING to switch sides to SAUD, and stop helping EL OMARI and turn against him. BUCHANAN said "I came in 2014 to clean up the mess of Faisal and Oussama. We know how to control the judges. Now we are after him and are going to report him to the IRS." He said, "I'm going to bring him [EL OMARI] down." BUCHANAN falsely stated EL OMARI was a 'human trafficker.' BUCHANAN also stated he visited Johnson George, ("GEORGE"), in a

Ras Al Khaimah prison and unsuccessfully attempted to get GEORGE to sign a document, which is believed to have contained a false confession. GEORGE is a lawyer who worked with EL OMARI at RAKFTZA.

17) Given the sovereign wealth fund and high net worth individual client base of LONGVIEW, the mutual employment relationships between LONGVIEW and the Ras Al Khaimah government, and the actions of BUCHANAN complained of herein, Plaintiff has reason to believe LONGVIEW manages RAK state assets, such as RAKIA, which are controlled by SAUD as Ruler of RAK, and BUCHANAN's actions on behalf of SAUD are related to gaining and maintaining said asset management contracts. LONGVIEW has only about seven employees in Guernsey, and Guernsey controls overall management of LONGVIEW and its subsidiaries. Founded in 2001 when BUCHANAN was an employee, LONGVIEW has had at least two mutual employees with at least two RAK Government sovereign investment funds, RAKIA and RAK Investment and Development Office, a/k/a RAK Development LLC, (RAK DEVELOPMENT"), both having had SAUD as Chairman and MASSAAD as CEO. Elizabeth Campbell, a/k/a Kate Campbell, ("CAMPBELL"), worked with BUCHANAN and was Head of Finance for RAK DEVELOPMENT for six years from 2010 to 2016, and became Finance Director and shareholder/director for LONGVIEW in 2016. From these employment interrelationships, LONGVIEW, BUCHANAN, and CAMPBELL knew for a fact that EL OMARI never worked for RAKIA and did not personally know MASSAAD or of his RAKIA activities. Also from these employment interrelationships, Plaintiff believes that both BUCHANAN and CAMPBELL were agents of LONGVIEW for asset management of RAK state funds and took their orders directly from SAUD.

18)     On or about April 2, 2019, a Wikipedia page was published and titled "Oussama El Omari," ("the Wikipedia page"). The Wikipedia page was previously nonexistent and EL OMARI was unaware of its creation. The Wikipedia page became edited to point readers to INTELLIGENCE ONLINE as a reference source about EL OMARI. On or about May 18, 2019, the Wikipedia page was deleted by Wikipedia itself by its own enforcement action because the page was created by a "banned user." The banned user was one of several technologically sophisticated internet "bots" designed to hide identity and which created and edited the Wikipedia page on February 8, 2019, February 13, 2019, March 16, 2019, April 2, 2019, April 3, 2019, April 16, 2019, and April 28, 2019. The inclusion of the reference to INTELLIGENCE ONLINE on the illegitimate Wikipedia page is related to the creation of the defamatory false facts by the Defendants and fed to INTELLIGENCE ONLINE for publication.

19)     On or about April 8, 2019, INTELLIGENCE ONLINE published an online story for its subscribers entitled "The Ras Al Khaimah Investment Authority trails French connection to recover its lost funds," ("the Article"), annexed hereto as Exhibit 1, which along with its advertising teaser for the Article, annexed hereto as Exhibit 2, named EL OMARI and contained wildly absurd and damaging false facts connecting EL OMARI to a multi-billion dollar fraud scheme involving RAKIA. The false facts quoted from the Article are the following:

    a)  Two false facts: "the Ras Al Khaimah Investment Authority is on a vast worldwide hunt to recover <u>arrears</u> reportedly <u>embezzled b</u>y <u>its former senior officials</u>, Khater Massaad and <u>Oussama El Omari</u>." [emphasis added] Article, p. 1.

        (i) It is a false fact that EL OMARI was a senior official of RAKIA. EL OMARI never worked for RAKIA. It is a false fact that EL OMARI embezzled any RAKIA arrears.

b) Two false facts: "<u>Massaad and his former alley [sic] **Oussama El Omari**</u>, who previously oversaw the **Ras Al Khaimah Free Trade Zone Authority** (RAKFTZA), <u>misappropriated as much as $1.5 billion in overpayments</u>." [boldface in original] [emphasis added] Article, p. 1.

        (i) It is a false fact that EL OMARI is or was a former ally of MASSAAD. During EL OMARI's fifteen years of employment at RAKFTZA, EL OMARI only met MASSAAD three times and each time was at a RAK government event unrelated to RAKFTZA or RAKIA. It is a false fact that EL OMARI misappropriated $1.5 billion or any RAKIA overpayments. EL OMARI only worked for RAKFTZA and had the RAKFTZA management system ISO 14000 certified and audited by the accounting firms of PWH and Deloitte. All RAKFTZA checks over $250,000 required dual signatures with FAISAL, and with EL OMARI's deputy on checks over $100,000. EL OMARI had no access to RAKIA funds.

c) One false fact: "the Massaad-Omari duo". Article, p. 1.

        (i) It is a false fact that MASSAAD and EL OMARI are or were a "duo."

d) Five false facts: "Khater Massaad <u>and</u> Oussama El Omari". [emphasis added] Article, p. 1. "Massaad <u>and</u> his former alley [sic] **Oussama El Omari**".

[boldface in original] [emphasis added] Article, p. 1. "the Massaad-Omari duo". Article, p. 1. "Massaad and El Omari". [emphasis added]Article, p. 4.

    (i) Each statement containing the word "and" and the hyphen "-" connecting EL OMARI to MASSAAD and the $1.5 billion RAKIA embezzlement allegations against MASSAAD are false.

20)    INTELLIGENCE ONLINE failed to retract upon demand by EL OMARI.

21)    EL OMARI never worked at RAKIA, and did not know the individual personally, Khater Massaad, ("MASSAAD"), also named in the Article, and EL OMARI has no personal knowledge of MASSAAD's activities.

22)    EL OMARI and MASSAAD were far apart in rank. MASSAAD is an individual who EL OMARI knew in the UAE by reputation only, to have headed RAKIA with SAUD. RAKIA was once classified as RAK's Sovereign Wealth Fund, but lost that status. MASSAAD was the Advisor to then Crown Prince, SAUD, and later Advisor to the Ruler and RAK Government, when SAUD assumed the position of Ruler. MASSAAD had a private jet, was awarded most successful businessman by the Dubai Ruler, and was the chairman of over 30 companies that were owned or controlled by SAUD and the RAK Government, in addition to his title of Advisor and CEO of RAKIA. MASSAAD became the *de facto* ruler of RAK and Abu Dhabi warned SAUD of over empowerment of MASSAAD causing unrest.

23)    SAUD created RAKIA in 2005 and was the Chairman, and MASSAAD was the CEO. SAUD and MASSAAD's sprawling mix of public and private sector activities of RAKIA are shown in the audited 2009 Consolidated Financial Statements for the "RAK Investment authority - Government of Ras Al Khaimah and its Subsidiaries," prepared by Talal Abu-Ghazaleh & Co. International, which is signed by MASSAAD. The cash flow statement shows

the "RAK government current account" to be in the <u>negative,</u> and Note 2 shows four 100%

owned "subsidiaries" in the country of Georgia, being the "JSC Poti Sea Port," "Ras Al Khaimah

Investment Authority Georgia LLC," "RAKIA Georgia Free Industrial Zone LLC," and the

"Yacht Club Port of Poti LLC (a subsidiary of JSC Poti Sea Port)." This suggests more money

was being paid out than brought into RAK, even with the holdings in Georgia in the mix.

