PLAINTIFF'S EXHIBIT 1



Claim No. QB-2020-003142

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**BETWEEN**

**JIHAD ABDUL QADER SALEH QUZMAR**

**Claimant**

**- and –**

**(1) DECHERT LLP**

**(2) NEIL GERRARD**

**Defendants**

_____

**PARTICULARS OF CLAIM**

_____

**A.   THE PARTIES**

1.   The Claimant ("**Mr Quzmar**") is a Jordanian citizen of Palestinian origin, who has since September 2014 been and continues to be imprisoned in Ras Al Khaimah ("**RAK**"), one of the constituent emirates of the United Arab Emirates ("**UAE**"). During the period 1989 to 2014 (save for the period 1995 to 2000, when he worked in private practice), Mr Quzmar served the Government of RAK and its ruler as legal advisor and a member of the judicial council of RAK, including as an assigned civil judge in the RAK courts. In May 2011, Mr Quzmar was appointed as a member of the Supreme Judicial Council of RAK, pursuant to which he was granted full judicial immunity from prosecution.

2.   The First Defendant ("**Dechert**") is a limited liability partnership registered in England and Wales with registration number OC306029, authorised and regulated by the Solicitors Regulation Authority of England and Wales, with its registered office at 160 Queen Victoria Street, London EC4Y 4QQ.

3.   The Second Defendant ("**Mr Gerrard**") is a solicitor of the Senior Courts of England and Wales, and a Partner in Dechert where he is global co-head of Dechert's white collar and securities litigation practice.  In August 2020, Mr Gerrard was reported in the

1

media as having announced his retirement from that role and the partnership of Dechert, effective from the end of 2020. Mr Gerrard's acts are attributable to Dechert in respect of the matters pleaded herein and/or Dechert is responsible and liable for all wrongs committed by Mr Gerrard and the consequences thereof.

4.   Dechert and Mr Gerrard are defendants in proceedings currently before the High Court brought by Mr Karam Salah Al Din Awni Al Sadeq ("**Mr Al Sadeq**") with Claim No. QB-2020-000322 ("**the Al Sadeq Proceedings**").

## B.   SUMMARY OF THIS CLAIM

### (1)   Wrongs committed against Mr Quzmar

5.   This claim concerns serious wrongs committed by the Defendants against Mr Quzmar in relation to a purported investigation led by Mr Gerrard into alleged frauds committed against the Ras Al Khaimah Investment Authority ("**RAKIA**") by its former Chief Executive Officer Dr Khater Massaad. The investigation occurred in the context of a dispute between the Ruler of RAK and other members of the Ruling Family (including the Ruler's brother, Sheikh Faisal) alleged to be associated with Dr Massaad.

6.   In the course of that purported investigation, the Defendants orchestrated and/or were responsible for and/or were involved in acts contrary to UAE and international human rights law and causing significant harm to Mr Quzmar and to his family. Those acts constituted an unlawful campaign against Mr Quzmar, the purpose of which was to pressurise Mr Quzmar into providing evidence, irrespective of its truth, that would implicate Dr Massaad and Sheikh Faisal in alleged frauds. As a result of those matters, the Defendants are liable under UAE law to compensate Mr Quzmar.

7.   The wrongs committed against Mr Quzmar include:

7.1   The forcible extra-judicial abduction of Mr Quzmar from his family home in RAK during the night of 6/7 September 2014 in the presence of his wife and 10 year old son, in circumstances where the abduction was politically motivated, there were no grounds to suspect Mr Quzmar of having committed any crime (nor were any suggested to him at the time of his abduction), and the persons carrying out the abduction were not police, but were members of the RAK Royal Guard, who did not possess or even purport to possess an arrest warrant or revocation of

Mr Quzmar's judicial immunity, both of which were necessary precursors of any lawful arrest.

7.2     The unlawful imprisonment of Mr Quzmar for the last six years since September 2014, first in the General Headquarters of State Security in RAK ("**GHQ**), and subsequently in a camp of the Ruler's private militia (and only from 17 December 2014 in RAK General Prison), in each case, in conditions amounting to torture and/or inhuman or degrading treatment. The conditions of Mr Quzmar's detention included:

(a)     At GHQ, detention for 23 days in solitary confinement in a dirty cell measuring only 2 metres by 2 metres, of which part comprised a squat toilet unseparated from the sleeping area, with no or little sunlight, no opportunity to exercise, and no ability to tell the time for the purposes of prayer or otherwise.

(b)     At Al Barirat, detention for over 15 months in a small dirty cell measuring no more than 2 metres by 2.5 metres, with its small window blocked by a piece of wood so as to restrict all access to sunlight, denial of proper or timely access to medical treatment, and detention under a false name, at a location outside the ordinary RAK judicial system so as to avoid or minimise any scrutiny or interference with the unlawful campaign.

7.3     The conditions and length of time of Mr Quzmar's detention led to Mr Quzmar suffering from severe health conditions, that have resulted in Mr Quzmar being hospitalised on at least 12 occasions during his imprisonment. The detriment to Mr Quzmar's health caused by the conditions of his detention includes injury to Mr Quzmar's face and front tooth caused by accidentally striking a glass door at the RAK court because he was required to be blindfolded, the denial of timely surgery for a severe hernia, the development of severe constipation as a result of lack of movement, irritable bowel syndrome, severe aches and pains, abscesses in the mouth, nose and back, a tear in leg muscles, and extreme colon irritation. Mr Quzmar was not permitted to exercise until 2 February 2015 – some 148 days after his imprisonment – resulting in severe pain in his joints.

7.4     Unlawful interrogation by Mr Gerrard in circumstances amounting to torture and/or inhuman or degrading treatment, intended to pressurise and blackmail Mr

Quzmar into providing information that would implicate Dr Massaad and/or Sheikh Faisal, irrespective of the truth or falsity of any such information. The conduct for which Mr Gerrard was responsible included the requirements for Mr Quzmar to be masked and/or hooded and his hands cuffed when being transported to and from his cell, for his feet to be shackled during interrogations, for his hands to be cuffed when outside his cell even when using the toilet, attempts to denigrate Mr Quzmar, and the threat that if Mr Quzmar did not provide information that would satisfy Mr Gerrard, he would be imprisoned "*indefinitely*", and there would be "*severe implications*" for Mr Quzmar and his family.

7.5   An unlawful search of Mr Quzmar's family home led by Mr Gerrard, in Mr Quzmar's absence but in the presence of his wife and 10 year old son, during which Mr Gerrard sought to humiliate Mr Quzmar's wife, Ms Suhad Abu Aitah ("**Mrs Quzmar**") and/or to apply improper pressure to the Quzmar family by (*inter alia*) personally searching through drawers in Mr Quzmar and Mrs Quzmar's bedroom, insisting that Mrs Quzmar be photographed holding items of her jewellery separately, and confiscating or directing the confiscation of numerous items of a personal nature that could bear no conceivable relationship to any lawful investigation, and which have never been returned or itemised to the Quzmar family. Those items included birth certificates, Mr Quzmar's and Mrs Quzmar's marriage certificate, Mrs Quzmar's certificate of proclamation of faith in Islam, Mr Quzmar's and Mrs Quzmar's school and university certificates and diplomas, Mr and Mrs Quzmar's children's school certificates, computers, mobile telephones and keys to property and vehicles located overseas.

7.6   The freezing and/or appropriation of Mr Quzmar's and his family's assets, including the bank accounts of his children with minimal balances, on or around 11 September 2014 with no allowance for living expenses and no mechanism for the making of necessary payments, such as mortgage repayments and school fees, and the imposition of a travel ban on Mr Quzmar's wife. The purpose of these steps was to seek to pressurise Mr Quzmar into cooperating with the purported investigation.

7.7   The denial of proper due process, including the denial of proper access to legal advice and representation until some 8 months after Mr Quzmar had been

abducted (by which time his purported criminal trial had already commenced), and a failure to place Mr Quzmar before a public prosecutor within 24 hours of his arrest, as required by Article 104 of the UAE Criminal Code. By the time Mr Quzmar was first placed before a public prosecutor (some six days after his abduction), Mr Quzmar had already been interrogated by Mr Gerrard in the absence of a lawyer. Mr Quzmar was not legally represented at his first meeting with a public prosecutor, although two employees of Dechert reporting to Mr Gerrard, Mr Jonah Andersen and Mr William Barrington, were present.

7.8   Assisting in, or acquiescing in, the wrongful conviction of Mr Quzmar by the RAK court, including his conviction on a prosecutor's appeal in respect of conduct that was not criminal at the time at which it occurred, but only became so subsequently (and only then, it is to be inferred, as a result of Mr Quzmar's case).

8.   Despite the extreme pressure placed upon him as a result of the above conduct, Mr Quzmar declined to provide information to Mr Gerrard in support of the purported investigation in circumstances where (as he repeatedly made clear to Mr Gerrard) he had no knowledge of any corruption or wrongdoing by Dr Massaad or Sheikh Faisal.

9.   On 28 October 2015, Mr Quzmar was sentenced by the RAK Court to 32 years of imprisonment in case no. 433/2015, in respect of an allegedly favourable lease agreement, and for delayed payment of license fees (which charges - even if well-founded, which they were not - could not possibly justify such an extraordinarily long sentence). On appeal by Mr Quzmar, that sentence was reduced to 11 years, however Mr Quzmar was also convicted for 3 years (in respect of alleged bribery) and 10 years (on the prosecutor's appeal pleaded above in respect of allegedly unlawful consultancy remuneration), resulting in a total sentence of 24 years imprisonment. Although it is not necessary for the purposes of this claim for Mr Quzmar to establish his innocence, Mr Quzmar denies all the charges brought against him and contends that he was wrongfully convicted and that the proceedings in RAK were part of a politically motivated campaign by the Ruler, encouraged and/or assisted by the Defendants, intended to coerce Mr Quzmar into providing false evidence to implicate the Ruler's political opponents, Dr Massaad and Sheikh Faisal.

**(2)   The Committee of Three / Mr Gerrard's role in the purported investigation**

10.   By 2013, Mr Gerrard and Dechert had been instructed by the RAK Government in relation to an investigation concerning fraud allegedly committed by Dr Massaad, as has been admitted by Mr Gerrard and Dechert at paragraph 131 of their Defence in the Al Sadeq Proceedings.

11.   Mr Gerrard and Dechert had overall control and/or responsibility for the purported investigation and for Mr Quzmar's treatment, as is to be inferred from the following facts and matters:

   11.1   The Ruler established a "Committee of Three" responsible for the conduct of the purported investigation into Mr Quzmar. The Committee of Three comprised the Ruler himself, Mr Gerrard, and the Attorney General, Mr Hassan Saeed Mohammid Al Habsi. Mr Gerrard was the individual within the Committee of Three who had responsibility for the day-to-day conduct of the purported investigation and for Mr Quzmar's treatment, and the Attorney General deferred to Mr Gerrard in those respects. Mr Quzmar became aware of the existence of the Committee and Mr Gerrard's dominant role in it through conversations with Major Al-Awadhi – a security official of the RAK Royal Guard - who told Mr Quzmar that Mr Gerrard had the "*upper hand*" in the Committee, and that everything was planned and designed by him.

   11.2   The Attorney General told Mrs Quzmar, in response to repeated requests for his help in relation to Mr Quzmar's situation, that the orders about the treatment of Mr Quzmar "*were coming from the top*", and that he (the Attorney General) was "*a coward*". It is to be inferred that this was as reference to the Committee of Three and that the Attorney General was required to carry out the strategy agreed between Mr Gerrard, as the dominant member of the Committee of Three, and the Ruler.

   11.3   Mr Gerrard had the power (and represented to Mr Quzmar that he had the power) to ensure that Mr Quzmar's mistreatment continued, if the information Mr Quzmar provided under interrogation was not satisfactory to Mr Gerrard. In particular, during the first interrogation by Mr Gerrard of Mr Quzmar on 10 September 2014 (and in subsequent interrogations) Mr Gerrard told Mr Quzmar that if he provided evidence implicating Dr Massaad and Sheikh Faisal, Mr

Quzmar would be released, whereas if he did not, Mr Quzmar would be detained indefinitely.

11.4    On or around 10 September 2014, Mr Gerrard personally directed and supervised an unlawful search of Mr Quzmar's home whilst Mr Quzmar was imprisoned, as is pleaded further below. It was apparent to Mrs Quzmar who was present during the search, that Mr Gerrard had the power to direct the RAK security or government officials conducting the search and otherwise control its conduct. This was apparent to her *inter alia* because, although senior persons such as the chief public prosecutor, Mr Zayed Mohammad and Major Al Awadhi were present during the search, it was Mr Gerrard who exercised overall control and responsibility for it, including by deciding what items should be removed from Mr Quzmar's home.

11.5    The conditions of Mr Quzmar's detention worsened significantly following an interrogation by Mr Gerrard in March 2015. During that interrogation, Mr Quzmar refused to submit to the pressure applied by Mr Gerrard and declined to provide false evidence implicating Dr Massaad, as Mr Gerrard had requested (notwithstanding Mr Quzmar's repeated denial that he knew anything about any wrongdoing of Dr Massaad). Mr Quzmar was told by members of the prison staff that the reason for the worsening of the conditions (which included denial of meals and timely access to the toilet) was because it was on the instructions of "*the English*", which Mr Quzmar understood to be a reference to Mr Gerrard and Dechert.

11.6    Mr Gerrard was the individual who, on behalf of the Ruler of RAK, put forward proposals for settlement to Mr Quzmar that amounted to blackmail, in that the proposals (to which Mr Quzmar did not agree, despite being told that his conditions would improve if he did) required Mr Quzmar to give evidence implicating Dr Massaad and Sheikh Faisal in allegations of fraud/corruption of which he knew nothing, as he had made clear to Mr Gerrard.

11.7    Mr Quzmar understood from discussions with prison guards and with Major Al Awadhi that the source of much of the mistreatment he suffered, including the requirement for his feet to be shackled and his head to be covered with a mask or blindfold when being transported to meetings and interrogations, as well as his

limited or non-existent visitation rights, and denial of access to newspapers, television or a radio, was "*the English*", which he understood to mean Mr Gerrard and Dechert.

11.8 In a letter to Mrs Quzmar dated on or around 13 March 2015, Mr Quzmar described Mr Gerrard's overall influence and control over the conditions of Mr Quzmar's detention, as well as Mr Gerrard's influence over the Ruler and the course of the purported investigation, as follows (in translation from the Arabic[1]):

> "*My lady, it became clear that the Englishman, Neil, is the one who issued the order to put my legs in iron chains, and he was the one who banned us from having a bath or shower for the first 23 days, in addition to handcuffing us by the orders of the Master [*the Sheikh*], and the directions of the colonizer, Neil. Yes, this settlement has 3 axes: confession, payment of money and perjury, and I knew that the colonizer would provoke the Master (S)....*
>
> *If their intention was to go to trial, why did they not allow us from the first day to appoint a lawyer to attend the investigations and study the file from the beginning? Why wasting 7 months?*
>
> *....The invention of the names of influence and bribery was originally from Englishman (Neil), who pointed out to the Master who adopted them…*"

## C.   FACTUAL NARRATIVE

### (1)   RAK, RAKIA Sheikh Faisal and Dr Massaad

12.   From the 1980s Dr Massaad established and managed businesses in RAK including RAK Ceramics, of which both he and the current Ruler of RAK, Sheikh Saud Bin Saqr Al-Qasimi (the "**Ruler**"), were founders and significant shareholders.

13.   In around August 2003 Dr Massaad was officially appointed adviser to the Ruler, who at that time had recently been appointed the Crown Prince and Deputy Ruler of RAK. From that point (at the latest) until around late 2010 Dr Massaad was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis.

14.   As a result of Dr Massaad's management, by 2010 RAK Ceramics was the world's largest ceramics manufacturer. The export success of RAK Ceramics provided RAK, a country with no oil or gas industry, with its most significant source of foreign exchange income.   The Ruler obtained significant private wealth through his shareholding in RAK Ceramics.

---

[1] Letters and notes of Mr Quzmar and Mrs Quzmar pleaded herein are quoted in English translation from the Arabic original, unless otherwise indicated.

15.   RAKIA was established in 2005 by Emirati Decree No. (2)/2005 in order to promote investment in RAK and to promote various economic sectors in the Emirate.

16.   From its establishment in 2005 until around 2012, RAKIA's Chief Executive Officer was Dr Massaad. Dr Massaad was in control of all day to day management of RAKIA, but at all material times worked closely with the Ruler, developing investment strategies and taking investment decisions with the knowledge, approval, and on the instructions of the Ruler.

17.   Dr Massaad developed RAKIA, and the RAK Free Zone, using his financial and business expertise and borrowing, without any significant capital investment from the RAK state itself. By 2011 RAKIA made a net profit of 300 million UAE Dirhams ("**AED**") and was worth more than one billion AED.

18.   In addition to promoting investment in RAK generally, by around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia (developed after a visit of the Georgian Prime Minister to RAK in 2006). The Georgian investments included shares in Poti Sea Port, the Sheraton Metechi Palace Hotel and Poti Port Free Industrial Zone, and a property development company called Rakeen Developments.

19.   The background to these investments is that, prior to his succession in late 2010, the Ruler had been keen to build up RAKIA's investments outside RAK, and had directed that this be done, because he was concerned about his half-brother Sheikh Khaled bin Saqr Al Qasimi ("**Sheikh Khaled**") succeeding in any succession dispute which might arise upon the death of his father, the previous ruler of RAK, the late Sheikh Saqr Bin Muhammad Al Qasimi (the "**Late Sheikh**"). Hence, he wished to have considerable assets which he could control for his own benefit, with the assistance of Dr Massaad, outside RAK, should he not become the next Ruler, rather than holding assets within RAK / the UAE and which would therefore be within the direct reach of a future government of RAK with his brother Sheikh Khaled as Ruler.

20.   In this regard, Sheikh Khaled was the Crown Prince and Deputy Ruler between around 1958 until around June 2003 when the Late Sheikh removed him and replaced him with the Ruler. This was an unpopular move in some quarters leading to street protests in favour of Sheikh Khaled in RAK, and he retained significant support in the Emirate to succeed the Late Sheikh. Subsequently, Sheikh Khaled claimed to have been reinstated

by an Emiri Decree, said to have been made by the Late Sheikh in 2004, although this was disputed by the government of RAK and the UAE. Upon being made Crown Prince, the Ruler promised that when he succeeded the Late Sheikh he would make his brother Sheikh Faisal the Crown Prince, and his other brother Sheikh Taleb would be made Deputy Ruler.

