UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
_____

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/10/2021
```

OUSSAMA EL OMARI,

                    Plaintiff,                    **20 Civ. 2601 (VM)**

          - against -

JAMES E. D. BUCHANAN, DECHERT LLP,            **DECISION AND ORDER**
ANDREW D. FRANK, a/k/a ANDREW D.
SOLOMON, NEIL GERRARD, AMIR ALI
HANDJANI, a/k/a AMIRALI HANDJANI,
KARV COMMUNICATIONS, INC.,
INTELLIGENCE ONLINE, and LONGVIEW
PARTNERS (GUERNSEY) LTD.,

                    Defendants.
_____

**VICTOR MARRERO, United States District Judge.**

        Plaintiff Oussama El Omari ("El Omari") brings this

action alleging violations of the Racketeering Influenced and

Corrupt Organizations Act ("RICO"), prima facie tort,

defamation per se, and a violation of the Computer Fraud and

Abuse Act ("CFAA"). (See "Amended Complaint" or "AC," Dkt.

No. 31.) Defendants James E. D. Buchanan ("Buchanan"),

Dechert LLP ("Dechert"), Andrew D. Frank, a/k/a Andrew D.

Solomon ("Frank"), Neil Gerrard ("Gerrard"), Amir Ali

Handjani, a/k/a Amirali Handjani ("Handjani"), KARV

Communications, Inc. ("KARV"), and Longview Partners

(Guernsey) Ltd. ("Longview," and with the foregoing

defendants, "Defendants"), move to dismiss the Amended

Complaint. (See "Mot." Dkt. No. 82.) For the reasons stated below, Defendants' motion to dismiss is **GRANTED**.

## I.   BACKGROUND

A. FACTS[1]

From 1997 to 2012, El Omari was a Director and CEO of the Ras Al Khaimah Free Trade Zone Authority ("RAKFTZA"). RAKFTZA is an agency or instrumentality of the Emirate of Ras Al Khaimah ("RAK"), one of seven emirates composing the United Arab Emirates. During most of his tenure at RAKFTZA, El Omari reported directly to Sheikh Faisal Bin Saqr Al Qasimi ("Sheikh Faisal"), who was the Chairman of RAKFTZA. In 2010, Sheikh Faisal's brother Sheikh Saud bin Saqr Al Qasimi ("Sheikh Saud") became the Ruler of RAK.

After he became the Ruler of RAK, Sheikh Saud allegedly solicited El Omari's political allegiance and asked him to no longer speak with Sheikh Faisal. Sheikh Saud later fired El Omari and several other RAKFTZA executives for refusing to pledge their allegiance. Sometime after, RAK filed criminal charges against El Omari relating to business projects he worked on with Sheikh Faisal. El Omari was eventually

---

[1]   Except as otherwise noted, the following background derives from the Amended Complaint. The Court takes all facts alleged therein as true and construes the justifiable inferences arising therefrom in the light most favorable to the plaintiff, as required under the standard set forth in Federal Rule of Civil Procedure 12(b)(6) and explained in Section II, *infra*.

convicted in absentia and sentenced to a term of imprisonment. El Omari alleges that the Defendants then engaged in a scheme to defame him and to deceive him into divulging confidential information.

### 1. KARV FARA Disclosures

In 2013, Frank founded KARV, a New York public relations company. Handjani (together with Frank, the "KARV Defendants") has been employed at KARV as a senior advisor since its founding. When KARV was established, the KARV Defendants filed several disclosures with the Department of Justice, pursuant to the Foreign Agent Registration Act ("FARA"), 22 U.S.C. § 612 *et seq.* The KARV Defendants disclosed that they began providing public relations services to RAK Maritime City and that KARV was paid by RAK.

El Omari alleges that, from 2013 to 2019, the KARV Defendants filed materially misleading FARA disclosures. The Amended Complaint states that these FARA disclosures suffered from the following three defects: (1) mispresenting the scope of KARV's engagement by RAK; (2) failing to include the true and complete terms of KARV's agreement with RAK; and (3) mispresenting that KARV's activities were not political. At bottom, the Amended Complaint alleges that these FARA disclosures misrepresented the public relations work that the KARV Defendants provided to RAK because the disclosures did

not reveal that the KARV Defendants were engaged in a scheme to defame El Omari. This alleged scheme, which El Omari calls the "propaganda racket," involved the alleged acts and statements described below.

    2. <u>Cooperation with the CIA</u>

El Omari alleges that in 2011, the Central Intelligence Agency ("CIA") asked him to provide it with documents and information relating to Iranian companies registered with RAKFTZA and business partners of entities affiliated with Sheikh Saud. With help from a legal advisor to RAKFTZA, El Omari compiled the requested documents and information, and thereafter provided them to the CIA. The KARV Defendants allegedly utilized the defamation scheme to retaliate against El Omari for his cooperation with the CIA.

    3. <u>2018 London Meeting</u>

From 2001 to 2014, Buchanan was employed by Longview, an asset management company based in St. Peter Port, Guernsey. Since 2014, Buchanan has been a Longview shareholder and member of its board of directors. El Omari alleges that Longview manages RAK state assets and that Buchanan takes orders directly from RAK.

In October 2018, Buchanan met with a human rights activist named Radha Stirling ("Stirling") in London, United Kingdom. During the meeting, Buchanan allegedly stated he was

affiliated with the Ras Al Khaimah Investment Authority ("RAKIA") and that he was in London on behalf of Sheikh Saud. El Omari alleges that Buchanan made three additional statements that constitute defamation and prima facie tort. First, Buchannan stated: "I came in 2014 to clean up the mess of [Sheikh] Faisal and Oussama [El Omari]. We know how to control the judges. Now we are after him and are going to report him to the IRS." (AC ¶¶ 16, 129.) Second, Buchanan told Stirling, "I'm going to bring [El Omari] down." (Id.) Third, Buchanan called El Omari a "human trafficker." (Id.)

Based on Buchanan's alleged threat to "bring him down," El Omari alleges that Longview and Buchanan made unspecified allegations to the Internal Revenue Service ("IRS"), Department of Homeland Security ("DHS"), and other law enforcement agencies. El Omari particularly asserts that, because of these unspecified allegation, two DHS agents visited him at home in North Carolina on May 28, 2019. The DHS agents asked him about Sheikh Faisal, including El Omari's previous work in New York on behalf of Sheikh Faisal.

4. 2019 Intelligence Online Article

On April 8, 2019, Intelligence Online, a trade newsletter based in France, published an article titled, "The Ras Al Khaimah Investment Authority trails French connection

5

to recover its lost funds" ("IO Article").[2] (AC ¶ 11.) The IO Article stated that "[RAKIA] is on a vast worldwide hunt to recover arrears reportedly embezzled by its former senior officials, Kather Massaad and Oussama El Omari." (Id. ¶ 19(a); "AC Ex. 1," Dkt. No. 31-1 at 1.) The IO Article also stated: "The investment authority believes that Massaad and his former alley [sic] Oussama El Omari, who previously oversaw [RAKFTZA], misappropriated as much as $1.5 billion in overpayments." (AC ¶ 19(b); AC Ex. 1 at 1.) El Omari also alleges that several phrases in the IO Article falsely connected him with Massaad.

   5. Deceptive News Reporter

   On February 5, 2020, someone named Samantha Alison ("Alison") emailed El Omari and stated she was a journalist at Fox News in New York. El Omari and Alison communicated via email, telephone, and Skype for several weeks after this initial email. In total, they exchanged thirteen emails and five Skype calls. During their conversations, El Omari provided Alison with the contact information for five individuals and a copy of a confidential letter from El

---

[2]   El Omari refers to the IO Article separately from an "advertising teaser" for the IO Article. (See AC ¶ 19; Opp'n at 1; Dkt. No. 32-2 (advertising teaser).) The Court treats these collectively as the IO Article since the "advertising teaser" displays the first paragraph of the IO Article verbatim, but the remaining paragraphs appear hidden behind a paywall.