24)     FRANK and HANDJANI, (collectively, "the KARV Defendants"), and

DECHERT and GERRARD, (collectively, "the DECHERT Defendants"), and BUCHANAN,

conveyed and published the false facts about EL OMARI between themselves and to

INTELLIGENCE ONLINE, and INTELLIGENCE ONLINE did publish the false facts. The

Article stated, "According to our information, RAKIA and its lawyers from **Dechert**, joined by a

team of investigators, are hot on the heels of anyone who might have benefitted from the

Massaad-Omari duo." [boldface in original] Article, p. 1. GERRARD is named in the Article as

representing RAKIA. "… the former CIA contractor [Farhad Azima] claims he was threatened in

2016 by Rakia's lawyer, Neil Gerrard, a former Metropolitan Police (MET) officer who now

practices at Dechert, as part of the sovereign fund's lawsuit against Massaad." Article, p. 3.

25)     The Defendants did publish the false facts with malice and knowledge that the

facts were false, or with reckless disregard as to whether the facts were true or false.

26)     In line with BUCHANAN's threat to "take down" EL OMARI, on May 28, 2019,

EL OMARI was visited at his home in Raleigh, North Carolina, by two agents from the U.S.

Department of Homeland Security, who asked questions of EL OMARI focusing on two lines of

questioning. The first line of questioning was on "Was your former chairman Sheikh Faisal

radicalized?" Any allegation underpinning this questioning is a false smear. EL OMARI knew

FAISAL as the opposite: secular, liberal and progressive. The second line of questioning was on

"What is the nature of the New York business center and the transactions in its New York bank account?" A "New York business center" would relate to EL OMARI's previous work with FAISAL, and any allegation of banking wrongdoing in New York is, like the ridiculous alleged "radicalizing" of FAISAL, a false smear in furtherance of BUCHANAN's threat. Prior to termination, SAUD threatened EL OMARI and FAISAL not to leave an office open in the United States, and closed the office after their termination, but left other foreign offices open in Germany, Turkey, and India.

27)     Similar to BUCHANAN's targeting EL OMARI on behalf of SAUD in this case, according to a November 12, 2019 filing by Farhad Azima, ("AZIMA"), a non-UAE national and defendant in *Ras Al Khaimah Investment Authority v. Farhad Azima*, Claim No. CR-2016-002798, presently pending before the High Court of Justice in London, UK, "The Ruler of RAK instructed key individuals in RAKIA (including Mr Buchanan) to 'target' and 'go after' Mr Azima."

28)     According to a January 28, 2020 claim filed in the High Court of Justice in London, UK, by Plaintiff, Karam Sadeq, ("SADEQ"), a non-UAE national and former in-house General Counsel for RAKIA, against DECHERT LLP and its then attorneys, GERRARD, and David Hughes, SADEQ was subjected to interrogation amounting to torture by GERRARD in a RAK jailhouse interrogation - after SADEQ was 600 days in solitary confinement - to extract a false confession implicating MAASSAD.

**EL OMARI HAS INSIDER KNOWLEDGE OF WRONGDOING BY SAUD**

29)     From 1997 to 2012, EL OMARI worked for RAKFTZA and closely with, and reported directly to Sheikh Faisal Bin Saqr Al Qasimi, ("FAISAL"), who was then Chairman of RAKFTZA. FAISAL held other top RAK government positions, including responsibilities over

RAK finances as Chairman of the RAK Government Financial Department. During this period, as necessary, EL OMARI had direct contact in person and by phone with SAUD.

30)     There came a point in time when FAISAL and SAUD became political rivals after SAUD deposed their half-brother, then RAK Crown Prince, Sheikh Khalid bin Saqr Al Qasimi, ("KHALID"). SAUD was preparing the way to start deposing his other brothers as well as FAISAL. To gain support for deposing his older half-brother, KHALID, in a coup, SAUD enlisted the support of all his full brothers and mother, promising to share the power in the family. Once the father Ruler died, SAUD took over as official Ruler, although not fully recognized by all the tribes in RAK and also not by the family. SAUD became Ruler of RAK in 2010, and failed to distribute his father Ruler's assets, believed to be about 1.5 billion U.S. dollars and missing, among the royal family as promised. Before being sacked, FAISAL had questioned SAUD about large amounts of money, in the billions of U.S. dollars, being transferred from RAK to the country of Georgia, but SAUD said he could do what he wanted and could not be questioned. After assuming the position of Ruler, SAUD dismantled the Ruler's Court offices by moving his Ruler's Court office to his palace, and away from his brothers' offices where tribes were received and the Ruler was traditionally helped.

31)     From his work experience in RAK, EL OMARI gained personal knowledge of the political activities of FRANK and HANDJANI in New York and the UAE on behalf of SAUD, including their investigations of SAUD's political rival KHALID. For example, on December 2, 2010, FRANK and HANDJANI met in New York with one or more individuals at a New York company investigating the financial ability of KHALID to mount a political campaign against SAUD, and whether KHALID had attended a reported political rally. The timing of this investigation of KHALID coincided with the February 8, 2010 publication of the KHALID

REPORT in the United States, further described below. An email sent to FRANK by the New York company of December 2, 2010, described the upcoming meeting:

> Andrew [FRANK],
>
> We are looking forward to meeting with you and Amir [HANDJANI] at 2:30 this afternoon at our office.
>
> In our last conversation, you mentioned some dissatisfaction with the information provided thus far about two topics: Sheikh K's [KHALID's] financial situation, and the lack of documentary (specifically photographic) evidence related to a rally he allegedly attended where a US flag or flags were burned. In preparation for our meeting this afternoon. I wanted to respond to your concerns.
>
> With regard to the first topic, Sheikh K's finances, our original brief was not to perform a full audit but rather to determine the nature and extent of the financial support for his campaign. As previously reported, reliable sources estimate his personal net worth to be in excess of $110 million, with these funds distributed through shell/holding companies in the Caribbean, Western Europe, and the Gulf. We uncovered no evidence indicating that his activities receive significant backing from outside sources. We also uncovered no evidence suggesting that his wife is receiving major financial support from backers other than her family in Sharjah. In short, we uncovered no evidence of major external backing, but we also determined that Sheikh K has the resources to mount a sustained PR campaign himself. We believe that this definitively answers the main question, and because we are operating under a tight budget, in order to conserve the client's resources on this project we did not pursue additional information on this subject once the primary question had been answered. However, we can discuss at this afternoon's meeting whether you would like to dedicate further resources to developing a more detailed picture of his financial holdings.
>
> With regard to the matter of the rally, we conducted a thorough search of available press and public records in English and Arabic and could find no documentary evidence of this event having taken place. We found reporting that mentions this rally (likely the same reporting you have already seen), but much of this appears upon analysis to be circular reportage--one reporter or blogger repeats what someone else has said without going back and fact checking the original source of the material. Our extensive search yielded no reputable original source (e.g,. photograph or reliable eye witness account by a named source) documenting the incident. Furthermore, and more importantly, we confirmed with a high degree of confidence that whatever information exists about Sheikh K in the primary repository of U.S. intelligence information does not meet the threshhold necessary to cause concern among intelligence consumers. We will elaborate on this point this afternoon.