21. Sheikh Khaled continued to challenge the Ruler's legitimacy as Crown Prince and his entitlement to succeed the Late Sheikh. As a result, the Ruler was concerned that when his father passed away Abu Dhabi, the most powerful of the Emirates, might favour Sheikh Khaled and allow him to succeed to the throne of RAK in his place.

22. From around 2008 in the face of continued lobbying through the media by Sheikh Khaled complaining about the Ruler's policy of making overseas investment through RAKIA, which the Ruler was concerned might undermine his prospects of succeeding his father in due course, the Ruler directed that RAKIA should change the policy of foreign investment set in place by Dr Massaad, that he had previously approved and directed, and instead divest itself of its foreign investments, and invest the proceeds within RAK. Dr Massaad disagreed with this change of policy, but the Ruler overruled him. The sudden change of policy led to the rushed sale of assets in Georgia at a premature stage with a detrimental effect on the return obtained from them.

23. In the event, when the Late Sheikh passed away in October 2010, the Ruler ultimately received the backing of Abu Dhabi over Sheikh Khaled and succeeded his father as Emir of RAK.

24. Upon his succession in October 2010, the Ruler appointed his son, Sheikh Mohammed, as Crown Prince instead of Sheikh Faisal, and abolished the role of Deputy Ruler meaning Sheikh Taleb could not take it up. In doing so he broke the promise he had made to each of them in 2003, causing animosity. At about the same time Sheikh Faisal was also removed from his role as Chairman of the Ras Al Khaimah Free Zone Authority and replaced by another of the Ruler's brothers, Sheikh Ahmed, who was considered more loyal to the Ruler.

25. As Crown Prince, Sheikh Mohammed wanted to become the Ruler's closest advisor in place of Dr Massaad, to take control of RAKIA, and to reduce Dr Massaad's influence in RAK. Ultimately Sheikh Mohammed succeeded in driving a wedge between the Ruler and Dr Massaad whose relationship soured, and the Ruler turned against Dr

Massaad. Furthermore, with the RAK economy suffering as a result of the global financial crisis, and in circumstances where the Arab Spring movement was growing between 2010 and 2012, the Ruler continued to be concerned about domestic criticism and potential civil unrest in relation to RAKIA's investments outside RAK, initially, as pleaded at paragraphs 16 to 22 above, made at his direction for his own potential personal financial and / or political benefit.

26. Following the disposal of RAKIA's key overseas assets, a process which was completed by 2012, Dr Massaad was side-lined from RAK Ceramics and other RAK businesses during this period, although he continued to work practically full-time for RAKIA until he left RAK in around June 2012, on good terms and without any suggestion of wrongdoing. He returned to the UAE on several occasions thereafter until August 2014, including for meetings with the Ruler.

27. In 2012, Dr Massaad founded a business in Lebanon with around six investors, one of whom was Sheikh Faisal. As pleaded above, the Ruler had removed Sheikh Faisal as Crown Prince in 2010 and replaced him with Sheikh Mohammed, causing animosity between them.

28. The Ruler came to learn of Dr Massaad's business relationship with Sheikh Faisal in around 2014. As a result, the Ruler became concerned that Dr Massaad was working with Sheikh Faisal and / or  Sheikh Khaled in order to destabilise the Ruler, and that Sheikh Faisal and / or Sheikh Khaled were plotting to remove the Ruler with the assistance of Abu Dhabi.

29. Since finding out about Dr Massaad's business relationship with Sheikh Faisal in 2014 and following on from the fall-out between Dr Massaad and the Ruler, and the Ruler's concerns about Dr Massaad's involvement in suspected moves to oust him by Sheikh Khaled and Sheikh Faisal, the Ruler with the assistance of the Defendants has pursued a vendetta against Dr Massaad and alleged co-conspirators such as Mr Quzmar, Mr Al Sadeq, Mr Mikadze, and Mr Azima (including by recent proceedings in the English High Court).

30. The background set out above at paragraphs 12 to 29 is the context in which wrongs have been committed against Mr Quzmar who has become collateral damage in the vendetta pursued by the Ruler against Dr Massaad, against whom RAKIA allegedly seeks to recover over USD 2 billion, and against Sheikh Faisal. The Ruler's motive in

11

pursuing his vendetta is both to punish Dr Massaad for his supposed disloyalty by destroying his reputation and discrediting him, and also to attempt to conceal the Ruler's own personal knowledge and direction of RAKIA's foreign investments for his own personal and political benefit in the years before his accession. In this regard:

30.1  It is a matter of public record (and has been admitted by Mr Gerrard in the Al Sadeq Proceedings) that Mr Gerrard was appointed by the Ruler in order to investigate and pursue Dr Massaad.

30.2  As pleaded further below, Mr Quzmar was told by Mr Gerrard that if he provided information that would assist Mr Gerrard and the Ruler in implicating Dr Massaad and Sheikh Faisal in allegations of fraud, then Mr Quzmar would be released, and in circumstances in which Mr Quzmar declined to do so, the conditions of Mr Quzmar's detention worsened, on the instructions of Mr Gerrard, as pleaded further below.

30.3  Despite several criminal sentences having been pronounced against Dr Massaad by the RAK courts *in absentia*, Dr Massaad maintains his innocence and presently lives and works in Saudi Arabia, an Interpol notice which had been lodged against him by RAK now having been removed, and an extradition request from RAK having been dismissed by the Saudi court.

**(2)   Human rights abuses in RAK**

31.  RAK is regarded by international observers (including Amnesty International and the UN High Commissioner for Human Rights, as pleaded further below) as having a record of human rights abuses including arbitrary detention, forced confessions, unfair trials, and mistreatment in detention.

32.  A report by Amnesty International in 2014 (the "**2014 Amnesty Report**") gave several examples of abuse in Ras-Al-Khaimah. As to this:

32.1  Saleh Mohammed al-Dhufairi was detained at the palace of the Ruler for 133 days: "*He was charged in connection with his activities on Twitter but released on bail after two weeks in custody. He was at liberty only briefly. On 29 April 2012, plain-clothed security officers arrested him without producing a judicial warrant and took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al-Khaimah. He remained there without charge under armed guard for some 133 days. During this period, he was permitted visits from his family but*

*they were prevented from discussing his whereabouts with anyone outside their immediate family. The authorities did not inform Saleh Mohammed al-Dhufairi of the reason for his detention, and under what law he was held, or whether they intended to bring charges against him. He was not allowed to meet with a lawyer or taken before any judge or court during this time. On 9 September 2012, the security authorities moved him to a new place of detention, whose location they did not disclose to his family, where they held him in solitary confinement in a freezing cold cell that they kept permanently lit, causing him extreme discomfort and making it difficult for him to sleep.*" (page 18).

32.2    Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a member of the Ruler's own family, was subjected to arbitrary detention in the Ruler's palace, then moved to a secret detention facility, and was denied access to legal representation and his family: "*Sheikh Dr Sultan Kayed Mohammed al-Qassimi, a senior member of the ruling family in Ras al-Khaimah emirate who helped found Ittihad University in the UAE and headed the board of directors of al-Islah, was arrested on 20 April 2012 by armed State Security officers who raided his home and failed to produce a judicial warrant for his arrest. They took him to the palace of Sheikh Saud Bin Saqr al-Qassimi, the Ruler of Ras al Khaimah, and then held him there without charge or trial for five months during which the authorities denied to his family that they were holding him there and refused to disclose any information as to his whereabouts. A victim of enforced disappearance, he was kept in solitary confinement in a locked room and watched over by armed guards. In September 2012, the security authorities moved him to a secret detention facility, where he remained until he went on trial as one of the UAE 94 defendants. Throughout his detention, the authorities denied him access to a lawyer and contact with his family.*"

32.3    Dr Mohammed al-Mansoori, until 2009 the legal advisor to the Late Sheikh, was held in solitary confinement for 8 months, and at his trial a confession was produced which he denied signing:

   "*Dr Mohammed al-Mansoori, a prominent lawyer and former head of the UAE's Jurists' Association, was detained by a group of State Security officers whose faces were concealed by balaclavas on 16 July 2012 near his home in Ras al-Khaimah emirate. The officers took him first to his home, which they*

*searched for six hours, and then to an undisclosed location where they detained him incommunicado and in solitary confinement for eight months. At his trial as one of the UAE 94, the prosecution submitted a "confession" that they said he had signed while he was held in incommunicado detention as evidence against him; he told the court that it was untrue that he had signed the statement and testified that he had not signed any documents when he was in pre-trial detention. The court took no steps to order an expert examination of the signature to verify it but accepted the confession as evidence. It then returned a guilty verdict against Dr Mohammed al-Mansoori and sentenced him to 10 years imprisonment, followed by three years' probation. He stood trial again with nine other UAE nationals and 20 Egyptian nationals and was convicted in January 2014, receiving an additional 15-month prison sentence, which he is to serve after his initial 10-year sentence is complete. In the second mass trial, he had refused, along with many of the other defendants, to attend a number of the court proceedings, in protest at not being allowed access to his case documents.*"

32.4   An expert panel appointed by the UN High Commissioner for Human Rights stated the following in relation to Dr Mansoori's treatment by RAK in a report on or around 7 May 2019:

> *"According to reports at our disposal, throughout his deprivation of liberty, Mr Mansoor has been kept in solitary confinement, and in conditions of detention that violate basic international human rights standards and which risk taking an irrevocable toll on Mr Mansoor's health," the experts said. "We implore the authorities of the United Arab Emirates to immediately grant him access to vital and consented medical care and to ensure that his conditions of detention conform to the United Nations' Standard Minimum Rules for the Treatment of Prisoners."*

> *"We are also alarmed at repeated and consistent reports that Mr Mansoor has not received a fair trial and call on the authorities to ensure his retrial in accordance with the fundamental judicial guarantees provided for in international human rights law, or his immediate release.".*

32.5 The 2014 Amnesty Report is damning in its assessment of the "confession culture" which prevails in the UAE:

> *"By allowing the State Security to detain suspects indefinitely, in undisclosed detention facilities and in isolation from the outside world, UAE law effectively facilitates torture and other ill-treatment and creates a "confession culture" whereby State Security investigators seek to obtain "confessions" and other incriminating statements from those in their custody as a basis for securing their conviction at trial. There is no independent oversight of the conditions in which the State Security holds detainees, often for many months, or the methods they use in seeking and obtaining "confessions."*

33. As pleaded below, Mr Quzmar's treatment follows a similar pattern to the examples given above, and to another RAK prisoner, Karam Al Sadeq, who also alleges torture against Dechert and Mr Gerrard, in that, *inter alia*, he was kidnapped, arbitrarily detained for over six years, subjected to torture and inhumane treatment, threatened to be detained indefinitely unless he gave evidence implicating Dr Massaad and / or Sheikh Faisal, and wrongfully convicted. The Defendants were aware of the abuse to which Mr Quzmar was subjected, which in the premises pleaded above was orchestrated by Mr Gerrard, at the behest of the Ruler.

**(3)   Mr Quzmar**

34. Mr Quzmar was born in Tulkarm on the West Bank in Palestine in 1962. In 1984, Mr Quzmar obtained his law degree at the University of Jordan, graduating second in his class and qualified as a member of the Jordanian bar in 1985. In 1987, Mr Quzmar obtained a Masters in Law (LLM) from the London School of Economics and Political Science.

35. In 1990, Mr Quzmar was appointed as Assistant Legal Counsel to the Government of RAK and served in that role and as an assigned civil judge until 1995, when he relocated to Abu Dhabi to work in private practice. In 2000, on the invitation of the Ruler, Mr Quzmar returned to RAK to work as Legal Counsel, advising the Ruler and the RAK Government. In that role, Mr Quzmar was the second most senior legal advisor to the RAK Government until 2007, when Mr Quzmar's predecessor retired, and Mr Quzmar then became the most senior legal official (although due to the age of his predecessor even upon his appointment in 2000 Mr Quzmar was *de facto* the senior

legal counsel). In 2011, Mr Quzmar was appointed to the Supreme Judicial Council of RAK, as the first Jordanian judge. Subsequently, Mr Quzmar was instrumental in the appointment of further Jordanian judges as part of a project of diversification of the RAK judiciary and the promotion of international relations between Jordan and RAK. As part of his role, Mr Quzmar led delegations of judges from RAK internationally, including to Tunisia, Georgia, Egypt, Jordan and France.

36.    In around 2010, Mr Quzmar and his family decided to relocate to Canada and were granted permanent residency status in September 2010. Mr Quzmar initially intended to remain in his post whilst his family lived in Canada for a limited period, in order to assist the Ruler by allowing him time to find a suitable replacement and to ease the transition. However, in 2013, Mr Quzmar finally submitted a formal resignation from his role in RAK with the intention of joining his family permanently in Canada, in part due to the increasing political tensions between the Ruler and his brothers. Although Mr Quzmar had good relations with the Ruler (who had personally requested in 2000 that Mr Quzmar return to his role from private practice), Mr Quzmar had also developed good relations with the Ruler's brother, Sheikh Faisal. Mr Quzmar therefore became concerned that this might result in him becoming embroiled in the conflict between the Ruler and Sheikh Faisal, as ultimately occurred. It is in significant part because of Mr Quzmar's relationship with Sheikh Faisal that the Ruler decided to target and victimise Mr Quzmar in order to make an example of him so as to deter others from associating themselves with Sheikh Faisal.

37.    After first accepting Mr Quzmar's resignation, the Ruler subsequently revoked his acceptance and insisted that Mr Quzmar remain in his post. Mr Quzmar's desire to resign was a source of the Ruler's hostility towards Mr Quzmar and in circumstances where the Ruler would not accept Mr Quzmar's resignation, he had no choice but to remain in his role. As a consequence, albeit during a family vacation in Canada he had decided to complete the process of resignation imminently, he was still in office as most senior legal advisor to the Ruler and the RAK Government at the time of his unlawful arrest in September 2014.

38.    As pleaded further below, in September 2014 Mr Quzmar was abducted and imprisoned several days after, and in similar conditions, to Mr Al Sadeq. Between 2008 and 2012, Mr Al Sadeq was employed by RAKIA as a legal advisor, and subsequently as Group

16

Legal Director. Prior to his assuming that role, Mr Al Sadeq was known to Mr Quzmar as the son of a family friend.

39. In addition to his role as the senior legal advisor to the Ruler/the RAK Government, Mr Quzmar also retained other business interests. There was a common practice in RAK of senior government officials (including lawyers and judges) also undertaking consultancy work and thereby supplementing their low state salaries. This practice was not unlawful, was commonplace, and was known about and authorised by the Ruler as well as government officials. For example, on 13 August 2011, the Ruler wrote to the General Manager of RAKGAS authorising the payment by RAKGAS to Mr Quzmar of a monthly salary of 31,000 AED (approximately £5,184[2]), as well as payment of Mr Quzmar's water and electricity expenses. This represented lawful payment for the consultancy services provided by Mr Quzmar to RAKGAS, as was known to and authorised by the Ruler.

40. In most cases, the majority of the consultancy legal services Mr Quzmar provided were provided via "Karmi Legal Consultants", in respect of which Mr Quzmar had applied for and been granted a license to provide such services.

41. In addition to his legal consultancy work:

   41.1  Mr Quzmar also established a property investment company, Jak Investment.

   41.2  The Quzmar family owned properties in RAK, Jordan, Turkey and Canada, some of which were rented to tenants, and some of which were subject to mortgages.

42. As a result of the unlawful campaign against him, as pleaded herein, Mr Quzmar's business activities have been harmed, and he has suffered loss and damage, as pleaded further below.

**(4)   Break-in to Mr Quzmar's home in RAK**

43. At some time prior to Mr Quzmar's return to RAK from Canada on 6 September 2014, Mr Quzmar's family home in the Al-Jazirah Al-Hamra district in RAK, Gate No. 3, Villa No. C19 (**"the Al-Hamra Property"**) was broken into. Mr Quzmar became aware of this on the family's return from Canada because Mrs Quzmar noticed cigarette butts on a table inside the house, in circumstances where neither Mr Quzmar nor Mrs Quzmar smoked and did not permit their guests to smoke indoors. As pleaded further

---

[2] At a rate of AED:GBP 5.980299561: 1 as at 13 August 2011, per xe.com.

below, it is to be inferred from Mr Gerrard's knowledge of the precise location of particular items in Mr Quzmar's home during the search conducted on 10 September 2014, that the unlawful earlier break-in was conducted by or on behalf of Mr Gerrard as part of the purported investigation. Mr Quzmar believes that entry to the Al-Hamra Property is likely to have been made using a master key obtained from the Government-owned compound in which the Al-Hamra Property is located.

**(5)    The abduction of Mr Al Sadeq – 4 September 2014**

44.    In September 2014, Mr Quzmar and his family were on vacation in Toronto, Canada. Mr Quzmar began to receive frequent calls from the Attorney General of RAK, requesting for him to return to RAK imminently.

45.    On 4 September 2014, Mr Al Sadeq was kidnapped from his home in Dubai and taken by unlawful extraordinary rendition to Ras Al Khaimah, where he was imprisoned at GHQ.

46.    Mr Quzmar learned of Mr Al Sadeq's abduction on 5 September 2014, after Mrs Quzmar received a telephone call from Mr Al Sadeq's wife, Mrs Dima Al Sadeq ("**Mrs Al Sadeq**"), seeking Mr Quzmar's assistance in his capacity as legal advisor to the Ruler. After that call, Mr Quzmar telephoned the Attorney General, Mr Hassan Saeed Mohammid Al Habsi , who was holidaying in Thailand, to ask why Mr Al Sadeq had been taken. The Attorney General told Mr Quzmar that he did not know why but would try to find out. The Attorney General then called Mr Quzmar back and told him only that the Ruler had asked for Mr Al Sadeq to be taken, and nobody was to know that he had been taken or why. The Attorney General asked Mr Quzmar when he was planning to return to RAK. Mr Quzmar told the Attorney General that his vacation was due to finish in two days' time and that he would be returning to RAK then. This was in part in order to participate in a planned trip to Egypt with the Attorney General to recruit judges, as the Attorney General reminded Mr Quzmar during the call. Mr Quzmar had no reason to think, and did not suspect, that it was unsafe for him to return to RAK or that he was at any risk of being detained when he arrived.  For the avoidance of doubt, he had no reason to consider, and did not consider, that he had committed any wrongful, criminal or otherwise unlawful acts.

**(6)    The abduction of Mr Quzmar – 6/7 September 2014**

18

47. On 5 September 2014, Mr Quzmar and his family flew to the UAE from Toronto, arriving at the Al-Hamra Property at around 11.20pm on 6 September 2014. Shortly after their arrival, a group of men wearing civilian clothing arrived in three 4x4 vehicles with tinted windows, and began knocking loudly on the door and shouting, demanding that Mr Quzmar come out. Mr Quzmar called Sheikh Talib, the Ruler's brother and then Head of the RAK Police, who stated that the men were not RAK police. One of the men, Mr Quzmar later understood, was Mr Hai Al Za-abi, a member of the RAK Royal Guards.