Omari's counsel to DHS. On or around April 20, 2020, El Omari discovered that Alison was an imposter and used a fake email address to contact him in the first instance. El Omari alleges that, through the exchange of emails and calls alone, Alison accessed his computer. El Omari also alleges that Alison was Defendants' agent.

B. PROCEDURAL HISTORY

On March 27, 2020, El Omari initiated this action by filing the original Complaint. A few weeks later, on May 5, 2020, El Omari filed the Amended Complaint. Consistent with the Court's Individual Practices, Defendants informed El Omari of purported deficiencies in the Amended Complaint by pre-motion letters. El Omari responded to each letter, challenging the asserted grounds for dismissal. (See Dkt. No. 79-2.) After reviewing the pre-motion letters and identifying overlapping arguments, the Court directed the parties to file a consolidated brief that addressed common arguments among Defendants. (See Dkt. No. 80.) Defendants thereafter submitted a consolidated Motion, (see "Mot.," Dkt. 82), and El Omari filed his Opposition, (See "Opp'n," Dkt. 84).

## II. LEGAL STANDARD

To survive a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim

to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). A complaint satisfies this standard when it contains sufficient "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. See id. However, if the factual allegations sufficiently "raise a right to relief above the speculative level," then a court should not dismiss a complaint for failure to state a claim. Twombly, 550 U.S. at 555.

In resolving a motion to dismiss, the Court's task is to "assess the legal feasibility of the complaint, not . . . the weight of the evidence which might be offered in support thereof." In re Columbia Pipeline, Inc., 405 F. Supp. 3d 494, 505 (S.D.N.Y. 2019) (quoting Eternity Glob. Master Fund ltd. v. Morgan Guar. Tr. Co. of N.Y., 375 F.3d 168, 176 (2d Cir. 2004)). In this context, the Court must draw reasonable inferences in favor of the nonmoving party. See id. However, the requirement that a court accept the factual allegations in the complaint as true does not extend to legal conclusions. See Iqbal, 556 U.S. at 678. In other words, a court must "accept as true all factual allegations and draw from them

all reasonable inferences; but [it is] not required to credit
conclusory allegations or legal conclusions couched as
factual . . . allegations." <u>Dane v. UnitedHealthcare Ins.</u>,
974 F.3d 183, 188 (2d Cir. 2020).

### III.   DISCUSSION

El Omari brings four claims against various defendants:
(1) a civil RICO claim against the KARV Defendants, (AC ¶
118); (2) prima facie tort against Longview and Buchanan,
(AC ¶ 128); (3) defamation per se against Defendants, (AC ¶
135); and (4) a CFAA claim against Defendants, (AC ¶ 150).
For the reasons explained below, El Omari fails to plausibly
allege any of these claims.

A. <u>CIVIL RICO</u>

RICO provides a civil cause of action for "[a]ny person
injured in his business or property by reason of a violation"
of 18 U.S.C. § 1962(c). <u>See</u> 18 U.S.C. § 1964(c). To state a
claim under Section 1962(c), a plaintiff must allege "(1)
conduct (2) of an enterprise (3) through a pattern (4) of
racketeering activity." <u>DeFalco v. Bernas</u>, 244 F.3d 286, 306
(2d Cir. 2001) (quoting <u>Sedima, S.P.R.L. v. Imrex Co.</u>, 473
U.S. 479, 496 (1985)).

To establish a pattern of racketeering activity, a
plaintiff must plead "at least two predicate acts, show that
the predicate acts are related, and that they amount to, or

pose a threat of, continuing criminal activity." Schlaifer
Nance & Co. v. Estate of Warhol, 119 F.3d 91, 97 (2d Cir.
1997). The acts of racketeering activity must be among those
criminal offenses listed in 18 U.S.C. § 1961(1). See Spool v.
World Children Int'l Adoption Agency, 520 F.3d 178, 183 (2d
Cir. 2008).

A plaintiff who alleges racketeering activity based on
mail or wire fraud must prove "(1) a scheme to defraud, (2)
money or property as the object of the scheme, and (3) use of
the mails or wires to further the scheme." United States v.
Greenberg, 835 F.3d 295, 305 (2d Cir. 2016) (quoting United
States v. Binday, 804 F.3d 558, 569 (2d Cir. 2015)).
Additionally, a civil RICO claim predicated on mail or wire
fraud must "satisfy the requirement that, '[i]n alleging
fraud or mistake, a party must state with particularity the
circumstances constituting fraud or mistake.'" Lundy v.
Catholic Health Sys. of Long Island Inc., 711 F.3d 106, 119
(2d Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). To plead fraud
with particularity, the "complaint must adequately specify
the statements it claims were false or misleading, give
particulars as to the respect in which plaintiff contends the
statements were fraudulent, state when and where the
statements were made, and identify those responsible for the

statements." Id. (quoting Cosmas v. Hassett, 886 F.2d 8, 11 (2d Cir. 1989)).

El Omari's RICO claim is based on three predicate acts. First, according to El Omari, the KARV Defendants committed mail and wire fraud by not revealing in their FARA disclosures that they were engaged in a scheme to defame El Omari. (See AC ¶¶ 62-116, 118-24.) Second, the KARV Defendants committed wire fraud by using Alison to deceive El Omari into providing confidential information. (See id. ¶¶ 124, 138-51.) Third, the KARV Defendants used the defamation scheme to retaliate against El Omari, in violation of 18 U.S.C. § 1513(e)-(f), because he cooperated with the CIA. (See id. ¶¶ 37, 62-116, 125-26.)

The KARV Defendants move to dismiss the RICO claim on the basis that El Omari has not alleged (i) a single predicate act, (ii) continuity of predicate acts, and (iii) a cognizable injury. (See Mot. at 5-9.) While the absence of any of these elements constitutes an independent ground for dismissal, the Court finds that El Omari's civil RICO claim should be dismissed for failure to satisfy each of these requirements.

1. Predicate Acts

a. Mail or Wire Fraud: FARA Disclosures

FARA provides that "[n]o person shall act as an agent of a foreign principal unless he has filed with the Attorney

General a true and complete registration statement and supplements thereto," unless otherwise exempt by FARA. 22 U.S.C. § 612(a). It is a crime to act as an agent of a foreign government without notifying the Attorney General, see 18 U.S.C. § 951(a), or to willfully make a false statement in a FARA filing, see 22 U.S.C. § 618(a). Instead of arguing that a FARA violation by itself constitutes a RICO predicate,[3] El Omari alleges that the KARV Defendants committed mail and wire fraud by failing to disclose that the true nature of their representations of foreign principals was to engage in a defamation scheme against him. (See AC ¶¶ 62-116, 118-24; Opp'n at 11.) The Court has not found, nor has El Omari presented, any case in which a court has held that a misleading FARA disclosure constitutes mail or wire fraud. The Court must then look to other cases that have addressed whether false or misleading regulatory disclosures constitute mail or wire fraud.

In Cleveland v. United States, 531 U.S. 12, 15 (2000), the Supreme Court utilized a two-step analysis to determine whether lying to the government to obtain a regulatory license qualified as a fraudulent scheme to obtain property, and thus

---

[3]   Sections 951 and 618 are not included in 18 U.S.C. § 1961(1)'s definition of "racketeering activity," and therefore violations of either provision necessarily cannot serve as a predicate act for a RICO claim.

constituted mail fraud. First, the Court found that it is insufficient that "the object of the fraud may become property in the recipient's hands; for purposes of the mail fraud statute, the thing obtained must be property in the hands of the victim." Id. at 15. Second, the Court held that the license was not property in the State's hands because "the State's core concern is *regulatory*" and it did not serve to vest the State with a property interest in the license. Id. at 20 (emphasis in original). Moreover, the Cleveland Court read the mail fraud statute narrowly to exclude regulatory licenses from the concept of property because doing otherwise would invite the Court "to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress." Id. at 24 ("Equating issuance of licenses or permits with deprivation of property would subject to federal mail fraud prosecution a wide range of conduct traditionally regulated by state and local authorities.").