I hope this addresses some of your concerns and look forward to speaking in greater detail in person.

32)     There came a point, about 2009, when EL OMARI witnessed SAUD meeting with a Kurdistani government delegation in RAK, which coincides with the time period the Kurdistan Region of Iraq gained its semi-autonomous status, part of a greater traditional Kurdistan region including Northwest Iran. This is related to Saud's Iran Oil Scheme, as further described below.

33)     There came a point when an Iranian group came to EL OMARI and asked to be introduced to SAUD, and said they wanted to bring cash involving China. EL OMARI called SAUD to tell him about the Iranian group, but EL OMARI was surprised that SAUD was eager and asked EL OMARI to bring the group to him. EL OMARI did not take the Iranian group to SAUD, and instead informed his boss, FAISAL. EL OMARI came to understand that the Iranian group came to the Ruler, SAUD, seeking to agree to receive a large amount of funds in U.S. dollars and help them to transfer it to Iran in exchange for a percentage.

34)     There came a point when SAUD sent EL OMARI on short notice to accompany the RAK Government Customs General Director, Mohammed Moharizi, ("MOHARIZI"), alone, to an Iranian island named Khish Island in a private jet to meet with Iranian government officials about exchange visas. There was an apparent hidden agenda that EL OMARI was not privy to, and afterwards learned the visa exchange program involved bringing in prostitutes to RAK from Ukraine, Chechnya, Turkmenistan, and Russia, and stays between visas at Iran's Kish Island. Moharizi was a known business partner with SAUD and facilitated smuggling arms, drugs, medicine, and human trafficking in prostitutes at RAK Airport, RAK's only airport and which could issue business licenses to foreigners. One of many CEOs of RAK Airport, Michelle Soliman, an Australian, conducted a critical internal investigation and was terminated. There

14

were long periods of no commercial flight activity at RAK Airport, yet the airport handled about one million pounds of freight per year and two or three 200-300 seat passenger and cargo charter jets per day, with flights involving Ukraine, Russia, and Congo.

35)     MOHARIZI was working with Iranian companies, which were undercover Iranian government companies, to use the three RAK ports for their interests. RAK's major port had been given to an undercover Iranian government company to participate in its management. Abu Dhabi's federal government was checking on the port and sent a special security squad to investigate SAUD's partnership with the Iranian government company at the port. Abu Dhabi intervened and forced an investigation. MOHARIZI was sent to Australia to "study." Once his hand was forced by Abu Dhabi, SAUD tried to cover up his illicit trade with Iran by bringing in an American company to write a false report saying it was RAKFTZA behind SAUD's covert activities and falsely implicating FAISAL, EL OMARI, and others.

36)     There came a point when El Omari and other RAK Government agencies were asked by SAUD to provide RAKFTZA accounting data to Moody's during a review of RAK finances. RAKFTZA was the only profitable RAK governmental entity at the time. This review was later used by SAUD when Crown Prince and then as Ruler to conduct a US$2 billion Islamic "Sakuk" borrowing and spending spree through his controlled RAKIA and RAK Investments Office on hotels, malls, and tv stations in the country of Georgia, and a mine and railroad in Indonesia, losses from which later became a financial disaster. This spending spree began by SAUD when he was Crown Prince and at a time his father, Ruler of RAK, suffered from dementia. SAUD took these steps of sending money from the RAK government by channeling money through Georgia, then somewhere else, in order to justify his father Ruler's wealth was going to be used to pay off debt and not to distribute to family members.

37)     There came a point in 2011, after publication of the KHALID Report, described below, when EL OMARI was approached in the UAE by an officer from the United States Central Intelligence Agency ("CIA") who knew EL OMARI was a United States citizen. EL OMARI was asked to provide sensitive documents and information relating to the Iranian companies registered with RAKFTZA, business partners with SAUD's institutions, and Iran. EL OMARI cooperated. Another SAUD target, JOHNSON GEORGE, former legal advisor of RAKTZA, helped EL OMARI collect documents, and may have had knowledge of EL OMARI's cooperation with the CIA.

38)     After SAUD became Ruler of RAK in 2010, SAUD began a purge of political rivals and persons connected with them, including EL OMARI's boss, FAISAL. SAUD solicited EL OMARI's political allegiance and asked him not to talk to his boss FAISAL, but EL OMARI refused. SAUD then fired top level employees of RAKFTZA and other government institutions, including EL OMARI in 2012. SAUD stripped FAISAL of his government positions in RAK, and FAISAL was put under surveillance and house arrest, which continues to the present.

39)     After EL OMARI was fired, EL OMARI was unfairly persecuted under bogus criminal charges by SAUD relating to legitimate RAKFTZA business projects that EL OMARI and FAISAL worked closely on together and were approved by FAISAL in writing. EL OMARI was prosecuted in SAUD's RAK Ruler's Court and denied due process of law, including denial to his lawyers of the nature of the charges against him, and denial of access to any evidence against him. EL OMARI was later convicted *in absentia* and sentenced to a prison term.

**SAUD'S IRAN OIL SCHEME**

**UAE's poorer and oil starved emirate of Ras Al Khaimah**

40)     RAK is one of seven emirates composing the UAE, each emirate ruled by an absolute monarchy (political parties are banned) which controls the courts and prosecutes crimes without basic internationally recognized basic legal protections of due process of law, such as a lack of an independent judiciary, a right to a hearing, a right to counsel, a right to be advised of charges, a right to evidence, and a right to cross examine witnesses. Due to its low population and high oil driven gross domestic product, the UAE has for many years ranked number one worldwide as the country with the highest per capita income, and is heavily dependent on foreign national employees in the private and public sectors of its economy. However, Ras Al Khaimah, meaning "top of the tent" in English, the northern-most emirate of the UAE, is a poorer oil starved emirate, and struggles for economic growth. RAK is situated approximately 60 miles across the Strait of Hormuz from the nearby coastline of the Islamic Republic of Iran, ("Iran"). The Strait of Hormuz is a relatively narrow oil transportation choke point between the Persian Gulf and the Gulf of Oman, and is of strategic interest to the United States and other oil dependent countries. The rulers of the seven emirates serve on a seven seat Federal Supreme Council, which governs the UAE.

41)     On or about June 14, 2003, SAUD became Crown Prince of RAK by deposing his rival brother, Crown Prince KHALID. On or about October 27, 2010, SAUD became Ruler of RAK and gained a seat on the UAE's Federal Supreme Council upon the death of his Ruler father who had ruled RAK for 62 years.

42)     Since being deposed by SAUD in 2003, KHALID did not, and has not, relinquished his position of Crown Prince, and continues to present day to vie from a nearby

emirate for instatement as head of state in RAK. On February 8, 2010, KHALID published a report in the U.S. attacking SAUD entitled "Ras Al Khaimah: A Rogue State Within the UAE?" ("the KHALID Report") for, among other things, alleged ties to Iran.