48. For several hours during the night of 6/7 September 2014, the men continued banging on the doors of Mr Quzmar's home, demanding that Mr Quzmar come out, and threatening to break the door. In addition to Mr Quzmar himself, Mr Quzmar's home was occupied by Mrs Quzmar, and their 10-year old son, Yousef, who was terrified by the continuous banging.

49. At approximately 6.30am, Mr Quzmar received a call from the RAK Attorney General Mr Al-Habsi who told him to go with the men. Mr Quzmar let the men into the house, who then forcibly removed him from his home, handcuffed his hands behind his back, manhandled him into one of the 4x4 vehicles and drove him away, without telling Mr Quzmar or his family where they were taking him or why.

50. The men did not have or even purport to have either an arrest warrant or a revocation of Mr Quzmar's judicial immunity, both of which would have been necessary precursors of any lawful arrest. Mr Quzmar asked Mr Za-abi to show his ID and an arrest warrant, but Mr Za-abi stated that he did not have them, and that the order to detain Mr Quzmar had come directly from the Ruler.

51. When the men arrived at Mr Quzmar's house, they tampered with the home security equipment at the property by tilting the cameras upwards so as not to record their activities. When the men left, they removed the camera receiver, along with Mr Quzmar's mobile telephone and laptop so as to extract any recorded evidence of the abduction.

52. At this time, Mr Quzmar had not been charged with any crime or given any indication as to the reasons for his abduction or for how long he might be detained.

**(7) Conditions of detention in GHQ**

53.   After his abduction, Mr Quzmar was detained for 23 days at the General Headquarters of State Security of RAK ("**GHQ**"), before being transferred to a camp of the Ruler's private militia, as pleaded further below. At GHQ, Mr Quzmar was placed in solitary confinement in a dirty cell that measured only 2 metres by 2 metres, of which part comprised a squat toilet with no separation from the sleeping area, and which flooded at times. The conditions of the cell were extremely unsanitary, and Mr Quzmar was not provided with any facilities to wash, or any change of clothes during the entire period of his detention at GHQ. There was no or little sunlight in the cell.  Mr Quzmar was not permitted to change clothes or even his underwear and was given no ability to tell the time to enable him to pray.

54.   In a note prepared by Mr Quzmar on or around 18 October 2014, Mr Quzmar described the conditions of his detention at GHQ as follows:

> "...*The first arrest centre in the police headquarters is a hygienic disaster, where the disgustful Arab toilet is part of the cell, where it is only separated by the head wall of the bed, and it can barely accommodate the prayer rug. In addition to the absence of a bidet or washbasin, rather, a lower faucet is attached to the wall of the bathroom. The sun barely enters the cell. It is a mixture of humidity and dampness, where I stayed in it for 22 nights and 23 days without any shower. Imagine whoever was keen on bathing and hygiene was deprived from showering, and this is part of the punishment system that increases its effectiveness in psychological pressure.*"

**(8)   Unlawful search of the Claimant's home – 10 September 2014**

55.   On 10 September 2014, while Mr Quzmar was detained in GHQ in the conditions pleaded above, the Al Hamra Property was searched by a team of men led by Mr Gerrard, in the presence of Mrs Quzmar, Mrs Quzmar's mother, Mrs Quzmar's brother, the housemaid and Mr Quzmar's 10 year old son Yousef. Although Mr Quzmar was detained at GHQ only a relatively short distance away, Mr Quzmar was neither told about the search nor permitted to be present, as required under Article 59 of the UAE Criminal Procedure Code.

56.   At around 4pm, Mr Gerrard arrived at Mr Quzmar's home, leading a team of approximately 20 men. Although Mr Gerrard stated to Mrs Quzmar that he had a warrant to search the property, Mrs Quzmar was not given an opportunity to inspect any such warrant. In addition to Mr Gerrard, the Chief RAK Public Prosecutor, Zayed Mohammed, was present, together with Major Al Awadhi. Mrs Quzmar heard the

public prosecutor ask Major Al Awadhi who Mr Gerrard was in light of Mr Gerrard's overall control and supervision of the search, and Mr Al Awadhi informed the public prosecutor that Mr Gerrard was a legal advisor appointed by the Ruler's court.

57. Mr Gerrard told Mrs Quzmar that he was going to go into her bedroom and asked her to tell him where a particular Samsonite suitcase and safe was in that room. Mr Gerrard could only have known about such items as a result of the earlier, and also unlawful search, pleaded at paragraph 43 above. It is to be inferred that that earlier search was conducted by, or at the behest of, Mr Gerrard, whilst Mr Quzmar and his family were in Canada. After Mrs Quzmar directed Mr Gerrard to the safe, Mr Gerrard asked Mrs Quzmar for a key, and snapped it in his haste whilst attempting to open the safe.

58. The circumstances of the search, and Mr Gerrard's conduct during the search, were intended to humiliate and/or to apply improper pressure to Mr Quzmar and his family to procure his cooperation in the investigation led by Mr Gerrard at the behest of the Ruler. In particular:

58.1 The search extended to every part of the house including the garden and each of the family's cars;

58.2 Mr Gerrard personally rooted through the drawers in Mr and Mrs Quzmar's bedroom during the search.

58.3 Mr Gerrard knocked a copy of the Quran from its prayer stand due to his over-enthusiasm whilst personally conducting a search in Mr Quzmar and Mrs Quzmar's bedroom.

58.4 The search resulted in damage to the property, for example, because ceiling tiles were removed from the kitchen and bathroom, ostensibly to see whether anything was concealed behind, but in reality to intimidate the Quzmar family.

58.5 Mr Gerrard's manner to Mrs Quzmar was rude and aggressive, and he frequently shouted at Mrs Quzmar.

58.6 Mr Gerrard required Mrs Quzmar to remove her jewellery from the family safe (after breaking one of the safe keys, as pleaded above) and be photographed holding each item of jewellery separately. This was humiliating conduct, in particular for the wife of a high-ranking public official and judge, and served no purpose other than to seek to intimidate and humiliate Mrs Quzmar.

58.7  Mr Gerrard required Mrs Quzmar to separate and count small amounts of foreign currency that the family retained from their vacations abroad. The sums involved were so small that there could be no possible purpose served in separating and counting the currency other than to humiliate Mrs Quzmar.

59.  During the search, Mr Gerrard removed and/or directed the removal of personal items belonging to Mr Quzmar and his family that could have no conceivable relationship with or relevance to any lawful investigation. Those items have never been returned or itemised to Mr Quzmar and his family (despite repeated requests by Mr Quzmar and/or Mrs Quzmar), but are understood to include:

59.1  Mr Quzmar's and Mrs Quzmar's marriage certificate;

59.2  Mr Quzmar's  and Mrs Quzmar's high school and university degree certificates;

59.3  Mr Quzmar's and Mrs Quzmar's children's school certificates;

59.4  Mr Quzmar's and Mrs Quzmar's birth certificates;

59.5  Mr Quzmar's and Mrs Quzmar's Canadian immigration file;

59.6  Records of conferences Mr Quzmar attended;

59.7  Mr Quzmar's desktop computer;

59.8  Mrs Quzmar's laptop computer;

59.9  Mrs Quzmar's Islam Proclamation Certificate;

59.10 Mr Quzmar's and Mrs Quzmar's ten year old son Yousef's laptop computer;

59.11 Five mobile telephones, including the family's Jordanian and Canadian mobile telephones, for use when traveling in those countries;

59.12 Powers of attorney from Mrs Quzmar to Mr Ali Al Mansoury, and from Mr Al Mansoury to Mr Quzmar in respect of a property;

59.13 Car registration documents;

59.14 Thankyou letters addressed to Mr Quzmar from various organisations with whom he had dealt during his career, including:

(a)  From the Ruler himself, complimenting Mr Quzmar on his work as a member of the Board of Directors in relation to the Al Jazeera Port, whilst the Ruler was the Chairman of the Board; that letter is only consistent with

the Ruler being aware of and approving of Mr Quzmar engaging in private sector work in addition to his role for the RAK Government?

(b) From the late Sheikh Saqr bin Mohammad Al Qasimi in 1995, thanking Mr Quzmar for his service to RAK, when Mr Quzmar left to work in private practice in Abu Dhabi.

(c) From His Excellency Mohammad Al Qadi, the Managing Director of RAK Petroleum, thanking Mr Quzmar for legal services provided by Mr Quzmar.

(d) From the department of Civil Defence/the Ministry of the Interior.

(e) From the General Manager of Mafco (the private company Mr Quzmar worked for in Abu Dhabi) in 2000, thanking Mr Quzmar for his service when he left to return to RAK.

59.15 Mr Quzmar's professional certificates awarded for attending international arbitration conferences in Dubai, Bahrain & France, as well as decrees affirming his positions as:

(a) Legal Advisor to the Ruler of RAK

(b) Legal Advisor to the Government of RAK

(c) Member of RAK Judicial Council.

(d) Member of RAK's Lawyer's Association

(e) Member of the Commercial Arbitration Committee.

59.16 The key to the Quzmar family's Toyota car in Canada;

59.17 Contracts and/or title documents for properties owned by the Quzmar family in Turkey and Jordan;

59.18 The key to an apartment owned by the Quzmar family in Turkey;

59.19 A mock Georgian passport containing pictures of Georgian archaeological sites presented to Mr Quzmar by the Georgian government as a souvenir when Mr Quzmar led a delegation of RAK government officials to Georgia. Mr Gerrard became particularly excited at locating this item and interrogated Mrs Quzmar about what he stated to be Mr Quzmar's alleged Georgian citizenship notwithstanding that the passport was an innocent souvenir which had also been

presented to the Attorney General, Mr Al Sadeq, and all other members of the delegation.

60.   In all the circumstances, the search was carried out in breach of at least Articles 55, 72 and 80 of the Criminal Procedure Law, as pleaded further at paragraphs 182 and 188-190 below.

**(9)   Asset freeze and detention order – 10-11 September 2014**

61.   On 10 September 2014, Crown Prince Mohammed, Head of the Judicial Counsel, and the Supreme Judicial Council issued a decision cancelling Mr Quzmar's judicial immunity. Mrs Quzmar was told by one of the judges on the Supreme Judicial Council, that the Crown Prince had forced the other judges to agree to this decision. On the same day, a detention order was issued in respect of Mr Quzmar by the public prosecutor. There were no reasonable grounds to suspect Mr Quzmar of having committed any crime, and these steps were intended to give an impression of legitimacy to the wrongful conduct that had already occurred.

62.   On 11 September 2014, further steps were taken that were intended to intimidate, threaten and cause harm to Mr Quzmar and to his family:

62.1   All of the family's assets and bank accounts were frozen. This included:

(a)   Mrs Quzmar's bank account with The Arab Bank, which were not unfrozen until 1 February 2015, after which Mrs Quzmar withdrew the balance.

(b)   The accounts of Mr Quzmar's daughters Maryam and Majd, aged 23 and 20 respectively at that time; these accounts were not released from the freezing order until March 2020.

(c)   The account of Mrs Quzmar's brother George Abu Aita, through which he received his salary and which he was thus unable to access.

(d)   The account of Mr Quzmar's son Yousef, containing a balance of only AED 5,000, approximately £844 as at 10 September 2014.[3]

(e)   The car of Mr Quzmar's son, Mohamed, which was only released from the asset freeze in January 2019, when it was sold at a depreciated value.

---

[3] Per xe.com, using an exchange rate of AED:GPB 5.925:1 as at 10 September 2014.

62.2   A travel restriction was imposed on Mrs Quzmar preventing her from leaving the UAE for two months which was lifted on 11 November 2014, only after Mrs Quzmar petitioned the Attorney General because she needed to travel outside the UAE for medical treatment; the Attorney General told Mrs Quzmar that he had needed to obtain the specific sanction of the Ruler in order to lift the restriction.

63.   No exception for the purposes of living expenses was given, nor was any provision made permitting necessary payments, such as mortgage repayments or school fees, to be made. Despite repeated requests by Mrs Quzmar to the Attorney General (including on 15 May 2015, 11 June 2015, 13 November 2015) for money to be released from Mr Quzmar's account, no such permission was granted. This caused significant harm to Mr Quzmar and to his family. Mrs Quzmar did not receive any monthly allowance for which she had petitioned the Attorney General, the Ruler and the trial judge, but had to be supported financially by her sister, Mrs Julie Al Yateem.

64.   In a WhatsApp message sent by Mrs Quzmar to the Ruler on 13 November 2015, Mrs Quzmar noted that the rent for a property owned by the Quzmar family at Al Mairid had been transferred to the Attorney General's office rather than to the family. Mrs Quzmar wrote:

> *"I demand our right to the rent so that we can live in dignity and without deprivation. I did not expect this right to be used as a pressure weapon from the Attorney General's office. My request for a monthly allowance has been repeatedly rejected, which would have helped us manage our affairs, and now they are putting their hands on the rent that is not even sufficient enough to pay the monthly bills and expenses, maybe just a few months' worth. And on what basis did the prosecution base its actions! We yearn from your side to look at this issue with mercy, wisdom and foresight…with all due respect."*

**(10)   Interrogation of Mr Quzmar by Mr Gerrard at GHQ – 11 September 2014**

65.   On 11 September 2014, Mr Gerrard conducted an interrogation of Mr Quzmar at GHQ. At this stage, Mr Quzmar had not yet been interrogated by a Public Prosecutor, in breach of Article 104 of the Criminal Procedure Law, as pleaded further below at paragraphs 194-195 below. Mr Quzmar was not permitted to have a lawyer present and did not have legal representation at any stage until April 2015, after he had already been incarcerated for nearly eight months and his criminal trial had already commenced.

66. Mr Gerrard's conduct during the interrogation amounted to torture and/or inhuman and degrading treatment and was intended to intimidate and humiliate Mr Quzmar into cooperating. In particular:

66.1 Mr Quzmar's hands were cuffed and his head was blindfolded and/or hooded whilst being taken from his cell to the interrogation.

66.2 Mr Quzmar's feet were shackled with a rusty chain before being taken to see Mr Gerrard and remained in that state throughout the interrogation.

66.3 Mr Gerrard's manner was rude, aggressive, and intended to belittle Mr Quzmar, as was the case in each of the interrogations conducted by Mr Gerrard.

67. Mr Gerrard told Mr Quzmar that he had been assigned by the Ruler to interrogate Mr Quzmar, but that a parallel interrogation would take place with the public prosecutor the next day. When Mr Quzmar asked why he would be interrogated twice (and told Mr Gerrard about the requirement for him to be placed before a public prosecutor within 24 hours of his arrest), Mr Gerrard stated that "this is what we have decided" (or words to that effect). Mr Gerrard told Mr Quzmar that if he wanted to get out of this situation, he was required to cooperate in implicating Dr Massaad (and also Sheikh Faisal, although Mr Gerrard's primary focus was on Dr Massaad) in corruption charges, and also to return any land and rents he had received from RAKIA in order to secure his release. Mr Quzmar told Mr Gerrard that he was willing to provide any money or profits he had received to the Ruler in order to secure his release, but that he had no knowledge of any involvement in any alleged corruption of Dr Massaad and Sheikh Faisal. Mr Gerrard further stated to Mr Quzmar that if he did not provide such information (described by Mr Gerrard as Mr Quzmar's "ticket out"), the Court would convict him, and he would stay in prison indefinitely which would be harmful to Mr Quzmar and his family.

68. Although Mr Gerrard referred in a general sense to a lease agreement with allegedly favourable terms, Mr Gerrard did not identify any specific charges to Mr Quzmar during the interrogation. Mr Gerrard's primary focus then, as on each subsequent occasion in which he interrogated Mr Quzmar, was not on any alleged wrongdoing of Mr Quzmar, but on whether Mr Quzmar was able to provide information that would be useful to Mr Gerrard in implicating Dr Massaad and/or Sheikh Faisal.

69. The very fact of Mr Gerrard conducting an interrogation of Mr Quzmar was contrary to Article 68 of the UAE Criminal Code, which requires such an interrogation to be

performed by the public prosecutor only and does not permit delegation. Mr Quzmar challenged Mr Gerrard as to the basis on which he was conducting the interview.  Mr Gerrard told him that he had been asked directly by the Ruler to carry out the investigation.

**(11)   First meeting with public prosecutor – 12 September 2014**

70.   On 12 September 2014, at around 8pm, Mr Quzmar was summoned to appear before the public prosecutor, Mr Ahmed Zaki to be interrogated. This interrogation occurred in excess of the lawful time period of 24 hours under Article 104 of the Criminal Procedure Code, as pleaded further below.

71.   During this meeting:

71.1   Mr Quzmar asked Mr Zaki why he was required to have his hands cuffed and wear a mask/blindfold. In response, Mr Zaki told the guards to remove the handcuffs and blindfold.

71.2   Mr Zaki mentioned, with greater specificity than Mr Gerrard had, the nature of the charges that were to be brought against Mr Quzmar. Mr Zaki stated that Mr Quzmar was accused of unlawfully obtaining licenses from RAKIA and concluding lease contracts with RAKIA in respect of vacant land.

71.3   Mr Zaki told Mr Quzmar that there should be no legal impediment to him being granted bail, however in the event this did not occur.

72.   Mr Quzmar was not permitted to have a lawyer present during the interrogation. However, two lawyers employed by Dechert were present during the interrogation, Mr Jonah Andersen and Mr William Barrington. Both Mr Andersen and Mr Barrington asked Mr Quzmar questions and participated in the interrogation, contrary to Article 68 of the UAE Criminal Code.  It is to be inferred that Mr Andersen and Mr Barrington attended on the instructions of, and reported to, Mr Gerrard.

73.   The interrogation continued until approximately 3am on 13 September 2014. Between 1-2am Mr Quzmar was permitted to call Mrs Quzmar. This was the first time Mr and Mrs Quzmar had spoken since Mr Quzmar's abduction on 6/7 September 2014.

**(12)   Hunger strike and second meeting with public prosecutor – 15 September 2014**

74.   By 15 September 2014, Mr Quzmar had commenced a hunger strike in protest at the appalling and inhumane conditions of his detention, including the lack of clean clothing, shower facilities, lack of communication with his family and inability to tell the time for prayer. Mr Quzmar's hunger strike lasted approximately four days. Mr Quzmar was brought again before the public prosecutor, Mr Zaki, as a consequence of this. Mr Zaki gave Mr Quzmar a biscuit and promised that the conditions of his detention would improve, however in the event this did not occur.