The Court finds that the KARV Defendants' allegedly misleading FARA disclosures do not serve as a predicate act for mail or wire fraud. As Cleveland instructs, the "property" defrauded in a mail or wire fraud claim must be property in the victim's hands. Id. at 15. El Omari does not allege a property interest in the KARV Defendant's FARA regulatory

approval.  Regardless,  the  Court  is  unpersuaded  that  FARA
approval  could  constitute  property  for  mail  or  wire  fraud,
given  the  Supreme  Court's  guidance  to  read  the  mail  fraud
statute  narrowly  to  avoid  a  "sweeping  expansion  of  federal
criminal  jurisdiction."  Id. at 24; see also United States v.
Schwartz, 924 F.2d 410, 417 (2d Cir. 1991) (holding that arms
export  licenses  did  not  constitute  government  property);
Empire Merchs., LLC v. Reliable Churchill LLLP, No. 16 Civ.
5226,  2017  WL  5559030,  at  *11  n.13  (E.D.N.Y.  Mar.  16,  2017)
(noting  that  Cleveland  "suggests  that  caution  is  warranted  in
expanding  the  scope  of  the  mail  and  wire  fraud  statutes  to
include  state  licensure  violations"),  aff'd 902 F.3d 132 (2d
Cir. 2018).

　　　　b. Wire Fraud: Alison's Communications

　　　　El Omari alleges that the KARV Defendants also committed
wire fraud by allegedly conspiring with Alison to defraud El
Omari  of  confidential  information.  (See AC ¶¶ 124, 138-51;
Opp'n at 10.) El Omari's wire fraud allegations must "satisfy
Rule 9(b) as to each defendant, and cannot do so by making
vague allegations about defendants as a unit." Monterey Bay
Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d
673, 729 (S.D.N.Y. 2021) (quoting SEC v. U.S. Env't, Inc., 82
F. Supp. 2d 237, 241 (S.D.N.Y. 2000)). As a result, for RICO
claims  involving  multiple  defendants,  "the  plaintiff  must

connect the allegations of fraud to each individual defendant." Flexborrow LLC v. TD Auto Fin. LLC, 255 F. Supp. 3d 406, 420 (E.D.N.Y. 2017) (quoting Colony at Holbrook, Inc. v. Strata G.C., Inc., 928 F. Supp. 1224, 1231 (E.D.N.Y. 1996)).

The only allegation connecting Alison to the KARV Defendants is the bare assertion that Alison was their "agent" and that they collectively "conspire[d]" to commit wire fraud. (See AC ¶ 150-51.) In his Opposition, El Omari argues that there is a "reason to believe" that Alison is related to the KARV Defendants based on the relationship between the KARV Defendants, El Omari's alleged past experiences with harassment, and similarities to other instances of alleged harassment by RAK and the KARV Defendants. (See Opp'n at 10.) But this allegation is fundamentally vague and conclusory, hence the Court cannot credit it. See Ho Myung Moolsan Co. v. Manitou Min. Water, Inc., 665 F. Supp. 2d 239, 260 (S.D.N.Y. 2009) (dismissing RICO claims where allegations merely stated that "some defendants" committed fraud "through" their purported agent); Jones v. Nat'l Commc'n & Surveillance Networks, 409 F. Supp. 2d 456, 473 (S.D.N.Y. 2006) ("[C]onclusory allegations are insufficient to survive a motion to dismiss RICO claims."). Because the Amended Complaint fails to plead any facts connecting Alison and the

KARV Defendants, Alison's conduct does not serve as a RICO predicate against the KARV Defendants.

### c. Witness Retaliation: CIA Cooperation

El Omari's final theory to state a RICO predicate is that the KARV Defendants violated 18 U.S.C. § 1513(e)-(f) by using the defamation scheme to retaliate against him for providing information to the CIA. (See AC ¶ 37, 125-26.) Section 1513(e) makes it a crime to "knowingly, with the intent to retaliate, take[] any action harmful to any person . . . for providing to a law enforcement officer any truthful information relating to the commission or possible commission of any Federal offense[.]" See 18 U.S.C. § 1513(e). Section 1513(f) makes it a crime to conspire to violate Section 1513(e). See id. § 1513(f). RICO defines "law enforcement officer" as someone who is "authorized under law to engage in or supervise the prevention, detection, investigation, or prosecution of an offense." Id. § 1515(a)(4)(A).

El Omari fails to adequately allege that he provided information to a "law enforcement officer." The CIA has no law enforcement authority. See 50 U.S.C. § 3036(d)(1) ("[T]he Director of the Central Intelligence Agency shall have no police, subpoena, or law enforcement powers or internal security functions."); Id. § 3035 ("The function of the [CIA] is to assist the Director of the [CIA] in carrying out the

16

responsibilities specified in section[s] 3036(c) [and 3036(d)].") . Rather than arguing that the CIA has law enforcement powers, El Omari contends that it is "obvious" that the information he provided to the CIA "would be passed on to FBI agents in the Embassy or Consulate in the UAE or Washington." (Opp'n at 10.) This assertion is not "obvious."

El Omari provides no legal authority to support a determination or reasonable inference that his communication with the CIA constitutes, for the purposes of Section 1513(e), providing information to a law enforcement officer merely because El Omari hoped or assumed the intelligence would be passed on to the FBI. And even if such a conclusion were permissible, El Omari does not allege any facts from which the Court could reasonably infer that in fact El Omari's information was relayed to the FBI. As a result, El Omari's assertion that the information was provided to the FBI is conclusory. See Jones, 409 F. Supp. 2d at 473-74 (conclusory allegations do not survive a motion to dismiss RICO claims).

El Omari also has not alleged that the KARV Defendants knew he provided information to the CIA. Section 1513 requires that a person "knowingly" commit a harmful act. See 18 U.S.C. § 1513(e). The Amended Complaint, however, is devoid of any allegation that the KARV Defendants had such knowledge. See Jones, 409 F. Supp. 2d. at 473-74 (conclusory allegations do

not survive a motion to dismiss RICO claims); <u>Nunes v. Fusion GPS</u>, 531 F. Supp. 3d 993, 1010 (E.D. Va. 2021) (finding plaintiff failed to establish Section 1513(e) predicate in part because he did not "maintain [d]efendants had knowledge that [he] provided such information" to law enforcement). For all the above reasons, El Omari also fails to plausibly allege retaliatory conduct in violation of Section 1513.

   2. <u>Continuity Requirement</u>

   The KARV Defendants also argue that El Omari's RICO claim should be dismissed because he fails to satisfy RICO's continuity requirement. (<u>See</u> Mot. at 8.) This requirement dictates that predicate acts must be "related, and [either] amount to or pose a threat of *continuing* criminal activity." <u>Spool</u>, 520 F.3d at 183 (emphasis added) (quoting <u>Cofacredit S.A. v. Windsor Plumbing Supply Co.</u>, 187 F.3d 229, 242 (2d Cir. 1999)). The continuity requirement can be satisfied either by "showing a 'closed-ended' pattern — a series of related predicate acts extending over a substantial period of time — or by demonstrating an 'open-ended' pattern of racketeering activity that poses a threat of continuing criminal conduct beyond the period during which the predicate acts were performed." <u>Id.</u>

   The Second Circuit has held that a close-ended scheme must extend at least two years, but this temporal period is

"insufficient, without more, to support a finding of a closed-ended pattern." First Cap. Asset Mgmt., Inc. v. Satinwood, Inc., 385 F.3d 159, 181 (2d Cir. 2004). Additional factors such as "the number and variety of predicate acts, the number of both participants and victims, and the presence of separate schemes are also relevant in determining whether closed-ended continuity exists." Id.