43)     The KHALID Report asserted the following findings relating to trade with Iran:

   a) "Numerous Iranian companies and suspected government agents operate in northern UAE. In recent months the UAE central authorities have arrested a number of suspected Iranian agents and seized Iranian weaponry."

   b)  "The Ras Al Khaimah government is pursuing natural gas deals with the government of Iran to provide power for the diamond factory and other projects owned and controlled by Saud al Qasimi and his chief aide Khater Massaad. The government of Sharjah, which is controlled by another branch of the Qasimi clan, is also in a gas deal with Iran."

   c) "The government of Ras Al Khaimah is invested in a high-profile real estate project in Isfahan, Iran affiliated with the Revolutionary Guards and endorsed by President Mahmoud Ahmadinejad."

   d) "A major investor in the real estate project is a company called RAK Ceramics, which makes high-grade materials with military applications and operates a factor in Isfahan."

44)     The company "RAK PETROLEUM" is named in the KHALID Report as an illicit link of RAK to Iran, both as a company, "[f]or its 'Geographical Ambitions,' RAK Petroleum lists Iran among it[s] 'Prior One' objectives, while adding a parenthetical: '(long term)," and through its managing director and chairman, BIJAN MOSSAVAR-RAHMANI, ("RAHMANI"), who according to the KHALID Report is a "vocal critic of US trade sanctions on Iran."

45)     Through their controlling interests in the company, DNO ASA, HANDJANI, RAHMANI, and SAUD, among others, have profited in Iranian oil, illegal under the sanction laws of the United Nations and the United States. In 2016, DNO ASA signed an illegal Memorandum of Understanding with the sanctioned National Iranian Oil Company, ("NIOC"). In 2017, there were €1,453 Million in publicly reported inter-company sales between DNO ASA and its Iranian subsidiary, DNO Iran AS.

46)     United States' legal sanctions have been in effect against Iran since President Jimmy Carter's Executive Order 12170 in 1979. Present sanctions include the Iran Sanctions Act of 1996, 50 U.S.C. § 1701 *et seq*., Comprehensive Iran Sanctions, Accountability, and Divestment Act of 2010, 22 U.S.C. § 8501, *et seq*., and various Presidential Executive Orders. In large measure, sanctions are carried out by the U.S. Department of Justice, "(DOJ"), and the U.S. Department of Treasury's Office of Foreign Assets Control, ("OFAC"), often through the Specially Designated Nationals List, ("SDN List").

47)     SAUD sought personal oil wealth, by and through HANDJANI and RAHMANI in the Kurdistan regions of Iraq and Iran, by a scheme composed of their controlled public companies, RAK PETROLEUM PLC, its holding company, RAK PETROLEUM HOLDINGS B.V., and its subsidiary, DNO ASA. EL OMARI gained some peripheral knowledge of information relating to this scheme during his employment in RAK. The controlling interests of SAUD and RAHMANI in DNO ASA's oil business in Iran is disclosed in public corporate filings in London, The Netherlands, and Norway.

48)     RAHMANI is a dual citizen of Iran and the United States, and was brought to SAUD by HANDJANI about 2008 after SAUD became RAK Crown Prince. HANDJANI and RAHMANI are two key Iranian persons behind SAUD's IRAN OIL SCHEME.

49)     RAK PETROLEUM PLC is a public company incorporated on June 17, 2013 in the United Kingdom, and is listed on the Norwegian Stock Exchange, Oslo Børs. As of August, 2019, there were only 195 companies listed on Oslo Bors.

50)     HANDJANI participates in the business operations of RAK PETROLEUM PLC, and uses its email address for communication with FRANK about their activities on behalf of SAUD.

51)     RAK PETROLEUM PLC gives tribute to SAUD on its website homepage, in its "heritage and history" http://www.rakpetroleum.ae/About-us/Our-heritage-and-history: "Our predecessor company, RAK Petroleum PCL, was inspired by the vision of His Highness Sheikh Saud bin Saqr Al Qasimi, Member of the Supreme Council of the United Arab Emirates and Ruler of Ras Al Khaimah." This page contains a picture of SAUD and RAHMANI sitting and looking over papers together.

52)     RAK PETROLEUM PLC's 2018 Annual Report also contains a picture of SAUD and RAHMANI together on its cover, states RAHMANI is its Executive Chairman, states it is a holding company, and states it indirectly owns 40.45% of DNO ASA. RAHMANI and HANDJANI are stated to be on the Board of Directors.

53)     The "Investor Relations" page of RAK PETROLEUM PLC's website, RAKPetroleum.ae, shows the top 3 shareholders make up 55.18% ownership, being, RAHMANI (36.88% indirect voting share), RAK GAS LLC (10.34% direct voting share), and DNO ASA (7.71% direct voting share). RAK GAS LLC is majority owned by the RAK government, controlled by SAUD. DNO ASA is a subsidiary of its parent RAK PETROLEUM PLC. RAK PETROLEUM PLC is majority owned and controlled by two people:  SAUD and RAHMANI.

HANDJANI holds 0.46% voting shares through AAH Holding Ltd., as his apparent finder's fee for bringing RAHMANI to SAUD.

54)     Other shareholders of RAK PETROLEUM PLC include family members of SAUD, such as Al Majid Investment Co. LLC (5.48%) owned by his in-laws, and Mashreq Bank (1.83%), owned by his Uncle.

55)     RAK PETROLEUM PLC's 2018 Annual Report states its holdings are achieved through its 100% owned subsidiary, RAK PETROLEUM HOLDINGS B.V., an entity organized in The Netherlands, which directly holds the 40.45% stake in its subsidiary, DNO ASA.

56)     DNO ASA is organized as a Norwegian company, and like its parent RAK PETROLEUM PLC, is listed on Oslo Børs.

57)     DNO ASA's 2018 Annual Report states RAHMANI is its Executive Chairman, and reported US$829.3 in oil revenue, with a near total dependence, 98% of that revenue, US$811.3 coming from the semi-autonomous Kurdistan Region of Iraq.

58)     Although DNO ASA owns over 7% of its parent, RAK PETROLEUM PLC, which gives majority control to SAUD and RAHMANI, the ownership share in its parent is unreported in the DNO ASA 2018 Annual Report.

59)     The Kurdistan Region of Iraq gained its semi-autonomous status about 2009, and is part of a greater traditional Kurdistan region which includes Northwest Iran. The DNO oil interests with the Kurdistan Region of Iraq date back to this time period when it gained semi-autonomous status.

60)     On or about November 16, 2016, DNO ASA signed a Memorandum of Understanding with the National Iranian Oil Company, ("NIOC"), sanctioned and illegal under U.S. law, for development of the Changuleh oil field in Western Iran. DNO ASA also created a

wholly owned subsidiary, DNO Iran AS, to increase its presence in Iran. At the same time, DNO

ASA issued a press release bragging of this contract. DNO ASA's 2017 Annual Report states

that in 2017 there were €1,453M inter-company sales between DNO ASA and DNO Iran AS.

61)     NIOC is an oil entity owned by the government of the Islamic Republic of Iran,

and is sanctioned and banned from trade by the United States. NIOC is on the United States

Department of Treasury, Office of Foreign Assets Control, "Specially Designated Nations and

Blocked Persons List," ("the SDN List").