75.   It is to be inferred, from Mr Zaki's inability to improve the conditions of Mr Quzmar's detention, despite his expressed willingness to do so, that Mr Quzmar's mistreatment was not under the control of the public prosecution in RAK but was the product of decisions made by the Committee of Three in respect of the purported investigation, of which Mr Gerrard was the driving force.

**(13)   Meeting between Mrs Quzmar and the Ruler at the Palace – 15 September 2014**

76.   On 15 September 2014, Mrs Quzmar met with the Ruler at the Palace to seek the Ruler's assistance in obtaining the release or improvement of conditions of Mr Quzmar. During that meeting:

76.1   The Ruler's manner was hostile and aggressive;

76.2   The Ruler accused Mr Quzmar of being a traitor, and asked whether Mr Quzmar "*works for me or my brother [*i.e. Sheikh Faisal*]*".

76.3   Mrs Quzmar asked the Ruler if she could see Mr Quzmar, which request the Ruler rejected.

76.4   The Ruler stated that he intended to "*make a lesson*" out of Mr Quzmar.

76.5   The Ruler expressed interest in the purported Georgian passport seized by Mr Gerrard, and asked Mrs Quzmar about Mr Quzmar's alleged Georgian citizenship.

76.6   The Ruler denied that Mr Quzmar was a political prisoner and became angry when Mrs Quzmar suggested this.

77.   In light of the Ruler's conduct at the meeting, it is to be inferred that:

77.1   Mr Quzmar was targeted and victimised not because of any evidence of criminality or corruption by him but (at least in significant part) because of his association with Sheikh Faisal, with whom the Ruler was in a political conflict, and/or because of the Ruler's conflict with Dr Massaad, and desire to build a case against Dr Massaad and Sheikh Faisal.

77.2   Mr Gerrard, who was in a position to and did influence the Ruler in respect of the course of the purported investigation generally, including as regards the (false) justifications adopted by the Ruler for the treatment of Mr Quzmar, had done his best to blacken Mr Quzmar's name with a view to increasing the fees that Dechert would charge in respect of a prolonged investigation. The Ruler's incorrect statement that Mr Quzmar was in possession of a genuine Georgian passport, in circumstances where the passport was a souvenir, can only have come from Mr Gerrard, who it is to be inferred sought to and did influence the Ruler's conduct in that and other respects, in particular through his role in the Committee of Three.

**(14)   Hacking of Mr Quzmar's email account and impersonation of Mr Quzmar – late September 2014**

78.   In or around September 2014, Mr Quzmar's personal Yahoo email account was accessed by a third party without his authority, who changed the password. On 28 August 2014, while on holiday in Canada, Mr Quzmar received a telephone call from a manager at Arab Bank informing him that a suspicious email had been sent from his account, requesting money to be transferred to a bank in Hong Kong. After discussion with Mr Quzmar, the bank did not action this transfer. Subsequently, in late September 2014, Mr Quzmar's son, Mohamed Jihad, attempted to access Mr Quzmar's email account in order to check for new messages, but discovered that the password had been changed. Upon discovery of this, Mohamed Jihad contacted Yahoo to change the password to enable him to access the account again. After gaining access, it was apparent to Mohamed Jihad that emails had been deleted. Mr Quzmar believes that his secretary, Ali, who was in possession of the old password, provided it to Dechert.

79.   Mr Gerrard's and/or Dechert's involvement in and/or authorisation of the unlawful hacking is to be inferred from the following facts and matters:

79.1 During an interrogation, Mr Quzmar was asked if he could supply emails relating to a Kuwaiti marine company owned by a Mr Saeed Deshti in respect of which the RAK Government was involved in an arbitration. When Mr Quzmar responded to that request by stating that the information was not relevant, Mr Gerrard told Mr Quzmar "*we [i.e. those conducting the investigation] have our own way of getting access to any emails*" (or words to that effect).

79.2 As pleaded above, Mr Gerrard had been party to and/or involved in and/or obtained the product of an unlawful search of Mr Quzmar's home, whilst Mr Quzmar and his family were away in Canada.

79.3 On 22 May 2020, Andrew Lenon QC (sitting as a Deputy Judge of the High Court) handed down judgment in *Ras Al Khaimah Investment Authority v Farhad Azima* [2020] EWHC 1327 (Ch) ("**the Azima Proceedings**"). In those proceedings (in which Mr Gerrard gave evidence for RAKIA), Mr Azima brought a counterclaim alleging that RAKIA had been involved in the unlawful hacking of his email account as part of an investigation led by Mr Gerrard. It was common ground that RAKIA/Dechert were in possession of a large volume of hacked material. Although the Judge dismissed Mr Azima's counterclaim, he held (at [67]; [380]), that the alleged innocent explanation provided by RAKIA for how it had come across the hacked emails was not credible. On 9 September 2020, Arnold LJ granted Mr Azima permission to appeal. In his reasons for granting permission to appeal, Arnold LJ drew particular attention to and described as "concerning" a witness statement served by Mr Gerrard in the Azima Proceedings after judgment had been handed down, in which Mr Gerrard accepted that the evidence he had given at that trial in relation to his dealings with Mr Al Sadeq had been untrue in numerous respects.

79.4 In June 2020, Stokoe Partnership ("**Stokoe**"), solicitors for Mr Quzmar and for Mr Al Sadeq in the Al Sadeq Proceedings, commenced a claim with Claim No. QB-2020-002218 against persons alleged to have been involved in unlawful attempts to obtain confidential banking information from Stokoe in connection with the Al Sadeq Proceedings. Although neither Mr Gerrard nor Dechert were party to those proceedings, their solicitors, Enyo Law, nonetheless attended a remote hearing on 7 July 2020 in those proceedings. Mr Gerrard and Dechert can only have become aware of that hearing in those proceedings (which at that stage

had not been publicised) through a connection with one of the defendants in those proceedings. Despite repeated requests, Enyo law have declined to explain in correspondence how they came to be aware of the existence of those proceedings and that hearing, relying on legal professional privilege in circumstances where no proper claim to privilege could arise.

**(15)   Transfer to Al Barirat Camp – 29 September 2014**

80.   On 29 September 2014, Mr Quzmar was transferred from his cell at GHQ to a place he later came to know was the Al Barirat Camp in Al Ashqar in RAK ("**Al Barirat**"). This is a camp for the Ruler's private militia and is not an official prison within the RAK criminal justice system.

81.   During his transfer from GHQ to Al Barirat, Mr Quzmar was blindfolded with a hood over his head, and the vehicle transporting him drove in circles so that he was disorientated and unable to tell where he was being taken, in an attempt to ensure that he was not able to guess the location of where he was being held. Although Al Barirat was only a short drive from GHQ, Mr Quzmar estimates that the journey took at least 45 minutes, due to the efforts to disorientate him.

**(16)   Conditions of detention in Al Barirat**

82.   During his detention in Al Barirat, Mr Quzmar was kept in inhumane and unsanitary conditions. In particular:

82.1   Mr Quzmar was placed in a small dirty cell measuring no more than 2 metres by 2.5 metres.

82.2   The cell had a small window that had been covered with a piece of wood so as to restrict daylight.

82.3   The cell was not cleaned until Mr Quzmar had already been occupying it for twelve days.

82.4   There was no table in the cell for Mr Quzmar to eat on, so he had to eat on the floor.

82.5   Mr Quzmar was detained in Al Barirat under an alias so as to conceal the fact of his detention, and his medical reports were also kept under a false name.

31

82.6 Whenever Mr Quzmar left his cell, he was handcuffed and accompanied by guards, even when going to the toilet (and was given no privacy when doing so).

82.7 Mr Quzmar was denied proper access to medical treatment, which was necessary in light of the severe medical conditions he developed as a result of the conditions of his detention, as pleaded further below at paragraphs 124-150.

82.8 Mr Quzmar was not given any sufficient opportunity to exercise.

83. Mr Quzmar became aware that Mr Al Sadeq was also detained at Al Barirat, albeit he had no direct contact with him. Although other prisoners were detained at Al Barirat in addition to Mr Quzmar and Mr Al Sadeq, the other prisoners (which included persons convicted or suspected of violent crimes such as murder) were detained in more favourable conditions than Mr Quzmar and Mr Al Sadeq, who were singled out for mistreatment, as part of the campaign against them orchestrated by Mr Gerrard in conjunction with the Ruler.

84. Mr Quzmar remained detained at Al Barirat in the above conditions for more than 15 months, from 29 September 2014 to 17 December 2015.


**(17)  Interrogation by Major Al-Awadi at Al Barirat – 1 October 2014**

85. On 1 October 2014, Mr Quzmar was interrogated by Major Al-Awadi at Al Barirat.

86. During that interrogation:

86.1 Major Al-Awadi asked Mr Quzmar about his relationship with Sheikh Faisal and asked him to provide information about corruption involving Sheikh Faisal, in particular in respect of the Free Zone and a company Julphar Pharmaceuticals.

86.2 Mr Quzmar responded that he was unaware of any corruption involving Sheikh Faisal.

86.3 Major Al-Awadi suggested that Mr Quzmar had issued a decree appointing Sheikh Faisal as Crown Prince and Deputy Governor. This was untrue (as Mr Quzmar told Major Al-Awadi), and was intended to provide a pretext for further mistreatment of Mr Quzmar, in circumstances where in reality there were no grounds to suspect Mr Quzmar had been involved in any crime.

86.4 Major Al-Awadi told Mr Quzmar that all of his friends had abandoned him, that nobody had interceded with the Ruler on his behalf, and that if he wanted to help himself and his mother, he should cooperate. This was intended to frighten and unsettle Mr Quzmar in circumstances in which he had no or no adequate contact with the outside world.

86.5 Major Al-Awadi repeated his request for information about the activities of Sheikh Faisal and Dr Massaad (although Major Al Awadhi's primary focus, in contrast to that of Mr Gerrard's, was on Sheikh Faisal rather than Dr Massaad). Again, Mr Quzmar denied any knowledge of or involvement in those matters.

86.6 Mr Quzmar also made various requests of Major Al-Awadi about changes in his conditions. Although Major Al Awadi stated that these requests would be complied with, in the event these either did not occur, or did not occur for some time. In particular:

(a) Mr Quzmar requested that Major Al-Awadi ask the Ruler whether Mr Quzmar could be placed under house arrest instead of imprisonment.

(b) Mr Quzmar requested that Mrs Quzmar be permitted to visit him. Mr Quzmar did not see Mrs Quzmar until 5 November 2014, two months after his abduction.

(c) Mr Quzmar requested to be permitted to sign a cheque in Mrs Quzmar's name so that money could be deposited in their children's bank accounts in Canada, and so that instalments for the mortgage for their apartment in Turkey could be paid, children's education expenses, and general living expenses.

86.7 At the end of the interrogation, Major Al-Awadi asked Mr Quzmar whether he was willing to return all of the leased plots of land in RAK that he owned and any rents received from those lands. Although Mr Quzmar did not consider there to be anything wrongful in those lease agreements, he agreed to do so as a result of the pressure he had been placed under.

87. During one of their conversations, Major Al-Awadhi told Mr Quzmar that the Ruler had established a "Committee of Three" to deal with the investigation and Mr Quzmar's own circumstances of detention. The Committee of Three, as Major Al-Awadhi told Mr Quzmar, comprised the Ruler, Mr Gerrard and the Attorney General.

Major Al-Awadhi told Mr Quzmar that Mr Gerrard had the *"upper hand"* in the Committee.

88. In light of Major Al-Awadhi's expressed willingness to assist Mr Quzmar in improving the conditions of his detention and/or Mr Gerrard's dominant role within the Committee of Three (as explained to Mr Quzmar by Major Al-Awadhi), it is to be inferred that Mr Gerrard, as the person with overall responsibility for the purported investigation, was the driving force behind Mr Quzmar's continued mistreatment.

**(18)   Interrogation by Mr Andersen and Mr Barrington – 28 October 2014**

89. On 28 October 2014, Mr Andersen and Mr Barrington, visited Al Barirat to interrogate Mr Quzmar again. Mr Andersen and Mr Barrington questioned Mr Quzmar about his relationship with Dr Massaad, as had been the focus of each of Mr Quzmar's interrogations. It is to be inferred that the interrogation by Mr Andersen and Mr Barrington was coordinated by Mr Gerrard, as the partner with overall responsibility for the purported investigation at Dechert.

90. The interrogations by Mr Barrington and Mr Andersen were unlawful, in that pursuant to Article 68 of the UAE Criminal Procedure Code, interrogations must be conducted by a public prosecutor only, and delegation is impermissible.

**(19)   Meeting with Mrs Quzmar at Court – 5 November 2014**

91. On 5 November 2014, for the first time since his abduction in the early hours of 7 September 2014 (59 days earlier), Mr Quzmar was permitted to see Mrs Quzmar at the detention centre at Court. Mr Quzmar was only permitted to see Mrs Quzmar in the presence of Major Al-Awadi. At that meeting, Mr Quzmar told Mrs Quzmar that he wanted to instruct a lawyer, and for any trial to take place outside RAK (either in Abu Dhabi or Dubai) because of the control the Ruler was able to exercise over the judiciary in RAK.

92. Both prior to and after this meeting, Mrs Quzmar had repeatedly sought to obtain permission for Mr Quzmar to instruct a lawyer, however those requests were denied and it was also not possible to identify a lawyer willing to act in circumstances where Mr Quzmar was a political prisoner. For example:

92.1 On 7 September 2014, the day of Mr Quzmar's abduction, Mrs Quzmar sought to instruct a lawyer in RAK, however she was told by a lawyer, Mr Jamal Najjar, that no lawyer in RAK would accept an instruction to represent Mr Quzmar in circumstances in which he had been abducted on the instructions of the Ruler.

92.2 During December 2014, Mrs Quzmar presented a power of attorney for a Dubai lawyer, Mr Salem Al Shaali, to the Attorney General in RAK so that Mr Al Shaali could attend interrogations and review the case file. The Attorney General told Mrs Quzmar that there was no need for Mr Quzmar to appoint a lawyer, as the case would be resolved by settlement.

92.3 On 30 December 2014, Mrs Quzmar met with Mr Quzmar again (their second meeting since his abduction), and Mr Quzmar confirmed that he wished for Mr Al Sahaali to represent him.

92.4 Accordingly, in January 2015, Mr Al Shaali presented the Attorney General with a power of attorney in respect of his representation of Mr Quzmar, and requested that he be present during any interrogations of Mr Quzmar. However, the Attorney General refused that request, and stated that further cases will be "piling up" against Mr Quzmar.

92.5 On 23 March 2015, Mr Quzmar sent a letter to the Public Prosecutor asking to be allowed to meet with Mrs Quzmar so that she could instruct a lawyer to represent him in the criminal case which was shortly to commence. Mr Quzmar did not receive any response to his letter.

93. From time to time Mr Quzmar, as a result of his treatment, had become so depressed and convinced that he would never receive a fair trial that he told his wife that rather than spending money on a lawyer, which would not improve his position, she would be better advised to husband her available resources so they could be used for her living expenses and those of their children, during the period of his imprisonment, which he regarded as inevitable. For instance, in three undated letters to his wife, Mr Quzmar stated:

93.1 *"I don't want to hire a lawyer. Save your little amount of money you have for the coming days. Please listen to me, the lawyer will not do anything, only the Lord of the world has the solution. The most important thing is that I can give you*

*power of attorney deal with everything, especially with what is far, despite that they seized all the papers."*

93.2   *"My love, I beg you to forget about hiring a lawyer. You and the children deserve every penny more than the greedy lawyer…."*

93.3   *"I do not want a lawyer because of the high costs. The decisions will be ready, as were the prosecutors' decisions."*

**(20)   Meeting with the Public Prosecutor – 25 November 2014**

94.   On 25 November 2014, Mr Quzmar was brought to see the public prosecutor, Mr Zaki. Mr Quzmar was shackled, blindfolded and in handcuffs. Mr Zaki told Mr Quzmar that he was shocked by his treatment.

95.   In a letter to Mrs Quzmar written on 25 November 2014, Mr Quzmar described the meeting with Mr Zaki as follows (*inter alia*):

> *"Today has not seen me without injustice for I was called before the prosecution, and when the police in their civil outfits came to escort me, a blindfold was placed over my head and eyes in my room, in addition to a black cap and a black wrap, both very bulky. My hands were also cuffed from behind and I was held up for fear of falling because I was completely blind. I was put in a four-wheel drive jeep, which I was able to climb into with great difficulty because of my tragic condition. The blindfolds and head cover and handcuffs from behind impeded my movement and reminded me of the prisoners in Guantanamo accused of terrorism. I was taken to court and immediately escorted to the senior prosecutor in charge of the investigation, who was shocked at my sight. I was taken into the prosecutor's office in the courthouse blindfolded and handcuffed without any respect for the sanctity of the court nor my person or position, no consideration for my age for the sole purpose of adding to my humiliation. There in the prosecutor's office, I told him that this treatment was barbaric, illegal and unbecoming. The prosecutor agreed that this behaviour should not be used with any accused person. It is simply sadistic and another form of terrorism. The other two police officers apologized to me but said they were acting under orders. Usually, a prisoner is blindfolded using his cap or one handkerchief but not more. Their reply stating that humiliating me was merely compliance with orders further added to their own humiliation, for they had manhandled an unarmed old man…."*

It is to be inferred from Mr Zaki's surprise at Mr Quzmar's treatment that the conditions of Mr Quzmar's detention were extraordinary, and determined not by the proper authorities or any proper process in RAK,  but by Mr Gerrard and the Committee of Three, of which Mr Gerrard was the dominant member.

**(21)  Attempts by Mr Quzmar to persuade the Ruler/public prosecutor to improve his conditions**

96.  In an effort to seek to ameliorate his situation, Mr Quzmar repeatedly wrote to the Ruler and Public Prosecutor describing the conditions of his detention. For example:

96.1  In a letter to the Ruler dated 1 February 2015, Mr Quzmar stated (*inter alia*):

> *"I have, over five withered months, been in solitary confinement in a very humid cell, then later in a small room that is very humid and cold, with my hands cuffed from the back and front all day long, and have experienced humiliation and abjectness, but despite this, it did not cross my mind any day that you would not care about my situation, because I have a lot of hope in your highness. I have suffered, chronic illness and pain have filled me, and medicine of all sorts, apart from walking and moving, have become more of a temporary pain killer the effect of which does not last, rather than a proper treatment. My bones have weakened, my hair is ashen grey, my joints, knees and spine have stiffened, humidity has penetrated my bones, my irritable bowel syndrome and chronic constipation have worsened, and my kidneys and ureter have suffered. This is in addition to increased fats content in my blood. All this is proven in medical records contained in my portfolio at the Royal Guard Prison, where several doctors visited me at various occasions when I was suffering severe pains.*
>
> *…*
>
> *Your highness,*
>
> *I have understood your letter and responded to its content with all honesty and impartiality. My imprisonment has lasted a long time, my glory and pride have been shattered, and I am mentally and financially destroyed. My, my kids' and my entire family's sustenance has been stopped, and our bank accounts and properties have been frozen. From a social angle, many stories have been made up about me and my family, and I cannot bear this anymore, with a family on the verge of collapse and eternal loss, one that is scattered in different countries. My elderly mother is sad and is constantly crying about what had happened to her righteous son, and I am sure this would not please your highness, as my family is ultimately your responsibility, a part of you and a trust held by you. My son Yousef, who used to take pride in your name and his father's work for you, was shocked when he visited me, for what he saw of aging and weakness in me."*

96.2  In the same letter, Mr Quzmar confirmed that he did not work for the Ruler's brother, Sheikh Faisal, but for the Ruler himself, and that he regretted having a friendly relationship with persons who are not on good terms with the Ruler.