El Omari has not alleged a single predicate act, and therefore cannot sustain a closed-ended theory of continuity.[4] For the reasons stated above, the KARV Defendants' FARA disclosures cannot serve as a predicate act, and El Omari also has not adequately alleged any relationship between Alison and the KARV Defendants. The only remaining specific act that the KARV Defendants allegedly committed is participating in the publication of the IO Article. (See AC ¶¶ 19, 24, 125-26.) A single act, however, necessarily cannot establish a pattern of activity. See Curtis v. Greenberg, No. 20 Civ. 824, 2021 WL 434078, at *11 (E.D.N.Y. Sept. 23, 2021) (finding "a single act of fraud . . . cannot sustain a RICO

---

[4]   El Omari argues that each misleading FARA disclosure and each deceptive communication with Alison is a separate RICO predicate. (See Opp'n at 10, 11.) Although he fails to make out a predicate, El Omari has also improperly fragmented these acts to make out multiple predicates. The alleged conduct falls into one of two sets of singular fraudulent acts: (1) the alleged defamation scheme; and (2) convincing El Omari to divulge information. See Schlaifer, 119 F.3d at 98 ("[C]ourts must take care to ensure that the plaintiff is not artificially fragmenting a singular act into multiple acts simply to invoke RICO.").

claim"). Regardless, for the reasons addressed below, El Omari has not adequately alleged that the statements in the IO Article are attributable to the KARV Defendants. El Omari therefore fails to allege closed-ended continuity.

As for open-ended continuity, the threat of continuing criminal activity is "generally presumed when the enterprise's business is primarily or inherently unlawful." Spool, 520 F.3d at 185. When an enterprise primarily conducts a legitimate business, however, "there must be some evidence from which it may be inferred that the predicate acts were the regular way of operating that business, or that the nature of the predicate acts themselves implies a threat of continued criminal activity." Cofacredit, 187 F.3d at 243. Since the Amended Complaint concedes that the KARV Defendants engaged in "legitimate public relations activities," (AC ¶ 120), El Omari is therefore required to show that the predicate acts were the regular way of operating KARV's business.

El Omari argues that the threat of continuing criminal activity exists because the KARV Defendants have continued filing misleading FARA disclosures since 2013 and because of Alison's deception of El Omari. The last FARA disclosure, occurred approximately one year before El Omari' original Complaint was filed, which does not establish a current or future threat. See First Cap., 385 F.3d at 181 (finding no

open-ended continuity where the last alleged predicate act occurred in December 1999 and the complaint was filed in July 2000, i.e., 7 months later). And Alison's conduct cannot serve as a basis for finding the KARV Defendants' conduct poses a threat of continuing criminal activity since El Omari has not established a relationship between the KARV Defendants and Alison.

For the above reasons, the Court finds that El Omari fails to allege RICO closed- or open-ended continuity.

### 3. Cognizable Injury

Lastly, the KARV Defendants argue that El Omari fails to allege a cognizable RICO injury. (See Mot. at 9.) RICO requires that the injuries to El Omari's "business or property . . . was by reason of the substantive RICO violation." Sykes v. Mel S. Harris and Assocs. LLC, 780 F.3d 70, 91 (2d Cir. 2015). "This causation analysis will require the district court to identify (1) the property interest that is protected by RICO, as alleged by plaintiffs, and (2) whether the injury to that interest was caused by the RICO violation." Id. The second prong of this analysis requires examining whether the RICO violation was both the proximate and but-for cause of El Omari's injuries. See UFCW Local 1776 v. Eli Lilly & Co., 620 F.3d 121, 132 (2d Cir. 2010).

El Omari alleges two injuries: (1) "interference with [his] livelihood," (AC ¶ 125-26; Opp'n at 12), and (2) harm from the confidential information disclosed to Alison,[5] (see AC ¶¶ 124, 143-50; Opp'n at 12). Emotional and reputational harm, and loss of future income, are generally not cognizable under RICO. See Westchester Cnty. Indep. Party v. Astorino, 137 F. Supp. 3d 586, 612 (S.D.N.Y. 2015) (collecting cases). Similarly, the loss of employment "for reporting or refusing to participate in an enterprise engaging in a pattern of racketeering activity is not injury sufficient for standing." Id. at 614-15 (quoting Hecht v. Com. Clearing House, Inc., 897 F.2d 21, 24 (2d Cir. 1990)) Reputational harm may be cognizable, however, if "the [pecuniary] loss of business opportunities is . . . quantifiable and non-speculative." Nygård v. Bacon, No. 19 Civ. 1559, 2021 WL 3721347, at *5 (S.D.N.Y. Aug. 20, 2021); see also Tsipouras v. W&M Props., Inc., 9 F. Supp. 2d 365, 368 (S.D.N.Y. 1998) ("*[M]ere* injury to character, business reputation, and/or the intentional infliction of emotional distress are not actionable under civil RICO." (emphasis added)). In light of these rules, the

---

[5]   The KARV Defendants argue that the Amended Complaint did not allege that Alison's receipt of "confidential information" and El Omari's financial injury were cognizable RICO injuries. (See Dkt. 86 at 3.) The Court will consider these injuries because El Omari alleged that his communications with Alison, as described in Count IV, constituted a RICO predicate for wire fraud. (See AC ¶¶ 124, 138-51.)

Court finds that El Omari's mere allegation of "interference with [his] livelihood" is not cognizable. The Amended Complaint contains no facts about any pecuniary losses that El Omari suffered. (AC ¶ 125-26.) This allegation is otherwise speculative and not quantifiable. See Westchester Cnty., 137 F. Supp. 3d 613-14.

El Omari also fails to allege that the KARV Defendants proximately caused his injuries from Alison's conduct. Under RICO, proximate causation requires "'some direct relation between the injury asserted and the injurious conduct alleged,' and '[a] link that is too remote, purely contingent, or indirec[t] is insufficient.'" Empire Merchs., 902 F.3d at 141 (alteration in original) (quoting Hemi Grp., LLC v. City of New York, 559 U.S. 1, 9 (2010)). As previously noted, El Omari fails to adequately allege a relationship between the KARV Defendants and Alison, and therefore necessarily fails to plausibly allege a direct relationship between El Omari's injury and the KARV Defendants sufficient to support a RICO claim.

The Court therefore finds that El Omari's civil RICO claim must be dismissed because he fails to adequately allege (1) RICO predicates; (2) continuity of predicate acts; and (3) a cognizable injury.

B. <u>PRIMA FACIE TORT</u>

El Omari alleges that Buchanan and Longview ("Tort Defendants") committed a prima facie tort during an October 2018 meeting between Buchanan and Sterling. During the meeting, Buchanan allegedly made three statements that El Omari contends defamed him. (<u>See</u> AC ¶¶ 16, 129.) First, Buchannan stated: "I came in 2014 to clean up the mess of [Sheikh] Faisal and Oussama [El Omari]. We know how to control the judges. Now we are after him and are going to report him to the IRS." (<u>Id.</u>) Second, Buchanan told Stirling, "I'm going to bring [El Omari] down." (<u>Id.</u>) Third, Buchanan called El Omari a "human trafficker." (<u>Id.</u>)

Preliminarily, the parties disagree on whether New York or North Carolina law governs this claim. El Omari argues that New York law applies because that is where the tort "arose and is continuing" and therefore New York has the greatest interest in the resolution of the dispute. (<u>See</u> Opp'n at 12.) The Tort Defendants argue that New York's conflict-of-laws rules dictate that North Carolina law applies since El Omari lives there and that is where the alleged tort occurred. (Mot. at 10.)

Sitting in New York and exercising diversity jurisdiction, this Court must apply New York's choice-of-law rules. See <u>GlobalNet Financial.com v. Frank Crystal & Co.</u>,

449 F.3d 377, 382 (2d Cir. 2006). Under New York law, the "first step in any case presenting a potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." See In re Allstate Ins., 613 N.E.2d 936, 937 (N.Y. 1993). An actual conflict exists when "the applicable law from each jurisdiction provides different substantive rules," and the differences "have a significant possible effect on the outcome of the trial." Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 331 (2d Cir. 2005) (citations omitted). New York law recognizes a prima facie tort claim for "the infliction of intentional harm, resulting in damage, without excuse or justification, by an act or a series of acts which would otherwise be lawful." Freihofer v. Hearst Corp., 480 N.E.2d 349, 355 (N.Y. 1985) (citations omitted). On the other hand, North Carolina courts have not recognized a separate cause of action for prima facie tort. See Bardes v. Mass. Mut. Life Ins., 932 F. Supp. 2d 636, 639 (M.D.N.C. 2013) (finding North Carolina courts have neither adopted nor rejected a prima facie tort cause of action). Since New York and North Carolina law evidently conflict on whether to recognize a prima facie tort claim, the Court must consider which law to apply.