**THE PROPAGANDA RACKET**

62)     The primary visible propaganda organ of SAUD is the Ras Al Khaimah Media

Office, ("RAKMO"), "established through Law No. 5 issued in 2018 by … Saud … with the aim

of elevating Ras Al Khaimah's media plan to be in line with the state's strategy" according to

RAKMO's LinkedIn home page. RAKMO is described by RAKMO's Executive Director, Heba

Fatani, ("FATANI"), on her twitter account, as the "Official Gov. communication arm of Ras Al

Khaimah/The Ruler." FATANI reports directly to SAUD, according to her media statement as a

speaker at the 2019 Innovation Summit Dubai, Mena 2019, "The Office is in charge of

positioning the emirate and H.H. the Ruler, and spreading a positive image of RAK locally,

regionally and internationally. In her capacity as Executive Director, Ms. Fatani reports directly

to H.H.Sheikh Saud bin Saqr Al Qasimi, Ruler of Ras Al Khaimah."

63)     The invisible propaganda organ of SAUD is KARV. On or about May 15, 2011,

FRANK's employer at that time, another New York public relations company, terminated

FRANK and their foreign principal, RAKIA, according to that company's FARA filing with the

DOJ on March 20, 2012. Later, in 2013, FRANK formed KARV in New York.

64)     KARV is visible only to the limited extent of its misrepresented FARA filings with the DOJ, as described herein. Before and after KARV was founded by FRANK, he and HANDJANI organized, aided and abetted, and targeted investigations and false smear campaigns against EL OMARI. Other targets have included:

a)     KHALID, half-brother to and deposed by SAUD, vying for his position from a nearby emirate.

b)     FAISAL, full-brother to and removed by SAUD from all RAK positions of power, and under house arrest. Sheikhs cannot be imprisoned in RAK.

c)     Mohan Das, former CFO at RAKFTZA, a non-UAE national, imprisoned in RAK.

d)     Maryam Al Murshidi, former Deputy Director at RAKFTZA, a UAE national, imprisoned and released. SAUD is afraid of her RAK tribe.

e)     Jihad Kuzmar, former Senior Legal Advisor to SAUD, a non-UAE national, convicted and imprisoned in RAK, possibly dead.

f)     Johnson GEORGE, a non-UAE national, Legal Advisor to RAKFTZA, imprisoned in RAK.

g)     Ismat Elassi , former Financial Advisor at RAKFTZA, a non-UAE national, convicted and imprisoned in RAK.

h)     Others unknown.

65)     FRANK protects SAUD in order to win and maintain KARV's public relations contracts. Since the founding of KARV, SAUD directed RAK public relations work to KARV, and more recently, SAUD is believed to have intervened in the awarding of public relations contracts to KARV from Saudi Arabia and China.

66)     HANDJANI protects SAUD in order to profit from the Iran Oil Scheme.

**KARV FAILED TO DISCLOSE THE PROPAGANDA RACKET UNDER FARA**

The omission of the public relations work for SAUD from FARA filings were material misrepresentations.

67)     From its first filing in 2013 pursuant to the Foreign Agents Registration Act, 22 U.S.C. § 612, *et seq*., ("FARA"), to the present time, KARV repeatedly filed documents with the United States Department of Justice, ("DOJ"), which were materially misleading on three main points:

a)     Materially misrepresenting the scope of its engagement to the foreign principal, the government of Ras Al Khaimah.

b)     Failing to include the true and complete terms of its agreement with Ras Al Khaimah.

c)     Materially misrepresenting that its activities were not political.

KARV's 2013 FARA Registration Statement and 3 amendments between 2013 and 2019 were material misrepresentations.

68)     On or about April 8, 2013, FRANK caused KARV to register under FARA, by filing a registration document with the DOJ. Subsequently, from April 8, 2013 to the present time, KARV, FRANK, HANDJANI, and others affiliated with KARV, have filed twenty-nine (29) more various FARA documents with the DOJ related to KARV's initial registration document of April 8, 2013, for a total of approximately thirty (30) documents. At no time did any of the said FARA documents disclose the true and complete engagement of KARV as agent for RAK, nor did KARV, FRANK, HANDJANI, or any other affiliated person register as promoting the political activities of SAUD with the DOJ.

69)     The first FARA filing by KARV was its Registration Statement filed on April 8,

2013, which was signed by FRANK under penalty of perjury pursuant to 28 U.S.C. § 1746. ("the

Registration Statement") KARV was assigned FARA registration number 6162. In this

document, at par. 5(g), KARV represented that it was "Wholly owned by Andrew D. Frank."

70)     At par. 6 of the Registration Statement, KARV represented that FRANK would be

rendering services to the foreign principal in the capacity of "Communications Consultant."

KARV failed in this FARA filing to disclose here the true and complete capacity of FRANK in

the propaganda racket, which was a material misrepresentation of fact.

71)     At par. 7 of the Registration Statement, KARV represented that it had one foreign

principal, being "RAK Maritime City." Although not listed as a foreign principal in par. 7, at par.

9, KARV represented it was paid in 2012 and 2013 by the foreign principal named as the

"Emirate of Ras Al Khaimah."

72)     At par. 8 of the Registration Statement, KARV answered "no" to the question: "In

addition to the activities described in any Exhibit B to this-statement, will you engage or are you

engaging now in activity on your own behalf which benefits any or all of your foreign

principals?" KARV failed in this and subsequent FARA filings to disclose here the true and

complete activities complained of its propaganda racket, which was a material misrepresentation

of fact.

73)     At par. 11 of the Registration Statement, KARV answered "yes" to the question:

"Will the activities of the registrant on behalf of any foreign principal include the preparation or

dissemination of informational materials?" This is the purported generic public relations activity

which formed the cover for the propaganda racket.

74)     Par. 18(a) of the Registration Statement requires the filing of two exhibits:

"Exhibit A- This exhibit, which is filed on Form NSD-3, sets forth the information required to be disclosed concerning each foreign-.principal named in Item 7.

Exhibit B- This exhibit which is filed on Form NSD-4, sets forth the information concerning the agreement or understanding between the registrant and the foreign principal."

At par. 3 of the Registration Statement, Exhibit A, also filed and signed on April 8, 2013, under penalty of perjury, KARV named its one foreign principal as the "Emirate of Ras Al Khaimah."

At par. 6 of the Registration Statement, Exhibit A, KARV answered the questions:

If the foreign principal is a foreign government, state:

a) Branch or agency represented by the registrant

"Office of the Ruler"

b) Name and title of official with whom registrant deals

"H.H. Sheikh Saud bin Saqr Al Qasimi"

At par. 6 of the Registration Statement, Exhibit B, also filed and signed on April 8, 2013, under penalty of perjury, KARV checked the box at par. 6:

The agreement or understanding between the registrant and the foreign principal is the result of neither a formal written contract nor an exchange of correspondence between the parties. If this box is checked, give a complete description below of the terms and conditions of the oral agreement or understanding, its duration, the fees and expenses, if any, to be received.

At par. 7 of the Registration Statement, Exhibit B, KARV represented in answer to the question:

Describe fully the nature and method of performance of the above indicated agreement or understanding.

"There is an oral understanding that this agreement will go on for at least one year from the start, at or near the same monthly payments."