96.3  On 5 February 2015, Mr Quzmar wrote to the Attorney General, Mr Al-Habsi, repeating various requests he had made before, including that:

(a)   Mr Quzmar be granted a monthly allowance of 50,000 AED to cover the expenses of his family, to be deducted from the frozen funds in Mr Quzmar's account at Arab Bank.

(b)   Arab Bank, as mortgagee of the family's property in Al Hamra, be permitted to release funds secured against the home, to provide the family with further living expenses.

(c)   Arab Bank be permitted to deduct mortgage repayments from the rental income in respect of a property owned by Mr Quzmar at Al Marirad, so as to prevent penalties from being imposed. (In fact, that rental income was retained by the Attorney General and not released to the Quzmar family, as pleaded at paragraph 64 above).

(d)   Mr Quzmar be permitted to speak with his elderly mother at least twice per week, and also to call his son, Mohammed, and two daughters in Canada, as well as his son Yousef in RAK once per week. Mr Quzmar noted that his children were *"now teenagers and need regular guidance, and I have no objection to do this under the monitoring and supervision of the prison's manager."*

(e)   The items taken during the search led by Mr Gerrard be returned, such as school certificates, university degrees, Mr Quzmar's and Mrs Quzmar's marriage certificate, and ownership documents for the family's cars so that they could be lawfully driven.

(f)   The Al Hamra Property's CCTV receiver and the family's cell phones be returned, once materials relevant to the investigation, if any, had been obtained.

96.4   On 9 February 2015, Mr Quzmar wrote to a RAK judge repeating requests for a limited use of the family's bank accounts to be granted, so as to permit necessary payments to be made.

96.5   On 10 February 2015, Mr Quzmar wrote to the Public Prosecutor, repeating and supplementing the requests made in his letter to the Attorney General dated 5 February 2015, as pleaded at paragraph 96.3 above.

96.6  On 24 March 2015, Mr Quzmar wrote to the Ruler, drawing attention (*inter alia*) to the conduct of Mr Gerrard and Dechert, suggesting that Mr Gerrard had deployed a tactic of prolonging the investigation in order to generate more fees:

> "*Your highness*
>
> *I truly still do not know the real reasons behind your abomination and anger at me despite my imprisonment, torture and the pain of my family and its destruction which lasted a long time. The accusations about a license which was issued 9 years ago and rental contracts which might have included one or more preferential conditions, aside from how true or serious they are, do not justify this level of anger and hatred which our long lasting relationship – which you do not value anymore – never saw…..*
>
> *Dechert's (Law Firm) employee used some wrong tactics and prolonged this, and despite my cooperation he failed to resolve this situation. His misuse of your name and power of the Public Prosecution was to prolong this and get more money, and to obtain an unconditional confession that I committed the crimes I am accused of, despite the lack of evidence and contrary to the true facts regarding Dr Khater Massaad. This is so that he can use this against Dr Khater and even against me whenever he wants and without offering any clarifications, consideration or guarantees for making such a confession contrary to standard practice.*

97.  Despite these requests, Mr Quzmar continued to be incarcerated at Al Barirat in the conditions pleaded above throughout 2015 with little or no improvement.

## (22)  Meeting between Mrs Quzmar and the Attorney General – 1 March 2015

98.  On 1 March 2015, Mrs Quzmar met with the Attorney General, Mr Al Hamsi, to discuss Mr Quzmar's situation. In contrast to earlier indications, Mr Al Hamsi now stated that no settlement would be possible and that criminal proceedings would be commenced.

## (23)  Meeting with Public Prosecutor at Court – 8 March 2015

99.  On 8 March 2015, Mr Quzmar was taken to meet with the public prosecutor, Mr Zaki, in his offices in the court building. Mr Quzmar's treatment at this meeting followed the same pattern as in other similar meetings:

99.1   Mr Quzmar was taken to the public prosecutor's offices at night, after the court's working hours had concluded, presumably so as to minimise the visibility of his treatment to staff and members of the public.

99.2   Mr Quzmar was transported with his hands cuffed behind his back, his legs shackled, blindfolded and with a hood covering his head.

99.3   Mr Quzmar was not permitted to have a lawyer attend any meetings with the public prosecutor, as was the case with Mr Quzmar's meetings with Mr Gerrard and Major Al-Awadi.

99.4   At the end of each interrogation, Mr Zaki would hand Mr Quzmar a report for Mr Quzmar to sign. Mr Quzmar was not permitted to read the report, he was simply required to sign it. No copy was ever provided to Mr Quzmar.

100.   Mr Quzmar understood, from his discussions with Major Al Awadhi and prison staff, that the nature and extent of his mistreatment generally and specifically the requirements for him to be masked and handcuffed from behind was because those instructions came from Mr Gerrard/Dechert, described by Major Al Awadhi and the prison staff as "*the English*". This was a reference to Mr Gerrard's role within the Committee of Three established by the Ruler, which was responsible for the conditions of Mr Quzmar's detention.


**(24)   Meeting with Mr Gerrard – 9 March 2015**

101.   On or around 9 March 2015, Mr Quzmar was summoned to meet with Mr Gerrard in Al Barirat. On this occasion, Mr Gerrard was accompanied by a female lawyer, believed by Mr Quzmar to be Ms Caroline Black, a defendant in the Al Sadeq Proceedings, and also an employee of Dechert, reporting to Mr Gerrard. The previous day, Mr Quzmar had been told that "*the English Group*" (i.e. Mr Gerrard and Dechert) were coming to discuss a potential settlement with him. Mr Quzmar understood from this that it was Mr Gerrard and Dechert who were ultimately in a position to make decisions concerning Mr Quzmar's fate and to influence the Ruler in that respect, as is consistent with Mr Gerrard's dominant role in the Committee of Three. Mr Quzmar understood that his meeting with Mr Gerrard followed an earlier meeting between Mr Gerrard and Mr Al Sadeq that lasted approximately three hours.

102.   As to the meeting:

102.1 On the way to the meeting, Mr Quzmar's hands were cuffed behind his back and his head was covered with a mask or hood.

102.2 Mr Gerrard sought to belittle and humiliate Mr Quzmar by telling him that (despite his many years of judicial service and advanced law degrees), he, unlike Mr Gerrard, was not a real lawyer.

102.3 Mr Gerrard's manner was rude and aggressive, and he shouted at Mr Quzmar.

102.4 For the first time, Mr Gerrard raised an allegation that Mr Quzmar had received a bribe in the form of tickets for air travel from a Mr Shahab. This was a baseless allegation:

(a) Pursuant to Article 6(d)(1) and (2) of Ras al Khaimah Law No. 4/2012 On Government Lawsuits Law of 2012 ("**Law No. 4/2012**"), anyone wishing to launch a lawsuit against the government of RAK was required to submit to the legal advisor (at the material time, Mr Quzmar) a written petition comprising all the details of their claim, along with evidentiary documents that supported it; and the legal advisor was required to refer the claim in a letter to the competent authority, in order for it to review it, within two weeks from the time he received it.

(b) In 2014 one of Mr Shahab's companies, RAK Business Square, submitted a petition to Mr Quzmar along with the relevant documents which Mr Quzmar was accordingly required to refer to the relevant competent authority within 14 days.

(c) At around this time, Mr Quzmar had purchased economy class tickets with Emirates for himself, Mrs Quzmar and their son Yousef to travel to Canada. Mr Shahab offered to use his Emirates points to upgrade Mr Quzmar to business class. Although Mr Quzmar declined to accept this offer, Mr Shahab nonetheless procured that the tickets be upgraded. Upon finding out that the tickets had been upgraded by Mr Shahab Mr Quzmar insisted on paying and did pay the difference in the fare to Mr Shahab.

(d) Wishing to discuss the matter with the Ruler first, Mr Quzmar did not at any time refer RAK Business Square's petition to the competent authority, in breach of Article 6(d)(1) and (2) of Law No. 4/2012, such that RAK Business Square was unable to pursue its claim.

41

(e)   In the circumstances pleaded at paragraphs 102.4(a) to (d) above, it could not possibly be said that Mr Quzmar had acted improperly in order to promote the interests of RAK Business Square or Mr Shahab as a result of the upgrade procured by Mr Shahab, which had been done without Mr Quzmar's knowledge or consent, and for which Mr Quzmar had in any event himself ultimately paid when had discovered it.  Mr Quzmar was in due course able to provide official confirmation that the said petition had not been referred to the competent authority.

(f)   Despite this, Mr Quzmar was subsequently convicted of bribery by the RAK Court and sentenced to 3 years imprisonment in respect of this incident. In the premises, the revival of this incident by Mr Gerrard and subsequent conviction of Mr Quzmar and disproportionate sentence formed part of the unlawful campaign to harm Mr Quzmar conducted by Mr Gerrard and the Committee of Three.

102.5 Mr Gerrard asked Mr Quzmar whether he wanted to settle the proceedings, or whether he wanted a trial. In response Mr Quzmar told Mr Gerrard that he wished to settle.

102.6 Mr Gerrard then stated that if Mr Quzmar wished to settle, he could only do so on three conditions:

(a)   That Mr Quzmar confessed to all the charges against him (notwithstanding that Mr Quzmar had made clear to Mr Gerrard, Major Al-Awadhi, to the Attorney General and to the Public Prosecutor that he considered he had not committed any crimes or wrongdoing.

(b)   That Mr Quzmar pay any rent he had received from land which Mr Quzmar had rented from RAKIA, and then sub-let.

(c)   That Mr Quzmar confess to having been bribed by Dr Massaad, and testify against Dr Massaad and Sheikh Faisal.

102.7 Mr Quzmar repeated that he would not confess to any false charges brought against him, and he was unaware of any illegal activity by Dr Massaad or Sheikh Faisal and would not say otherwise.

102.8 Mr Gerrard told Mr Quzmar that if he did not agree to these conditions the alternative would be a trial, which would have *"severe implications"* for Mr Quzmar's family and children. It is to be inferred that by this Mr Gerrard meant that the outcome of any trial in RAK would inevitably result in the imposition of a lengthy sentence on Mr Quzmar, and that Mr Gerrard knew and was able to say this because of his awareness of the control the Committee of Three could exercise over the judicial process in RAK.

103. The meeting ended with Mr Gerrard becoming extremely angry as a result of Mr Quzmar's unwillingness to agree to implicate Dr Massaad and Sheikh Faisal. Mr Gerrard called Mr Quzmar *"arrogant"* and then abruptly left.

104. Despite the threats and pressure to which Mr Quzmar was subjected (heightened by the worsening health conditions from which Mr Quzmar was suffering at the time, including severe chest and back pain and bowel irritation as at the date of that meeting), Mr Quzmar did not submit to Mr Gerrard's pressure and was not willing to confess to crimes he did not believe he committed, nor to falsely implicate Dr Massaad or Sheikh Faisal in circumstances where, as he told Mr Gerrard, he knew nothing of any corruption by them.


**(25)  Worsening of the conditions of Mr Quzmar's detention following the meeting with Mr Gerrard – March 2015**

105. After the meeting with Mr Gerrard on 9 March 2015 in which Mr Quzmar refused to submit to Mr Gerrard's pressure, the conditions of Mr Quzmar's detention significantly worsened. In particular:

105.1 Meals began to be withheld or delayed from Mr Quzmar.

105.2 Mr Quzmar was not permitted access to the toilet except after a significant delay.

105.3 Mr Quzmar's visiting rights began to be increasingly restricted.

105.4 Mr Quzmar was more frequently required to be in handcuffs and shackles.

106. When Mr Quzmar asked the prison guards what the reason was for the increasingly restrictive conditions of his detention, he was told that it was the instructions of "*the English*". Mr Quzmar understood this to be a reference to Mr Gerrard and Dechert, who, in virtue of Mr Gerrard's position as the dominant member in the Committee of



Three with overall responsibility for the purported investigation, was in a position to and did exercise control over these matters.

**(26)  The judicial process in RAK and the conviction of Mr Quzmar**

107.  On 13 April 2015, Mr Quzmar attended a preliminary hearing for criminal proceedings brought against him, Mr Al Sadeq and Dr Massaad. Contrary to Articles 158 and 159 of the Criminal Procedure Law, Mr Quzmar was not given personal notice 10 days in advance of the date or time of the hearing by the RAK authorities. On the morning of the hearing, approximately an hour before it commenced, Mr Quzmar was simply told that he was required to wash and change his clothes and then was taken to the Court.

108.  Mr Quzmar was not represented by a lawyer at the hearing. In protest at this, Mr Quzmar refused to speak unless he was allowed to instruct a lawyer. The Judge expressed surprise at the fact that Mr Quzmar was not legally represented, and adjourned the hearing to enable Mr Quzmar to instruct a lawyer.

109.  The adjourned preliminary hearing took place on 27 April 2015. This was the first time since his abduction on 7 September 2014 that Mr Quzmar had been entitled to be represented by a lawyer.

110.  The criminal proceedings were conducted in an inherently unfair and/or unlawful way. In particular:

110.1 As pleaded above, Mr Quzmar had not been permitted to be represented by a lawyer until after the first hearing had begun. Mr Quzmar was therefore not legally represented at any of the many interrogations he had undergone prior to the commencement of the trial.

110.2 It was only on 11 May 2015, over 8 months after his initial abduction, that Mr Quzmar was allowed to hold a discussion with his lawyer, Mr Muhammad Al Kumati, for the first time, however he was not permitted to do so in private.

110.3 The Judge and Public Prosecutor sought to pressurise Mr Quzmar's lawyer into quitting by not permitting Mr Quzmar and Mr Al Kumati to meet privately so as to prevent Mr Al Kumati from being able to obtain proper instructions.

44

110.4 The composition of the Court underwent several unexplained changes, with the removal of Jordanian and Palestinian judges and replacement with hostile Egyptian judges.

110.5 Mr Quzmar was not permitted to fairly present his case, or to call witnesses in his defence, and both he and his lawyer were interrupted by the Court when trying to make points in his favour or examine witnesses.

110.6 Documents that Mr Quzmar wished to rely on, such as contracts evidencing the legitimate consultancy work he performed, had been taken during the search conducted by Mr Gerrard and were not provided to Mr Quzmar or to his legal team (and have still not been to date).

110.7 The Court was not provided with or inexplicably did not place any reliance on exculpatory evidence, including:

(a)   The letter from the Ruler dated 14 August 2011, which authorised the payment to Mr Quzmar of a salary of 31,000 AED by RAKGAS.

(b)   A minute of interrogation dated 7 January 2016 of Mr Ajay Jagdish Diwan, Accountant and Head of Follow Up Department at RAK Ceramics, which suggested that legal services provided by Mr Quzmar to RAK Ceramics were provided with the approval of the Ruler.

(c)   A minute of interrogation dated 4 January 2016 of Mr Santosh Kumar Komorojo, the Head of Financial Planning and Analysis of RAK Airport, in which Mr Komorojo stated that the reason Karmi Legal Consultants had historically provided legal services to RAK Airport was because it began doing so when there was no facility within the RAK government to provide such services, and the contract for Mr Quzmar's consultancy fees (worth 96,000 AED) was approved by Sheikh Salem bin Sultan Al Qasimi.

(d)   A letter dated 10 January 2016 from Mr Mohamed Sultan Al Qadi, the Managing Director of RAK Petroleum Company JSC, in which he stated that Mr Quzmar should not be required to return the sum of 120,000 AED that he had been paid, as this was lawful remuneration to which Mr Quzmar was entitled as a member of the Founders' Committee of RAK Petroleum.

(e)     A minute of interrogation dated 10 January 2016 of Mr Al Qadi (in his capacity as Managing Director of RAK Investment and Development Office, in which Mr Al Qadi stated that Sheikh Saud had specifically authorised the payment to Mr Quzmar of AED 120,000 in virtue of his role as a member of the founders' Committee.

(f)     A minute of interrogation dated 31 January 2016 of the General Manager of RAK Petroleum, Mr Aria Hussein Bolurfrushan, in which Mr Bolurfrushan stated that the reason Karmi Legal was instructed by RAK Petroleum to provide legal services was because RAK Petroleum's in-house legal department comprised foreign lawyers without knowledge of UAE law.

(g)     A minute of interrogation dated 21 January 2016 of Ms Hanan Ibrahim Mahmoud Al-Hourani, Chief Account Manager at Julphar Pharmaceutical, in which Mr Al-Hourani stated that Mr Quzmar was entitled to provide legal services to Julphar Pharmaceutical, that Mr Quzmar's predecessor as legal advisor to the Ruler/Government, Mr Khaled Al-Safrini, had also done so and Mr Quzmar had taken over that role on Mr Al-Safrini's death.

111.   On 28 October 2015, Mr Quzmar was sentenced to 32 years imprisonment in respect of case no. 433/2015.  This was a manifestly excessive and/or disproportionate sentence even assuming that the charges had any basis, which they did not. Following an appeal by Mr Quzmar in December 2015, Mr Quzmar's sentence was reduced to 11 years in respect of these convictions.

112.   Although Mr Quzmar was acquitted at first instance in relation to some of the charges brought against him concerning consultancy fees received by Karmi Legal:

112.1  Mr Quzmar was convicted on appeal pursuant to new charges, in respect of which he had not been given a proper opportunity to prepare a defence.

112.2  The new charges, in effect, criminalised Mr Quzmar for conduct which was not criminal when it occurred, and the appellate court expressly relied on laws which only entered into force in 2016 (and, in one case, purportedly in 2013), in relation to conduct that occurred during the period 2005-2012. In that respect:

(a)     The two charges upon which Mr Quzmar was convicted on appeal related to conduct that occurred in the periods 2005-2012 (in respect of the first charge) and 2008-2009 (in respect of the second charge).