New York courts utilize an "interest analysis" that seeks to apply the law of the state with the greatest interest in the litigation, and the only "facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." Schultz v. Boy Scouts of Am., Inc., 480 N.E.2d 679, 684 (N.Y. 1985) (quoting Miller v. Miller, 237 N.E.2d 877, 879 (1968)). This analysis involves an assessment of whether the conflicting laws are conduct-regulating or loss-allocating. See id. at 684-85. "Loss-allocating rules are applicable once there is admittedly tortious conduct, while conduct-regulating rules are those people use as a guide to governing their primary conduct." K.T. v. Dash, 827 N.Y.S.2d 112, 117 (App. Div. 1st Dep't 2006). "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." Cooney v. Osgood Mach., Inc., 612 N.E.2d 277, 280 (N.Y. 1993). "A tort occurs in the place where the injury was inflicted, which is generally where the plaintiffs are located." Lyman Com. Sols., Inc. v. Lung, No. 12 Civ. 4398, 2013 WL 4734898, at *4 (S.D.N.Y. Aug. 30, 2013).

Intentional torts, like El Omari's prima facie tort claim, are typically conduct-regulating. See Tyco Int'l, Ltd.

v. Kozlowski, 756 F. Supp. 2d 553, 559 (S.D.N.Y. 2010) ("It is usual in intentional tort claims to classify the law as conduct-regulating."); Hitchcock v. Woodside Literary Agency, 15 F. Supp. 2d 246, 251-52 (E.D.N.Y. 1998) (finding defamation, intentional infliction of emotional distress, and prima facie tort are "clearly rules of conduct regulation"). Given that El Omari resides in North Carolina, the alleged prima facie tort against El Omari occurred in North Carolina and the Court must apply that State's laws. (See AC ¶¶ 4, 16, 26.) See Hitchcock, 15 F. Supp. 2d at 251-52 (finding Maryland was "the place where the plaintiff's injuries occurred" because plaintiff resided there). Since North Carolina courts have not recognized a prima facie tort cause of action, El Omari's claim therefore must be dismissed. See Bardes, 932 F. Supp. 2d at 639.

The Court notes that even if New York law applied, El Omari's prima facie tort claim would also be dismissed. This claim is time-barred by New York's one-year statute of limitations. See Havell v. Islam, 739 N.Y.S.2d 371, 372 (App. Div. 2d Dep't 2002) (one-year limitations period applied to prima facie tort). Moreover, the prima facie tort claim is duplicative of El Omari's defamation claim. See Goldman v. Barrett, No. 15 Civ. 9223, 2016 WL 5942529, at *7-8 (S.D.N.Y. Aug. 24, 2016) (dismissing prima facie tort claim since the

same factual allegations underlie plaintiff's defamation claim).

The Court therefore finds that El Omari's prima facie tort claim against Buchanan and Longview must be dismissed under North Carolina or New York law.

C. DEFAMATION

El Omari's defamation claim is based on two sets of statements: (1) Buchanan's statements to Stirling at the October 2018 meeting, (see AC ¶ 134), and (2) statements in the IO Article, (see AC ¶ 19, 24, 135).[6] The parties again dispute whether New York or North Carolina law applies to El Omari's claim. Defendants argue that there is no substantial conflict between North Carolina and New York defamation law, but that North Carolina law should apply. (See Mot. at 11 n.4.) El Omari argues that New York law applies to his defamation claim for the same reasons it applies to his prima facie tort claim. (See Opp'n at 14.)

1. North Carolina Law Applies

The Court will forgo with a conflict-of-laws analysis because North Carolina law applies regardless. If there is a conflict between New York and North Carolina defamation law,

---

[6]   Intelligence Online is a defendant in this action but failed to appear. The Court granted El Omari's motion for a default judgment, (see Dkt. No. 67), but the Order was stayed pending the resolution of the defamation claims against Defendants, (see Dkt. No. 81).

the Court would apply North Carolina law because defamation is a conduct-regulating rule and El Omari lived in North Carolina when the alleged tort occurred. (See AC ¶¶ 4, 26.) See Catalanello v. Kramer, 18 F. Supp. 3d 504, 512 (S.D.N.Y. 2014) (noting that "discouraging defamation is a conduct regulating rule" and applying law of the state where plaintiff resided). However, in the absence of a conflict, New York courts may dispense with a choice of law analysis, see IBM Corp. v. Liberty Mut. Ins., 363 F.3d 137, 143 (2d Cir. 2004), and "courts may apply New York law, but are not required to do so." Feldman Law Grp. P.C. v. Liberty Mut. Ins., 819 F. Supp. 2d 247, 257 (S.D.N.Y. 2011). In other words, in the absence of a conflict of laws, the Court could apply North Carolina law. Since North Carolina law would or could apply regardless of a conflict, the Court will apply North Carolina law to El Omari's defamation claim. See Negri v. Friedman, No. 14 Civ. 10233, 2017 WL 2389697, at *4 (S.D.N.Y. May 31, 2017) (finding that "regardless of whether or not a conflict exists between [Nevada and New York's] laws here, the Court may—and will—apply Nevada law").

    2. El Omari's Defamation Claim Fails

    To state a defamation claim under North Carolina law, "a plaintiff must prove: (1) defendant spoke or [published] base or defamatory words which tended to prejudice him in his

reputation, office, trade, business or means of livelihood or hold him up to disgrace, ridicule or contempt; (2) the statement was false; and (3) the statement was published or communicated to and understood by a third person." <u>Friel v. Angell Care Inc.</u>, 440 S.E.2d 111, 113-14 (N.C. Ct. App. 1994). Defamation claims are subject to a one-year statute of limitations, which "begins to run upon publication, regardless of when the plaintiff learns of the statement." <u>Progress Solar Sols., LLC v. Fire Prot., Inc.</u>, No. 17 Civ. 152, 2019 WL 3544072, at *4 (E.D.N.C. Aug. 1, 2019) (applying N.C. Gen. Stat. § 1-54(3) to defamation).

   a. <u>Statements at the October 2018 Meeting</u>

   The statute of limitations for El Omari's claim based on Buchanan's statements to Stirling, during the October 2018 meeting, expired in October 2019. (<u>See</u> AC ¶ 134.) The allegations that Buchanan's statements defamed El Omari are therefore dismissed as time-barred, since El Omari brought his claim seventeen months after the alleged meeting. <u>See</u> <u>Progress Solar</u>, 2019 WL 3544072, at *4. El Omari argues that if discovery shows Buchanan repeated the statement that El Omari is a human trafficker, then he may have a claim for actionable republishing. (<u>See</u> Opp'n at 15.) But a plaintiff is not entitled to discovery for claims that are dismissed. <u>See</u> <u>Boda v. Phelan</u>, No. 11 Civ. 028, 2012 WL 3241213, at *3

(E.D.N.Y. Aug. 6, 2012) (finding that plaintiff could not "invoke the discovery process as a basis to search for evidence of other possible defamation claims that were not alleged due to the fact that his existing claims may be time-barred"). Now remaining are the allegedly defamatory statements in the IO Article.

### b. Statements in the IO Article

El Omari challenges three statements from the IO Article: (1) that El Omari "reportedly" embezzled money from RAKIA; (2) that RAKIA "believes" that El Omari misappropriated $1.5 billion; and (3) several phrases that associated El Omari with another senior official, Kather Massaad. (See AC ¶ 19; AC Ex. 1 at 1.) Defendants move to dismiss El Omari's defamation claim on three grounds, which the Court will analyze in turn.

### i. Allegations Are Facially Insufficient

Defendants first argue that El Omari has failed to allege with any specificity that they made the challenged statements. Under North Carolina law, "the words attributed to [a] defendant [must] be alleged 'substantially' *in haec verba*, or with sufficient particularity to enable the court to determine whether the statement was defamatory." Horne v. Cumberland Cnty. Hosp. Sys., Inc., 746 S.E.2d 13, 20 (N.C.