In this document, KARV failed to answer paragraphs 6 and 7, thereby failing to disclose not only any agreement, but most importantly the agreement with SAUD relating to the propaganda racket. KARV never disclosed any terms of any agreement in this or later filings.

75)     Since the initial filing, three amendments to the Registration Statement have been filed, on December 6, 2013, August 28, 2017, and most recently on February 25, 2019. None of the amendments disclosed the propaganda racket.

76)     The first amendment to the Registration Statement was filed by KARV on December 6, 2013 ("the 2013 Amendment"). This document was signed by FRANK under penalty of perjury, and under par. 3 states the Amendment was "To correct a deficiency in Supplemental Statement for the period ending 10/31/2013." Under par. 5, KARV states: "Please see signed execution page." Although not truly an amendment to the Registration Statement, this document referenced, incorporated and rendered KARV's answers in the First Supplemental Statement to be under penalty of perjury.

77)     The second amendment to the Registration Statement was filed by KARV on August 28, 2017 ("the 2017 Amendment"). This document was signed by Carol Haynes, under penalty of perjury, and referenced and incorporated Exhibits A and B, also filed and signed by Carol Haynes under penalty of perjury as KARV's Financial Controller. Exhibit A disclosed a new Chinese foreign principal, "COSCO Shipping Holdings Co, Ltd. (through The Harbour Group)," and Exhibit B annexed a related written contract. The amendment and its exhibits did not disclose the propaganda racket.

78)     Later, on September 25, 2019, two subsidiaries of foreign principal COSCO Shipping Holdings Co., Ltd., being COSCO Shipping Tanker (Dalian) Co. and COSCO Shipping Tanker (Dalian) Seaman & Ship Management Co., were sanctioned by the U.S. Department of

Treasury under E.O. 13846 for violating Iranian sanctions and placed on the OFAC SDN List. It is believed that these contracts came about by intervention by SAUD.

79)     The third and last amendment to the Registration Statement was filed by KARV on February 25, 2019, in the time period of the events relevant to the creation and publishing of the EL OMARI "Wikipedia page" and the INTELLIGENCE ONLINE Article. This document was signed by FRANK under penalty of perjury, for the stated purpose of "Filing a new agreement between registrant and foreign principal," and annexed "Exhibit A, Exhibit B (with attachment), [and] Short Form Registrations for Andrew Frank, Amirali Handjani, Eric Andrus and Jonathan Leibowitz." Exhibits A and B disclosed a third additional foreign principal, "The Public Investment Fund." a Saudi Arabian Sovereign Wealth Fund, and a related written contract, respectively. The amendment and its exhibits did not disclose the propaganda racket. It is believed that this contract came about by intervention by SAUD.

KARV's 12 reporting period Supplemental Statements between 2013 and 2019 were material misrepresentations and did not disclose the propaganda racket.

80)     On October 29, 2013, KARV filed its first six month Supplemental Statement. ("The First Supplemental Statement") Although required, this document was filed unsigned.

81)     In par. 11 of the First Supplemental Statement, KARV was required to "describe in detail your activities and services." KARV answered:

> "Public affairs and communications advice for the United States (primarily), Europe and elsewhere; monitoring and advising on issues related to the Emirate, and UAE and how they are perceived by oaths; and recommend conferences and speaking venues that may be of interest. In addition we oversee the implementation of the www.rakinfo.ae website and outreach to businesses who may want to invest in RAK."

This is the purported generic public relations activity which formed the cover for the propaganda racket. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which was a material misrepresentation of fact.

82)     In par. 12 of the First Supplemental Statement, KARV was required to answer: "have you on behalf of any foreign principal engaged in political activity as defined below?"[1] [footnote omitted. See footnote below.] KARV failed to answer. KARV failed in this FARA filing to disclose here the true and complete political activities of the propaganda racket, which was a material misrepresentation of fact.

83)     In par. 13 of the First Supplemental Statement, KARV failed to answer the question: "In addition to the above described activities, if any, have you engaged in activity on your own behalf which benefits your foreign principal(s)? KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which was a material misrepresentation of fact.

84)     On May 9, 2014, KARV filed its second six month Supplement Statement ("the Second Supplemental Statement"), signed by FRANK under penalty of perjury.

85)     Under par. 11 of the Second Supplemental Statement, KARV again only stated its purported generic public relations activity which formed the cover for the undisclosed activity described in this complaint. KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which was a material misrepresentation of fact.

86)     Under par. 12 of the Second Supplemental Statement, KARV answered "no" to the question of "political activity." KARV failed in this FARA filing to disclose here the true and

---

[1] Said form in footnote 5, states: The term "political activity" means any activity that the person engaging in believes will, or that the person intends to, in any way influence any agency or official of the Government of the United States or any section of the public within the United States with reference to formulating, adopting or changing the domestic or foreign policies of the United States or with reference to political or public interests, policies, or relations of a government of a foreign country or a foreign political party."

complete political activities complained of the propaganda racket, which was a material misrepresentation of fact.

87)     Under par. 13 of the Second Supplemental Statement, KARV again stated "no" to the question about any other beneficial activities to the foreign principal. KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which was a material misrepresentation of fact.

88)     On November 21, 2014, KARV filed its third six month Supplemental Statement, signed by FRANK under penalty of perjury. ("the Third Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously. KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which were material misrepresentations of fact.

89)     On May 28, 2015, KARV filed its fourth six month Supplemental Statement, signed by FRANK, under penalty of perjury. ("the Fourth Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

90)     KARV failed to timely file its Fifth 6 month Supplemental Statement, which was not filed until November 29, 2016, signed by FRANK, under penalty of perjury. ("the Fifth Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously, except under par. 11 KARV failed to name any foreign principal or include any description of its activities. KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which were material misrepresentations of fact.

91)     On May 27, 2016, KARV filed its Sixth 6 month Supplemental Statement, signed by FRANK, under penalty of perjury. ("the Sixth Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

92)     On November 28, 2016, KARV filed its Seventh 6 month Supplemental Statement, signed by FRANK, under penalty of perjury. ("the Seventh Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

93)     On May 25, 2017, KARV filed its Eighth 6 month Supplemental Statement, Signed by FRANK, under penalty of perjury. ("the Eighth Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV again answered the same as previously. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

94)     On November 20, 2017, KARV filed its Ninth 6 month Supplemental Statement, signed by FRANK, under penalty of perjury. ("the Ninth Supplemental Statement") Under par. 11, 12, and 13 of this Supplemental Statement, KARV answered the same as previously, except under par. 12, KARV indicated "yes" to political activity, added "COSCO Shipping Holdings Co., Ltd. (through The Harbour Group)" and added the words "No specific contacts were made on behalf of either principal with US government/US media during the reporting period." KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which were material misrepresentations of fact.

95)     On May 16, 2018, KARV filed its Tenth 6 month Supplemental Statement, signed by FRANK, under penalty of perjury. ("the Tenth Supplemental Statement") This document is slightly changed from the previous filings, but still contains the same material misrepresentations. Par. 11 contains the same boilerplate public relations language as previously. Par. 12 reports "yes" to political activity, but contains the same cover language as in par. 11. Par. 13 contains the same answer "no" as in previous filings. KARV failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which were material misrepresentations of fact.