(b)  Prior to the new Article 225 bis of the Federal Penal Code (Law 3 of 1987), which only entered into force in 2016 – possibly as a result of Mr Quzmar's case - it had not been a criminal offence in RAK for public officials to earn fees from private consultancy work.

(c)  Although during the period 2005-2012, Article 225 and Article 227 of the Penal Code criminalised certain conduct (but not the earning of private consultancy fees by public officials *per se*), those crimes were limited in Federal Law to (i) the state authorities identified in Article 5 of the Penal Code (which did not include state owned entities), and in RAK to (ii) "public officers" (as defined in the Civil Service Law 2003, which did not include judges). During that period, such conduct was regulated by the Civil Service Law 2003, which did not impose any criminal sanctions, and did not apply to judges.

(d)  It was therefore not criminal or even unlawful for Mr Quzmar to earn private consultancy fees from state-owned entities during the period 2005-2012. Nonetheless, in convicting Mr Quzmar, the appellate court relied on several laws that were not in force when the relevant conduct occurred, namely (i) an amended Article 227, introduced in 2016, (ii) the new Human Resources Law, purportedly passed in 2013 (to replace the Civil Service Law 2003), which expanded the definition of "Government entity" to encompass any entity affiliated to the Government of RAK, and broadened the definition of public official, and (iii) the Government Lawsuits Law of 2012.  There was no legitimate basis for these laws to be applied, as the RAK Court did, to the conduct during the period 2005-2012 upon which Mr Quzmar was convicted, and to the allegations in respect of RAK Airport, which was not an entity even within the expanded definition of "government entity" purportedly introduced in 2013.

(e)  The appellate court impermissibly sought to circumvent the evident retroactivity of the criminal charges upon which Mr Quzmar was convicted on appeal, by dismissing the amendments purportedly introduced by the Human Resources Law in 2013 as merely "procedural", notwithstanding that those amendments, according to the RAK Court, rendered criminal conduct which otherwise would not be.

113. In the premises, a further facet of the unlawful campaign against Mr Quzmar was his conviction in a prosecutor's appeal in respect of conduct which was not criminal under UAE law when it took place, contrary to the principle against retroactive criminal penalties enshrined in the UAE constitution and international human rights law, as pleaded further below.

**(27)  Visit by Dr Alan Mitchell to Al Barirat – 29 October 2015**

114. On 29 October 2015, Dr Alan Mitchell, a Scottish human rights expert, visited Al Barirat. Dr Mitchell had been engaged by Dechert to produce a report stating that the conditions in the Al Barirat Camp were adequate and did not breach the detainees' human rights.

115. In advance of Dr Mitchell's visits, the conditions of Mr Quzmar's detention were artificially improved, for example, through sudden and unprecedented cleaning, the placement of books on shelves to give the impression that the detainees had access to reading materials, and the installation of tables. This was intended to give a false appearance that detainees were not being mistreated and that the conditions were compliant with human rights obligations and consistent with the standard of RAK prisons generally. However, after discussions with Mr Quzmar and Mr Al Sadeq, Dr Mitchell declined to write the report on the basis that the conditions were not adequate. Further:

115.1 Dr Mitchell expressed particular concerns about Mr Quzmar's health which, as pleaded further below, had by this stage deteriorated considerably.

115.2 Dr Mitchell asked the prison guards for Mr Quzmar's medical file so that he could review it. Dr Mitchell asked the guards what the Arabic word "*iftaq"* meant and he was told that it meant "cold", although it actually meant "hernia".

115.3 Dr Mitchell was suspicious because he had seen the word "surgery" written next to it, and asked to meet with Mr Quzmar to speak with him. After his meeting with Mr Quzmar, Dr Mitchell concluded that he was in poor health, including that he was suffering from a hernia, as pleaded further below.

115.4 Dr Mitchell asked Mr Quzmar where his telephone, television and library were. When Mr Quzmar responded that he was not permitted access to a telephone, television, radio, newspapers or books, Dr Mitchell was surprised, as he had been

given the impression that Mr Quzmar had access to these facilities and told Mr Quzmar he had seen a library to which he had (falsely) been told Mr Quzmar had access.

115.5 Dr Mitchell asked a prison guard whether he could remove the curtain covering Mr Quzmar's window. Dr Mitchell was then surprised to discover that behind the curtain the window was covered with a piece of wood, such that Mr Quzmar did not have access to daylight and was unable to tell what time of day it was.

115.6 Dr Mitchell asked Mr Quzmar for how many hours per day he was permitted to exercise and go outside. When Mr Quzmar informed Dr Mitchell of the limited extent of permissible exercise (at most, a few times per week), Dr Mitchell stated that he could not write a positive report, and the conditions in Al Barirat were not even compliant with the RAK Ministry of Interior's own regulations concerning prisons.

116. On 23 November 2015, Mr Quzmar wrote a letter to the Head of the Al Barirat Camp. In that letter, Mr Quzmar drew attention to Dr Mitchell's visit and his shock at the conditions in the prison, which Mr Quzmar summarised as follows (*inter alia*):

> "*As you know, I have been arrested and imprisoned in this local prison for a year and three months in complete isolation from all creatures in a manner that violates the divine laws, local laws and international conventions of human rights.*
>
> *Visits are prohibited, newspapers are forbidden, television, telephones,, and contacting my mother, wife and my scattered children in the far corners of the earth are strictly prohibited. Exercising is once every two days for less than an hour, with the removal of Friday from the days of the week, and that was only after the illnesses and pains I suffered from and after many conversations and appeals. I only leave the cell or the solitary room cuffed to got to the toilet, or to go to the court with a thick black blindfold, and this goes against the established laws and systems.*
>
> *Denying me these basic rights and putting me in solitary confinement since arresting me is not only a blatant breach of the divine laws and the international conventions which the state has adopted regarding human rights, but also a flagrant violation of the UAE's law regarding prisons, which requires observing these basic rights and services for all prisoners, including murderers and drug traffickers who pose the greatest danger to society.*
>
> *There is no legislation that permits isolating me from all creatures in a dark and indefinite manner, and that prohibits visits from and contracting my family and parents, or prevents reading daily newspapers, watching television, playing sports, and performing congregational prayers. On the contrary, the*

*state's law regarding prisons mandates facilitating these services and allow prisoners to exercise these basic rights, and in fact this is what all inmates have access to in authorized legal prisons.*

**(28)   Negotiations with Mr James Buchanan – December 2015-2016**

117.   During late 2015 and early 2016, Mr Quzmar's family engaged in negotiations with Mr James Buchanan ("**Mr Buchanan**"), the CEO of Ras Al Khaimah Development LLC, an adviser to the Ruler, a spokesman for the RAK Government, and a close associate, family friend and neighbour in Sussex, of Mr Gerrard, who had introduced him to that role.

118.   During a telephone call that took place in the first week of December 2015, attended by Mrs Quzmar's brother in law, Sam Ali Yateem, Mr Buchanan sought to persuade Mr Quzmar's family to get him to cooperate in the purported investigation. Mr Buchanan referred to "*another individual*" who had "*turned State's witness*", and as a consequence had seen his conditions of detention improve. This was a reference to Mr Al Sadeq, who by that time had been persuaded to sign false confession statements based on the promise of release and pardon. Mr Buchanan stated that as a result of that other individual's cooperation "*we have created a more comfortable environment out of the prison environment*". It is to be inferred from this that the inhuman and degrading conditions in which Mr Quzmar was detained were intended to coerce him into providing evidence against Dr Massaad, and were orchestrated by Mr Gerrard in his capacity as the driving force in the Committee of Three.

119.   Mr Buchanan further stated that any settlement would likely require Mr Quzmar, in addition to making a full admission of wrongdoing, to "*pay for all our expenses incurred to date*", which was a reference to (*inter alia*) the legal fees incurred by RAK through the instruction of Mr Gerrard and Dechert.

120.   On 17 January 2016, Mr Buchanan emailed Mr Ali Yateem to say that he had met with Mr Quzmar to discuss settlement. In that email, Mr Buchanan explained (*inter alia*), that Mr Quzmar wished to settle, but was unwilling to falsely implicate others or admit to wrongdoing that he did not believe he had committed:

> "*He reaffirmed the offer we discussed (I think – not sure about fees) other than the admission of guilt. When I asked him questions he was at best unhelpful – he said – ask me specific questions and I will try to answer you – but I won't*

*tell lies about people. When I did he, he came across as evasive and unhelpful/ untruthful. Frankly, I am not sure I have anywhere to go with this/.... Let me know how you wish to proceed – I believe he is certain of his innocence and won't either accept or acknowledge the position in which he finds himself. In my personal view his perception of right and wrong is blurred.*"

**(29)   Allegation of attempted suicide – December 2015**

121.   In December 2015, Mr Quzmar was falsely accused of attempting suicide, however this was not pursued after the manager of Al Barirat stated to the public prosecutor that he had not seen any evidence to support this.

122.   The false allegation of attempted suicide – a serious matter for a devout Muslim - was part of the campaign to harm Mr Quzmar and was intended to further threaten, denigrate and humiliate him, and if necessary to provide a basis for additional criminal charges so as to justify and extend his continued mistreatment. As Mr Quzmar stated in a letter to his wife dated 27 May 2015:

> "*...I was very disappointed to see no visitors and I felt disappointed and sad after realizing I was up to investigation by the new Egyptian prosecutor Ahmad [illegible] for an accusation of attempting suicide which is refused by our religion and every divine law for it is a sign of unbelief and Allah forbid that I would die an Unbeliever. I Asked the prosecutor how he would accuse me of such a horrible thing, since I am a Muslim believer that is committed to religious solemnization and I preserve in worships, so how would I attempt suicide.....*"

**(30)   Transfer to RAK Central Prison – 17 December 2015**

123.   On 17 December 2015, after 466 days of detention in solitary confinement, Mr Quzmar was transferred away from Al Barirat to RAK Central Prison, where he continues to be incarcerated. The conditions of Mr Quzmar's detention in RAK Central Prison were a significant improvement in that he lived in a small apartment with two rooms and a bathroom and access to a television. However, Mr Quzmar continued to be isolated from other prisoners.

**(31)   The deterioration in Mr Quzmar's health as a result of the conditions of his detention**

124.   The conditions of Mr Quzmar's detention resulted in his suffering significant health conditions, which were exacerbated by the denial of timely and proper medical

treatment. At present, Mr Quzmar has undergone two instances of surgery, and has been hospitalised at least 12 times during his incarceration.

125. By 15 September 2014, Mr Quzmar had commenced a hunger strike due to the lack of clean clothing and unsanitary conditions in which he was detained at GHQ, which hunger strike lasted for around four days.

126. By 19 October 2014, Mr Quzmar's feet had begun to flatten and crack as a result of the humidity and coldness of his cell, and the lack of exercise. Mr Quzmar also began to suffer from chest pains.

127. On 3 November 2014, Mr Quzmar was offered to attend an appointment with a doctor away from Al Barirat, on condition that Mr Quzmar was blindfolded and handcuffed, and that he was examined under a false name so as to conceal his identity. Mr Quzmar refused to visit a doctor under these conditions, and instead a doctor examined him at Al Barirat. The doctor performed a clinical examination, and reported that Mr Quzmar had a problem that might be in the kidneys, ureter and urinary tracts. The doctor took a sample and prescribed a medicine and a painkiller.

128. On 27 November 2014, while attending a meeting at the Court building in which he had been forced to wear a blindfold, Mr Quzmar accidentally injured himself by hitting his head against a glass door, causing damage to Mr Quzmar's face and front teeth (one of which subsequently had to be replaced as a result).

129. By early January 2015, Mr Quzmar had experienced over 120 days without proper physical movement, and as a result he began to suffer severe pain in his joints when sitting or standing, and pain in his knees. As a consequence of this, on 15 January 2015, Mr Quzmar wrote to the prison director asking him to relieve the restrictions, noting also that in addition to joint pain that was preventing him from praying properly, Mr Quzmar was suffering from high cholesterol.

130. On 20 January 2015, Mr Quzmar wrote a note about his health. That note recorded that he had begun to suffer from chronic constipation, as a result of lack of movement:

"*My health is declining if not deteriorating due to my miserable imprisonment conditions….How would a healthy person live as if he is lame, and how would he proceed with his life while they force him to live as if paralyzed. I am not able of passing more than one stool a week. I developed a chronic constipation due to lack of movement and long hours of sitting. These are fascist methods. Even the toughest criminals in the central prison such as the perpetrators of murders and the drug dealers, which are often punishable by death, can got out to the prison*

*yard and walk. I am being denied from that and for an open-ended period. If this is not tyrannical, then what is tyranny and authoritarianism?"*

131. At about the same time, Mr Quzmar began to suffer from severe pain in his back and chest, which he understood to result from irritable bowel syndrome caused by the conditions of his detention.

132. On 25 January 2015, Mr Quzmar was seen again by a doctor. He was prescribed some painkillers, however he was not permitted to attend hospital for more detailed tests.

133. On 1 February 2015, Mr Quzmar wrote to the Ruler, summarising his health problems, as pleaded at paragraph 96.1 above.

134. The following day (on 2 February 2015), Mr Quzmar was permitted to exercise for the first time since his incarceration, a period of some 148 days without exercise. Although this was an improvement in his conditions, in reality any improvement was minimal and the conditions of his detention remained wholly inadequate, as Mr Quzmar was only permitted to exercise three times per week.

135. On 13 February 2015, Mr Quzmar developed a cold/flu, which persisted throughout the remainder of February. Although by this stage Mr Quzmar had also begun to suffer abdominal pain from a hernia, he was not permitted to leave Al Barirat for necessary medical treatment.

136. By March 2015, Mr Quzmar had begun to take the anti-depressant, Prozac, to seek to relieve the anxiety he was suffering as a result of the conditions of his detention.

137. On 23 March 2015, Mrs Quzmar wrote to the Ruler, drawing attention to Mr Quzmar's worsening health conditions, and seeking permission for him to be treated:

> *"I am deeply saddened by the health condition of [Mr Quzmar], and what he suffers from tooth ache, ulceration of his mouth and gums, and pain in right lower abdomen with some inflammation. For this reason, I am addressing your Highness from a purely humanitarian standpoint, and without reminding you of the friendship that I am tired of restating, to ask for Abu Muhammad to be seen by specialist doctors to do whatever is necessary for him. I am more than willing to pay all costs. With all due respect and thanks."*

138. A medical report on 29 March 2015 recommended that Mr Quzmar be seen by a specialist surgeon about his hernia, however this did not occur until late June 2015, as pleaded further below.

139. By April 2015, Mr Quzmar's health had become particularly bad:

139.1 Mr Quzmar's hernia pain had increased significantly. Despite the earlier recommendation that he be seen by a surgeon, Mr Quzmar was not informed when and if he might be given permission to be examined in a hospital.

139.2 Mr Quzmar began to spit blood in the night.

139.3 In addition to hernia pain, Mr Quzmar was suffering from chronic rheumatism.

139.4 On 19 April 2015, Mr Quzmar was again examined by a doctor who recommended that he be admitted to hospital for treatment of his hernia.

140. On 22 April 2015, Mrs Quzmar wrote to the Ruler, drawing attention to Mr Quzmar's hernia, and the need for him to have emergency surgery:

> *"I hope that you are well, as I told you before, [Mr Quzmar] suffers from arthritis, as well as swelling and pain in his abdomen. And as he told me on the day of the trial, that the doctor diagnosed his abdominal pain to be due to a hernia in the abdominal wall (the intestine comes out of place), and after inquiring, we were informed he has an inguinal hernia that needs emergency surgery otherwise there is a risk of gangrene of the bowels, or blood poisoning. Therefore, I went with several petitions to the prosecution to sponsor Abu Muhammad to follow up on his health issues, but no response was received. I hope that you will be generous and look at Abu Muhammad's health conditions with compassion. God protect you."*

141. On 25 April 2015, Mr Quzmar wrote to the director of the prison about his poor health, stating (*inter alia*):

> *"As you remember, on Wednesday 25/03/2015, I asked for a doctor due to pain and swelling in my lower abdomen on the right side, and the doctor came on Sunday 29/03/2015. After the examination, he diagnosed the disease as a hernia in the abdominal wall and needed a surgeon to decide on the necessary surgery. The doctor also indicated that I suffer from an abscess in the gum of the upper jaw and it needs a dentist and an oral and dental surgeon. Then, aches and pains arose at me from the hernia, so the doctor came again on 19/04/2015. He reaffirmed that he could do nothing about the hernia and that the condition needed a surgeon, he also could not do anything about the abscess in the gum of the upper jaw of the mouth and needed a dentist, and in his report suggested that I should be referred to a surgeon. Here I am suffering for a month and more without obtaining the necessary medical care recommended by the General Practitioner.*
>
> *Yesterday, the frequency of pain increased significantly and, I informed the prison official on duty, knowing that I had previously asked more than once the Public Prosecutor to allow the completion of the necessary medical and*

*laboratory examinations in the hospital without getting any response from him so far.*

*There is no doubt that every day that the treatment is delayed will contribute negatively and have unforeseen effects on my health.*

*Thus, does healthcare and saving a person's life need all this time of thinking and hesitation? This is a fundamental right guaranteed by the state constitution and its effective laws as well as by international covenants on human rights and above all previously guaranteed by divine laws."*

142. On 28 April 2015, Mr Quzmar again wrote to the prison director to request copies of the medical reports about his hernia, and a copy of the doctor's recommendation for him to be referred to a surgeon. These documents were never provided to Mr Quzmar.

143. On 17 May 2015, Mr Quzmar was examined by a doctor, who advised that Mr Quzmar needed surgery for his hernia, and to see a dentist for treatment of an oral abscess. At the time, Mr Quzmar was attending Court for ongoing proceedings in the criminal trial, and the Judge did not permit him to attend hospital. However, on 19 May 2015, the public prosecutor gave an order for Mr Quzmar to be taken to hospital to see a doctor, but only on condition that Mr Quzmar had his feet shackled and his head covered, which condition Mr Quzmar did not accept.

144. By 29 May 2015, Mr Quzmar's constipation had worsened, and was now accompanied by severe pain, nausea and faintness while trying to pass stools, and bleeding from the anus. Mr Quzmar was seen by a doctor two days later, on 31 May 2015, who confirmed a diagnosis of severe constipation and prescribed some medicine.

145. Notwithstanding that a doctor had recommended that Mr Quzmar be seen by a specialist surgeon to treat his hernia in March 2015, it was not until 23 June 2015 that Mr Quzmar was finally examined by a surgeon (and not until December 2015, as pleaded further below, that Mr Quzmar had the surgery that the surgeon advised should be undertaken urgently). The surgeon confirmed the diagnosis of a hernia and recommended surgery. Further, the surgeon stated that the proposed surgery was a preventative procedure that if performed quickly could prevent the condition from worsening, however if left longer would increase the likelihood of more serious problems developing.