Ct. App. 2013) (quoting Stutts v. Duke Power Co., 266 S.E.2d 861, 866 (N.C. Ct. App. 1980)).

El Omari quotes the challenged statements, but the IO Article never attributes those statements to Defendants. (See AC ¶ 19; AC Ex. 1 at 1.) The IO Article instead attributes its sources to "our information," "legal proceedings open in various jurisdictions," and to details from an issue of a British magazine called Private Eye. (See AC Ex. 1 at 1, 3.) In effect, the only allegation in the Amended Complaint that connects Defendants to the IO Article is El Omari's bare assertion that they "conveyed and published the false facts about El Omari between themselves and to Intelligence Online, and Intelligence Online did publish the false facts." (AC ¶ 24.) This is a conclusory allegation since El Omari does not plead any facts that Defendants ever spoke to each other or to Intelligence Online regarding the information underlying the IO Article. Dane, 974 F.3d at 188 (noting that courts are not required to "credit conclusory allegations . . . couched as factual allegations"). El Omari thus fails to state a plausible defamation claim because the Amended Complaint fails to plead sufficient facts demonstrating that any of the statements in the IO Article are attributed directly to the

Defendants.[7] See <u>Wynn v. Tyrrell Cnty. Bd. of Edu.</u>, No. COA16-1130, 2017 WL 2118713, at *3 (N.C. Ct. App. May 16, 2017) (dismissing defamation claim where complaint "merely refers to statements that 'Defendants' made to 'third parties.'").

El Omari argues that Gerrard and Dechert are "cited for credibility" in the IO Article, (Opp'n at 17), but he is incorrect. The IO Article *refers* to Gerrard and Dechert only when describing allegations against them by a different plaintiff in pending actions in the District of Columbia and the High Court of Justice in London. (See AC Ex. 1 at 3.)

### ii.  Failure to Allege Falsity

Defendants next argue that the statements regarding El Omari "reportedly" misappropriating funds, and that RAKIA "believes" he embezzled funds, are opinions or facts. (See Mot. at 14.) Under North Carolina law, "rhetorical hyperbole and expressions of opinion not asserting provable facts are protected speech." <u>Daniels v. Metro Mag. Holdings, Co.</u>, 634 S.E.2d 586, 539 (N.C. Ct. App. 2006). "Whether a statement constitutes fact or opinion is a question of law for the trial court to decide." <u>Lewis v. Rapp</u>, 725 S.E.2d 597, 602 (N.C.

---

[7]  El Omari also fails to allege any facts that Defendants ever reported him to DHS or any law enforcement agency, such that Defendants could be responsible for generating the DHS agents' visit to El Omari in North Carolina. As a result, these allegations also do not state a plausible defamation claim. <u>Dane</u>, 974 F.3d at 188 (noting that courts are not required to "credit conclusory allegations . . . couched as factual allegations").

Ct. App. 2012) (quoting Potomac Valve & Fitting Inc. v. Crawford Fitting Co., 829 F.2d 1280, 1285 n.12 (4th Cir. 1987)). When determining whether a "statement can be reasonably interpreted as stating actual facts about an individual, courts look to the circumstances in which the statement is made," specifically "whether the language used is loose, figurative, or hyperbolic language, as well as the general tenor of the article." Id. (quoting Daniels, 634 S.E.2d at 540). To be clear, the issue before the Court is not whether El Omari *actually* embezzled or misappropriated funds but merely whether in fact RAKIA *believes* that El Omari misappropriated funds.

Although El Omari alleges that the charges against him in RAK are "bogus," (AC ¶ 39), he cannot contest that the circumstances of his allegations show that RAK and its instrumentalities *believe* that he misappropriated funds. The Amended Complaint itself references his conviction in RAK. (See id.) Several months before the IO Article was published, El Omari wrote an op-ed in *The Washington Post* where he stated that he was falsely prosecuted and convicted in RAK of "embezzlement and abuse of position."[8] (See "El Omari Op-Ed,"

---

[8]   Defendants argue that a declaration from RAKFTZA's counsel, submitted in another action, support the assertion that RAK and its instrumentalities believe that El Omari is guilty of criminal conduct. (See Mot. at 14.) The Court does not consider this declaration because it is not proper for judicial notice. See Int'l Star Class Yacht Racing

Dkt. No. 83-2 (Oussama El Omari, _Opinion: Interpol's 'Red Notices' Are Being Aboused. One Ruined My Life_, Wash. Post (Dec. 19, 2018)).) See _Garber v. Legg Mason, Inc._, 347 Fed. App'x 665, 669 (2d Cir. 2009) (finding courts may take judicial notice of news articles on a motion to dismiss even if not "mentioned on the face of the complaint"). El Omari's op-ed demonstrates that there is sufficient basis supporting a finding that RAK and its instrumentalities believe that El Omari misappropriated funds, regardless of whether the embezzlement allegations have merit. As a result, the challenged statements in the IO Article contain provable facts.

Defendants separately argue that the statements in the IO Article are protected by the fair report privilege, which bars defamation claims against publishers for statements regarding matters of public interest, such as arrests and criminal charges. See _LaComb v. Jacksonville Daily News Co._, 543 S.E.2d 219, 220-21 (N.C. Ct. App. 2001) (applying fair report privilege to article regarding arrest of two minors). The privilege protects a publisher whenever statements are "substantially accurate" in describing the proceedings. Id.

_Ass'n v. Tommy Hilfiger U.S.A., Inc._, 146 F.3d 66, 70 (2d Cir. 1998) ("A court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." (quotations omitted)).

For the same reasons that the challenged statements in the IO Article assert facts, the Court is persuaded that such representations are substantially accurate and are therefore also protected by the fair report privilege. See Desmond v. News and Observer Publ'g Co., 772 S.E.2d 128, 140-41 (N.C. Ct. App. 2015) (finding statements were subject to fair report privilege although "not absolutely accurate").[9] To be clear, the Court finds only that the IO Article accurately stated the existence of allegations against El Omari, but not that those allegations are absolutely true or meritorious.

### iii. Failure to Allege Actual Malice

Defendants lastly argue that El Omari is a public figure and must therefore allege actual malice. (See Mot. 16-17.) A statement is made with actual malice when it is published "with knowledge that it was false or with reckless disregard of whether it was false or not." Lewis, 725 S.E.2d at 601 (quoting Varner v. Bryan, 440 S.E.2d 295, 299 (N.C. Ct. App. 1994)). Although malice is normally presumed in defamation cases, when a plaintiff is a public figure, the First Amendment requires the plaintiff to prove that a defamatory

---

[9]  El Omari alleged that he never worked at RAKIA and that the IO Article falsely stated that he worked there. (AC ¶ 19(b); Opp'n at 16.) This error does not overcome a determination that the challenged statements were substantially, although not absolutely, accurate. See LaComb, 543 S.E.2d at 222 (concluding statements were substantially accurate despite grammatical mistakes); Desmond, 772 S.E.2d at 140-41.

statement was made with actual malice. See <u>N.Y. Times Co. v.
Sullivan</u>, 376 U.S. 254, 279-80 (1964) (requiring public
officials to prove actual malice); <u>Curtis Publ'g v. Butts</u>,
388 U.S. 130, 154-55 (1967) (extending <u>Sullivan</u> to public
figures).

"Public figures are categorized as 'involuntary public
figures, all purpose public figures, and limited purpose
public figures.'" <u>Boyce & Isley, PLLC v. Cooper</u>, 710 S.E.2d
309, 318 (N.C. Ct. App. 2011) (quoting <u>Gaunt v. Pittaway</u>, 534
S.E.2d 660, 665 (N.C. Ct. App. 2000)). "Under North Carolina
law, an individual may become a limited purpose public figure
by his purposeful activity amounting to a thrusting of his
personality into the 'vortex' of an important public
controversy." <u>Id.</u> (quoting <u>Gaunt</u>, 534 S.E.2d at 665). El Omari
argues that he never occupied a position of "persuasive power
and influence" to be an all-purpose public figure, and that
initiating this and two prior cases, alleging retaliation and
harassment from RAK, to "vindicate his rights" does not make
him a limited-purpose public figure.[10] (Opp'n at 16-17.)