96)     On November 19, 2018, KARV filed its Eleventh 6 month Supplement Statement, signed by FRANK, under penalty of perjury. ("the Eleventh Supplement Statement") This document contains the same representations under par. 11, par. 12, and par. 13, as previously. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

97)     On May 30, 2019, KARV filed its Twelfth 6 month Supplement Statement, signed by FRANK, under penalty of perjury. ("the Twelfth Supplement Statement") This document differs from previously in that the answers to par. 11, par. 12, and par. 13 are in the form of attachments and the public relations cover statement is similar, shortened, and broadened the scope beyond public relations to business by adding "business development guidance."

98)     In answer to par. 11 of the Twelfth Supplement Statement, KARV answered "yes" and stated:

> "Emirate of Ras Al Khaimah( RAK)
> The registrant provides public affairs and communications advice to the foreign principal on various issues facing RAK in the U.S., and elsewhere. Additionally, the registrant provides business development guidance to RAK and oversees the maintenance of the www.rakinfo.ae website. "

KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

In answer to par. 12 of the Twelfth Supplement Statement, KARV answered "yes" to political activity, and stated the same new boilerplate cover language as in par. 11. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which were material misrepresentations of fact.

99)     In answer to par. 13 of the Twelfth Supplement Statement, KARV again stated "no" to the question about any other beneficial activities to the foreign principal. KARV failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which was a material misrepresentation of fact.

**FRANK FAILED TO DISCLOSE THE PROPAGANDA RACKET**

FRANK's FARA filings were material misrepresentations.

100)     FRANK's true identity is ANDREW D. SOLOMON, and this true identity has never been disclosed in a FARA filing.

101)     FRANK founded KARV in 2012 when he left employment with public relations firm Kreab USA (Inc.).

102)     As an individual, FRANK has filed three FARA documents relating to KARV, on April 8, 2013, August 28, 2017, and February 25, 2019.

103)     On April 8, 2013, FRANK filed his first personal FARA document, under penalty of perjury. ("the FRANK Registration Statement")

104)     On par. 7, 8, and 10 of the 2013 FRANK Registration Statement, FRANK represented himself as a "Corporate Communications Executive" on behalf of the primary

registrant "Karv Communications, Inc." rendering services to the foreign principal of the "Emirate of Ras Al Khaimah," respectively.

105)    Mirroring the language on par. 11 of the KARV Supplements to its Registration Statement, on par. 11 here FRANK materially misrepresented the information given to the question: "Describe separately and in detail all services which you will render to the foreign principals) listed in Item 10 either directly, or through the primary registrant listed in Item 8, and the date(s) of such services." FRANK answered:

> "Public affairs and communications advice for the United States (primarily), Europe and elsewhere; monitoring and advising on issues related to the Emirate, and the UAE and how they are perceived by others; and recommend conferences and speaking venues that may be of interest. In addition we oversee the implementation of the www.rakinfo.ae website and outreach to businesses who may want to invest in RAK."

This is the same purported generic public relations activity which formed the cover for the undisclosed activity described in this complaint. FRANK failed in this FARA filing to disclose here the true and complete activities complained of the propaganda racket, which was a material misrepresentation of fact.

106)    Mirroring the language of par. 12 of the KARV Supplements to its Registration Statement, on par. 12 here FRANK checked the box "no" when asked if his services include "political activity."

107)    On August 28, 2017, FRANK filed his second personal Registration Statement relating to KARV, under penalty of perjury. ("The Second FRANK Registration Statement")

108)    On paragraph 11 of the Second FRANK Registration Statement, FRANK condensed the earlier description of his services for foreign principal Ras Al Khaimah to provide the same public relations cover:

> "Emirate of Ras AI Khaimah: Public affairs and communications advice and monitoring; advice on issues related to the Emirate and the UAE."

FRANK failed in this FARA filing to disclose here the true and complete activities of the propaganda racket, which was a material misrepresentation of fact.

109)    On par. 12 of the Second FRANK Registration Statement, FRANK again falsely checked "no" to political activity.

110)    On February 25, 2019, FRANK filed his third personal Registration Statement relating to KARV, under penalty of perjury. ("The Third FRANK Registration Statement")

111)    On par. 11 of the Third FRANK Registration Statement, FRANK again restated the false misrepresentation of his activities as in his Second FRANK Registration Statement.

112)    On par. 12 of the Third FRANK Registration Statement, FRANK checked "yes" for political activity, but false restated the same cover language as in par. 11.

**HANDJANI FAILED TO REGISTER AND DISCLOSE THE PROPAGANDA RACKET**

HANDJANI failed to register under FARA for any UAE foreign principal and failed to disclose any UAE related activities, including the propaganda racket.

113)    HANDJANI failed to register under FARA for any UAE foreign principal and failed to disclose any UAE related activities, including the propaganda racket.

114)    On February 25, 2019, HANDJANI filed his one and only FARA registration relating to KARV, under penalty of perjury, disclosing and pertaining only to activities for the Saudi Arabian foreign principal, "The Public Investment Fund." ("THE HANDJANI Registration Statement") This is the same date FRANK filed his Third Registration Statement. It is believed that SAUD intervened for the awarding of this contract.

115)     On par. 10 of the HANDJANI Registration Statement, HANDJANI failed to disclose and register for any UAE foreign principal. Said failure was a material misrepresentation of fact.

116)     On par. 11 and 12 of the HANDJANI Registration Statement, HANDJANI failed to disclose any activities relating to any UAE principal, including the activities of the propaganda racket.

### COUNT I
### (*Civil RICO as to FRANK and HANDJANI*)

117)     Plaintiff incorporates the above paragraphs as if each were fully and completed restated herein.

118)     The KARV Defendants, FRANK and HANDJANI, did run their employer, KARV, in violation of 18 U.S.C.A. § 1962(c) and (d) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§ 1961 to 1968 ("Civil RICO"). Each of the FARA filings were material misrepresentations and retaliation by mail and wire in furtherance of the PROPAGANDA RACKET and constitute Civil RICO predicate offenses.

119)     From 2013 to the present time, FRANK and HANDJANI, did violate 18 U.S.C.A. §1962(c) of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. §§1961 to 1968, ("Civil RICO"), which prohibits a person from conducting the affairs of an enterprise, here New York Public Relations firm, KARV, through a pattern of racketeering, and did violate Section 1962(d), which prohibits a person from conspiring to violate §1962(c).

120)     In summary, as previously described, during said time period, KARV, FRANK, and HANDJANI, filed materially false and misleading FARA documents with the DOJ as to the true and complete nature of their agency representation of SAUD and RAK. In addition to the disclosed legitimate public relations activities, KARV, FRANK and HANDJANI were also

engaged to, and did, investigate, attack, smear, and damage, EL OMARI, and other perceived

political opponents of SAUD and persons who have knowledge of SAUD's activities, including

SAUD's violating U.S. oil sanctions law against Iran.

121)    In furtherance of the non-disclosed propaganda racket, from 2013 to the present

time, KARV, FRANK and HANDJANI, filed materially false statements and willful omissions

in violation of 22 U.S.C. § 618(a).