146. On 16 August 2015, Mr Quzmar was examined by a doctor again, who diagnosed irritable bowel syndrome and recommended a blood test. Although Mr Quzmar was

subsequently prescribed some medicine, it was delivered by the prison staff without the information leaflet and packaging such that Mr Quzmar was not aware of what medicine he was being given and what the recommended dose was. Mr Quzmar was then given a different medicine the following day, again, without being given the ability to verify the identity of the medicine and the dosage.

147. In October 2015, Mr Quzmar developed extreme colon irritation and was examined by Dr Abdulaziz Abdulbasit, who recommended daily exercise.

148. On 27 December 2015, without any prior warning or indication of where he was being taken, Mr Quzmar was placed in shackles and handcuffs, and transported to a hospital for his hernia to be operated on. This was the surgery that in June 2015 the surgeon had recommended should be performed as soon as possible, to prevent the condition from worsening. Although Mrs Quzmar was permitted to be in the hospital, she was only allowed to speak to Mr Quzmar for 10 minutes, and Mr Quzmar was accompanied by two soldiers at all times, save for when in the operating theatre.

149. On 10 November 2019, Mr Quzmar was again admitted to hospital for surgery on an abscess that had developed on his lower back. While in hospital, Mr Quzmar contracted MRSA following his surgery, and had to be treated with antibiotics for two weeks.

150. Since 10 November 2019, Mr Quzmar has been hospitalised on at least 10 further occasions for various conditions caused by the conditions of his detention. In addition to the above matters, the health problems Mr Quzmar has experienced following his abduction and detention include:

150.1 Hand flaccidity and weakness resulting in an inability to carry even very lightweight objects.

150.2 A tear in his leg muscle resulting in blood clots in his legs. Mr Quzmar attended hospital on at least three occasions as a result of this.

150.3 Severe aches and pains throughout his body.

150.4 Dental problems, including painful abscesses in his upper lip and problems with his teeth.

150.5 Enlarged prostate which requires permanent medications.

150.6 Abscesses in his nose.



**(32)    Attempts to hamper legal proceedings concerning the purported investigation**

151.   At paragraph 215 of his Particulars of Claim in the Al Sadeq Proceedings, Mr Al Sadeq
pleads instances in which, since those proceedings were issued, there was been
deliberate interference with Mr Al Sadeq's ability to provide instructions to his legal
team for the purposes of those proceedings. Those matters include the confiscation of
Mr Al Sadeq's papers and placement of Mr Al Sadeq in solitary confinement
immediately after the Claim Form in the Al Sadeq Proceedings was issued, and the
revocation of Mr Al Sadeq's telephone rights immediately after a call with his UK legal
team. Further, Mr Al Sadeq has recently, without any reason or explanation, been
relocated to a different part of the prison, where he is now imprisoned alongside violent
offenders. It is to be inferred that this sudden change in Mr Al Sadeq's treatment is a
further attempt to pressurise and intimidate him into no longer pursuing these
proceedings.

152.   In the premises, if Mr Quzmar becomes subject to similar changes in the conditions of
his detention after the service of these Particulars of Claim, Mr Quzmar will invite the
Court to infer that such treatment has been taken in order to impede the preparation of
this claim, with the knowledge and/or at the request of the Defendants.

**D.    CAUSES OF ACTION UNDER UAE LAW**

153.   Section 282 of the Federal Civil Transactions Law No. (5) of 1985 (as amended) (the
"**Civil Code**") ("**Section 282**") provides that: "*Any harm done to another shall render
the doer thereof, even though not a person of full capacity, liable to make good the
damage.*"

**(1)    Breaches of Article 282**

154.   Under Article 282 the Defendants and each of them owed a duty to Mr Quzmar not to
cause him harm; and if they did cause him harm to make good any damage caused
thereby.

155.   In the premises pleaded herein, the Defendants and each of them have caused harm to
Mr Quzmar.

156. The harm done to Mr Quzmar as pleaded herein, which arises from the conduct and / or unlawful and / or criminal acts of the Defendants and each of them, includes (*inter alia*):

156.1 Abduction from his home in RAK;

156.2 The removal of personal items belonging to Mr Quzmar and his family from their home in RAK;

156.3 Detention in degrading and inhumane conditions in solitary confinement in GHQ and in Al Barirat;

156.4 Detention in conditions causing severe detriment to Mr Quzmar's health;

156.5 Seeking to blackmail and/or pressurise Mr Quzmar into making false confessions in order to assist the Ruler in his political campaign against Dr Massaad and Sheikh Faisal;

156.6 Assisting in, or acquiescing in, the wrongful conviction of Mr Quzmar as part of a political trial without any proper procedural safeguards or fairness.

156.7 Deprivation of contact with his family.

156.8 Appropriation of assets and/or interference with Mr Quzmar and his family's ability to conduct their business interests or otherwise deal with their finances.

157. In the premises pleaded above, all of the harm suffered by Mr Quzmar was the direct result of the purported investigation led by Mr Gerrard and Dechert, the sole object of which was to place improper pressure on perceived political opponents of the Ruler. As a consequence Mr Gerrard and Dechert (and in particular in virtue of Mr Gerrard's role as the dominant force within the Committee of Three) have committed and / or orchestrated and / or led and / or acquiesced in all of the wrongdoing generally and / or the criminal acts under the Penal Code committed against Mr Quzmar which are pleaded herein.

158. The Defendants and each of them are liable to make good the harm caused to Mr Quzmar as a result of the wrongs committed against him as pleaded herein.

**(2)   Abuse of right**

159. Article 106 of the Civil Code, provides as follows:

> *"(1) A person shall be held liable for an unlawful exercise of his rights.*

58

*(2) The exercise of a right shall be unlawful :*
    *(a) if there is an intentional trespass [infringement of another's right]*
    *(b) if the interests which such exercise of right is designed to bring about are contrary to the rules of the Islamic Shari'a, the law, public order or morals;*
    *(c) if the interests desired are disproportionate to the herm that will be suffered by others; or*
    *(d) if it exceeds the bounds of custom and practice"* .

160.   In all the premises pleaded herein, the Defendants and each of them have used the rights accorded to them by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler in respect of the purported investigation concerning Dr Massaad unlawfully within the meaning of Article 106 in order to commit the harms complained of by Mr Quzmar herein.

161.   As a result of the aforesaid unlawful use of rights Mr Quzmar has suffered loss and damage for which the Defendants and each of them are required to compensate Mr Quzmar pursuant to Article 106(1) of the Civil Code.

162.   The provisions of international human rights law, UAE law and the UAE constitution and the breaches thereof pleaded at paragraphs 163-202 below are material to the consideration of the liability of the Defendants and each of them pursuant to Articles 282 and 106 of the Civil Code. Those acts by their very nature constitute harm and/or an abuse of right for the purposes of Mr Quzmar's claims under Articles 282 and 106 of the Civil Code.

**(3)   Relevant breaches of the UAE Constitution and UAE law**

163.   In all the circumstances set out above, the treatment of Mr Quzmar and the manner in which he was kidnapped, detained, threatened, mistreated and blackmailed as a consequence of that treatment since September 2014 is in breach of the law applicable in the UAE and the Defendants themselves have committed crimes and unlawful acts under the laws of the UAE.

**(4)   The UAE's international human rights obligations**

164.   The UAE has ratified the Convention against Torture and Other Cruel Inhuman or Degrading Treatment or Punishment (the "**Convention against Torture**") and the Arab

Charter on Human Rights (the "**Arab HR Charter**"), the latter of which prohibits arbitrary detention as well as inhuman and degrading treatment.

165. As a matter of customary international law, the 1948 Universal Declaration of Human Rights (the "**UDHR**") is binding on the UAE and provides additional rights and protections to persons in the UAE which are enforceable as a matter of international law. These include the right not to be subjected to inhuman treatment, arbitrary detention, and the right to have a fair trial (which includes the right not to be forced into a confession).

166. In all of the circumstances pleaded herein the treatment of Mr Quzmar since his kidnap on 7 September 2014 has amounted *inter alia* to illegal abduction, arbitrary detention, subjection to torture and inhuman treatment, and denial of the right to a fair trial contrary to international law. Further, all these denials of his fundamental rights are contrary to his rights and / or the UAE's obligations under the Convention against Torture, the Arab HR Charter and the UDHR, each of which forms part of domestic UAE law.

167. Insofar as the Defendants have acted as agents of the RAK state, they have participated in the UAE's denial of Mr Quzmar's fundamental rights under the aforesaid conventions.

**(5)   Breaches of the UAE Constitution**

168. The UAE Constitution of 1971 (as amended)  (the "**Constitution**") prohibits torture and degrading treatment of detainees and protects a person's rights to legal due process when accused of a crime.  As pleaded at paragraphs 169-176 below, Mr Quzmar's rights under Articles 26, 28 and 40 of the Constitution have been violated by the treatment of him by RAK since 6 September 2014 which treatment has been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

169. Article 26 of the Constitution provides that "*Personal liberty is guaranteed to all citizens. A person may not be arrested, searched, detained or imprisoned except in accordance with the provisions of the law. A person may not be subjected to torture or to degrading treatment.*"

170. In the circumstances pleaded herein, Mr Quzmar's rights under Article 26 have been violated: he has been deprived of his liberty unlawfully; he has been detained and imprisoned outside the RAK criminal justice system at the whim of the Defendants and the Ruler; and he has been subjected to torture and degrading treatment including (without prejudice to all of the relevant matters pleaded herein):

170.1 Kidnap from his home in RAK, without arrest as pleaded at paragraphs 47-52 above;

170.2 Detention without charge (or without lawful revocation of his judicial immunity), as pleaded at paragraphs 41 to 71 above;

170.3 Detention in solitary confinement in inhumane and degrading conditions under an assumed name, as pleaded at paragraphs 53-54 to 82-84  above;

170.4 Threats and pressure applied against him and his family to force him to "cooperate" and to give false evidence as pleaded at paragraphs 67, 86 and 102-104 above.

170.5 Appropriation of property belonging to him and his family, as pleaded at paragraphs 59-64 above, and paragraph 230 below.

170.6 Deprivation of timely access to medical treatment, in circumstances where the conditions of his detention caused significant detriment to his health, as pleaded at paragraphs 124-150 above.

171. Article 27 of the Constitution provides that:

> "*Crimes and punishments shall be determined by the law. No penalty shall be imposed for any act or omission committed prior to promulgation of the relevant law.*"

172. To the extent that Mr Quzmar was convicted by the appellate court in respect of activities that were not subject of criminal penalties at the dates they took place, and prior to the addition of Article 225 bis of the UAE Federal Criminal Code (Law 3 of 1987) in 2016 and/or the promulgation of the new Human Resources Law, purportedly introduced in 2013, his conviction was wrongful and infringed the principle enshrined in Article 27.

173. Article 28 of the Constitution provides that:

"*Penalty is personal. An accused is presumed innocent until proved guilty in a legal and fair trial. An accused person has the right to appoint as his/her attorney at law anyone who is capable to defend him/her in trial.  The law specifies the cases where a counsel for defense must represent an accused person. An accused person may not be physically or morally harmed.*"

174.  In the circumstances pleaded herein, Article 28 of the Constitution has been violated in that, as pleaded at paragraphs 43 to 152 above, at all material times Mr Quzmar:

   174.1 was presumed guilty;

   174.2 was not permitted a legal or fair trial in respect of the charges against him;

   174.3 was deprived of the right, in any substantive sense, to appoint a lawyer capable of defending him at trial;

   174.4 was caused physical harm as a result of the circumstances of his detention at GHQ and in Al Barirat necessitating hospital treatment;

   174.5 has suffered moral harm from the conditions of his detention.

175.  Pursuant to Article 40 of the Constitution "*Foreigners in the UAE enjoy the rights and freedoms stipulated in the applicable international instruments or in the treaties and conventions to which the UAE is a party, and have to perform the duties which correspond to those rights and freedoms.*"

176.  In the circumstances pleaded herein Article 40 of the Constitution has been breached in that Mr Quzmar has not been permitted to enjoy the rights and freedoms stipulated in the Convention against Torture, the Arab HR Charter and the UDHR.

*Breaches of the UAE Criminal Procedure Law*

177.  The UAE Criminal Procedural Law 1992 (as amended) sets out the procedures which must be applied in relation to persons accused of committing criminal acts in the UAE. Mr Quzmar's treatment by RAK since 6 September 2014 as pleaded herein amounts to multiple breaches of the Criminal Procedure Law, which breaches have been orchestrated and / or led by and / or acquiesced in by the Defendants and each of them.

178.  Article 2 of the Criminal Procedure Law provides as follows:

   "*No criminal sanction may be adjudicated against any person unless he is proved guilty according to this Law.*

*No person may, as well, be arrested, searched, detained or imprisoned except in the cases and under the conditions provided for in this Law. Detention and imprisonment may not occur except in the places specially reserved for such and for the period specified in the order issued by the competent authority.*

*It is forbidden to cause bodily or moral harm to the accused or subject any person to torture or degrading treatment.*"

179.    In breach of Article 2 of the Criminal Procedure Law Mr Quzmar:

179.1   was detained and imprisoned other than under the conditions provided for in the Criminal Procedure Law in the respects pleaded at paragraphs 180 to 202 below.

179.2   was detained and imprisoned at Al Barirat, Al Barirat not being a place specially reserved for detention or imprisonment in RAK but rather being a camp for the Ruler's personal militia; and his detention and imprisonment were not the subject of any (or any proper) order issued by any competent authority given that (at least) he was held under an assumed name and not his real name.

179.3   has been caused bodily and / or moral harm and / or has been subjected to torture and / or degrading and inhumane treatment.

180.    Article 47 of the Criminal Procedure Law provides as follows:

"*The judicial police officer must hear the deposition of the accused immediately upon his arrest, apprehension and arraignment and if he does not submit proof of his innocence, he shall be sent, within forty-eight hours to the competent public prosecution.*

*The public prosecution shall interrogate the accused within twenty-four hours then it shall order either his arrest or his release.*"

181.    Contrary to Article 47 of the Criminal Procedure Law:

181.1   No judicial police officer heard Mr Quzmar's deposition immediately upon his abduction and kidnap from his home in RAK on 6/7 September 2014 (Mr Quzmar not having been arrested or arraigned); and he was not sent within 48 hours to the competent public prosecution.

181.2   Mr Quzmar was not interrogated by the public prosecution within 24 hours of being abducted from his home in RAK as pleaded at paragraph 70 above.

181.3 It was only in fact on 12 September 2014, some five days after his abduction, that Mr Quzmar was interrogated by the public prosecution, and only then without the benefit legal representation (but with the company of two lawyers from Dechert, acting on behalf of the Ruler), and in circumstances in which no charges were brought against him until around mid-2015.

182. Article 55 of the Criminal Procedure Law provides as follows:

*'The dwelling of the accused may not be inspected except for the search of the things related to the crime, for which evidence is collected, or constitute the object of investigation. Nevertheless, if during the inspection, some objects are incidentally discovered which possession constitutes per se a crime or which may lead to revealing the truth in another crime, the judicial police officer shall proceed with their seizure."*

183. In breach of Article 55 of the Criminal Procedure Law, as pleaded at paragraphs 55-59 above the searches conducted at Mr Quzmar's home and office in September 2014, in respect of which Mr Gerrard was in charge, were indiscriminate, conducted in Mr Quzmar's absence, intended to frighten and intimidate Mr Quzmar's family, and led to the removal of property which could not possibly have been relevant to any crime by Mr Quzmar, even were there any *bona fide* suspicions or accusations against him.

184. Article 65 of the Criminal Procedure Law provides as follows:

*"The public prosecution shall by itself proceed with the investigation in felonies and in misdemeanours, where deemed necessary."*

185. In breach of Article 65 of the Criminal Procedure Law, at all material times the Defendants (and Mr Barrington, Mr Andersen and Ms Black), at the behest of the Ruler, were permitted to and did pursue the investigation in the stead of the public prosecution.

186. Article 68 of the Criminal Procedure Law provides as follows:

*"The member of the public prosecution may assign to one of the judicial police officers one or more task of the investigation, except the interrogation of the accused. He may also, if required to take any of the measures outside his jurisdiction, to delegate for its performance a member of the public prosecution or a judicial police officer within this area of performance and, in all cases, the delegated person shall,*

*for the investigation, all powers that the principal may have in order to carry out, in his jurisdiction, the investigation.*"

187.  In breach of Article 68 of the Criminal Procedure Law, Mr Gerrard, Ms Black, Mr Barrington and Mr Anderson acting in their capacities as employees of Dechert, carried out interrogations of Mr Quzmar despite neither of them being a member of the public prosecution or judicial police officers (albeit that as pleaded at paragraphs 206-209 below they were Public Servants within the meaning of Article 5 of the Penal Code).

188.  Article 72 of the Criminal Procedure Law provides as follows:

"*The member of the public prosecution shall search the dwelling of the accused upon a charge imputed to him of perpetrating a crime or by acting as an accomplice in it. He may, in this respect search any place and seize any papers, arms and all what may likely be used in the perpetration of the crime or resulting therefrom, as well as anything that may help in revealing the truth.*"

189.  In breach of Article 72 of the Criminal Procedure Law, as pleaded at paragraphs 55-59 above, Mr Gerrard was permitted to direct the search of Mr Quzmar's home, and exceeding the power provided in the Article, seized property which was not likely to have been used in the perpetration of any crime by Mr Quzmar, and which did not result therefrom.

190.  Article 80 of the Criminal Procedure Law provides as follows:

"*Objects seized in the course of the investigation, even before the judgment, may be restituted unless they are necessary for the action process or under confiscation.*"

191.  In breach of Article 80 of the Criminal Procedure Law, as pleaded at paragraph 59 above, none of the items seized from Mr Quzmar's home have ever been returned or even itemised to Mr Quzmar or his family.

192.  Article 100 of the Criminal Procedure Law provides as follows:

"*The attorney for the accused must be enabled to attend the investigation with him and take knowledge of the investigation papers, unless otherwise decided by the member of the public prosecution in the interest of the investigation.*"

193.  In breach of Article 100 of the Criminal Procedure Law Mr Quzmar's lawyers have, at the instigation and / or with the involvement of the Defendants, continuously and consistently been denied the right to attend the investigation carried out against him and

have been denied access to or knowledge of the relevant investigation papers, without any proper justification.

194.   Article 104 of the Criminal Procedure Law provides as follows:

> "*The public prosecution member must immediately interrogate the arrested person or, if this be impossible, he should be put in one of the specialized places of detention until his interrogation. The period of detention must not exceed twenty-four hours after which the administrator of this place has to send the detained person to the public prosecution which must instantly interrogate him, otherwise order his release.*"

195.   In breach of Article 104 of the Criminal Procedure Law Mr Quzmar was detained for more than 24 hours in the GHQ without interrogation by the public prosecution; and he was then detained at Al Barirat outside the criminal justice system entirely.