---

[10]  See <u>El Omari v. Ras Al Khaimah Free Trade Zone Auth.</u>, No. 16 Civ. 3895,
2017 WL 3896399, at *11 (S.D.N.Y. Aug. 18, 2017) (dismissing all claims
against defendants, including Sheikh Saud and RAKFTZA) [hereinafter
<u>RAKIA</u>], <u>aff'd sub nom. El Omari v. Kreab (USA), Inc.</u>, 735 Fed. App'x
30 (2d Cir. 2018); <u>El Omari v. Int'l Criminal Police Org. - Interpol</u>,
No. 19 Civ. 1457, 2021 WL 1924183 (E.D.N.Y. May 13, 2021) (dismissing
claims against Interpol).

The Court finds, however, that El Omari is a limited-purpose public figure. His status as the former Director and CEO of RAKFTZA, an instrumentality of the RAK government, makes him a public figure. (AC § 4, 29.) See Phifer v. City of Rocky Mount, No. 08 Civ. 292, 2010 WL 3834565, at *10 (E.D.N.C. Aug. 12, 2010) (finding that former police officer was still a "public figure" after he resigned); see also Cabello-Rondon v. Dow Jones & Co., No. 16 Civ. 3346, 2017 WL 3531551, at *7-8 (S.D.N.Y. Aug. 16, 2017) (holding that member of Venezuela's legislature was a public figure for defamation claim). Putting aside the commencement of this action and other lawsuits alleging retaliation by RAK, El Omari thrust himself into the controversy around the charges against him by publishing the Washington Post op-ed. (See El Omari Op-Ed.) See Gaunt, 534 S.E.2d at 665-66 (finding plaintiff was a public figure where he took steps to "enhance his public image" and was interviewed by news outlet). El Omari is therefore required to allege actual malice. But the Amended Complaint does not adequately allege that any statements in the IO Article were attributable to Defendants, let alone that Defendants made statements with knowledge of or reckless disregard for their falsity.

For the above reasons, the Court finds that El Omari failed to allege a plausible defamation claim based on

(1) Buchanan's statements to Stirling in October 2018, or (2) statements from the IO Article.

D. CFAA

El Omari's final claim alleges a civil CFAA violation, under 18 U.S.C. § 1030(a)(4), based on his communications with Alison, which underlie a predicate for his civil RICO claim. To maintain a Section 1030(a)(4) claim, a plaintiff must allege the defendant "(1) knowingly and with intent to defraud; (2) accessed a protected computer without authorization; (3) obtained anything of value; and (4) caused loss . . . aggregating at least $5,000." Sprint Sols., Inc. v. Sam, 206 F. Supp. 3d 755, 765 (E.D.N.Y. 2016) (citing 18 U.S.C. §§ 1030(a)(4), 1030(g)).

Preliminarily, Defendants argue that El Omari's claim is subject to the heightened pleading standards of Federal Rule of Civil Procedure Rule 9(b). Courts in this Circuit have generally found that CFAA claims are subject to the notice pleading standard under Federal Rule of Civil Procedure 8(a). See Dedalus Found. v. Banach, No. 09 Civ. 2842, 2009 WL 3398595, at *4 (S.D.N.Y. Oct. 16, 2009); Feldman v. Comp Trading, LLC, No. 19 Civ. 4452, 2021 WL 930222, at *3 (E.D.N.Y. Mar. 11, 2021). Some courts across the country have held that Section 1030(a)(4) claims are subject to Rule 9(b). See Synopsys, Inc. v. Ubiquiti Networks, Inc., 313 F. Supp.

3d 1056, 1072 (N.D. Cal. 2018) (applying Rule 9(b) to
1030(a)(4) claim); <u>Motorola, Inc. v. Lemko Corp.</u>, 609 F. Supp.
2d 760, 765 (N.D. Ill. 2009). However, the weight of court
opinion suggests that that Rule 9(b) does not apply to Section
1030(a)(4) because "intent to defraud" is best understood as
requiring wrongdoing, but not the elements of common law
fraud. <u>See</u> <u>Sprint Nextel Corp. v. Simple Cell, Inc.</u>, No. 13
Civ. 617, 2013 WL 3776933, at *6 (D. Md. July 17, 2013)
(collecting cases); <u>T-Mobile USA, Inc. v. Terry</u>, 862 F. Supp.
2d 1121, 1130 (W.D. Wash. 2012) ("'Intent to defraud' under
Section 1030(a)(4) simply means wrongdoing whereby the
defendant participated in dishonest methods to obtain the
plaintiff's secret information." (citation and quotation
marks omitted)). The Court agrees with the weight of cases
and applies Rule 8(a) to El Omari's Section 1030(a)(4) claim.

Defendants move to dismiss El Omari's CFAA claim for
failure to allege (1) any affiliation to Alison, (2) the
requisite injury under the CFAA, and (3) that Alison or
Defendants "accessed" El Omari's computer. (<u>See</u> Mot. at 17-
20.)

1. <u>Affiliation with Alison</u>

El Omari alleges that Defendants, "by and through their
agent 'Samantha Alison' did conspire and/or attempted to"
violate Section 1030(a)(4). (AC ¶ 151.) He argues, in his

Opposition, that he has adequately alleged a conspiracy to violate the CFAA and does not need to allege an overt act. (See Opp'n at 20.) As noted above concerning El Omari's RICO claim, the Amended Complaint fails to allege any facts that Alison had any relationship to or conspired with the Defendants.

A CFAA claim should be dismissed where plaintiffs "provided no facts to establish that [the defendant] or any of its employees is affiliated with the hacks of [p]laintiffs' computers." Broidy v. Global Risk Advisors LLC, No. 19 Civ. 11861, 2021 WL 1225949, at *9 (S.D.N.Y. Mar. 31, 2021) (dismissing claim where none of the allegations "provide support for the contention that [defendant] actually executed the hack in this case or otherwise suggest that [defendant] is plausibly liable"); JBC Holdings NY, LLC v. Pakter, 931 F. Supp. 2d 514, 526 (S.D.N.Y. 2017) (dismissing CFAA claim since plaintiff made "speculative" allegations). El Omari filed a prior action against RAKFTZA in this District and sought to amend his complaint to add a CFAA claim alleging that those defendants hacked his personal website in March 2014. See RAKFTZA, 2017 WL 3896399, at *11, aff'd sub nom. El Omari v. Kreab (USA), Inc., 735 Fed. App'x 30 (2d Cir. 2018). The RAKFTZA court denied the request because El Omari simply did "not allege sufficient factual matter to permit a 'reasonable

inference,' that RAKFTZA — as opposed to someone else — was involved in the hacking of plaintiff's website." Id. As was the case in RAKFTZA, the Court finds that El Omari's fails to plausibly allege that Defendants — as opposed to someone else — were responsible for any purported hacking of El Omari's computer or conspired with Alison for that purpose. JBC Holdings, 931 F. Supp. 2d at 526; Broidy, 2021 WL 1225949, at *9; RAKFTZA, 2017 WL 3896399, at *11.

### 2. Financial Loss Greater Than $5,000

Defendants next argue that El Omari fails to allege that he "incurred any cost or otherwise realized any economic loss from his decision to speak with Alison." (Mot. at 19.) El Omari alleges that the information he provided to Alison "amounts to illegal information gathering and is valuable to a party defending this action far in excess of $5,000," as demonstrated by Alison's "efforts" to speak with him. (AC ¶ 148.) He now also argues, in his Opposition, that his attorneys' fees and investigation costs responding to Alison's conduct exceed $5,000. (See Opp'n at 19-20.)

Under the CFAA, a plaintiff must allege that he or she suffered one of five types of statutorily prescribed injuries. See 18 U.S.C. § 1030(g) (requiring injury set forth in Section 1030(c)(4)(A)(i)). El Omari concedes that the injury applicable here is "loss . . . during any 1-year period

. . . aggregating at least $5,000 in value." 18 U.S.C. §
1030(c)(4)(A)(i)(I). (See AC ¶ 149.) The CFAA defines "loss"
as "any reasonable cost to any victim, including the cost of
responding to an offense, conducting a damage assessment, and
restoring the data, program, system, or information to its
condition prior to the offense, and any revenue lost, cost
incurred, or other consequential damages incurred because of
interruption of service." 18 U.S.C. § 1030(e)(11).