122)    The false statement and willful omission offenses committed in violation of 22

U.S.C. § 618(a) constitute:

a)      Violations of the requirement of a true and complete registration statement

and supplements under 22 U.S.C. § 618(a).

b)      Violations of the requirement of the status of the registrant under 22

U.S.C. § 618(a)(2).

c)      Violations of the requirement of a comprehensive statement of the nature

of the registrant's business under 22 U.S.C. § 618(a)(3).

d)      Violations of the requirement of copies of each written agreement and the

terms and conditions each oral agreement under 22 U.S.C. § 618(a)(4).

e)      Violations of the requirement of a detailed statement of every activity

under 22 U.S.C. § 618(a)(6).

f)      Violations of the requirement of disclosing the name, business, and

residence addresses, and if an individual, the nationality, of any person other than

a foreign principal for whom the registrant is acting, assuming or purporting to act

or has agreed to act under such circumstances as require his registration, under 22

U.S.C. § 618(a)(7), being SAUD.

g)      Violations of the requirement of keeping books and records under 22 U.S.C. § 615.

h)      22 U.S.C. § 618(a) makes it a federal crime for any person who "(1) willfully violates any provision of this subchapter or any regulation thereunder, or (2) in any registration statement or supplement thereto or in any other document filed with or furnished to the Attorney General under the provisions of this subchapter willfully makes a false statement of a material fact or willfully omits any material fact required to be stated therein or willfully omits a material fact or a copy of a material document necessary to make the statements therein and the copies of documents furnished therewith not misleading, shall, upon conviction thereof, be punished by a fine of not more than $10,000 or by imprisonment for not more than five years, or both, except that in the case of a violation of subsection (b), (e), or (f) of section 614 of this title or of subsection (g) or (h) of this section the punishment shall be a fine of not more than $5,000 or imprisonment for not more than six months, or both."

123)    The aforesaid FARA document filings furnished by KARV, FRANK and HANDJANI to the DOJ in violation of 22 U.S.C. § 618(a) constitute individual Civil RICO predicate violations of 18 U.S.C § 1341, being illegal use of the mails to further a scheme or artifice to defraud.

124)    The aforesaid documents furnished by KARV, FRANK and HANDJANI to the DOJ in violation of 22 U.S.C. § 618(a) constitutes individual Civil RICO predicate violations of 18 U.S.C. § 1343, being illegal use of the wires to further a scheme or artifice to defraud.

125)     The aforesaid undisclosed propaganda racket by KARV, FRANK and HANDJANI constitutes individual Civil RICO predicate violations of 18 U.S.C § 1513(e), being the knowing retaliation harmful to Plaintiff and interference with Plaintiff's livelihood, for providing truthful information to a law enforcement officer, here to the CIA officer in the UAE, previously described, relating to the commission or possible commission of a U.S. federal offense by SAUD in violation of U.S. sanctions law against Iran.

126)     The aforesaid undisclosed propaganda racket by KARV, FRANK and HANDJANI constitutes individual Civil RICO predicate violations of 18 U.S.C § 1513(f), being a conspiracy to commit the offense under 18 U.S.C § 1513(e) of the knowing retaliation harmful to Plaintiff and interference with Plaintiff's livelihood, for providing truthful information to a law enforcement officer relating to the commission or possible commission of a U.S. federal offense by SAUD in violation of U.S. sanctions against Iran.

## COUNT II
### (*Prima Facie Tort as to LONGVIEW and BUCHANAN*)

127)     Plaintiff incorporates the above paragraphs as if each were fully and completed restated herein.

128)     On behalf of SAUD, LONGVIEW and its agent BUCHANAN did commit *prima facie* tort as to EL OMARI.

129)     At the meeting in London with STIRLING on or about October 2018, as previously described, on behalf of SAUD, BUCHANAN stated his scheme and plan "I came in 2014 to clean up the mess of Faisal and Oussama. We know how to control the judges. Now we are after him and are going to report him to the IRS." "I'm going to bring him [EL OMARI] down." EL OMARI was a 'human trafficker."

130)    By these actions, whose motive was pure malevolence, LONGVIEW and its agent BUCHANAN did intend to inflict harm on EL OMARI, without any lawful excuse or justification, by an act or series of acts of making allegations to the U.S. Internal Revenue Service, U.S. Dept. of Homeland Security, and possibly other law enforcement agencies in the U.S., which would otherwise be lawful.

131)    All to the damage of EL OMARI.

## COUNT III
### (*Defamation per se as to all Defendants*)

132)    Plaintiff incorporates the above paragraphs as if each were fully and completed restated herein.

133)    Each Defendant did defame EL OMARI per se.

134)    At the meeting in London with STIRLING on or about October 2018, as previously described, BUCHANAN did slander and defame EL OMARI by publishing the false fact to STIRLING that EL OMARI was a "human trafficker." Said false statement accuses EL OMARI of a serious crime and injures EL OMARI in his trade, business and profession.

135)    The Defendants individually, and collectively, did slander, libel and defame EL OMARI by procuring, composing and publishing false facts about EL OMARI between themselves and to INTELLIGENCE ONLINE, as previously described, and INTELLIGENCE ONLINE did libel and defame EL OMARI by procuring, composing and publishing the false facts about EL OMARI in its story "The Ras Al Khaimah Investment Authority trails French connection to recover its lost funds," as previously described, and said Defendants did so with malice and knowledge that the facts were false, or with reckless disregard as to whether the facts were true or false. Said false statements accuse EL OMARI of a serious crime and injures EL OMARI in his trade, business and profession.

136)    All to the damage of EL OMARI.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Plaintiff, Oussama El Omari, seeks a money judgment in favor of Plaintiff and against the Defendants, in an amount to be determined by a jury in excess of $75,000.

1)    **As to Count I:**

a)    Pursuant to Section 1964(a), equitable and permanent injunctive relief to restrain KARV, FRANK and HANDJANI from violations of Section 1962.

b)    Compensatory damages,

c)    Special damages,

d)    Emotional distress,

e)    Pursuant to Section 1964(c), treble damages,

f)    Plus, court costs, and attorney fees pursuant to Section 1964(c),

g)    Plus, pre-judgment interest,

h)    Plus, post-judgment interest, and

i)    Any other and further relief the Court may deem appropriate and proper.

2)    **As to Count II:**

a)    Compensatory damages,

b)    Special damages,

c)    Emotional distress,

d)    Punitive damages,

e)    Plus, court costs and attorney fees,

f)    Plus, pre-judgment interest,

g) Plus, post-judgment interest, and

h) Any other and further relief the Court may deem appropriate and proper.

3) **<u>As to Count III:</u>**

a) Compensatory damages,

b) Special damages,

c) Emotional distress,

d) Punitive damages,

e) Plus, court costs and attorney fees,

f) Plus, pre-judgment interest,

g) Plus, post-judgment interest, and

h) Any other and further relief the Court may deem appropriate and proper.

<b><u>JURY DEMAND</u></b>

Plaintiff demands a trial by jury on all issues so triable.


Dated:  New York, New York
   March 27, 2020


MOORE INTERNATIONAL LAW PLLC.


/s/ Scott M. Moore

By: _____

Scott Michael Moore, Esq.
*Attorneys for Plaintiff, Oussama El Omari*
45 Rockefeller Plaza, 20th Floor
New York, New York 10111
T. (212) 332-3474
F. (212) 332-3475
E. smm@milopc.com