196.   Article 106 of the Criminal Procedure Law provides as follows:

> "*With due observance of the provisions provided in the Law on Juvenile Delinquents and Homeless Persons, the public prosecution member may, after interrogating the accused, order his provisional detention if there is enough evidence and if the act constitutes a felony or a misdemeanour sanctioned by other than the fine penalty.*"

197.   Mr Quzmar's transfer to and detention in Al Barirat was not pursuant to Article 106 because he was dealt without outside the criminal justice system, Al Barirat not being an official detention centre, but a camp controlled by the Ruler's private militia.

198.   Article 107 of the Criminal Procedure Law provides as follows:

> "*In addition to the information stated in clause 2 of Article (101), the order of detention must include an instruction to the person in charge of the administration of the place of detention to accept the accused and place him therein. The order should mention the law provision applicable to the case and shall be governed by the law provisions provide for by the last paragraph of Article (108).*"

199.   Article 108 of the Criminal Procedure Law provides as follows:

> "*When confining the accused in the place of detention, a copy of the order of detention must be delivered to the person in charge of the administration of the place after securing his signature on the original stating that he received the copy thereof.*

*The administrator of the place of detention may not allow any member of the public authority to have any contact with the person under provisional detention inside the place except by a written authorization from the public prosecution and, if this be the case, he must write down in the book kept for the purpose, the name of the person giving the authorization, the time of the visit and the date and contents of the authorization.*"

200. Given that Al Barirat was not an official detention centre but a camp for the Ruler's private militia, it necessarily follows that Articles 107 and 108 of the Criminal Procedure Law were not complied with in Mr Quzmar's case whilst he was detained in Al Barirat.

201. Article 109 of the Criminal Procedure Law provides as follows:

"*Should the investigation procedures so necessitate, the public prosecution member shall issue an order forbidding any contact between the provisionally detained accused and the other detained and any visits by any person whatsoever, without prejudice to the right of the accused to permanently contact in private his attorney.*"

202. In any event, in breach of Article 109 of the Criminal Procedure Law Mr Quzmar was deprived of the right to permanent contact (or any adequate contact) with his attorney at any stage whilst detained in GHQ, Al Barirat or in RAK Central Prison.


**(6)**    **Breaches in relation to Mr Quzmar's judicial status**

203. The RAK Law on Judicial Organisation No 5 of 2012 ("**Law No 5 of 2012**") makes provision for *inter alia* immunity from prosecution of members of the judiciary.

204. By virtue of his position as a member of the Supreme Judicial Council of RAK and his appointment as a civil judge, pursuant to Law No 5 of 2012, Mr Quzmar was entitled to full judicial immunity from prosecution, unless the immunity was lawfully revoked by following the appropriate procedure.

205. In breach of Law No 5 of 2012, Mr Quzmar was abducted whilst his judicial immunity remained in place.


**(7)**    **Crimes committed under the UAE Penal Code**

206. Under Article 5(5) of the UAE Penal Code 1987 (as amended) (the "**Penal Code**") a Public Servant is defined as including "*Any person assigned to a certain task by a public authority, to the extent of the delegated task.*"

207. Mr Gerrard was engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler and assigned to a certain task by a public authority for the purposes of the Penal Code. He therefore falls within the definition of a Public Servant.

208. Further or in the alternative, the final paragraph of Article 5 of the Penal Code provides that:

> "*Shall be deemed the same as a public servant in the present Law, any person who is not included within the categories set forth in preceding Clauses, and who is engaged in a work of public service as assigned to him by a public servant in charge under laws or regulations with respect to the assigned task.*"

209. Mr Gerrard was engaged by RAKIA and / or the government of RAK and / or the RAK public prosecution service and / or the Ruler (falling with the definition of Public Servant in Article 5), in a work of Public Service (being the carrying out of an investigation in relation to purported allegations of a criminal nature against Mr Quzmar, Mr Al Sadeq, Dr Massaad, Mr Mikadze, Mr Azima and other alleged co-conspirators), and is therefore to be deemed to be a Public Servant for the purposes of the Penal Code under the said final paragraph of Article 5 of the Penal Code.

210. Article 240 of the Penal Code provides as follows:

> "*Shall be sentenced to detention, every public servant or person in charge of a public service arresting a person, detaining or confining a person in cases other than those provided for by Law.*"

211. In the premises pleaded at paragraphs 10-11 above, Mr Gerrard orchestrated and / or acquiesced in the unlawful detention and / or confinement of Mr Quzmar in GHQ and / or in Al Barirat. Accordingly, as a Public Servant for the purposes of the Criminal Procedure Law, Mr Gerrard committed a crime in relation to the treatment of Mr Quzmar pursuant to article 240 of the Penal Code.

212. Article 241 of the Penal Code provides as follows:

> "*Any public servant or person entrusted with a public service who searches a person, a house or establishment in other than the cases prescribed by Law or contrary to the rules indicated in such Law, with his knowledge of such fact, shall be subject to a jail sentence*".

213. In the premises pleaded at paragraphs 55-59  above, Mr Gerrard led the search of Mr Quzmar's home, and that search was unlawful. Accordingly, as a Public Servant for the purposes of the Criminal Procedure Law, Mr Quzmar committed a crime in relation to the search of Mr Quzmar's home pursuant to article 241 of the Penal Code.

214. Article 242 of the Penal Code provides as follows:

> "*Shall be sentenced to term imprisonment, every public servant using, in person or through others, torture, force or threat with the accused, a witness or an expert in order to have him confess a crime, make a statement or give information concerning it to withhold any relevant matter*."

215. In the premises pleaded at paragraphs 65-69 and 101-106 above, Mr Gerrard  used in person, and or through others, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Quzmar in order to cause him to confess to crimes and / or to make statements and / or to give information in relation to crimes of which Mr Quzmar and / or Mr Al Sadeq and / or Dr Massaad and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as a Public Servant for the purposes of the Penal Code, Mr Gerrard committed a crime in relation to the treatment of Mr Al Quzmar pursuant to article 242 of the Penal Code.

216. Article 245 of the Penal Code provides as follows:

> "*Shall be sentenced to detention for a minimum term of one year and/or to a minimum fine of ten thousands dirham, every public servant, or person in charge of a public service, using force on a person, basing himself in the power granted to him by virtue of his office, dishonouring or causing him bodily pain.*"

217. In the premises pleaded at paragraphs 65-69 and 101-106 above, Mr Gerrard used, and or acquiesced in and / or orchestrated the use of, force on Mr Quzmar which dishonoured Mr Quzmar and / or caused him bodily pain. Accordingly, as a Public Servant for the purposes of the Penal Code, Mr Gerrard committed a crime in relation to the treatment of Mr Quzmar pursuant to article 245 of the Penal Code.

218.  Article 259 of the Penal Code provides as follows:

"*Without prejudice to the provision of Article 242 of the present Law, any person who uses torture, force or threat against another person, or who offers a gift or a benefit of any kind, or makes a promise of the same to induce another person to conceal a matter or to declare false statements or information or to hide away evidence from a judicial authority, shall be punished by jail sentence and a fine*".

219.  In the premises pleaded at paragraphs 65-69 and 101-106 above, Mr Gerrard used, and or acquiesced in and / or orchestrated the use of, torture and / or force and / or threats to Mr Quzmar in order to cause him to give untrue statements or information before the RAK court in relation to crimes of which Mr Quzmar and / or Mr Al Sadeq and / or Dr Massaad and / or Mr Mikadze and / or Mr Azima and / or other alleged co-conspirators were accused. Accordingly, as a Public Servant for the purposes of the Penal Code, Mr Gerrard committed a crime in relation to the treatment of Mr Quzmar pursuant to article 259 of the Penal Code.

220.  Article 344 of the Penal Code provides as follows:

"*Shall be sentenced to imprisonment, whoever illegally kidnaps, arrests, detains or deprives from freedom, a person by any means whatsoever and whether by himself or through the intermediary of others. The penalty shall be life imprisonment in the following instances:*

*1. If the act takes place by impersonating a public capacity, pretending the performance or assignment of a public service or to contact under a false representation.*

*2. In case the act is performed by use of subterfuge or accompanied by use of force, threat of killing, inflicting severe body harm or by acts of physical or psychological torture.*

*3. If the act is perpetrated by two or more armed persons.*

*4. If the period of kidnapping, arresting, detaining or depriving from freedom exceeds one month.*

*5. In case the victim is of female sex, a juvenile, an insane or imbecile person.*

*6. In case the purpose of the act is to draw profit, revenge, rape of the victim, disgrace him, injure him or have him perpetrate a crime.*

70

*7. If the act is perpetrated against a public servant during, or because of, the discharge of his duties.*

*Should the act lead to the death of the victim, the sanction shall be the death penalty or life imprisonment. Shall be sanctioned to the same penalty prescribed for the principal perpetrator, any of the intermediaries in the perpetration of any of the crimes provided for in this Article (as well as whoever knowingly hides a kidnapped person.*"

221. In the premises pleaded at paragraph 11 above Mr Gerrard orchestrated and / or acquiesced in the illegal kidnap and / or detention and / or deprivation from freedom of and / or hiding of Mr Quzmar and therefore committed a crime in relation to the treatment of Mr Quzmar pursuant to Article 344 of the Penal Code.

222. Article 348 of the Penal Code provides as follows:

"*Shall be sentenced to detention and/or to a fine, whoever deliberately perpetrates an act that exposes the life, health, security or freedom of human beings to danger. Without prejudice to a prejudice any more severe penalty prescribed by law, the penalty shall be detention in case the act results in a prejudice of any kind.*"

223. In the premises pleaded at paragraphs 47-150 above Mr Gerrard orchestrated and / or acquiesced in the perpetration of acts which exposed the life and / or health and / or security and / or freedom of Mr Quzmar to danger, and therefore committed a crime in relation to the treatment of Mr Quzmar pursuant to Article 344 of the Penal Code.

224. Article 351 of the Penal Code provides as follows:

"*Shall be sentenced to imprisonment for term not exceeding seven years, whoever threats another person, in writing or verbally, to perpetrate a felony against his person or property or against the person or property of others, or by attributing or divulging dishonouring matters, where all these are accompanied by a demand, instructions to do or abstain from doing something or if so intended.*"

225. Article 352 of the Penal Code provides as follows:

"*Shall be sentenced to detention, whoever threatens another to perpetrate a felony on his person or property or on the person or property of others, by attributing or divulging dishonouring or disrespectful matters a instances other than those stated in the preceding article.*"

71

226.  Article 353 of the Penal Code provides as follows:

"*Whoever threatens another by words, acts or signs, in writing or verbally or through another person and in instances other than those stated in the two preceding articles, shall be sentenced to detention for a term not exceeding one year or to a fine not in excess of ten thousands dirham.*"

227.  In the premises pleaded at paragraphs 65-69 and 101-106 above, Mr Gerrard made threats towards Mr Quzmar to perpetrate felonies against Mr Quzmar accompanied by demands and / or instructions to give information and / or evidence and / or false testimony, and Mr Gerrard therefore committed a crime in relation to the treatment of Mr Quzmar pursuant to Articles 351 and / or 352 and / or 353 of the Penal Code.

## E.    LOSS AND DAMAGE

228.  As a result of the aforementioned harms and / or breaches and / or torts by the Defendants and each of them Mr Quzmar has suffered loss and damage.

### (1)    Physical and psychological harm

229.  Mr Quzmar has suffered severe psychological and physical harm, pain and suffering as a result of his incarceration and the circumstances thereof and seeks and is entitled to compensation in respect thereof. Paragraphs 124-150 above are repeated.

### (2)    Financial loss

230.  Mr Quzmar intends to provide fuller particulars of financial loss and expert evidence in respect of the quantum thereof in due course. However, his losses include (at least):

230.1 Loss of income, profits and earnings, including:

(a)    Loss of earnings from Mr Quzmar's role for the RAK Government, at approximately 950,000 AED per annum, totalling 4,750,000 AED for the period 2015-2020.

(b)    Further or alternatively, loss of end of service benefits and allowances, totalling 1,700,000 AED for the period 2015-2020.

(c)   Loss of earnings from Mr Quzmar's board membership of the Hilton Hotel, at 130,000 AED per annum, totalling 910,000 AED for the period 2014-2020.

(d)   Loss of earnings from Mr Quzmar's board membership of Julphar Pharmaceuticals, at 130,000 AED per annum, totalling 910,000 AED for the period 2014-2020.

(e)   Loss of consultancy fees payable to Mr Quzmar by RAK Petroleum, at 250,000 AED per annum, totalling 1,500,000 AED for the period 2015-2020.

(f)   Loss of earnings from JAK Invest, estimated in the sum of 1,100,000 AED per annum, totalling 6,600,000 AED for the period September 2014 to September 2020.

(g)   Loss of rental income for the Al Hamra villa, in the sum of 200,000 AED per annum (totalling 1,000,000 AED for the period 2016-2020).

(h)   Loss of rental income for a property at Al Mairi, in the sum of 1,200,000 AED per annum (totalling 4,900,000 AED in respect of the period 2016-2020).

(i)   Loss of rental income for Al Mairid villa No. 1, in the sum of 150,000 AED per annum (totalling 300,000 AED for the period 2015-2017).

(j)   Loss of rental income for Al Mairid villa No. 2, in the sum of 130,000 AED per annum (totalling 780,000 AED for the period 2015 to 2020).

230.2 Loss of assets seized during the course of the purported investigation (alternatively, diminution in value and/or cost of repair in respect of such assets), including:

(a)   The Al Hamra villa, with estimated value in 2014 of AED 8,000,000.

(b)   The residential/commercial building at Al Mairid leased to the Free Zone Authority, with estimated value of AED 15,000,000 at the date of Mr Quzmar's arrest (and damage caused since the date of Mr Quzmar's arrest, with estimated cost of AED 2,100,000).

(c)   The Al Mairid Villa No. 1, with estimated value in 2014 of AED 4,500,000.

73

(d)    The Al Mairid Villa No .2, with estimated value in 2014 of AED 2,500,000.

(e)    Cost of maintenance work on Al Mairid Villas No. 1 and No. 2, totalling 40,000 AED.

(f)    An apartment owned by Mrs Quzmar in Al Hamra/Marina, with estimated value 2,000,000 AED.

(g)    An apartment owned by Mr Quzmar's son, Yousef in Al Hamra/Marina, with estimated value 983,000 AED.

(h)    A BMW 740 car, estimated loss at 150,000 AED.

(i)    A BMW Z4 car, estimated loss at 70,000 AED.

(j)    A Range Rover car, with estimated value AED 80,000.

(k)    A personalised number plate, with number 7773 B, with estimated value 15,000 AED.

(l)    A personalised number plate, with number 7774 B, with estimated value 15,000 AED.

230.3  Specific costs and expenses incurred by Mr Quzmar as a result of the unlawful campaign and/or his abduction and imprisonment, including:

(a)    A civil judgment entered against Mr Quzmar by Arab Bank, in respect of an unpaid loan, in the sum of 5.9m AED.

(b)    A civil judgment entered by RAKIA against JAK Invest, in the sum of 5,784,389 AED.

(c)    Legal, judicial and administrative fees in respect of the proceedings in RAK, in the estimated sum of 1,700,000 AED.

(d)    Trustee's expenses for the period 2017-202, int eh estimated sum of 700,000 AED.

(e)    Personal expenses incurred at prison, including in respect of medicine, personal care supplied and clothes, in the estimated sum of 300,000 AED for the period September 2014 to September 2020.

230.4  Further or alternatively, sums of money removed by the RAK Government from bank accounts of Mr Quzmar and/or the Quzmar family and/or otherwise retained

by the RAK Government, in purported execution of RAK judicial proceedings arising from the investigation (but in reality as part of the unlawful campaign against Mr Quzmar):

(a)   The sums of 8,505,972.81 AED and 15,767.26 AED collected from Mr Quzmar's account at Arab Bank.

(b)   The sum of 549,320.07 AED collected from Mr Quzmar's account at RAK Bank.

(c)   The sums of 601,647.74 AED and 6,559.07 CAD collected from Mr Quzmar's account with HSBC Middle East.

(d)   Rent in respect of a residential/commercial building in Al Mairid, paid by the tenant the Free Zone Authority, in the sum of 2,224,504.75 AED.

(e)   Rent in respect of a villa in Al Mairid, from the tenant the Hilton Hotel for the year 2014-2015, in the sum of 90,000 AED.

(f)   Rent payable to JAK Invest, Mr Quzmar's company, in the sum of at least 3,060,000 AED.

(g)   The proceeds of sale of a villa in Al Hamra, in the sum of 4,862,373 AED (which sum represented a significant discount on its true value).

(h)   The proceeds of sale of a BMW 740 car, in the sum of 30,000 AED (which sum represented a significant discount on its true value).

(i)   The proceeds of sale of a personalised license plate B 7773, in the sum of AED 6,3000 (which sum represented a significant discount on its true value).

(j)   End of service benefits, salaries, vacation and other allowances in the sum of 1,700,000 AED, for the period 2000 to 2020.

231.  For the avoidance of doubt, Mr Quzmar does not seek to double-recover any of the financial losses pleaded at paragraph 230 above. Mr Quzmar estimates his financial losses to exceed 72m AED as at the present date.

**(3)   Moral damage**

232. Furthermore, Mr Quzmar has suffered moral damage as a result of the wrongs committed against him, including (*inter alia*) damage to his reputation for which he also seeks and is entitled to compensation.

**(4)   Interest**

233. Mr Quzmar also seeks interest pursuant to section 35A of the Senior Courts Act 1981 at such rate and for such period as the court shall see fit.


**AND THE CLAIMANT CLAIMS:**

   i.    Damages for breach of Article 282 of the UAE Civil Code;

   ii.   Damages for abuse of right under Article 106 of the UAE Civil Code;

  iii.   Such accounts or enquiries as the Court may see fit;

  iv.   Further or other relief;

   v.   Interest;

  vi.   Costs.


**EDWARD FITZGERALD QC**

**JOHN BRISBY QC**

**ALASTAIR TOMSON**

**SIMON PAUL**


**1 October 2020**

**STATEMENT OF TRUTH**

The Claimant believes the facts stated in these Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement. I understand that proceedings for contempt of court may be brought against anyone who makes, or caused to be made, a false statement in a document verified by a statement of truth without an honest belief in its truth.

**Full name:**   Bambos Tsiattalou

**Signed:**

Claimant's legal representative

**Dated:**   1 October 2020