In Van Buren v. United States, 141 S. Ct. 1648, 1660
(2021), the Supreme Court recently found that the "statutory
definitions of 'damage' and 'loss' . . . focus on
technological harms — such as the corruption of files — of
the type unauthorized users cause to computer systems and
data." This limitation "makes sense in a scheme 'aimed at
preventing the typical consequences of hacking.'" Id.
(quoting Royal Truck & Trailer Sales & Serv., Inc. v. Kraft,
974 F.3d 756, 760 (6th Cir. 2020)). Prior to Van Buren, courts
in this District similarly interpreted the CFAA to require
"loss" related to damage or impairment of the target computer
itself. See Better Holdco, Inc. v. Beeline Loans, Inc., No.
20 Civ. 8686, 2021 WL 3173736, at *3 (S.D.N.Y. July 26, 2021)
(collecting cases). For these reasons, the Court finds that
when determining whether certain costs fall under "loss," the
focus is on the connection between the plaintiff's response

and "damage to or impairment of the protected computer." Id.;
see also Deutsche v. Hum. Res. Mgmt., Inc., No. 19 Civ. 5305,
2020 WL 1877671, at *4 (S.D.N.Y. Apr. 15, 2020).

The Amended Complaint falls short of this requirement.
El Omari does not allege that he suffered costs "from efforts
to identify, diagnose, or address damage" specifically to his
computer or any other device. Deutsche, 2020 WL 1877671, at
*4. He only alleges that the information he provided is
"valuable to [the Defendants]" in excess of $5,000, (AC ¶
148), which is insufficient for alleging "loss." While El
Omari now argues that he incurred attorneys' fees and
investigation costs related to Alison's conduct, there are no
factual allegations in the Amended Complaint connecting these
costs to any damage to his computer itself. (See AC ¶ 148.)
El Omari therefore also fails to plausibly allege he suffered
the requisite "loss" needed to maintain a CFAA claim.

    3. "Access" to El Omari's Computer

Defendants' final argument to dismiss El Omari's CFAA
claim is that he fails to allege Alison "accessed" his
computer. (See Mot. at 18-19.) Defendants specifically
contend that there are no allegations in the Amended Complaint
that Alison's emails and Skype communications with El Omari
contained malware of any sort. (See id.)

Section 1030(a)(4) imposes liability where a defendant "accesses" a computer either "without authorization" or while "exceed[ing] authorized access." 18 U.S.C. § 1030(a)(4). The statute defines "exceeding authorized access," but it does not define "access" or "without authorization." In turn, courts have developed competing interpretations of "access." Some courts have adopted a broad construction, finding that computers are interoperable machines and, as a result, "access" occurs by sending a signal that is received or processed by another computer. See, e.g., United States v. Drew, 259 F.R.D. 449, 457 (C.D. Cal. 2009) (reasoning that "access" will "always be met when an individual using a computer contacts or communicates with an internet website"); Am. Online, Inc. v. Nat'l Health Care Disc., Inc., 121 F. Supp. 2d 1255, 1273 (N.D. Iowa 2000) (concluding that when someone sends an email that is "transmitted through a number of other computers until it reaches its destination," the sender is "accessing" those computers). Other Courts have adopted a narrow interpretation of the term, concluding that "access" to a computer occurs when a defendant bypasses restrictions on a computer to obtain information or privileges not otherwise available to the public. See, e.g., Sandvig v. Barr, 451 F. Supp. 3d 73, 85 (D.D.C. 2020) (noting that most courts have found accessing a computer "without

45

authorization" involves "transitioning from a public area of the internet to a private, permission-restricted area, often requiring some form of authentication before a viewer is granted access"); United States v. Lawson, No. 10 Civ. 114, 2010 WL 9552416, at *5 (D.N.J. Oct. 12, 2010)(holding indictment adequately alleged "unauthorized access and exceeding authorized access" based on "a number of actions taken by defendants to defeat code-based security restrictions on [the victim's] websites").

The Van Buren Court recently provided additional guidance on this issue. The Supreme Court noted that "[w]hen interpreting statutes, courts take note of terms that carry technical meaning[s]." Van Buren, 141 S. Ct. at 1657 (quotations omitted). "[A]ccess" is such a term that has "long carr[ied] a 'well established' meaning in the 'computational sense.'" Id. The Van Buren Court found that, "in the computing context, 'access' references the act of entering a computer 'system itself' or a particular 'part of a computer system,' such as files, folders, or databases.'" Id.; see also Royal Truck, 974 F.3d at 759 (reviewing the Oxford English Dictionary to find that "access" is "commonly defined as some variation of 'entry,' generally the initial entry into something"); WEC Carolina Energy Sols. LLC v. Miller, 687 F.3d 199, 204 (4th Cir. 2012) (finding that "access" is

defined as a means "'[t]o obtain, acquire,' or '[t]o gain admission to'"). The Supreme Court ultimately appeared to approve of the narrow interpretation of "access" when it held that "an individual 'exceeds authorized access' when he accesses a computer with authorization but then obtains information located in particular areas of the computer — such as files, folders, or databases — that are off limits to him." Van Buren, 141 S. Ct. at 1662.

Considering the preceding cases, the Court concludes that, to maintain a Section 1030(a)(4) claim, El Omari must establish that Alison "accessed" his computer by entering the computer system itself or any part thereof, such as its files, folders, or data. See id. at 1657. The Amended Complaint again fails to satisfy this standard. El Omari alleges that Alison "accessed" his computer by him merely exchanging several emails, phone calls, and Skype communications with Alison. (See AC ¶¶ 139-41; Opp'n at 18-19.) Passive receipt of an electronic communication without more is insufficient to establish that a defendant *entered* a plaintiff's computer system or any part thereof.[11] See Van Buren, 141 S. Ct. at

---

[11] The Court recognizes that a common hacking technique is to send malicious code via an electronic message that in turn grants entry to a victim's computer system or a part thereof. See Cybersecurity & Infrastructure Security Agency, U.S. Dep't of Homeland Sec., Protecting Against Malicious Code, (last revised Sept. 28, 2018), https://us-cert.cisa.gov/ncas/tips/ST18-271 (noting that malware may spread by email attachments and social media). But again, El Omari

1657; see also Delacruz v. State Bar of Cal., No. 16 Civ. 06858, 2018 WL 3077750, at *6 (N.D. Cal. Mar. 12, 2018) ("[S]ending an email does not constitute accessing a computer."), aff'd, 768 F. App'x 632 (9th Cir. 2019). Although El Omari asserts that Alison deceived him, the Amended Complaint alleges that El Omari divulged information to Alison of his own accord, by his own statements in emails, phone calls, and Skype communications. (AC ¶¶ 141, 143, 147.)

The Court therefore finds that El Omari's civil CFAA claim for violation of 18 U.S.C. § 1030(a)(4) must be dismissed because he fails to plausibly allege (1) any affiliation between Defendants and Alison, (2) the requisite injury under the CFAA, and (3) that Alison or Defendants "accessed" El Omari's computer. (See Mot. at 17-20.)

---

fails to allege that Alison or any Defendant was granted entry to his computer or any part thereof.

48

## IV.   ORDER

For the reasons stated above, it is hereby

**ORDERED** the motion from defendants James E. D. Buchanan, Dechert LLP, Andrew D. Frank, a/k/a Andrew D. Solomon, Neil Gerrard, Amir Ali Handjani, a/k/a Amirali Handjani, KARV Communications, Inc., and Longview Partners (Guernsey) Ltd., to dismiss the Amended Complaint of plaintiff Oussama El Omari (Dkt. No. 82) is **GRANTED**.

**SO ORDERED.**

Dated:   December 10, 2021
         New York, New York

                                        Victor Marrero
                                          U.S.D.J.