# EXHIBIT A

# Weil, Gotshal & Manges LLP

100 Federal Street, 34th Floor
Boston, MA 02110-1802
+1 617 772 8300 tel
+1 617 772 8333 fax

**Patrick J. O'Toole Jr.**
+1 (617) 772-8365
patrick.otoole@weil.com

August 11, 2020

The Honorable Victor Marrero
United States District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

**Re: Oussama El Omari v. James E.D. Buchanan, et al. Case No. 1:20-cv-02601 (VM)**

Dear Judge Marrero:

On behalf of Defendant Longview Partners (Guernsey) Ltd. ("Longview"), we write to request a pre-motion conference under Individual Practice Rule II.B.2 regarding Longview's proposed Motion to Dismiss the Amended Complaint (the "AC") (the "Motion").

Per Rule II.B.1, Longview and Plaintiff ("Omari") exchanged letters, Exhibits A and B, setting forth their positions. Longview's Motion is necessary as Omari refuses to dismiss his claims as to Longview (Counts II, III and IV). Longview—with no connection to this forum or the facts alleged—advised Omari that this Court lacks personal jurisdiction over Longview, that Longview does not now and has never managed assets on behalf of the State of Ras Al Khaimah, that Defendant James Buchanan has never been an employee nor a shareholder of Longview, and that the AC fails to state a cognizable claim against Longview. Despite being repeatedly informed of the AC's factual inaccuracies and legal deficiencies, Omari doubled down on speciously alleged "employment interrelationships." AC ¶ 17. The only allegation connecting Longview to this litigation is that Buchanan was one of Longview's non-executive directors. But an individual director is not an agent of a corporation and has no authority to act on his own. *Harlen River Consumer Co-Op, Inc. v. Assoc'd Grocers of Harlen, Inc.*, 408 F. Supp 1251, 1270 (S.D.N.Y. 1976). Moreover, the AC makes clear Buchanan was not acting on behalf of or at the direction of Longview. AC ¶ 5, 16, 17. Omari's response attached irrelevant pleadings and testimony—not mentioning Longview—and SEC filings not supporting his claims. The sole pleading Omari submits that mentions Longview is a complaint from *Whitman & Co. v. Longview Partners (Guernsey)*, Case 1:14-cv-12047 (D. Mass.), which has no relationship to the current claims, forum or parties. In fact, Omari references a claim of "unfair and deceptive business acts" from that case that was dismissed with prejudice for failure to state a claim. Case 1:14-cv-12047 (D. Mass. July 20, 2015), ECF No. 46, at 7. Omari's use of an unrelated claim dismissed by a federal court's decision shows the lengths he will go to hide the AC's deficiencies.

Omari fails to fix any fatal flaw Longview flagged. Notably, Omari did not respond to the one-year time bar of Counts II and III for an alleged 2018 meeting, effectively conceding those claims. *See Feiske v. Hirschmann*, 2012 WL 716632, *3 (S.D.N.Y. 2012). Omari fails to rebut Longview's other bases for dismissal: (1) Longview is not subject to personal jurisdiction in New York, as it has no systematic contacts, no alleged conduct occurred in New York, and, even if it did, Omari insufficiently alleged an agency relationship for jurisdiction over Longview; (2) Count II is

precluded—as a prima facie tort claim is disfavored under New York law and can only stand where there are *no* traditional tort remedies; (3) Counts II, III, and IV fail as no agency relationship is well-pleaded to link any conduct and Longview; and (4) Counts III and IV are fatally deficient.

**PERSONAL JURISDICTION:** Omari fails to meaningfully contest the Court's lack of personal jurisdiction over Longview. Instead, Omari only offers speculation and baseless conclusion. Firstly, Omari's claims lack minimum contacts and reasonableness due process requires. Omari pleads no facts why Longview should "anticipate being haled into court" in New York or New York's interest, "particularly in [this] international context." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 627-28 (S.D.N.Y. 2003), *aff'd*, 355 F.3d 206 (2d Cir. 2004). Longview has no office, no property, and no employees in New York, and no alleged conduct was in, or directed at, New York. New York's long-arm falls short of Longview. *Best Van Lines v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec. v. Mont. Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006)). Jurisdiction needs "an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Id*. But Omari alleges no act by Longview, or link among this suit, Longview and New York. Nor exists general jurisdiction over Longview. Longview's links with New York would need to be "continuous and systematic" rendering it "essentially at home." *Aybar v. Aybar*, 169 A.D.3d 137, 144 (2019); *see also Brown v. Lockheed Martin*, 814 F.3d 619, 627 (2d Cir. 2016). These requirements cannot be met here. Omari ignores all this. Omari's cases all contradict his claims or are inapt to the facts alleged: *Walden v. Fiore*, 571 U.S. 277, 288 (2014) (holding no personal jurisdiction); *Sonterra v. Barclays*, 366 F. Supp. 3d 516, 562 (S.D.N.Y. 2018) (requiring nationwide service of process unavailable here); *Wilson v. Dantas*, 128 A.D.3d 176, 182 (1st Dep't 2015) (contract negotiated and signed in New York).

**PRIMA FACIE TORT:** Longview informed Omari that New York law disfavors—and that any claim covered by a traditional tort, including defamation, cannot survive as—a prima facie tort. *Goldman v. Barrett*, 2016 WL 5942529, at *7 (S.D.N.Y. Aug. 24, 2016) (collecting cases). Omari tried to argue that as his claim is unrecoverable as defamation, it is available as a prima facie tort. But New York law is clear that a failed traditional tort cannot be a viable prima facie tort. *Friends of Falun Gong v. Pac. Cult. Enter.*, 288 F. Supp. 2d 273, 284 (E.D.N.Y. 2003), *aff'd*, 109 F. App'x 442 (2d Cir. 2004) ("[I]t is well-settled that any claim that is covered by a traditional tort cannot be the basis for a claim of prima facie tort—even if the traditional tort claims turn out not to be viable."). Omari also omits response to: (a) his failure to plead special damages, *see Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 369 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 4 (2d Cir. 2010); (b) his failure to plausibly plead any action by Longview or agency, AC ¶¶ 5, 16, 17, *Treppel v. Biovail*, 2005 WL 2086339 at *3 (S.D.N.Y. 2008), *Mahoney v. Staffa*, 256 A.D.2d 827, 828 (1998); or (c) his claim is time-barred, *see Riddell Sports v. Brooks*, 872 F. Supp. 73, 76 (S.D.N.Y. 1995). Omari instead cites unavailing or irrelevant cases. *E.g.*, *Loudon v. Hayek*, 756 F. Supp. 107, 108 (S.D.N.Y. 1989); *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010).

**DEFAMATION:** As noted, Omari did not dispute and thus concedes that the defamation claim (and prima facie tort) relating to an alleged October 2018 meeting are time-barred, but tries to recast the AC to somehow connect Longview to an Intelligence Online ("IO") article. Longview's opening letter showed that Omari failed to plead Longview had any part in the publication. Omari, in reply, surprisingly claims "AC, Par. 24, made such an allegation." But paragraph 24 makes no

mention of Longview, and no way bolsters a conclusory "employment interrelationships" agency assertion. AC ¶ 17. Likewise, the UK decision Omari cites nowhere mentions Longview. Ex. 1 to Ex. B. Omari vaguely cites "*Palatkevich*," and other cases he cites are irrelevant, inapposite or underscore AC deficiencies.  *E.g.*, *Medcalf v. Walsh*, 938 F. Supp. 2d 478, 486 (S.D.N.Y. 2013); *Fuji Photo Film U.S.A. v. McNulty*, 669 F. Supp. 2d 405, 411 (S.D.N.Y. 2009). Omari tries to confuse the Court with unrelated material, but pleads no plausible facts as to Longview.

**CFAA:** Longview explained that Omari's claim that all defendants (save IO) violated the Computer Fraud and Abuse Act in a faux-Fox News reporter conspiracy bears three chief fatal flaws. AC ¶¶ 139-51. First, Omari's communications with the reporter were neither unauthorized nor access to a computer under the CFAA. *LivePerson, Inc. v. 24/7 Customer*, 83 F. Supp. 3d 501, 511 (S.D.N.Y. 2015). Second, the CFAA requires at least $5,000 in harm, but Omari incurred no fiscal or computer damage. He only assertedly gave facts worth over $5,000 sans explanation. AC ¶¶ 147-49. Third, Omari conclusorily alleges the reporter was the agent of, and conspired with, defendants. *Id.* ¶¶ 150-51. He pleads *no* facts of conspiracy, nor of the CFAA's heightened pleading. *Oracle v. Serv. Key*, 2012 WL 6019580, at *6 (N.D. Cal. Dec. 3, 2012). Omari points to a cease-and-desist letter that he mistakenly sent to Buchanan "care-of Longview" 15 months before this suit. Again, nothing plausibly links the cease-and-desist letter to the current claims or to Longview. Omari also claims the reporter's emails were actionable "spear-phishing," but his cited UK decision's definition of the term rebuts him. Ex. 1 ¶ 35, to Ex. B. He claims legal fees suffice for harm too, but nowhere in the AC alleges investigating a security breach. The CFAA claim fails.

**DISCOVERY:** Omari cites *DiVittorio v Equidyne*, 822 F.2d 1242, 1247-49 (2d Cir. 1987), involving a claim of fraud, to somehow claim discovery is needed… But, *DiVittorio* still requires the pleader to "alleg[e] facts upon which his belief is founded." *Id.*  Before discovery, a plaintiff must plead in good faith "legally sufficient allegations of jurisdiction" to overcome dismissal for lack of personal jurisdiction. *Ball v. Metallurgie*, 902 F.2d 194, 197 (2d Cir. 1990). That requires more than a legal standard restated as fact. *Jazini v. Nissan*, 148 F.3d 181, 184-85 (2d Cir. 1998). Rather, a plaintiff must "allege facts constituting a *prima* facie showing of personal jurisdiction." *PDK Labs v. Friedlanden*, 103 F.3d 1105, 1108 (2d Cir. 1997). Conclusory allegations, "particularly those stated only upon 'information and belief,'" fail to establish personal jurisdiction. *Chone v. Healthtronics*, 2007 WL 1836831, at *5 (E.D.N.Y. June 20, 2007). Omari's unfounded and frankly erroneous "employment interrelationships" allegations fail. Here, any alleged conduct is unrelated to Longview. Omari fails to make a prima facie showing needed to avoid dismissal. *Jazini*, 148 F.3d at 184; *Sonterra v. Credit Suisse*, No. 15-cv-0871 (S.D.N.Y. Sept. 22, 2015), ECF No. 81.

Counts II, III and IV should be dismissed with prejudice as to Longview for all these reasons. We respectfully request a conference on the Motion, and are available at the Court's convenience.

Sincerely,

Patrick J. O'Toole, Jr.

cc:      (by email) Scott Michael Moore, counsel for Omari with enclosures

# Exhibit A

# Weil, Gotshal & Manges LLP

100 Federal Street, 34th Floor
Boston, MA 02110-1802
+1 617 772 8300 tel
+1 617 772 8333 fax

Patrick J. O'Toole Jr.
+1 (617) 772-8365
patrick.otoole@weil.com

July 27, 2020

Scott Michael Moore, Esq. (via email SMM@MILOPC.com)
45 Rockefeller Plaza, 20th Floor
New York, New York 10111

**Re:  Oussama El Omari v. James E.D. Buchanan, et al. Case No. 1:20-cv-02601 (VM)**

Dear Mr. Moore:

Pursuant to Judge Marrero's Individual Practice Rule II B.1 and on behalf of Defendant Longview Partners (Guernsey) Ltd. ("Longview"), we intend to move to dismiss the Amended Complaint (Dkt. 31) ("AC") for lack of personal jurisdiction and failure to state a claim.

Longview is a licensed regulated asset manager who serves a diverse range of clients. Plaintiff's spurious allegations are an obvious attempt to improperly use this litigation to tarnish Longview's reputation. First, Longview has no connection to this forum and Plaintiff's claims are fatally flawed and time barred. Although the AC spans 151 paragraphs and 51 pages, it refers to Longview in only 8 paragraphs. The AC's references to Longview are conclusory, speculative, self-contradictory, and many times flatly wrong. Plaintiff's "belief[s]" that Longview manages Ras Al Khaimah ("RAK") state assets or that Defendant James Buchanan ("Buchanan") was a former employee or shareholder of Longview are simply false. (¶¶ 5, 12, 17). Longview has never managed RAK assets nor was Buchanan ever a Longview employee or shareholder. Rather, Buchanan served only as a non-executive director who attended quarterly board meetings. Plaintiff fails to provide any facts to support his conclusory allegation that Buchanan was Longview's agent. And Plaintiff's "[c]onclusory allegations regarding [an] agency relationship … are not sufficient to survive a motion to dismiss." *RSM Prod Corp v. Fridman*, 643 F. Supp. 2d 382, 409 (S.D.N.Y. 2009) (collecting cases and authorities). Moreover, an individual director is not an agent of a corporation and has no authority to act on his own. *Harlem River Consumers Co-Op., Inc. v. Assoc'd Grocers of Harlem, Inc.* 408 F Supp. 1251, 1270 (S.D.N.Y. 1976) (noting that authorizing an agent to do tortious acts is not readily inferred); *Mgmt. Techs., Inc. v. Morris*, 961 F. Supp. 640, 651 (S.D.N.Y. 1997). Plaintiff's agency claim also directly contradicts the AC. Specifically, the AC alleges Buchanan (1) was employed by and in charge of litigation for the RAK Investment Authority ("RAKIA"), (2) was CEO of a RAK entity, (3) came to London "on behalf of [the "Saud"]," and (4) "took orders directly from the Saud." (¶¶ 5, 16, 17). These allegations do not involve Longview. In fact, the purported "hierarchy" Plaintiff submitted in reply to Defendant Dechert's letter does not mention Longview and makes clear that the alleged acts were not on its behalf. ECF No. 47-2 at 30.

**Lack of Personal Jurisdiction over Longview** – At the outset, the claims lack the minimum contacts and reasonableness that due process requires for personal jurisdiction over Longview, let alone the requirements of New York's long-arm statute or general jurisdiction. Plaintiff pleads no facts why

Longview should "anticipate being haled into court" in New York or of New York's interest in this case, "particularly in [this] international context." *Gmurzynska v. Hutton*, 257 F. Supp. 2d 621, 627-28 (S.D.N.Y. 2003), *aff'd*, 355 F.3d 206 (2d Cir. 2004) (quoting *Huang v. Sentinel Gov't Sec.*, 657 F. Supp. 485, 489 (S.D.N.Y. 1987)). Longview has no office, no property, and no employees in New York, and no alleged conduct was in, nor directed at, New York.

The only possible basis for long-arm jurisdiction is § 302(a)(1) which examines "(1) whether the defendant 'transacts any business' in New York and, if so, (2) whether this cause of action 'aris[es] from' such a business transaction." *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 246 (2d Cir. 2007) (citing *Deutsche Bank Sec., Inc. v. Mont. Bd. of Invs.*, 850 N.E.2d 1140, 1142 (N.Y. 2006)). A claim only arises from a party's activities in New York if there "is an articulable nexus, or a substantial relationship, between the claim asserted and the actions that occurred in New York." *Id.* Here, Plaintiff alleges no activities by Longview in New York. And no nexus links this litigation, Longview and New York. Neither Plaintiff nor Longview is domiciled or has a place of business in New York. The only activities purportedly relating to Longview are an alleged October 2018 meeting overseas (¶ 129) and Skype and email to Plaintiff's computer in North Carolina (¶ 139). Because these actions do not arise from any business Longview transacted in New York, there is no basis for specific jurisdiction.[1]

Finally, there is no general jurisdiction. New York exercises general personal jurisdiction only if "the corporation's affiliations with the state 'are so "continuous and systematic" as to render them essentially at home in the forum State.' " *Aybar v. Aybar*, 169 A.D.3d 137, 144 (2019); *see also Qudsi v. Larios*, 173 A.D.3d 920, 922 (2d Dep't 2019) (recognizing New York courts typically exercise general jurisdiction only over corporations incorporated or with a principal place of business in New York); *Brown v. Lockheed Martin Corp.*, 814 F.3d 619, 627 (2d Cir. 2016) (same). Longview is a limited corporation under Guernsey law with its principal place of business in Guernsey. Longview has no offices, property, employees, or other physical presence in New York. Longview is essentially *not* "at home" in New York.

**Prime Facie Tort (Count II) and Defamation (Count III)** – Counts II and III involve the same statements at an alleged 2018 meeting. Both claims fail. First, the claims are duplicative. A claim for prima facie tort is disfavored under New York law and any claim that is covered by a traditional tort, including defamation, cannot be the basis for a claim of prima facie tort. *Goldman v. Barrett*, No. 15 CIV. 9223 (PGG), 2016 WL 5942529, at *7 (S.D.N.Y. Aug. 24, 2016) (collecting cases). The prima facie tort claim also fails to allege with specificity any special damages. *Biosafe-One, Inc. v. Hawks*, 639 F. Supp. 2d 358, 369 (S.D.N.Y. 2009), *aff'd*, 379 F. App'x 4 (2d Cir. 2010); *Freihofer v. Hearst Corp.*, 480 N.E. 22 389, 335 (N.Y. 1985). Moreover, both claims are time-barred because they involve allegedly defamatory statements at a 2018 meeting. *See* N.Y. C.P.L.R. § 215(3); *see also Solomon v. Amazon.com*,

---

[1] Plaintiff's allegations that Buchanan acted on behalf of Saud preclude agency as a basis for jurisdiction over Longview. *Doe ex rel. Doe v. Abercrombie & Kent, Inc.*, No. 09 CIV. 7052 (VM), 2010 WL 286640, at *3 (S.D.N.Y. Jan. 19, 2010) ("[t]he agent "must be primarily employed by the defendant and not engaged in similar services for other clients"); AC ¶¶ 5, 16, 17. Nor does Plaintiff allege any nexus between Buchanan's actions and New York.

*Inc.*, No. 18-CV-5528 (ERK) (PK), 2019 WL 2601794, at *2 (E.D.N.Y. 2019); *Riddell Sports Inc. v. Brooks*, 872 F. Supp. 73, 76 (S.D.N.Y.1995). This action was commenced on March 27, 2020, so any statement prior to March 27, 2019 is time-barred. Finally, both claims fail because the alleged statements are not attributable to Longview. As discussed above, the AC makes clear the alleged statements were not made on behalf of, and cannot be attributed to Longview. ¶¶ 5, 16, 17; *Treppel v. Biovail*, No. 03 CIV. 3002 (PKL), 2005 WL 2086339 at *3. (S.D.N.Y. 2008); *Mahoney v. Staffa*, 256 A.D.2d 827, 828 (1998); *Kjar v. Jordan*, 217 A.D.2d 981, 981 (1995).

The defamation claim relating to Defendant Intelligence Online's ("IO's") article does not allege Longview published the article (¶ 24) and thus Longview is not subject to those allegations. To the extent Plaintiff is improperly lumping Longview into those allegations, the claim fails for the same reasons presented by Defendant Dechert. ECF Nos. 47, 47-1. Plaintiff alleges no facts to connect Longview to the IO article. No statements are attributed to Longview and nothing in the article suggests Longview had any involvement. *See, e.g.*, *Kahn v. New York Times Co., Inc.*, 269 A.D.2d 74, 80 (1st Dep't 2000); *Izydore v. Tokuta*, 242 N.C. App. 434, 445 (N.C. Ct. App. 2015); *Mahoney*, 256 A.D.2d at 828. Further, what IO published were merely allegations, belief or opinion, which do not constitute defamation. Lastly, Plaintiff is a former public official who must allege facts showing a reckless disregard for the truth. *See New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964); *Kahn*, 269 A.D.2d at 79.

**CFAA (Count IV)** – The CFAA claim alleges that after receiving an email from a person posing as a reporter, Plaintiff volunteered information to the purported reporter by Skype, phone, and email. As detailed in Defendant Dechert's letters, the CFAA claim is fundamentally deficient. ECF Nos. 47, 47-1. First, Plaintiff fails to allege facts plausibly asserting any connection between the alleged reporter and Longview. Second, communicating with Plaintiff by Skype and email is not accessing his computer. *LivePerson, Inc. v. 24/7 Customer, Inc.*, 83 F. Supp. 3d 501,511 (S.D.N.Y. 2015); 18 U.S.C. § 1030(a)(4); *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 642 (S.D.N.Y. 2011); *U.S. v. Aleynikov*, 737 F. Supp. 2d 173, 192 (S.D.N.Y. 2010). Third, there is no alleged unauthorized access because the AC admits Plaintiff knowingly provided information to the alleged reporter. *See Aleynikov*, 737 F. Supp. 2d at 192. Fourth, Plaintiff does not allege the reporter caused damages exceeding $5,000. *See* 18 U.S.C. § 1030(e)(11). Finally, Plaintiff only conclusorily alleges a conspiracy between the alleged reporter and Defendants but provides none of the required particularity. *See Garland-Sash v. Lewis*, No. 05 CIV. 6827 (WHP), 2007 WL 935013, at *4 (S.D.N.Y. 2007); *Welenco, Inc. v. Corbell*, 126 F. Supp. 3d 1154, 1176-77 (E.D. Cal. 2015). For these reasons, the AC should be summarily dismissed.

Sincerely,

Patrick J. O'Toole, Jr.

cc:     (by email) Chambers of Judge Victor Marrero

# Exhibit B



# MOORE
## INTERNATIONAL LAW PLLC

INTERNATIONAL LEGAL MATTERS

WRITER: SCOTT MICHAEL MOORE
smm@MILOPC.COM

**ROCKEFELLER CENTER**
**45 ROCKEFELLER PLAZA, 20TH FLOOR**
**NEW YORK, NEW YORK 10111 USA**
**TELEPHONE: + (212) 332-3474**
**FACSIMILE: + (212) 332-3475**
WWW.MILOPC.COM

LICENSED & ADMITTED
SUPREME COURT OF THE UNITED STATES OF AMERICA
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
U.S. COURT OF INTERNATIONAL TRADE
OTHER U.S. FEDERAL COURTS
STATES OF NEW YORK & MICHIGAN only
LONDON COURT OF INTERNATIONAL ARBITRATION

Via Email

3 August 2020

Weil
Patrick J. O'Toole, Jr. (Patrick.otoole@weil.com)

Re:     *El Omari v. Buchanan, et al*, 20-cv-2601 (S.D.N.Y.)

Dear Mr. O'Toole:

This letter is sent pursuant to Judge Marrero's Practice Rule II(B)(1), in response to your pre-motion letter on behalf of Defendant, Longview Partners (Guernsey) Ltd., dated July 27, 2020.[1]

**Other similar litigation involving Longview's Director/Shareholder Buchanan** – See Amended Compl., (AC), Par. 27, *Ras Al Khaimah Investment Authority v. Farhad Azima*, Claim No. CR-2016-002798. Similarities include instructions from Saud to Buchanan and associates to "target" and "go after" Azima, like El Omari, (Par. 33, 34, 37, 255c), use of spear-phishing emails to illegally access Azima's emails, similar to the "Samantha Alison" scheme (Par. 343, 350), and Buchanan's 8/16/16 email to Frank and Handjani, connecting them to Azima's hacked emails (Par. 350). (*RAKIA* Judg., May 20, 2020, excerpts, **Exh. 1**).[2] Also, Buchanan's 7/19/15 email to "go after FA subject to guidance from AF [Andrew Frank]." (*RAKIA* Judg., Par. 288). See communication hierarchy from *RAKIA* judgment. (**Exh. 2**). See Buchanan's *RAKIA* trial testimony about Azima's hacked emails (P. 185-186), and Buchanan's missing emails mentioning Dechert's New York attorney, Linda Goldstein.[3] (P. 162). (**Exh. 3 and 4, respectively**). See also AC, Par. 28, *Sadeq v. Dechert, et al*, High Court Case No. QB-2020-322, "Buchanan … told Mrs Al Sadeq that he was part of the investigation into RAKIA…." and "that her husband needed to 'cooperate', and that he would attempt to use his influence with the Ruler to assist Mr Al Sadeq." Excerpts, Sadeq's Particulars of Claim. (**Exh. 5**). Compare AC, Par. 17, 34 with Compl., Par. 16, 27, 32, 34, *USA v. Funds in the amount of 73,293,750 AED (Approximately $20 Million) in the possession and control of Ras Al Khaimah Investment Authority (RAKIA) et al.*, No. 20-cv-126 (D. Alaska). (**Exh. 6**).

**Longview** – Contrary to Longview's attempt to distance itself, of all the places to work in the world, two of its small group of directors/shareholders, Buchanan and Kate Campbell, had CEO and Finance Head employment relationships, respectively, with RAKIA and affiliate RAK Development LLC, both having Saud as Chairman and Massaad as former CEO, in of all places, the emirate RAK. (AC, Par. 5, 12, 17). This employment relationship gives rise to a strong

---

[1] On 6/17/20, Plaintiff inquired if you would be willing to share information about whether Longview initiated any independent review of the allegations in the AC, to which you declined to respond.
[2] *RAKIA* excerpts include discussions of party submissions, testimony, documents, emails, and findings.
[3] Ms. Goldstein is also a Dechert attorney of record in this case.

**MOORE**

**INTERNATIONAL LAW PLLC**

implication that Longview receives a pecuniary benefit, and that benefit is management of RAK state assets controlled by Saud. *Id*. Similar to the use of "multiple shell companies… in multiple jurisdictions" in *$20M*, the identity of clients, movement of money, and related communication, ultimately traceable back to RAK state assets directed by Saud, are peculiarly in the possession of Longview, Buchanan, and Campbell, necessitating discovery. *DiVittorio v Equidyne Extractive Indus., Inc.*, 822 F2d 1242, 1247 (2d Cir 1987). From 2006 to 2010, Longview had one Massachusetts company as its agent for North America (U.S. and Canada) and Bermuda. Exclusive Agency Agreement, Par. 1 (ECF No.16-1), *Whitman & Company, Inc. v. Longview Partners (Guernsey)*, Case No. 14-cv-12047 (D. Mass).[4] **(Exh. 7)**. The same year of the 2014 *Whitman* litigation, Buchanan became a Longview shareholder and board member (AC, Par. 5) and Buchanan and Campbell were working together with Saud in RAK (AC, Par. 17), and it's plausible Buchanan acted like Whitman in bringing in investors. Silence or a prolonged failure to object to the act can constitute ratification. *E.g.*, *Matter of Cologne Life Reins. Co. v. Zurich Reins. (N.Am.), Inc.*, 286 A.D.2d 118, 126-28 (1st Dept. 1991); *Clark v. Bristol-Myers Squibb & Co.*, 306 A.D.2d 82, 85 (1st Dept. 2003) Longview's conduct which led to *Whitman* included allegations of "unfair and deceptive business acts" (*Whitman* AC, Par. 146), and together with the alleged conduct in the AC, coincided with Buchanan's rising influence at Longview.

**I.** __Personal Jurisdiction over Longview__ – You contend lack of specific and general jurisdiction. However, see *Walden v. Fiore*, 571 U.S. 277, 283-84 (2014). Here, offshore Longview is registered with the U.S. Securities and Exchange Commission in Washington, D.C., and on behalf of approximately 75 clients, including Sovereign Wealth Funds and High Net Worth Individuals, manages approximately $24.5 Billion in RAUM invested in approximately 24 stocks listed on the New York Stock Exchange in New York. Longview's managed assets connected to RAK would be invested in New York's NYSE. (AC, Par. 12). See also, Longview's reported 72 SEC filings since 2013 **(Exh. 8)**, some $20B in reported 2018 NYSE investments **(Exh. 9)**, and Buchanan and Campbell are reported as directors, shareholders, and SEC "control persons" **(Exh 10).** Thus, Longview purposely availed itself of the benefits and protection of the U.S. and New York, both for purposes of general jurisdiction and specific jurisdiction. *Walden*; *Sonterra Capital Master Fund, Ltd. v. Barclays Bank PLC*, 366 F.Supp.3d 516, 562 (S.D.N.Y. 2018); *Wilson v. Dantas*, 128 A.D.3d 176, 182 (1st Dep't 2015). Moreover, agent Buchanan attended a business meeting at a New York apartment on 9/23/15, just one of his many other contacts with New York. (AC, Par. 27) See also other NY/USA communications from *RAKIA*. **(Exh. 11)**. *Wilson v. Dantas*, 128 A.D.3d 176, 182 (1st Dep't 2015).

**II.** __El Omari sufficiently plead a claim of prima facie tort__ – You opine this claim is duplicative of defamation and is thus barred, fails to allege special damages with specificity, and this and the defamation claim are time barred, pointing to the 2018 meeting. However, "there may be instances where the traditional tort cause of action will fail and plaintiff should be allowed to assert this alterative claim." *Loudon v. Hayek*, 756 F.Supp. 107, 108 (S.D.N.Y. 1989); *Board of Education v. Farmingdale Classroom Teachers*, 38 N.Y.2d 397, 406 (1975). See also, *U.S. Aluminum Siding Corp v. Dun & Bradstreet, Inc*, 163 F.Supp. 906, 907 (S.D.N.Y. 1958); *Advance Music Corp. v. American Tobacco Co*., 296 N.Y. 79, 83 (1946); *Ruiz v. County of Rockland*, 609 F.3d 486, 492 (2d Cir. 2010). Your duplicative argument fails because there was an intention by Buchanan to inflict harm onto El Omari with a disinterested malevolence motive. *Restis v. American Coalition Against Nuclear Iran, Inc*., 53 F.Supp. 3d 705, 716 (2014). Buchanan's conduct of attempting to persuade El Omari expert witness to switch sides, making comments such as "I'm going to bring him down," and making threats to report El Omari to IRS are not published

---

[4] You also defended Longview in *Whitman*. (Exh. 7, p. 29)

false statements. El Omari specifically alleged that the malicious conduct of Longview and its agent Buchanan, while knowing retaliation would be harmful, interfered with El Omari's livelihood, causing a specific temporal injury. *Advance Music Corp.*; *Firester v. Lipson*, 50 Misc 2d 527, 530 (Nassau Cty. Sup. Ct. 1966).

**III. El Omari sufficiently plead a claim of defamation per se** – You argue Longview did not publish the IO Article, the IO Article was opinion, and El Omari is a public figure. However, all who take part in the procurement, composition and publication of a libel are responsible in law and equally so. *Restis v. American Coalition Against Nuclear Iran, Inc.*, 53 F.Supp.3d 705, 716-717 (S.D.N.Y. 2014)*. AC*, Par. 24, made such an allegation. See *Palatkevich.* Note the similarity with *RAKIA*. See e.g., "View from the window" and emails between Buchanan and Handjani (*RAKIA* Judgment, P. 283-288), in particular, "to go after FA subject to guidance from AF [Andrew Frank]. … will speak to AF tomorrow and fill you in." "Talking to the boss now. He wants me … to coordinate with you." (*RAKIA* Judg., P. 288). ). The AC alleges the IO article and its advertisement reports that El Omari committed a serious crime, a billion dollar RAKIA related fraud, at a place where El Omari never worked, and with its CEO whom El Omari didn't know personally. (AC, Par. 19, 19a, 19b, 19c, 19c-d, and 25). *Medcalf v. Walsh*, 938 F.Supp.2d 478, 487 (S.D.N.Y. 2013); *Fuji Photo Film U.S.A., Inc. v. McNulty*, 669 F.Supp.2d 405, 411( S.D.N.Y. 2009). Here, the specific language about El Omari's RAKIA billion dollar fraud and connection with RAKIA's CEO has a precise meaning which is readily understood, is capable of being proven true or false, the full context of the communication in which the statement appears are such as to signal readers  that what is being read is likely to be fact, not opinion. *Lan Sang v. Ming Hai,* 951 F.Supp.2d 504, 517, 519 (S.D.N.Y. 2013); *Restis*, at 718. El Omari denies he is a public figure for purposes of defamation. Nonetheless, El Omari did allege "reckless disregard" at AC, Par. 25.

**IV. El Omari sufficiently plead a claim under the CFAA** - You opine lack of connection between Longview and "Samantha Alison," communicating by Skype and email is not accessing El Omari's computer, lack of unauthorized access, lack of damages in excess of $5,000, and lack of particularity in pleading conspiracy. See AC, Par. 138 – 143. Note the connection of the cease and desist letter sent to Longview (AC, Par. 138) followed by "Samantha Alison" (AC, Par. 139) seeking "knowledge about allegations found in three lawsuits" (the instant, *RAKIA*, and *Sadeq*) (AC, Par. 143). The AC alleges the emails and Skype contact were intentionally sent to El Omari, and used identity misrepresentation and a promise of confidentially, to gain access. AC, Par. 140-143. This was "spear-phishing" El Omari to gain access, in contrast to passive "phishing" emails to the general public. Spear-phishing emails were also used to hack in *RAKIA*. (RAKIA Judgment, Par. 36). The email access (AC, Par. 140 *et seq.*), as well as the Skype access (AC, Par. 143), alleges that the access was unauthorized due to the misrepresentation of identity and promise of confidentiality, both of which were relied upon by El Omari. El Omari's attorney fees and investigation costs in response to "Samantha Alison" have easily exceeded $5,000. (AC, Par. 149) "[T]he costs of investigating security breaches constitute recoverable 'losses.'" *Sell It Social, LLC v. Strauss,* 15-cv-970, Mem. and Order, March 8, 2018, p. 8 ( S.D.N.Y. 2018). Lastly, see above headings, "Other similar litigation …" and "prima facie tort."

For all these reasons, El Omari will respectfully oppose your motion to dismiss.

Sincerely,

/s/ Scott M. Moore

Attachments: Plaintiff's Letter Exhibits1-11
Cc:  Hon. Victor Marrero, U.S.D.J., via Email: ChambersNYSDMarrero@nysd.uscourts.gov

PLAINTIFF'S EXHIBIT 1

Neutral Citation Number: [2020] EWHC 1327 (Ch)

**IN THE HIGH COURT OF JUSTICE**                    Case No. HC-2016-002798
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**BUSINESS LIST (ChD)**

<u>Royal Courts of Justice</u>
<u>Rolls Building, Fetter Lane, London EC4A 1NL</u>

<u>Date: 22 May 2020</u>

**Before**:

**ANDREW LENON Q.C. (sitting as a Deputy Judge of the Chancery Division)**

**BETWEEN:-**

**RAS AL KHAIMAH INVESTMENT AUTHORITY**

**<u>Claimant</u>**

**- and -**

**FARHAD AZIMA**

**<u>Defendant</u>**

_____

**APPROVED JUDGMENT**
_____

**Hugh Tomlinson Q.C. and Edward Craven (instructed by Stewarts Law LLP) for the Claimant**
**Tim Lord Q.C. and Hugo Leith (instructed by Burlingtons LLP) for the Defendant**

**Hearing dates: 22nd - 24th January, 27th - 31st January, 3rd - 5th February, 12th - 14th February 2020**
-
Date: 22 May 2020

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

Covid-19 Protocol: This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii. The date and time for hand-down is deemed to be 14.00 am on 22 May 2020.

**(6)      The Project Update and its aftermath**

30.   By late 2014 investigations were under way within RAK into the actions of Dr
Massaad and his associates.

31.   In January 2015 Stuart Page, a private investigator, was engaged by the Ruler to
investigate what the Ruler feared was a plot between a member of his family and Dr
Massaad aimed at destabilising his rulership.

32.   In March 2015 Mr Page provided the Ruler with a report entitled RAK Project Update
("the Project Update") which was mainly concerned with Dr Massaad's activities but
which also described how Mr Azima was managing a team of advisers in the US, hired
by Dr Massaad, who were planning to spread allegations about human rights issues in
RAK; their campaign had not yet been made public. Mr Page's agents who compiled
the report said that they would be able to gather intelligence on the campaign team in
order to monitor their progress and "attempt to contain or ruin their plans".

33.   In around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and
other assistants to "target" Mr Azima. The Ruler directed his associates to bring
charges against Mr Azima. The Ruler's associates discussed meeting to "coordinate
our attack" on Mr Azima and Dr Massaad but persuaded the Ruler not to pursue this
plan at that time.

34.   In or around July 2015, the Ruler instructed another of his assistants, Naser Al Bustami,
to "go after" Mr Azima. Mr Azima's case is that, just as Henry II's question "Will no
one rid me of this turbulent priest?" led to the murder of Thomas Becket, so the Ruler's
directions to "go after" Mr Azima led in due course to the hacking of Mr Azima's
emails, whether or not this was the Ruler's express instruction.


**(7)      The hacking of Mr Azima's emails**

35.   A 'phishing' email is an email that seeks to trick the recipient into clicking on a
hyperlink taking the user to a webpage that the criminal controls, or into downloading
malicious software. A 'spear-phishing' email is a more targeted and sophisticated form
of a 'phishing' email which indicates that the sender has purposely targeted the
deception at that individual (as shown by the fact that the email has been constructed to
include material pertinent to the recipient, or otherwise to be of more interest to them).
The fact that the spear-phishing email contains material of particular interest to the
targeted recipient makes it more likely to be effective in that the recipient is more likely
to open the deceptive email and any further links it may contain.

36.   It is common ground that in October 2015 Mr Azima received a number of spear-
phishing emails. Mr Azima's case is that these spear-phishing emails led at the time to
the hacking of his confidential email accounts, that the hacking was organised by agents
acting on behalf of RAKIA and that consequently by late 2015 RAKIA had accessed
his confidential emails and the evidence which it now relies on in support of its claims.
RAKIA denies that it had anything to do with the spear-phishing emails and does not
admit that the spear-phishing emails led to the hacking of Mr Azima's email accounts.

37.	On 29 December 2015 a document called the "View from the Window" was drawn up by Andrew Frank, an employee of Karv Communications, a PR firm engaged by RAK. The document referred to Mr Azima as "having orchestrated, if not fully participated in numerous fraudulent activities" and to "companies being set up with Iranian nationals". Mr Azima contends that this document shows that RAKIA had by this stage obtained access to Mr Azima's confidential emails and data. This is disputed by RAKIA.

**(8)	The Settlement Agreement**

38.	On 2 March 2016 RAKIA, HeavyLift and Mr Azima entered into the Settlement Agreement. The Recitals to the Settlement Agreement read as follows:

> "(A) By an agreement dated 12 April 2007, HeavyLift and RAK Airways PJSC ("RAK Airways") entered into a joint venture (the "Joint Venture Agreement") to establish an Aircraft Simulator and Training Facility at Ras Al Khaimah International Airport, located in Ras Al Khaimah, UAE ("RAK");
> (B) RAKIA guaranteed the performance of RAK Airways under the Joint Venture Agreement;
> (C) HeavyLift, acting through Mr Azima, has asserted that RAK Airways owes HeavyLift for investments HeavyLift made in the joint venture pursuant to the Joint Venture Agreement;
> (D) RAKIA does not agree that there is any legal basis for any such claim;
> (E) Mr. Azima has recently provided negotiation assistance to RAKIA on an informal basis which RAKIA recognises and appreciates;
> (F) Each Party has the greatest of respect for the other Parties, and wishes to resolve all outstanding issues relating to the Joint Venture Agreement."

39.	Clause 1.1 required RAKIA to pay the sum of $2.6 million in settlement of any claims that Mr Azima or HeavyLift might have had against RAKIA or another RAK entity:

> "RAKIA will pay HeavyLift the sum of $2,600,000 to resolve all claims which Mr Azima or HeavyLift may have against it or any other RAK Entity as further detailed in paragraph 3.1."

40.	RAKIA's case is that it was deceived into entering the Settlement Agreement by fraudulent misrepresentations made by and on behalf of Mr Azima regarding the amount of HeavyLift's investment, that the settlement sum of $2.6m was intended to reflect the amount spent by HeavyLift in making its contribution to the Training Academy JV and that the true amount of HeavyLift's investment was significantly smaller than this.

41.	In exchange for the payment of $2.6m, Mr Azima and HeavyLift agreed to relinquish

**(11)** **The downloading of the hacked material**

51.  The dispute with Dr Massaad was not resolved. RAKIA admits to creating websites attacking Dr Massaad a few days after the July 2016 meeting and shortly after those sites were created, in early August 2016, blogging websites began appearing denigrating Mr Azima as a "fraud" and a "scammer" and linking to websites containing Mr Azima's confidential emails which appeared at around the same time.

52.  There is an issue as to how these blogging web sites came to the attention of RAKIA. RAKIA's case is that they were discovered by a journalist, Majdi Halabi, who drew them to the attention of Mr Page, by whom Mr Halabi had been allegedly asked to look out for references to Mr Azima on the internet. Mr Page is alleged to have communicated the information to Mr Gerrard and Mr Buchanan. Mr Azima contends that this version of events is fictitious, that Mr Halabi played no part in the discovery of the blogging web sites and that RAKIA's account of the discovery of the blogging websites is designed to conceal RAKIA's role in the hacking.

53.  RAKIA subsequently instructed an independent third party, Northern Technology Inc. ("NTi") to download the material from these links and others which were subsequently discovered and which RAKIA contends had been posted by unknown hackers. The material was downloaded by NTi in August and September 2016.

54.  RAKIA's case is that the subsequent analysis of the internet data established that, contrary to the Good Faith Clause, Mr Azima had in fact committed multiple acts of serious wrongdoing towards RAKIA and other RAK entities and that, as a result of that discovery, the present action was commenced on 30 September 2016.

55.  On Mr Azima's case, RAKIA already had access to the hacked data by late 2015 so that the downloading process in August/September 2016 was a charade.

56.  On the same day as these proceedings were commenced (30 September 2016) Mr Azima brought proceedings against RAKIA in the US District Court for the District of Columbia alleging that RAKIA had hacked his computers. RAKIA challenged the proceedings on jurisdictional grounds. Its challenge failed in the US District Court but on 18 June 2019 the US Court of Appeals allowed RAKIA's appeal and dismissed the US proceedings.

57.  Mr Azima amended his defence in these proceedings on 18 July 2018 to allege that RAKIA was responsible for hacking his computers and emails and publishing their contents on the Internet and on 8 August 2019 was given permission to add a Counterclaim for damages and other relief arising out of the alleged hacking which was stayed pending final judgment on RAKIA's claim.

**The witnesses**

58. RAKIA served witness statements from twelve witnesses, nine of whom gave oral evidence. The evidence of two of the witnesses, Richard Garcia and Jessica Gray, who were involved in the downloading of data from the BitTorrent sites, was uncontroversial and admitted by Mr Azima without cross-examination.

59. The Ruler of RAK, Sheikh Saud bin Saqr Al Qasimi, provided a witness statement responding to Mr Azima's first witness statement but did not attend the hearing. RAKIA submitted that for the Ruler to attend the hearing or appear by video link would be incompatible with this constitutional role and status as sovereign ruler. It is regrettable that the Ruler chose not to attend the hearing or give evidence by video link as there were a number of issues on which he could have given relevant evidence. As the Ruler's witness statement was not tested by cross-examination, I do not propose to attach significant weight to it.

60. Jamie Buchanan was RAKIA's main witness. Between September 2014 and December 2019 when he took retirement, Mr Buchanan was the chief executive of Ras Al Khaimah Development LLC ("RAK Dev") which holds the assets and liabilities that were previously owned by RAKIA.

61. Counsel for Mr Azima submitted that Mr Buchanan gave dishonest evidence on a number of issues relating to Mr Azima's hacking clam. In relation to one matter, namely Mr Buchanan's claim to have been mistaken, until shortly before the trial, as to the authorship of the Project Update, which I address at paragraph 266 below, I consider that Mr Buchanan's evidence was disingenuous. I was not persuaded that Mr Buchanan's evidence was dishonest in other respects. He struck me as a generally reliable witness who gave his evidence in a measured way and was prepared to concede a number of points adverse to RAKIA's case that were put to him in cross examination.

62. Neil Gerrard is a former policeman and a partner in the firm of Dechert LLP which was instructed to assist with the investigation into Dr Massaad's alleged fraudulent activities which it has continued to work on to the present time. His witness statement dealt with his engagement by RAK, the meeting he had with Mr Azima in July 2016 and the events in August 2016 surrounding the downloading of the hacked material. He was cross-examined about his involvement with the questioning of detainees within RAK, in particular Karam Al Sadeq and Shahab Izadpanah. Allegations that Mr Gerrard had attempted, on behalf of RAK, to extort money from Mr Izadpanah and had offered Mr Izadpanah and Mr Al Sadeq to drop all charges against them if they confessed to charges implicating Dr Massaad were put to Mr Gerrard who denied them in forthright terms. On the basis of the material before me, I am not in a position to make any findings in relation to those allegations or other allegations of misconduct extraneous to the events in issue in these proceedings that were put to Mr Gerrard.

63. Counsel for Mr Azima submitted that Mr Gerrard gave dishonest evidence on key issues. He was also criticised for not referring to Mr Page and the Project Update in his witness statement. In my view, Mr Gerrard's witness statement should have dealt

with the Project Update which was a clearly relevant document and one which, as he accepted in cross-examination, was of concern to him when it was produced because it referred to the threat of a press campaign to smear RAK and its Ruler with human rights allegations. I do not, however, regard the omission to deal with the Project Update, or the other criticisms made of his evidence, as leading to the conclusion that I should treat Mr Gerrard as dishonest.

64.     Stuart Page, also a former policeman and now the Chairman and majority shareholder of a business providing security and surveillance services, dealt in his witness statement with his engagement in RAK to assist with the investigations into Dr Massaad and the discovery of the hacked material. Counsel for Mr Azima submitted that Mr Page was a dishonest witness who lied about a number of matters. I consider that Mr Page was an unsatisfactory and unreliable witness. As set out in greater detail in the context of the hacking claim, his witness statement was misleading in relation to two significant matters. First, his witness statement implied that he did not produce written reports for the Ruler on his investigations whereas in fact he did so on a regular basis. Second, his witness statement said that he first came across the name of Mr Azima in early 2016 whereas in it was in fact a year earlier. His evidence in connection with the discovery of the hacked material was both internally inconsistent and at odds with the contemporary documents. I have concluded that it would be unsafe to rely on any evidence from Mr Page that was not corroborated by some other source.

65.     Amir Ali Handjani is on the board of RAK Petroleum and was involved in discussions with Mr Buchanan and Mr Bustami regarding both the money that Mr Azima said was owed to him and matters involving Dr Massaad. Mr Azima criticised him as an evasive witness giving further dishonest evidence. Mr Handjani was criticised for his contention that the Ruler's instruction to "go after" Mr Azima was in part prompted by a demand for payment of $8 million by Mr Azima. I do not regard the evidence on this point to be so clear cut as to justify the inference that he gave deliberately false evidence on it.

66.     Naser Al Bustami sits on the boards of a number of companies owned by the government of RAK and is one of the Ruler's advisers. He was criticised for an email proposing that the Government of Georgia be enlisted to support RAKIA's claims against Dr Massaad. It is not clear from the email what assistance Mr Bustami had in mind and his oral evidence was that the assistance sought would be subject to Dr Massaad being convicted in a fair trial in a court of law. Even accepting that the email was improper, I do not consider that it supports the inference that Mr Bustami was a dishonest witness.

67.     Majdi Halabi gave evidence in relation to the discovery of the hacked material. As set out later in this judgment, I came to the conclusion that his evidence was inherently implausible and not credible.

68.     Stuart Leach ran the specialist litigation division at the public relations agency Bell Pottinger at the relevant time. Dave King is the Chief Executive of Digitalis, an online reputation and digital risk management firm, who were engaged by Bell Pottinger. I consider that they were both reliable witnesses who were seeking to assist the court.

69.  Nicholas del Rosso gave evidence as to his involvement in retaining NTi to download the Hacked Material from the BitTorrent sites. His evidence was uncontroversial.

70.  For Mr Azima, there were three witnesses. First there was Mr Azima himself. Second there was Mr Adams, a close friend and confidant of Mr Azima who deals with the accounts and paperwork for Mr Azima's business, who provided a short witness statement expressing agreement with Mr Azima's first witness statement. Finally there was Professor Donald Fowler, a friend of Mr Azima, who did not appear at the trial but provided an unchallenged witness statement describing an assignment that he had carried out for the Ruler at Mr Azima's request.

71.  Mr Azima is a businessman with more than forty years' experience in all aspects of aviation, the airline industry and logistics. He has served as chairman of various airlines in different parts of the world. I am told that he has never before faced an allegation of fraud. RAKIA submitted that Mr Azima and Mr Adams were dishonest witnesses. After hearing evidence from Mr Azima and Mr Adams, I reached the conclusion that their evidence in opposition to RAKIA's claims was frequently inconsistent with the contemporaneous documents and inherently implausible. One example was their evidence concerning the retrospective drafting of the Joint Venture Agreement, which I deal with at paragraphs 123 to 128 below. I consider that Mr Azima and Mr Adams, in giving evidence, were more concerned to support Mr Azima's case than to assist the court with an honest recollection of the true facts.

72.  The two expert witnesses, in the field of Computer Forensics and Investigations, were Christopher Tarbell (for Mr Azima) who is Director of Cyber Security and Investigations in the New York office of BRG, a global consulting firm, and Winston Krone (for RAKIA), who is Global Managing director in the Amsterdam office of Kivu Consulting Inc, a global technology firm. The experts each produced an expert report and together a joint report. The parties agreed that the experts, between whom there was a large measure of agreement, would not be called to give oral evidence.

**Documentary evidence**

73.  Mr Azima made wide ranging criticisms of RAKIA's documentary evidence and invited me to draw inferences against RAKIA on the ground that it had destroyed relevant documents.

74.  Mr Buchanan's disclosure statement referred to an incident at the Covent Garden Apple store on 16 October 2016 when a substantial number of emails had been inadvertently deleted from his iPhone by an Apple employee. In witness statements filed for the purposes of an interim application before HHJ McCahill QC, it was explained that Mr Buchanan had attended the Apple store because of a problem in sending emails from his phone. On 22 October 2016, six days later, Mr Buchanan was informed of the need to preserve documents, whereupon he informed Dechert of the possible deletion of emails. Steps were then taken to address the situation by restoring the deleted emails but these were only partially successful.

75.  It was submitted for Mr Azima that it was "very likely" that Mr Buchanan deliberately

company. [...]

> … [D]ue to the failure of RAK Airways to provide its share of the joint venture investment, the amount HeavyLift has already disbursed needs to be repaid."

129.2 Mr Stewart replied the same day explaining that he was "not familiar with the agreement" and asking, "when the agreement was originally signed". Mr Adams replied by attaching a copy of what he claimed was "a copy of the 2007 Joint Venture Agreement" which had been produced and signed the previous week.

129.3 On 2 October 2013, Mr Azima sent an email to the Ruler concerning the Training Academy JV. The email began: "I am not sure how to bring an unresolved business matter to your Highness as I never have before". This statement contradicts Mr Azima's claim that he spoke with the Ruler about the joint venture in 2010 and supports the Ruler's denial that any such conversation took place. The email made no reference to an alleged agreement with RAK Airways regarding the value of HeavyLift's investment in the Training Academy joint venture.

129.4 In June 2015 Mr Azima introduced Ms Azadeh to RAKIA to present his position on HeavyLift's claim for compensation. On 13 June 2015, Mr Buchanan met with Ms Azadeh and made it clear that RAKIA was willing to investigate HeavyLift's claim to ensure a fair outcome.

129.5 According to Mr Adams' witness statement, following that meeting, he was asked by Mr. Azima to provide additional information and documentation requested by Mr. Buchanan on behalf of RAKIA to assist them with quantifying the amount which they would be "reimbursing" HeavyLift for its involvement in the joint venture.

129.6 By an email sent on 14 June 2015, Mr Buchanan requested detailed information and records concerning the project including various "Financial records, asset register and reports". In particular, he requested amongst other things (a) "financial records that back up the Statement of Account and show all investments made by HeavyLift into or on behalf of the JV, including date, account details etc"; and (b) "details of the assets owned or held/used by the Training Academy JV to the extent not already forming part of the financial data". Mr Buchanan also asked: "More generally, what (if any) information can you provide about RAK's actual contribution [to] the joint venture in financial terms?".

129.7 On 6 July 2015, Ms Azadeh sent a letter from Mr Adams to Mr Buchanan which stated that prior to the termination of the Training Academy JV "HeavyLift had already invested $2.5 million." The letter further stated that while hard copies of the Training Academy JV's audited accounts for 2007 and 2008 were not available, an extract from the "Director's Report and Balance Sheet Signature page" showed that as of 31 December 2008 the "Total Investment by

Adams to Jim Stewart. None of those involved in the original arrangements remain in RAK, and some of the RAK companies that appear to have been involved have been restructured".

(b) On 9 August 2015, Mr Buchanan sent an email to Ms Azadeh which explained that there were significant "difficulties in identifying and assessing information that might enable us to respond properly to the issues you have raised". Given the difficulty in locating relevant records, Mr Buchanan therefore requested Ms Azadeh to "set out your claims against RAK Airways in greater detail and provide evidence to support those claims".

147.4 Mr Azima's assertions that the inducement requirement is not made out because RAKIA entered into the Settlement Agreement "for purposes unconnected to the settlement of the claim" and because it had reached an "internal evaluation…that Mr Azima was acting against RAKIA, and fraudulently" is incorrect.

147.5 If a misrepresentation is of such a nature that it would be likely to play a part in the decision of a reasonable person to enter into a transaction it will be presumed that it did so unless the representor satisfies the court to the contrary; *Dadourian v Simms* [2009] EWCA Civ 169.

148. Mr Azima denies that RAKIA has established reliance. He submits as follows:

148.1 The evidence at trial established that the decision to enter the Settlement Agreement was taken by the Ruler, not by Mr Buchanan or the board of RAK Dev or the board of RAKIA. Mr Buchanan's evidence established that his function was to make a "recommendation" and the actual power to decide rested with the Ruler. His oral evidence confirmed clearly that entry into the Settlement Agreement was the Ruler's personal decision:

"Q. And it's right, isn't it, that the decision to enter into the settlement agreement was taken on behalf of RAKIA by the Ruler? A. That is correct. Q. It wasn't taken by you, was it? A. That is correct."

148.2 Mr Gerrard's evidence was similarly that the Ruler was the "ultimate authority in RAK" and "if RAKIA was to undertake a course of events that he didn't approve of" it "wouldn't necessarily happen."

148.3 Mr Buchanan also confirmed that he did not know the Ruler's reasons for entering into the Settlement Agreement:

"Q. Thank you. You are not in a position, are you, Mr Buchanan, to give evidence as to what the Ruler may have -- what may have influenced the Ruler into entering into the settlement agreement in March 2016? A. No, I'm not."

148.4 There is no evidence that the Ruler had regard to or relied on the alleged representation by Mr Azima as to the contribution made by HeavyLift into the Training Academy. Nor does the Ruler suggest that he relied on Mr

**Were the stories false?**

201.    Mr Azima submits that:

201.1    RAKIA failed to adduce any evidence in its witness statements that the stories said to have been procured and promoted by Mr Azima were in fact false;

201.2    RAKIA attempted to fill this gap through a series of leading questions to Mr Gerrard in re-examination in which Mr Gerrard denied that he had been involved in illegal detentions in RAK or had taken on prosecutorial or judicial roles. Mr Gerrard's answers, elucidated in this way at the end of his evidence, were simply not a sufficient basis for this Court to find that the "falsity" of any alleged media stories is established.

201.3    This is particularly so in circumstances where there was evidence showing that concern at detentions in RAK was well-founded, and there was also evidence of Mr Gerrard's and/or Dechert's role in those detentions giving rise to legitimate concerns. It was incumbent on RAKIA to address these issues with evidence, which it has not even attempted to do.

201.4    Mr Azima referred to a November 2014 Amnesty International report referring to several cases in which individuals had in fact been detained for long periods in the Ruler's palace or in other undisclosed locations. None of RAKIA's witnesses were in a position to refute its findings.

201.5    Reports had been provided to Mr Azima about Mr Gerrard conducting (on behalf of the Ruler and/or RAKIA) highly aggressive and unlawful interrogations of prisoners including Mr Al Sadeq; and aggressively threatening Mr Al Sadeq's wife and threatening one of RAKIA's opponents (Mr Izadpanah) with prison unless he agreed to pay $7.5 million to RAK, and offering clemency in exchange.

201.6    Under cross-examination, Mr Gerrard accepted that he had in fact interviewed Mr Al Sadeq and other individuals while in prison in RAK. He also admitted investigating and interviewing Mr Izadpanah in RAK.

201.7    If RAKIA was to sustain its case that complaints about these practices in RAK were false, disclosure should have been given of these incidents including of the records of interview that Mr Gerrard said would exist. This is particularly so given that Mr Gerrard's own account of Mr Al Sadeq's interview in detention itself raised concerns. Mr Gerrard claimed that the interview had been conducted strictly pursuant to the standards in the Police and Criminal Evidence Act 1984 although it became clear in Mr Gerrard's evidence that this was not true. No audio recording of the interview was made and he was unsure whether a record of the interview had been provided to Mr Al Sadeq's lawyers. Mr Al Sadeq was detained in RAK without charge for at least a year. Mr Gerrard accepted that he interviewed Mr Al Sadeq at some point during that detention, before he was charged.

201.8 Mr Gerrard saw no problem with an individual being detained for a prolonged period without charge and being interrogated in that period: "They have a process. It is not like ours -- many parts of it are -- and he agreed to talk to us whilst he was detained. We followed the process of PACE when we met him." As noted, the claim that PACE was followed was not correct, on Mr Gerrard's own evidence.

## Conclusion

202. In order to make good its case that Mr Azima procured and promoted false stories in the media, it was incumbent on RAKIA to establish that the stories which it was intended to publish about human rights violations were untrue. It has not done so. It appears that Project Clay intended to draw attention to actual cases of detention and illegality, not fabricated cases. The 2014 Amnesty International Report indicates that there were real grounds for concern about detention procedures in RAK. None of RAKIA's witnesses were in a position to refute the findings in that report.

## Mr Azima's role in relation to the Security Assessment

203. The facts relating to the Security Assessment as they appear from the documents before the Court were as follows:

203.1 In late 2014 Mr Azima was engaged by Mr Kirby Behre, a lawyer at Miller & Chevalier, lawyers who acted for Dr Massaad (and later Mr Azima) to act as a consultant to assist with a PR campaign involving the investigation of human rights abuses in RAK for the benefit of Dr Massaad who had fled RAK and was in dispute with RAKIA and the government of RAK.

203.2 Mr Azima introduced former CIA operative Scott Modell to Dr Massaad and Miller & Chevalier and commissioned him to produce the Security Assessment and was responsible for arranging Mr Modell's remuneration for producing it.

203.3 The Security Assessment consisted of a review of the security issues affecting Dr Massaad including a detailed series of "Recommendations" which included "aggressive tools" and "offensive media operations" to "display the critical weak points of the RAK", using media teams to "denigrate the reputation of Sheikh Saud and the RAK as a place of doing business", and a campaign going beyond negative stories and including: "Organized protests and other forms of manufactured dissent, sustained over an extended period of time".

203.4 The Security Assessment also included a recommendation for "orchestrating business deals in RAK with disreputable individuals from other parts of the world" setting out how the RAK Government, the ruling family and RAK-owned banks and businesses could be deceptively lured into entering

255. Mr Azima's pleaded case in support of his hacking claim (at paragraph 8J of the Re-Re-Amended Defence and Counterclaim) is as follows.

"(a) Between autumn 2015 and July 2016 Mr Azima was assisting in the mediation of a dispute between RAKIA and Dr Massaad.

(b) To the best of Mr Azima's knowledge, on or around 14 October 2015 Mr Azima received several emails containing malicious internet links which were aimed at him specifically so as to induce him to open the emails. The opening of the emails and the links in them enabled those carrying out the hacking to gain unauthorised access to and steal Mr Azima's confidential data.

(c) RAKIA has targeted Mr Azima in the context of its dispute with Dr Massaad. In particular, in around April 2015, the Ruler told Mr Buchanan that he wanted Mr Buchanan and other assistants to "target" Mr Azima. The Ruler directed his associates to bring "charges" against Mr Azima and also to pursue "other channels" for taking action against Mr Azima. The Ruler's associates discussed meeting to "coordinate our attack" on Mr Azima and Dr Massaad. In or around July 2015, the Ruler instructed another of his assistants, Mr Bustami, to "go after" Mr Azima. Further, in the context of his role in assisting in the mediation of the dispute between RAKIA and Dr Massaad, Mr Azima had meetings and discussions with RAKIA's representative, Mr Buchanan, and its counsel, Mr Neil Gerrard, of Dechert LLP. At a meeting on or about 23 July 2016, Mr Gerrard told Mr Azima that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad. Mr Azima understood this statement to be a threat.

(d) The dispute between RAKIA and Dr Massaad was not resolved. RAKIA engaged investigators and public relations consultants (including the now defunct firm, Bell Pottinger) to make inquiries into Mr Azima and to disseminate information about him.

(e) On around 29 July 2016, Mr Azima learned of a website making allegations against Dr Massaad, similar to those which RAKIA had made in the course of the mediation of its dispute with Dr Massaad. Shortly thereafter, Mr Azima learned of two other websites containing similar allegations against him. The websites contained links to BitTorrent internet sites, where certain materials stolen from Mr Azima were available to download with appropriate software and expertise. At this point, Mr Azima apprehended that his emails and data had been stolen, and so changed his passwords and increased his computer security.

(f) RAKIA has admitted that it and its lawyers, Dechert LLP, hold a substantial quantity of the data stolen from Mr Azima, including an admission made in September 2016 to holding around 30GB of material. RAKIA denies responsibility for the hacking and theft of data or awareness of the persons responsible. Its explanation for holding these materials, given through its solicitor Mr David Hughes, is that the materials were obtained from internet sites. In proceedings brought by Mr Azima against RAKIA in the United States

257.5 RAKIA was able to gather information about Mr Azima from the hacked material by December 2015, as evidenced by the View from the Window document;

257.6 Although Mr Azima had (on his case) a genuine entitlement to receive $2.6 million in compensation from RAKIA in respect of the Training Academy JV, the Settlement Agreement was in fact a device which was intended to equip RAKIA with a legal mechanism to bring a claim against Mr Azima on the basis of material which it already had from hacking his emails. The $2.6 million was paid to "lure" Mr Azima into an agreement, to "reel him in and use him in our negotiation with Dr Massaad".

257.7 RAKIA's case as to how it came across the hacked material innocently was untrue and designed to conceal RAKIA's role in the hacking. Contemporaneous emails which show that RAKIA innocently discovered the hacked material were in fact a false "paper trail"created by Mr Buchanan and Mr Gerrard in order to conceal their involvement in the hacking.

257.8 Wrongdoing can be inferred from RAKIA's "highly suspicious" approach to the documentary evidence.

258.    RAKIA's position is, in summary, as follows.

258.1 The hacking claim is unfounded. RAKIA had no involvement whatever in the hacking of Mr Azima's emails/devices or in the publication of any hacked documents online. These were documents which were publicly available on the internet which were discovered by individuals who reported them to RAKIA in early August 2016 at about the same time as the documents were discovered by individuals acting on behalf of Mr Azima.

258.2 An allegation that a party engaged in a criminal conspiracy to unlawfully hack into and publish a person's confidential data in pursuit of a malicious vendetta, and then took extensive steps to deliberately and dishonestly conceal that criminal activity from the Court, is an allegation of the utmost seriousness. It is trite law that cogent evidence is required to justify a finding of discreditable conduct and that "the cogency of the evidence relied upon must be commensurate with the seriousness of the conduct alleged".

258.3 These principles required Mr Azima to adduce particularly cogent and persuasive evidence in order to make good his hacking claim. Mr Azima's hacking claim necessarily entails not only a claim that RAKIA dishonestly obtained access to his emails but that its witnesses including Mr Buchanan, the Ruler, Mr Gerrard, Mr Halabi, Mr Bustami and Mr Handjani were parties to a conspiracy to deceive the court by the presentation of a fundamentally false case concerning RAKIA's role in the hacking of Mr Azima's emails.

258.4 In any event, whatever the position about RAKIA's direct or indirect involvement in hacking, the public interest in the fair and just disposal of the

following the Project Update, the Ruler was concerned about Mr Azima and interested in pursuing him. The Ruler said in his witness statement that in early 2015 he wanted information about Dr Massaad's organised criminal scheme and, in particular, as to the role Mr Azima had played. It seems most unlikely that he did not discuss Mr Azima with Mr Page, the investigator with whom he was having monthly meetings, in which case it is hard to believe that Mr Page could have completely forgotten about any mention of Mr Azima prior to his meeting with Mr Buchanan in early 2016.

## (2) The April and July 2015 emails

279. On 4 April 2015, Mr Buchanan emailed Mr Handjani as follows:

"HHSS [i.e. the Ruler] had wanted us to target FA [i.e. Mr Azima] – on what basis would we do this?"

280. It is unclear precisely what prompted this email. Mr Handjani's evidence, which I accept, was that Mr Azima had called him out of the blue in March 2015 and said that there was a big problem between him and the Ruler in that he was owed $8m by RAK and that, if things were not resolved, they could "get ugly" for everyone. Mr Handjani was also called by Dr Massaad at about this time who asked him to talk to the Ruler and get the Ruler to stop investigating him. Mr Handjani then spoke to the Ruler about both calls.

281. Mr Buchanan's evidence was that the Ruler's instruction to target Mr Azima in April 2015 was prompted in part by Mr Azima's claim for $8 million, which the Ruler considered to be unfounded, and in part by the information in the Project Update. He said that the reference to "targeting" was a reference to the bringing of criminal charges.

282. The Ruler's own evidence as to his state of mind was that he wanted information about the extent of the criminal scheme organised by Dr Massaad and, in particular, as to the role Mr Azima had played and, if he was involved in those schemes, to have criminal charges brought against him. He dismissed the suggestion that the emails were prompted by the Project Update.

283. The email of 4 April 2015 led to the following exchanges on the same day:

(a) Mr Handjani: "I'm not sure that's possible at the moment. I don't know what basis you would target him. Thoughts?".
(b) Mr Bustami: "As for Farhad, I would say get AH [Mr Handjani] on the case to check with the boss on what exactly he wants done".
(c) Mr Buchanan: "AH has no idea how we might go after him"
(d) Mr Bustami: "I think next week Amir is in town so we can both hook up with him and brain storm it."

284. Later that day, Mr Bustami wrote to Mr Handjani and Mr Buchanan as follows:

"I have had few discussions with boss about FA [Mr Azima] and he is adamant that we bring charges against him. He was very happy that you told him that FA is no longer asking for the $8 m.

The boss told me that you have checked with your people and confirmed back to him that the boys with the hotel are no issue now and we should not be intimidated by them and that FA may not be orchestrating this.

He wants me to get you on the case to file some sort of charges against Farhad. He also told me today that you have another channel that you are using with khater [Dr Massaad]. When are you next in town so that me you and Jamie [Mr Buchanan] could hook up and coordinate our attack?"

285. Mr Handjani's evidence, which I accept, was that the reference to "going through another channel" was a reference to attempts that were going on at that time to open a dialogue with Dr Massaad.

286. On 6 April 2015 Mr Handjani wrote to Mr Bustami and Mr Buchanan as follows:

"Subject: Re Farhad Azima
Dear Naser
Thank you for your email. I spoke to the boss and advised him against both using other channels and pressing charges against Farhad for now. I believe both approaches could undermine the work that you and Jamie are doing. I was very clear with him that we should speak with one voice-and for the moment you and Jamie are that voice.

We have to see how Khatter responds with his lawyer. If we start pressing charges with Farhad it would disrupt this process. My humble opinion is that we should not be fighting multiple fires at one time.

We need to keep this circle of information tight and give full weight and support to you and Jamie.

I have advised boss as much as
well. Best,
AAH"

287. There is no evidence of any steps being taken against Mr Azima between April and July 2015 and the natural inference from this email is that the Ruler was dissuaded from taking any action for the time being. Mr Buchanan's evidence was that Mr Azima did not feature at all in his discussions with the Ruler in this period.

"Q. What was going on in relation to investigating Mr Azima between the beginning     of April 2015 and 19 July 2015?
A. Absolutely nothing to my knowledge.
Q. Did you have some monthly meetings with Mr Page over this time?
A. Yes, I would have done.
Q. And would there have been some reports in all likelihood, written reports?
A. Yes, written or verbal, and I can't tell you which they were.
Q. And you would have discussed those with the Ruler?
A. I would have done -- I did.

Q. And is it your evidence that Mr Azima didn't feature at all in any further updates from Mr Page between the beginning of April 2015 and 19 July 2015?
A. I have no recollection of Mr Azima's name or his activities coming on to the radar screen in that period."

288. On 19 July 2015, Mr Buchanan wrote to Mr Handjani as follows:

"NB [Naser Bustami] says the Boss wants criminal stuff taken out of letter and to go after FA subject to guidance from AF [Andrew Frank].

Nothing ELSE new from NB - will speak to AF tomorrow and fill you in."

Mr Handjani replied as follows:

"Talking to the boss now. He wants me to respond to the little guy in an email and to coordinate with you."

289. Mr Buchanan's evidence about this exchange in his witness statement was that he had received a message from Mr Bustami to the effect that the Ruler wanted criminal allegations taken out of a letter to be sent to Dr Massaad's lawyers. The reference "to go after FA" was a reference to the prospect of some form of criminal proceedings or criminal charges being brought against Mr Azima which were not in the event pursued although in cross-examination, Mr Buchanan said that he did not know what was meant by "going after FA". "Guidance from AF" was a reference to guidance being sought from Mr Andrew Frank who provided public relations assistance to RAK in the US and whose guidance would be sought in relation to any reputational issues that might arise as a result of criminal charges being brought against Mr Azima as a US citizen. The reference to "the little guy" was a reference to Mr Azima. Mr Buchanan said that the planned coordinating was to do with the HeavyLift claim for compensation about which Mr Azima had emailed Mr Handjani on the same day (19 July 2015). Mr Bustami's and Mr Handjani's evidence was to the same effect. On 28 July 2015 Mr Handjani sent a response to Mr Azima explaining that there was nothing he could do beyond putting him in touch with Mr Buchanan.

290. It is unclear what prompted the Ruler to give the indication or instruction reflected in Mr Buchanan's email of 19 July. Mr Buchanan was unable to explain what prompted the Ruler to want Mr Azima to be "gone after" at this time. What is clear is that the Ruler's desire for action to be taken against Mr Azima had not abated since April. The evidence of Mr Buchanan and Mr Handjani was that this desire was prompted in part by annoyance over what the Ruler perceived was an unmeritorious claim for the $8 million but this seems unlikely given that Mr Handjani's email of 4 April 2015 had made clear that this claim was not being pursued. The Ruler himself does not suggest that the $8 million claim prompted his desire to go after Mr Azima. It is more likely that the Ruler's hostility towards Mr Azima stemmed from his perception, originating in the Project Update, that Mr Azima was an associate of Dr Massaad who was threatening to cause trouble for him.

countries with which Mr Azima had no connection. Mr Krone accepts that this access appears to be suspicious.

300. In summary, it is possible that the hacking of Mr Azima's emails is linked to his receipt of spear-phishing emails in October 2015 but this is not firmly corroborated by the evidence. There is no evidence as to who carried out the hacking.


**(4) The View from the Window document**

301. Following the alleged hacking in October/November 2015, on 29 December 2015 a document was prepared on RAKIA's side which described a "series of investigations" and labelled Mr Azima as a participant in "fraudulent activities". It was prepared by Andrew Frank, a senior individual at Karv Communications, a PR company working for RAKIA, who had been mentioned in Mr Buchanan's email of 19 July 2015. It was sent to Mr Gerrard on 4 January 2016.

302. The document reads as follows:

> "View from the window
> The window has opened on Ras Al Khaimah through a series of investigations that have unearthed a massive fraud that has taken place in the Emirate, the UAE, and several other countries including the Republic of Georgia, India, Congo and others.
> A number of things have been exposed as fact over the past twenty-four months:
> -KM was the CEO of RAK Ceramics beginning in 2003, as well as the RK Investment Authority (RAKIA) beginning in 2006 and oversaw a series of investments inside and outside of RAK that are under now intense scrutiny and have exposed wrong-doing
> -Gila Mikadze was head of RAKIA's operations in Georgia and created and oversaw numerous corporations that stole money from the Emirate and was used for his own purposes and to bribe former government officials.
> -Others committed crimes inside RAK, including the Ruler's Chief legal advisor and the legal advisor to RAKIA (they also happen to be cousins(?))
> … -FA, a U.S. citizen, appears to have orchestrated, if not (fully) participated in numerous fraudulent activities.
> … -Companies were set up with Iranian nationals"

303. Mr Azima's case is that the reference in the document to "FA" (i.e. Mr Azima) appearing "to have orchestrated, if not (fully) participated in numerous fraudulent activities" establishes that RAKIA must by this stage have hacked into Mr Azima's emails because otherwise Mr Frank would not have not known about what RAKIA alleges in these proceedings to be his "fraudulent activities".

304. In support of this case, Mr Azima submits as follows:

304.1 It is striking that none of RAKIA's witnesses even acknowledged the existence of the View from the Window document. RAKIA failed to call Mr Frank

as a witness and failed to identify Karv when ordered by HHJ Kramer QC to identify its public relations consultants, indicating an awareness that his evidence would be damaging to RAKIA.

304.2 The View from the Window document establishes "beyond serious argument" that by the end of December 2015, RAK and RAKIA had obtained access to Mr Azima's confidential emails and data. The author of the document had clearly been informed that RAK and RAKIA had a firm basis for asserting that Mr Azima had orchestrated or participated in "numerous fraudulent activities".

304.3 A belief on RAKIA's part that there was such a basis could only have come from the hacked material. As Mr Buchanan, who was leading RAKIA's investigation, explained, RAKIA only believed that Mr Azima had engaged in any fraud upon reviewing the Hacked Material:

> "A. The investigations that had taken place until that point gave me no cause to believe that Mr Azima was involved in any frauds in respect of Dr Massaad.
> Q. But you changed your mind when you saw the hacked data; is that right?
> A. I changed my mind when I saw the hacked data, that is correct."

304.4 When Mr Buchanan was shown the View from the Window document, he claimed to be able to offer no explanation for its contents and to have been unaware of it until it was put to him in cross-examination.

304.5 Mr Gerrard gave inconsistent explanations for the document, alleging initially that it was "ramblings" of Mr Frank which had come "out of the blue" and later that it was the product of a meeting which had taken place two weeks earlier concerning a "blitzkrieg" of negative publicity. He claimed that he told Mr Frank that the section of the View from the Window concerning Mr Azima "isn't going to work" because all that was known about Mr Azima was "suspicions".

304.6 This account is not credible given the absence of any response by Mr Gerrard to Mr Frank's email attaching the View from the Window document and the inconsistency with the evidence of Mr Buchanan, according to whom the "blitzkrieg" meeting did not take place until January 2016. Moreover, the View from the Window does not purport to describe "suspicions". It states that investigations have "unearthed a massive fraud" and that the matters listed in it (including Mr Azima's involvement in "numerous frauds" "have been established as fact".

305. The View from the Window document shows that in late 2015, a negative PR campaign was being planned against Mr Azima alongside Dr Massaad. Mr Azima had not dropped out of the picture. It also suggests that someone had planted in Mr Frank's mind the idea that Mr Azima had been involved in fraudulent activities. That

person was probably Mr Gerrard who had briefed Mr Frank before the document was sent. It was put to Mr Gerrard in cross-examination that, in order to have accused Mr Azima of fraud, Mr Gerrard must have been aware of the contents of Mr Azima's confidential emails:

> "Q. … by that stage, I suggest, Mr Gerrard, you were aware of the confidential material that had been procured illegally from within Mr Azima's email records in October/November 2015 and one way or another you thought you were on to something. You started to think that you could -- that you had some material to allege fraud. That's what I put to you.
> A. So I'd like to deny that, my Lord. It's preposterous. But I'd also like to explore that question because what you're suggesting is I had a secret little stash of Mr Azima's documents which I could select at will to identify frauds. I mean, how would I do that? How do I pull this stuff down? How do I search for it?"

306.     Shortly thereafter, the following exchange took place:

> "Q. And you would have been aware that Mr Page had been successful in gathering intelligence from within Mr Azima's confidential email archive?
> …
> Q. I'm putting that to you.
> A. Right. No, I wasn't aware.
> Q. And that this is the only explanation for why Mr Frank has recorded, based upon what you and Mr Buchanan must have told him, the idea that Mr Azima had been involved in numerous fraudulent activities.
> A. My Lord, that's ridiculous. Mr Frank is a clever man, but he's not a lawyer. He will have heard on a regular basis concerns as to gun-running, fraud, etc, etc. What he will not have grasped that we did not have sufficient evidence to proceed. On everything else we had stacks of evidence against -- let's take the first bullet point, Dr Massaad. We had evidence. Indeed he was prosecuted. We had evidence against Mikadze. He was prosecuted. We had evidence of other crimes inside RAK, including the Ruler's chief adviser and the general counsel. They were prosecuted. Let me ditch Farhad Azima for the moment. We had dummy corporations set up in the RAK, UK, Georgia, Cayman Islands, etc. We could have put those in, and so on. Fraudulent bank accounts, possible gun-running … we did not have any evidence that we could have proceeded against of actual fraud against Farhad Azima. That is just plainly wrong and that's what I told Andrew Frank"

307.     Mr Gerrard's explanation for the reference in the View from the Window document to Mr Azima's "orchestrating if not participating" in "numerous fraudulent activities" was confused. At one point he referred to the Project Update, although this had not alleged fraud against Mr Azima. He also referred to information provided to Mr Frank at a meeting attended by Mr Buchanan, although this meeting did not take place until later. His evidence was essentially that Mr Frank was told about suspicions concerning Mr Azima but these suspicions had nothing to do with Mr Azima's hacked emails.

document destruction, much less of any instruction by RAKIA to destroy relevant documents.

**(7)    The July 2016 meeting**

322.    Following execution of the Settlement Agreement in March 2016, Mr Azima continued to engage with RAKIA with a view to brokering a settlement of its dispute with Dr Massaad.

323.    On 16 July 2016, a meeting was held between Mr Azima and three representatives of RAKIA: Mr Buchanan, Mr Gerrard, and an associate in Mr Gerrard's firm, Dechert, at the Churchill Hotel in London.

324.    Mr Azima's case is that at this meeting Mr Gerrard threatened him that if Dr Massaad would not agree to a settlement, Mr Azima would be made "collateral damage" in a war that RAKIA would then wage on Dr Massaad, a threat that was put into effect a few weeks later.

325.    Mr Azima's evidence was as follows:

325.1    Mr Gerrard told him to stop acting as a mediator, and instead work solely for RAKIA to assist them in their campaign against Dr Massaad.

325.2    He refused and told Mr Gerrard that is not how he operated; this aggravated Mr Gerrard who proceeded to reference his history, stating that he had been a policeman, a detective, a prosecutor and a lawyer, and that he had connections with "Number 10" and that if Mr Azima did not settle the case with Dr Massaad then there would be a war against Dr Massaad and Mr Azima would be "collateral damage".

325.3    Mr Azima asked Mr Gerrard whether he was threatening him. He told Mr Azima that this was not a "threat but a promise."

325.4    At the end of the meeting, he asked Mr Buchanan for a copy of the handwritten notes that Mr Gerrard's colleague had taken. Mr Buchanan informed Mr Azima that he would be sent a copy of the notes after they were transcribed that evening. However, after repeated chasing, Mr Buchanan said that Mr Azima could not have them without Mr Gerrard's permission. He also set out in an email dated 23 July 2016, in response to Mr Azima's complaint that what Mr Gerrard had said to him amounted to "extortion" and "blackmail", a dictionary definition of those terms.

326.    Dechert's note of the relevant part of the meeting reads as follows:

"NG noted that Kirby had referred to "mutually assured destruction" but that KM was delusional if he thought that bringing the criminal and civil actions would destroy HHSS. NG noted that HHSS was now engaging with  Abu

included email communications up to August 2016 suggesting that the hackers had access to Mr Azima's email accounts throughout the period from October 2015 to August 2016.

339. Mr Azima contends that the proximity in time between (i) the breakdown in the negotiations with Dr Massaad and RAKIA and the consequential appearance of the websites attacking Dr Massaad (which RAKIA admits to arranging through Digitalis) and (ii) the websites with links to the hacked material, cannot realistically be a coincidence but is a clear indication that the Ruler or RAKIA were behind both attacks.

340. RAKIA contends that there is no connection between the Massaad websites and the appearance of the blogging websites with links to the hacked material and that it is inherently unlikely that sophisticated hackers (which is what the hackers would be, if Mr Azima's hacking claim were correct) acting on the instructions of RAKIA or the Ruler, would put up the blogging websites so soon after the Massaad websites as this would inevitably give rise to suspicion that both the blog websites and the Massaad websites were part of the same PR campaign and hence that RAKIA had carried out the hacking. On Mr Azima's case, RAKIA had had access to the hacked material since the preceding October 2015 and could have delayed publicising it for several more weeks or months. Mr Azima's answer to this point is that RAKIA may have been sufficiently confident that it had covered its tracks for it not to be concerned about detection.

341. In my judgment, if the hackers were acting on the instructions of the Ruler or RAKIA, it is unlikely that they would have timed the publication of the hacked material to coincide with the end of the "ceasefire" and the posting of the anti-Dr Massaad websites. It is more probable in my view that the two incidents, while close in time, were not in fact related. The posting of the Massaad websites was a deliberate PR campaign instructed by the RAKIA; the other was the unrelated act of hackers.


## (9)    RAKIA's alleged discovery of the hacked material

342. RAKIA has sought to explain how it became aware of the hacked material on the internet. Mr Azima submits that RAKIA's account is false and dishonest and is advanced by RAKIA in order to cover up its own responsibility for the hacking.

343. RAKIA's pleaded case, and the case it advanced in its witness statements concerning its discovery of the hacked material, is, in summary, as follows:

343.1 Following a meeting in January 2016 with Mr Azima, Mr Buchanan was alarmed by a warning from Mr Azima that, if RAKIA did not resolve matters with Dr Massaad soon, there would be an aggressive and negative public relations campaign directed against the individuals and companies involved and the Emirate of RAK more generally.

343.2 Mr Buchanan discussed this warning with Dechert. It was decided that it would be prudent to take steps on RAK's behalf to prepare for any such

106

campaign, including by actively monitoring what was being published online. As part of that preparation, Mr Buchanan discussed Mr Azima's warning with various advisers including Mr Page.

343.3 In around February/March 2016, Mr Buchanan met with Mr Page and asked him to look out for anything relevant about a possible negative publicity campaign against RAK. Following that meeting, Mr Page contacted Mr Halabi and asked him to keep an eye out for anything interesting and unusual relating to RAK, the Ruler, Dr Massaad and Mr Azima.

343.4 Following Mr Page's request, Mr Halabi carried out Google searches for those names from time to time. During one of those regular Google searches in early August 2016, Mr Halabi discovered the blog sites containing links to a torrent file containing information relating to Mr Azima.

343.5 Mr Halabi therefore contacted Mr Page and sent him the links to the torrent sites. Mr Page then informed Mr Buchanan and Mr Gerrard about the links.

343.6 Mr Gerrard, in turn, contacted Mr del Rosso at Vital Management Services ("VMS") to seek advice on instructing a suitably qualified company to download the materials. Mr del Rosso emailed Chris Swecker, a former Assistant Director of the FBI and VMS's attorney, to ask for recommendations.

343.7 On Mr Swecker's recommendation, VMS then contacted Mr Garcia at NTi and engaged NTi to download the materials and to identify any other websites containing information relevant to Mr Azima.

343.8 On 23 and 24 August 2016, Ms Gray, a senior analyst with NTi, downloaded the contents of the files listed in the torrent file entitled "Farhad Azima of the Aviation Leasing Group Exposed" using BitTorrent software (the "First Tranche of the Internet Data").

343.9 On 1 September 2016, Mr del Rosso sent an email to Mr Swecker, Mr Garcia and Ms Gray informing them that a new dump of data relating to Mr Azima had been discovered online. The following day Mr del Rosso sent a further email with links to the torrent site. When she returned to the office the following week, Ms Gray downloaded the contents of the files that were listed in that torrent file (the "Second Tranche of the Internet Data").

343.10 Ms Gray thereafter continued actively searching for any additional information relating to Mr Azima. During the course of those searches on 9 September 2016 she discovered an additional dump of data relating to Mr Azima. She then proceeded to download the contents of the files listed in that torrent file (the "Third Tranche of the Internet Data").

343.11 NTi provided copies of the First, Second and Third Tranches of the Internet Data to Mr del Rosso. Mr del Rosso then provided those copies to RAKIA's lawyers at Dechert.

344. Mr Page deals in his witness statement with Mr Halabi's involvement as follows:

344.1 Following a conversation with Mr Buchanan in early 2016 in which he had been asked to keep his ears and eyes open for anything he heard about a negative publicity campaign that might be damaging for RAK, Mr Page spoke to a few contacts he uses occasionally in the investigations business, journalism and PR industry and asked them to keep their ear to the ground. One of those was Mr Halabi, whom he believes he met at a round table lunch in 2012. Mr Halabi is an Israeli journalist who specialises in Middle Eastern affairs. They have more of a friendship than a professional relationship.

344.2 At some point later that year, Mr Halabi called him and told him that he had come across something interesting on the internet about Mr Azima. As far as he could recall Mr Halabi sent him the website address where the material could be found in a WhatsApp message. He cannot check because he regularly deletes his WhatsApp messages for security reasons. Mr Halabi also told him that he believed the information came from the UAE. Mr Page did not ask why he thought this.

344.3 When Mr Page received this information from Mr Halabi, he would have picked up the phone to Mr Buchanan although he does not specifically remember doing so. He believes that Mr Buchanan asked him then to contact Neil Gerrard at Dechert and let him know what he had heard but it may have been the other way round.

344.4 A few weeks later, he learned that a second set of data relating to Mr Azima had been put onto the Internet. He cannot recall when or how exactly he learned of this. As he had not discussed the first set with any of his sources other than Mr Halabi, he believes it may have been Mr Halabi that told him about the second set but it is possible that he was told by one of his other sources. He does not recall being told anything about how or when the second set had been discovered. He believes that he would have called Mr Buchanan or Mr Gerrard immediately. He made no attempt to download the data.

344.5 He was never asked to hack or otherwise access Mr Azima's emails or data by RAKIA or anyone else. He does not know who hacked Mr Azima's computers or placed his data online. His involvement in this matter was limited to passing on of information provided by sources to RAKIA.

345. Mr Page's evidence in cross-examination was different from his witness statement in that he claimed that he passed on the information that he had received from Mr Halabi on a single occasion and that was the end of his involvement.

Halabi to Mr Gerrard and Mr Buchanan on or around 8 or 9 August 2016, he considered the task complete and did not contact Mr Gerrard or Mr Buchanan again. Mr Halabi was also clear that he only spoke to Mr Page on one occasion.

349.8    There is therefore no explanation in the evidence as to how RAKIA found out about the Second Tranche of Data.

350.    There are further discrepancies between the evidence of Mr Page and the documents. On 16 August 2016 Mr Buchanan emailed Mr Frank and Mr Handjani, copied to Mr Gerrard, as follows.

> "Good morning. I have been informed by Stuart last night that there is an internet site that is carrying a huge amount of material relating to FA - I will get you the link later. I have asked Neil to have a team start reviewing the material as a matter of urgency. At this time, I have no idea whether this relates to us or whether it is of value in respect of our ongoing dispute with KM. More importantly, I cannot tell you whether there is anything on the site about which we should have any concern. Clearly, it would be very interesting to know who is behind this action - Stuart tells me it is UAE based. We will speak later. Jamie"

351.    This email raises further questions.

351.1    The email reads as Mr Buchanan was "breaking the news" regarding the hacked material (as Mr Buchanan accepted in cross-examination) even though, on RAKIA's case, Mr Buchanan had been informed of the Hacked Material by Mr Page over a week before, on 8 or 9 August 2016.

351.2    Mr Page denies contacting either Mr Gerrard or Mr Buchanan after the initial alleged call in which he passed on the two links from Mr Halabi, which is said to have taken place on 8 or 9 August 2016. It follows that Mr Page did not contact Mr Buchanan on 15 August 2016.

351.3    Mr Buchanan's email states that he would "get the link later". There is no evidence that Mr Buchanan ever did get "the link" or that any of the recipients of the email followed up to ask for the link. Mr Gerrard's evidence is that he believed that he "already had it by then" but there is no evidence that Mr Gerrard was provided with a link on 15 August 2016 or that he provided a link to anyone else at that time or thereafter. The emails between Mr del Rosso and NTi do not identify any such new link being provided.

351.4    No reply was sent to this email at all, by any of the recipients despite the dramatic nature of the news that Mr Buchanan had 'broken'.

351.5    The email refers to "Stuart", meaning that Mr Buchanan understood his audience – Mr Frank and Mr Handjani – to know who Mr Page  was  and that he was undertaking  some sort of  work for RAKIA.

is not true and that the true facts as to how RAKIA came to know about the hacked material have not been disclosed.

356. It does not of course necessarily follow from this conclusion that RAKIA was responsible for the hacking. As RAKIA pointed out, there would be variety of explanations for Mr Page's failure to give a true account of the discovery. He may, for example, have wanted to conceal his sources of information, even though they were not the hackers, for reasons of confidentiality.

## (10) RAKIA's deployment of the hacked data

357. Mr Azima submits that RAKIA's responsibility for the hacking should be inferred from the fact that, apart from RAKIA no other party in any jurisdiction has sought to use any of Mr Azima's stolen material in any proceedings or indicated that it was able to access the stolen data using the BitTorrent sites.

358. RAKIA's response to that argument is that Mr Azima appears to have been the subject of long term interest by Iran who perceived him as an enemy of the Iranian Government and who actively sought to acquire information and intelligence about him by targeting his communications and the communications of his close associates. In particular:

   358.1 On 2 September 2012, for example, Ms Azadeh sent an email to Mr Azima which described how Mr Azima was being spied on by agents of Iran. The email was sent after Ms Azadeh was arrested and detained for more than three months by the Iranian Government and Revolutionary Guards.

   358.2 On 24 February 2016, Ms Azadeh emailed Mr Azima a detailed account of her arrest and detention in Iran which made it clear that she and her communications were deliberately targeted by the Iranian state because of her close connection to Mr Azima, whom the Iranians believed was working with the CIA. She went on to explain that, "They had access to my computer and emails" and that she was eventually released after being "made to confess that I was a CIA agent and I was working with Farhad Azima in relation to all anti-Islamic government activities supported by U.S."

   358.3 Jay Solomon, a former journalist for the Wall Street Journal, published an article in the Columbia Journalism Review dated 7 March 2018 which stated his belief that the Government of Iran was responsible for the hacking of Mr Azima's emails. The article recounted how emails between him and Mr Azima were hacked and put on the web as a torrent file. This happened just weeks after his first story broke in August 2016 about the Obama administration's secret cash shipments to Iran.

   358.4 On 18 July 2016 – two weeks before the First Tranche of the Internet Data was published online – Ms Azadeh filed a lawsuit against the Islamic Republic of Iran and the Islamic Revolutionary Guards Corps before the United States

PLAINTIFF'S EXHIBIT 2

**The Ruler**

"Status as sovereign ruler" (par. 59)

"Your highness" (par. 129.3)

**RAKIA**

"If RAKIA was to undertake a course of events that he (the Ruler) didn't approve of" it "wouldn't necessarily happen." (par. 148.2)

**Mr Gerrard/Mr Buchanan (Dechert LLP)**

Ruler told him and "other associates" (par. 33)

"He, on behalf of RAK" (par. 62)

"Conducting (on behalf of the Ruler and/or RAKIA)" (par. 201.5)

"Three representatives of RAKIA: Mr Buchanan, Mr Gerrard" and a Dechert associate (par. 323)

**Mr Handjani**

"Involved with Mr Buchanan and Mr Bustami" (par. 65)

"I spoke to the boss (the Ruler)" (par 286)

"It would undermine the work you (Gerrard) and Buchanan are doing." (par 286)

**Andrew Frank/KARV Communications, Inc.**

"Provided public relations assistance to RAK in the US" (par. 289)

Created "View from the Window" (par. 301)

"View from the Window" suggests someone gave Mr Frank the idea that Mr Azima was partaking in "fraudulent activities" and "that someone was probably Mr Gerrard." (par. 305)

**VMS**

To advise Mr Gerrard on "a suitably qualified company to download the materials" (par. 343.7)

Provided the "Dechert lawyers" with "copies of the First, Second and Third Tranches of the Internet Data." (par. 343.11)

**NTi**

"RAKIA instructed them to download materials" (par. 53)

To download the materials for VMS (par. 343.7)

PLAINTIFF'S EXHIBIT 3

```
 1                                      Friday, 24 January 2020

 2      (10.30 am)

 3   MR TOMLINSON:  My Lord, before my friend starts, it has been

 4        reported to me that there may be individuals in court

 5        who have been recording the proceedings on mobile

 6        phones.  Now, in the modern world, that's a very common

 7        thing to do, and it may seem odd for it to be forbidden

 8        in the context where those proceedings are being

 9        recorded in any event, but, obviously as your Lordship

10        knows, it's not permitted and perhaps it might just be

11        helpful to remind people of that.

12   JUDGE LENON:  Yes, I'm happy to do that.

13        It's illegal to record the proceedings and if

14        anybody is doing that, they should immediately stop.  It

15        would be a contempt of court and potentially punishable.

16        I don't think I need to say anything more than that.

17                         MR JAMES BUCHANAN (continued)

18                  Cross-examination by MR LORD (continued)

19   MR LORD:  May it please your Lordship, Mr Buchanan, could

20        you please be shown {H9/106/1}, which should be on

21        screen for you as well.

22        Have you seen this document before?

23   A.  No, I have not.

24   Q.  Never in your life?

25   A.  No.
```

1    Q.   Are you saying that view was taken before 23 July when

2         you wrote this email?

3    A.   I believe it was done via email and I don't know when.

4    Q.   If we go to the response at {H10/229/1} from Mr Azima on

5         23 July 2016, he said:

6              "Dear Jamie,

7              "There are fundamental misunderstandings in your

8         email.

9              "Please call me for clarification/correction before

10        forwarding your email to KM.

11             "Jamie, you obviously had time to compose this

12        email.  It will take much less time to review notes of

13        75 minutes [of] meeting.  Copied of original

14        hand-written notes will be good enough, no need to edit.

15        They are what they are."

16             Can you see that?

17   A.   Yes, I can.

18   Q.   So Mr Azima was pressing you again, wasn't he --

19   A.   Yes, he was.

20   Q.   -- for a record of the meeting that you had with him and

21        Mr Gerrard and Mr Fotherby a week earlier?

22   A.   That is correct.

23   Q.   I suggest to you, Mr Buchanan, that by this stage the

24        only reason for you to hold back a note of a meeting

25        you've had with a counterparty is because you are

1           look at them and see what they contain - I'm concerned

2           about viruses, etc."

3               Can you see, there's two more websites?

4      A.   Yes, I can.

5      Q.   So that's Friday, 12 August.  Then if we go, please, to

6           {H10/254}.  You can see some emails on 13 August 2016.

7           You can see the email exchange that we've just -- sorry,

8           no, on 13 August 2016 Chris Swecker wrote:

9               "Rich, here are two more sites Nick has learned

10          about.  Nick says to watch for malware but I am sure you

11          already know that.  Best, Chris."

12              So it looks as if Mr Swecker is forwarding

13          Mr del Rosso's email about the two further sites,

14          doesn't it?

15     A.   That's correct.

16     Q.   And those are forwarded to NTi by -- can you see

17          Rich Garcia sends an email to Jessica Gray?  They're

18          both at NTi, aren't they?

19     A.   Yes, they are.

20     Q.   And Mr Garcia says this:

21              "Jess, note the phone line on the message - the

22          attorney would like this on every email message and/or

23          communication produced.  Note the malware concerns.

24          Thanks."

25              Can you see that?

1    A.  Yes, I can.

2    Q.  So it looks as if Mr Swecker wanted to put that rubric

3        on all these communications in relation to the

4        downloading of the data, doesn't it?

5    A.  Sorry, when you say "the rubric", what are we referring

6        to?

7    Q.  It's the privileged attorney/client communication.  You

8        see that appears -- that pops up at the top, can you

9        see --

10   A.  No, I can see that.  Sorry, I was just trying to

11       understand.  If you read the email, I don't see it

12       referring to that.

13   Q.  Note the first line on the message.

14   A.  Okay.

15   Q.  The first line of all these messages has that rubric.

16   A.  I understand, thank you.

17   Q.  You know what they're trying to do here.  There's

18       obviously a desire to try to cloak this with some sort

19       of legal privilege.  You can see that, can't you,

20       Mr Buchanan?

21   A.  I think the use of the word "cloak", I wouldn't have

22       used the word "cloak".  What I would have said is this

23       is -- this is in the US, Chris Swecker is a lawyer, and

24       Chris Swecker advises VMS.

25   Q.  If we go to {H10/256}, please.

PLAINTIFF'S EXHIBIT 4

1                                        Monday, 27 January 2020

2       (10.30 am)

3                   MR JAMES BUCHANAN (continued)

4              Cross-examination by MR LORD (continued)

5   MR LORD:  May it please your Lordship, Mr Buchanan, you went

6              to Oxford University, didn't you?

7   A.  That is correct.

8   Q.  And what did you read there?

9   A.  I read geography.

10  Q.  And have you had any training or qualification in any

11             legal matters?

12  A.  No, I haven't.

13  Q.  Have you had any training or qualification in any

14             forensic accountancy matters?

15  A.  No, I haven't, but it's been learning by experience

16             through my career.

17  Q.  Other than in relation to your severance contracts, can

18             you confirm to his Lordship on oath that you have not

19             discussed any matter to do with this case at all since

20             4.30 on Friday afternoon?

21  A.  That is correct.

22  Q.  Including receiving any communication about the case by

23             email?

24  A.  That is correct.

25  Q.  Or by text?

          1          this information down at any time, but if you pull it

          2          down now, you're going to have the same problem on your

          3          iPhones".  I go back to them and say, "If you're sure,

          4          then please proceed".

          5    Q.   Could you be shown {B/31/4}, please, which is the order

          6          of the court I've been asking you about.  You know,

          7          Mr Buchanan, that there was a dispute between the

          8          parties as to what the judge ordered in November?

          9    A.   No, I'm not.

         10    Q.   And anyway, the order was finally made by the judge

         11          requiring specification of what is set out in (iv) at

         12          {B/31/4}.  Can you see that?

         13    A.   I was not involved in that at all so I can't comment.

         14    Q.   Just read subparagraph (iv).  There was an order made

         15          for RAK to confirm:

         16              "... whether the Claimant is aware of any other

         17          device or platform on which emails from the MSN Account

         18          sent or received after 1 September 2014 and before

         19          14 October 2016 are or may be stored which has not been

         20          referred to in the ninth witness statement of

         21          Lucy Ward ..."

         22              Do you see that?

         23    A.   That's correct.

         24    Q.   "... or the fourth witness statement of [you]."

         25              Mr Buchanan, are there any other devices where your

1              emails might still exist, any other platform or server

2              or memory stick?

3      A.  Not to my knowledge, no.

4      Q.  At all?

5      A.  No.

6      Q.  Whether within your control or not?

7      A.  No, neither.

8      Q.  Can I ask you one last question, please?  Can you go to

9              today's transcript, please, at page 60, line 23

10             {Day4/60:23}?

11                 Can you see I asked you around about line 19 whether

12             you discussed with anybody else Mr Page's work?  Do you

13             remember?

14     A.  Yes, I do.

15     Q.  And you said at line 23 -- I said:

16             "Question:  What about Mr Handjani?"

17             And you said:

18             "No."

19     A.  That's correct.

20     Q.  And did you understand that Mr Frank was or was not

21             aware of Mr Page's work?

22     A.  I don't know.  I didn't tell him.

23     Q.  Could you go to {H10/262/1}, please?  This is your email

24             of 16 August 2016.  Can you see that, where you're

25             emailing Mr Frank and Mr Handjani?  Can you see that?

```
 1    A.  Yes, I do.

 2    Q.  "Good morning.  I have been informed by Stuart last

 3        night ..."

 4            You're referring to Stuart Page there, aren't you?

 5    A.  I am.

 6    Q.  So, Mr Buchanan, you must have assumed when you sent

 7        this that the audience would know who the "Stuart" was.

 8        That's right, isn't it?

 9    A.  They knew who Stuart Page was, that's correct.

10    Q.  Right.  So when you sent this, you knew that Mr Handjani

11        and Mr Frank knew that you would be referring to

12        Stuart Page?

13    A.  Yes, they would.

14    Q.  So how would they have known about Stuart Page unless

15        they had been involved or known about the work that

16        Mr Page was doing for RAK or RAKIA?

17    A.  They knew that Stuart Page was undertaking work.  The

18        question that I received this morning was did I ever

19        share any of the information in Stuart Page's reports,

20        and the answer to that is, "No, I did not".

21    Q.  Can we have page 60 of today, please {Day4/60:1}?

22            I asked you in line -- can you go, please, to

23        page 61 {Day4/61:7}:

24            "As far as you understand, do you think Mr Handjani

25        was aware that Mr Page had been retained at the Ruler's
```

1    suggestion?"

2         You said:

3         "I don't know.  If he was, it would have been

4         a private discussion between the Ruler and Mr Handjani.

5         I was not privy to those meetings."

6    A.   That's correct.

7    Q.   It's right, isn't it, from {H10/262/1}, that you did

8         know that Mr Handjani was aware of Mr Page's work?

9    A.   They were aware that Mr Page undertook work on behalf of

10        the Government.  They were not -- I never at any point

11        shared with either of those two individuals the work

12        that Mr Page was producing.

13   Q.   What about Mr Frank?

14   A.   No.

15   Q.   Did Mr Frank to your knowledge -- as you understood it

16        did Mr Frank know about Mr Page's work?

17   A.   I did -- he knew that -- sorry?

18   Q.   What was the answer?  Sorry.

19   A.   The answer was that both individuals knew that Mr Page

20        was undertaking work on our behalf.  They did not --

21        sorry, I did not at any stage share that work with

22        either of those two individuals.  It would have been

23        inappropriate and against what I was told to do by

24        the Ruler.

25   MR LORD:  Thank you Mr Buchanan.

1    JUDGE LENON:  We'll have our five-minute break now.

2    (3.31 pm)

3                        (A short break)

4    (3.36 pm)

5    JUDGE LENON:  Before you start, Mr Tomlinson, do you have

6        any idea of how long you're going to be?

7    MR TOMLINSON:  Probably half an hour or so.

8    JUDGE LENON:  Very good.

9                   Re-examination by MR TOMLINSON

10   MR TOMLINSON:  Mr Buchanan, can I start at the end of your

11       long cross-examination?  You were asked about a document

12       at {G/34/106}.  Do you remember this is the email that

13       was sent -- I'm sorry, {G/34/107}.  It was sent by

14       Lucy Ward to you and then you replied in red, but

15       unfortunately the version here is only in black --

16   A.  That's correct.

17   Q.  -- so a bit confusing.

18            Now, if you now go to {G/34/106}, this is a document

19       which is after in time, so we have Ms Ward replies to

20       you:

21            "Hi Jamie

22            "Thank you for responding so quickly."

23            Do you see that?

24   A.  Yes, I do.

25   Q.  And then do you see your response at the top of the

1         page?

2     A.  Yes, I do.

3     Q.  And was that your understanding of the position at the

4         time?

5     A.  That's correct.

6     Q.  You thought there had been a problem.  What did you

7         think had then happened to your emails?

8     A.  I thought there had been a problem.  I thought that they

9         would be available throughout because that's what

10        Control Risks informed me.

11    Q.  And did you think at that stage that any emails had been

12        permanently lost?

13    A.  No, I did not.

14    Q.  Now, going then back in time, as it were, to

15        October 2016, after the incident at the Apple Store --

16        can you go to {D/12/4}, please?  After the incident at

17        the -- I'm not sure whether it was being suggested that

18        the incident at the Apple Store was a fiction or whether

19        it was something that you tricked the Apple Store into

20        doing to hide your previous wrongdoing, but what did you

21        do after you'd been to the Apple Store?  What steps did

22        you take to try and put things right?

23    A.  I immediately rang Linda Goldstein at Dechert to inform

24        her what had transpired.  I then also sent a note to

25        Andre Nel, who worked for me, to see if he could help

1           me.

2      Q.   If we go to {H10/341.01}, is that the note you sent to

3           Andre Nel?  It should be on the screen as well,

4           Mr Buchanan.

5      A.   Oh, sorry.  That's correct.

6      Q.   And then did you then contact someone else at some other

7           organisation about this?

8      A.   I contacted Control Risks, who were currently

9           undertaking some work on behalf of the Government.

10     Q.   And I don't want to rehearse your evidence in your

11          fourth witness statement because I don't think it was

12          challenged, but did gentlemen from Control Risks come to

13          see you?

14     A.   They undertook an extensive exercise over a number of

15          days to retrieve all that had been lost and they

16          believed -- they believed -- that they could get back

17          everything that had been lost by the Apple employee.

18     Q.   Just to be absolutely clear to his Lordship,

19          Mr Buchanan, did you at any stage deliberately destroy

20          emails relating to Mr Azima to conceal some kind of

21          wrongdoing by yourself?

22     A.   Never at any stage.

23     Q.   I now want to take you back in the chronology to the

24          beginning of your time at RAK Development.  If you take

25          your witness statement at {D/9/3}, again I don't

PLAINTIFF'S EXHIBIT 5

**IN THE HIGH COURT OF JUSTICE**

**QUEEN'S BENCH DIVISION**

**BETWEEN**

### KARAM SALAH AL DIN AWNI AL SADEQ

<u>Claimant</u>

**– and –**

**(1) DECHERT LLP**

**(2) NEIL GERRARD**

**(3) DAVID HUGHES**

**(4) CAROLINE BLACK**

<u>Defendants</u>

---

### PARTICULARS OF CLAIM

---

<u>The Parties</u>

1. The Claimant ("**Mr Al Sadeq**") is a lawyer and Jordanian citizen who is a resident of the United Arab Emirates (the "**UAE**"). For the past six years he has been incarcerated in Ras Al Khaimah ("**RAK**"), one of the constituent Emirates of the UAE, having originally been abducted and unlawfully detained in September 2014 for alleged involvement in fraudulent transactions allegedly committed against his former employer, the RAK Investment Authority ("**RAKIA**"), and having been subsequently convicted by the RAK criminal court after a prolonged period of solitary confinement and other inhumane treatment in breach of UAE law and his human rights under international law. Mr Al Sadeq denies any involvement in wrongdoing and maintains that the charges against him were politically motivated on the part of the Ruler of RAK in an attempt to conceal the Ruler's own close involvement in RAKIA's activities and that he was convicted on the basis of false confessions obtained from him under duress by the Defendants.

1

2. This claim is brought expressly without prejudice to any future claims or proceedings (whether in this jurisdiction or any other, and whether by way of court proceedings, arbitration or any other form of action) Mr Al Sadeq may wish to bring against any person in relation to his convictions and / or the circumstances thereof, including the setting aside of those convictions and / or any claims for losses arising as a result thereof to the extent that such losses are not recovered in these proceedings.

3. The First Defendant (**"Dechert"**) is a limited liability partnership registered in England & Wales with registration number OC306029, authorised and regulated by the Solicitors Regulation Authority of England and Wales, with its registered address at 160 Queen Victoria Street, London EC4V 4QQ.

4. The Second Defendant (**"Mr Gerrard"**) is a solicitor of the Senior Courts of England and Wales, and a Partner in Dechert where he is global co-head of Dechert's white collar and securities litigation practice.

5. The Third Defendant (**"Mr Hughes"**) is a solicitor of the Senior Courts of England and Wales, and currently a Partner at Stewarts Law. Prior to joining Stewarts Law in or around June 2017, Mr Hughes was a Partner at Dechert, working closely with Mr Gerrard.

6. The Fourth Defendant (**"Ms. Black"**) is a solicitor of the Senior Courts of England and Wales and is a Partner at Dechert specialising in corporate investigations, working closely with Mr Gerrard with whom she joined Dechert from DLA Piper in around 2011.

7. All of Mr Gerrard's, Mr Hughes's and Ms. Black's acts as particularised herein are attributable to Dechert, and Dechert is responsible and liable for all wrongs committed by them or any of them, and the consequences thereof.

Summary of this claim

8. These proceedings concern serious wrongs committed against Mr Al Sadeq by persons including Mr Gerrard, Mr Hughes, Ms. Black and Dechert in relation to an investigation, led by Mr Gerrard, into the affairs of RAKIA and an alleged fraud committed by its former Chief Executive Officer, Dr Khater Massaad (**"Dr Massaad"**), allegedly assisted by *inter alios* Mr Al Sadeq and several other alleged co-conspirators. Dr Massaad had been a close confidant of the current Ruler of RAK, but they fell out between 2010 and 2012.

9. These wrongs, involving breaches of UAE criminal law and procedure, the UAE Constitution and which are in breach of Mr Al Sadeq's human rights as a matter of UAE and international law, give rise to actionable claims under UAE law, as pleaded at paragraphs 220 to 229 below, and include the following:

2

9.1. Kidnap and extraordinary rendition of Mr Al Sadeq from Dubai to RAK;

9.2. Unlawful detention of Mr Al Sadeq in RAK without arrest or charge;

9.3. Mr Al Sadeq's detention in solitary confinement for around 560 days between September 2014 and April 2016, first at the General Headquarters of State Security in RAK (the "**GHQ**") and subsequently in a camp run by the Ruler of RAK's private militia, under a false name, without any or any proper due process, no access to legal representation, in unsanitary and inhumane conditions, and without adequate medical attention, exercise or access to his family, who were refused information as to his whereabouts.

9.4. Interrogation of Mr Al Sadeq by Mr Gerrard and Ms. Black during the period he was detained in solitary confinement in the GHQ and by Mr Gerrard, Mr Hughes and Ms. Black during the period he was detained in solitary confinement in the said militia camp. Mr Gerrard and Mr Hughes made it apparent by their words and actions that they had the power to improve his inhumane conditions if he gave them sufficient "cooperation".

9.5. Threats by Mr Gerrard and Mr Hughes to Mr Al Sadeq against him, his wife and children at various times as more specifically particularised herein to force him to "cooperate" in building a case against Dr Massaad, Mr Jihad Quzmar, (the former Legal Advisor to the Ruler, and an advisor of long standing) ("**Mr Quzmar**"), Mr Farhad Azima (a US-Iranian businessman who had dealings with RAKIA) ("**Mr Azima**"), and Mr Gela Mikadze (former General Manager of RAKIA's Georgia operations) ("**Mr Mikadze**") and other alleged co-conspirators by giving false evidence, including threats that Mr Al Sadeq's wife would be arrested and imprisoned and that neither of them would ever see their children again.

9.6. Pressure applied by Mr Gerrard and Ms. Black and Mr Hughes at various times as more specifically particularised herein to Mr Al Sadeq's wife to persuade Mr Al Sadeq to "cooperate" by giving false evidence, including by threatening her directly with imprisonment and by telling her that if Mr Al Sadeq told them what they wanted he would be released from detention and the inhumane conditions in which he was being kept.

9.7. Forcing Mr Al Sadeq to make knowingly false confessions prepared by Mr Gerrard and Mr Hughes containing evidence which Mr Al Sadeq told them was untrue, in return for promises, subsequently reneged upon, said to have been given by the Ruler of RAK, that he would be released and pardoned if he made the false confessions.

10. In summary, it is Mr Al Sadeq's case that Mr Gerrard and Mr Hughes and Ms. Black and Dechert were prepared to, and did, violate Mr Al Sadeq's rights, including by using threats and / or mistreatment and / or unlawful methods to force Mr Al Sadeq to give evidence and / or false evidence, as more specifically particularised below, in an attempt to build a case against Dr Massaad and his alleged co-conspirators at the behest of the ruler of RAK. In doing so, and thereby directing and/or being complicit in Mr Al Sadeq's ill treatment and / or torture, they caused Mr Al Sadeq physical, emotional, psychological, moral and financial harm, loss and damage for which compensation is sought in these proceedings.

RAK, RAKIA and Dr Massaad

11. From the 1980s Dr Massaad established and managed businesses in RAK including RAK Ceramics, of which both he and the current Ruler of RAK, Sheikh Saud Bin Saqr Al-Qasimi (the "**Ruler**"), were founders and significant shareholders.

12. In around August 2003 Dr Massaad was officially appointed adviser to the Ruler, who at that time had recently been appointed the Crown Prince and Deputy Ruler of RAK. From that point (at the latest) until around late 2010 Dr Massaad was the Ruler's close friend and confidant, in his presence on a daily, or almost daily, basis.

13. As a result of Dr Massaad's management, by 2010 RAK Ceramics was the world's largest ceramics manufacturer. The export success of RAK Ceramics provided RAK, a country with no oil or gas industry, with its most significant source of foreign exchange income. The Ruler obtained significant private wealth through his shareholding in RAK Ceramics.

14. RAKIA was established in 2005 by Emirati Decree No. (2)/2005 in order to promote investment in RAK and to promote various economic sectors in the Emirate.

15. From its establishment in 2005 until around 2012, RAKIA's Chief Executive Officer was Dr Massaad. Dr Massaad was in control of all day to day management of RAKIA, but at all material times worked closely with the Ruler, developing investment strategies and taking investment decisions with the knowledge, approval, and instructions of the Ruler.

16. Dr Massaad developed RAKIA, and the RAK Free Zone, using his financial and business expertise and borrowing, without any significant capital investment from the RAK state itself. By 2011 RAKIA made a net profit of 300 million UAE Dirhams ("**AED**") and was worth more than one billion AED.

17. In addition to promoting investment in RAK generally, by around 2010 RAKIA had, with the full knowledge and approval of the Ruler, very significant investment interests outside RAK, particularly in Georgia (developed after a visit of the Georgian Prime Minister to

4

63. Mr Al Sadeq was blindfolded and his hands were tied behind his back at this interrogation. Mr Gerrard began by telling Mr Al Sadeq that *"we know more about you than you know about yourself"* and told Mr Al Sadeq that he needed to cooperate with them.

64. When Mr Al Sadeq asked him what right he had to interrogate him, and in what role, Mr Gerrard responded that he was in control of Mr Al Sadeq's fate, and that he was the one with whom Mr Al Sadeq should cooperate at that stage. Mr Gerrard made clear that if Mr Al Sadeq did not do so he would never be released and said that he was *"the law"* in RAK, or words to that effect. From these statements Mr Al Sadeq concluded that Mr Gerrard had been behind his kidnap and illegal rendition and was the person ultimately in charge of his detention and overall fate, alongside the Ruler.

65. During this initial interrogation Mr Gerrard threatened to have Mrs Al Sadeq arrested unless Mr Al Sadeq "cooperated" with them and made false claims that she was on the board of directors of a Lebanese airline (which she has never been: her career to that point was in media production and management) and had embezzled monies (which she has never done). Mr Al Sadeq denied this and said that his wife had never been on the board of a Lebanese airline and that it must be someone with the same name. In response, Mr Gerrard smiled and said *"no matter, we will arrest her until we figure out if it is the same name or not"* thereby indicating to Mr Al Sadeq that he was in control of the police and justice system in RAK.

66. Mr Gerrard conducted further interrogations of Mr Al Sadeq, accompanied by Ms. Black, while he was detained in the GHQ.

67. From this point on Mr Gerrard was the central figure in the interrogation and prosecution of Mr Al Sadeq, generally assisted and accompanied by Ms Black, with his then-colleague at Dechert Mr Hughes taking over from him at times. Mr Gerrard's indications that he was *"the law"* in RAK, which were borne out by the pivotal role he took in the treatment of Mr Al Sadeq and his wife and the degree of control over Mr Al Sadeq's treatment which he repeatedly demonstrated, give rise to the inference that he orchestrated the unlawful and abusive treatment of Mr Al Sadeq in order to pursue the Ruler's vendetta against Sheikh Faisal, Dr Massaad and Mr Quzmar, in addition to Mr Mikadze, Mr Azima and other alleged co-conspirators. This treatment included making threats against Mr Al Sadeq and his wife.

Presentation to public prosecutor – 10 September 2014

142.10.    Mrs Al Sadeq then met with the Ruler again on 4 August 2015. At this meeting, the Ruler repeated that Karam would be pardoned.

Introduction of Mrs Al Sadeq to Mr Buchanan

143.    On 20 May 2015 Mrs Al Sadeq went to the Ruler's palace with Mr Al Sadeq's sisters in an attempt to meet the Ruler. After waiting for several hours on the pavement outside the palace they were told that the Ruler would not see them. However, one of the Ruler's courtiers gave them the telephone number of a Mr James Buchanan ("**Mr Buchanan**"). Mr Buchanan was the Chief Executive Officer of Ras Al Khaimah Development LLC, an adviser to the Ruler, a spokesman for the RAK Government, and is a close associate, and a neighbour in Sussex, of Mr Gerrard.

144.    Mrs Al Sadeq called Mr Buchanan and he invited her to meet with him at the Waldorf Hotel in RAK, which she did a few days later. At this meeting, at which a notetaker from Dechert or Al Tamimi was also present, Mrs Al Sadeq explained the history of her husband's kidnap and incarceration to Mr Buchanan who in turn told Mrs Al Sadeq that he was part of the investigation into RAKIA and claimed that wrongdoing had been found on the part of Dr Massaad but that Mr Al Sadeq's conduct was still under investigation.

145.    Mrs Al Sadeq told Mr Buchanan that even if Mr Al Sadeq was guilty then this did not justify his treatment. Mr Buchanan responded by telling Mrs Al Sadeq that her husband needed to "cooperate", and that he would attempt to use his influence with the Ruler to assist Mr Al Sadeq. He further stated that if Mr Al Sadeq "cooperated" he would be released within two months. If he did not, and refused to help develop a case against, and testify against, Dr Massaad and other alleged co-conspirators, he would be prosecuted through the RAK Courts.

146.    From that point Mrs Al Sadeq was in regular contact with Mr Buchanan by telephone and SMS, and met him on around ten occasions in person, sometimes with Mr Al Sadeq also present.

147.    During one of these meetings which took place at the courthouse in RAK, Mr Buchanan admitted to Mrs Al Sadeq that he hoped her husband would be released because he knew what was happening to him was wrong.

Pressure on Mrs Al Sadeq used to try to persuade Mr Al Sadeq to agree to sign confessions

148.    While Mr Al Sadeq was in Al Barirat, Mr Gerrard and Mr Hughes were also, in addition to Mr Buchanan after 20 May 2015, in regular contact with Mrs Al Sadeq in order to put

he would be released if he did so. Mr Al Sadeq, considering that his life was in danger if he remained at Al Barirat, felt that he had been left with no other choice and was no longer able to endure the torments and torture heaped upon him, directly or indirectly, by or on the instructions of the Defendants, and Mr Gerrard in particular. In substance, he therefore agreed to the proposal made by Mr Buchanan at the 2 September 2015 Meeting, thereby concluding an agreement on those terms (the "**False Confession Agreement**") with the Ruler via Mr Buchanan. In doing so Mr Al Sadeq relied upon the promise made by the Ruler and the Defendants and Mr Buchanan *inter alia* that he would be released and pardoned.

174. Despite his "cooperation" with the Defendants in producing false confessions, criminal court proceedings against Mr Al Sadeq continued, as Mr Gerrard had said they would. On around 12 October, around two weeks prior to a sentencing hearing, Mr Hughes told Mrs Al Sadeq while she was at the RAK court trying to prepare a bail application for her husband, that Mr Al Sadeq's sentence would be 8 years. When she asked him how he knew this he responded: "*Because I know*", or words to that effect. He separately told Mr Al Sadeq a similar thing.

175. On 28 October 2015 the RAK Court of First Instance passed of a sentence of 8 years imprisonment against Mr Al Sadeq. In the same case, Dr Massaad received a sentence of 30 years *in absentia*, and Mr Quzmar was also sentenced to 30 years in prison.

176. The fact that the RAK Court of First Instance handed down this sentence as had been correctly foretold by Mr Hughes some two weeks earlier, as pleaded at paragraph 174 above, appeared to Mr Al Sadeq and Mrs Al Sadeq to confirm the Ruler's and Dechert's control over the sentences which had been passed and the proceedings, just as they were seemingly in control of all other parts of the justice system in RAK. It further confirmed that they controlled Mr Al Sadeq's fate, thereby necessitating his continued cooperation in providing the Defendants with false confessions implicating Dr Massaad, Mr Mikadze and other alleged co-conspirators.

177. The announcement of the RAK Court's sentences several weeks before they were delivered was not Mrs Al Sadeq's only direct interaction with Mr Hughes whether alone, or together with Mr Al Sadeq. As to this:

    177.1. At the same meeting on 12 October 2015 in a room in the Court in RAK at which Mr Hughes told Mrs Al Sadeq what Mr Al Sadeq's sentence would be, he also told them that the result of Mr Al Sadeq's agreement to make a false confession and to implicate Dr Massaad and others, he (Mr Hughes) had the Ruler's agreement to

though by that stage Dr Al Shamsi had ceased to act, or in reality to attempt to act, for Mr Al Sadeq.

184.2. that the Ruler was unaware of the arrangements and transactions said to constitute wrongdoing on the part of Dr Massaad and Mr Al Sadeq. This was untrue, as Mr Al Sadeq had told Mr Gerrard, Ms Black, Mr Hughes and Mr Buchanan repeatedly. The Ruler had had contemporaneous knowledge of all the relevant aspects of the transactions about which complaint was made and had approved and/or directed them. That fact would have provided Mr Al Sadeq (and Dr Massaad) with a defence to the claims brought against them which, it is to be inferred, is why it was important to the Ruler and the Defendants that Mr Al Sadeq give false evidence in this respect.

Mr Al Sadeq's continued detention at Al Barirat

185. During the period between agreeing to the False Confession Agreement and signing the False Confession Statements, Mr Al Sadeq remained incarcerated at Al Barirat.

186. On 30 December 2015 however, Mrs Al Sadeq was allowed to see Mr Al Sadeq, taking with her their two children. This was due to be the first time that Mr Al Sadeq had been allowed to see his children since March 2015 when Mr Al Habsi had allowed them to meet in his office. However, Mr Al Sadeq was not produced, and the meeting did not take place.

187. On 28 January 2016 Mrs Al Sadeq emailed the Ruler, explaining about the cancelled meeting with their children on 30 December, and the three hearings at which Mr Al Sadeq was not in attendance and, in any event, unable to afford legal representation.

188. On around 13 January 2016 an appeal hearing took place in the RAK court to consider Mr Al Sadeq's appeal. This appeal had been adjourned on two previous occasions, 19 December and 30 December 2015, because Mr Al Sadeq had not been informed of the hearings and had not been produced.

189. In or around February 2016, Mrs Al Sadeq met with the Ruler, Sheikh Ahmed (the Ruler's son), and Mr Buchanan to discuss Mr Al Sadeq's release now that he had complied with his side of the False Confession Agreement. The Ruler asked if a satisfactory house had been found, and Mrs Al Sadeq explained that she did not care about the house, she just wanted her husband to be released now that he had provided the requested "cooperation". The Ruler confirmed to Mrs Al Sadeq that he would abide by the False Confession Agreement and that as soon as the house to which he was to be moved was ready, Mr Al Sadeq would be granted bail and released from Al Barirat. The Ruler then told Mr

196.    On 10 April 2016, Mrs Al Sadeq sent an SMS to Mr Buchanan complaining at the way Mr Al Sadeq was being treated, as follows:

> "*Dear James, hope this finds you well. Karam went on a hunger strike and he* [sic] *taken to the prosecutor today to meet Hassan and Khalid. He called to tell me the deal we agree on with you is not on the table anymore and he will suffer more if he doesn't obey. It's shocking how they treat ppl who cooperate. How do you expect others to cooperate when they see and hear about what's happening to Karam.*"

197.    Mr Buchanan was in New York but agreed to meet Mrs Al Sadeq in order to try to assist upon his return, and they met on 17 April 2016, together with Mr Al Sadeq's mother, at the Waldorf Hotel in RAK. Mr Buchanan said he would do what he could to help Mr Al Sadeq. Mr Buchanan also promised to help Mrs Al Sadeq travel outside the UAE (which she had been prevented from doing since September 2014), including procuring a visa for her.

198.    On 19 April 2016 Mr Buchanan messaged Mrs Al Sadeq to confirm that Mr Al Sadeq would be moved to a house the following day, Wednesday, 20 April.

199.    As Mr Buchanan had informed Mrs Al Sadeq, on 20 April 2016 Mr Al Sadeq was transferred to the second floor of a two-storey villa in Al Hamrah village in RAK (the "**Villa Prison**"), where he was detained until around August 2016. The Villa Prison was secured with bars on the windows and a security door, and Mr Al Sadeq was not allowed to leave the Prison Villa.

200.    During his time in the Villa Prison Mr Al Sadeq was allowed the use of the upstairs, and four guards were constantly present downstairs. Mrs Al Sadeq was allowed to stay for weekends and her children to visit. However, the circumstances of those visits were degrading and humiliating. On each occasion Mrs Al Sadeq was subjected to a strip search and body search in front of her children; and her children were subjected to intrusive searches which included searches inside their underwear by the guards. Any toys they brought with them were also searched, and on at least one occasion one of the children's cuddly toys was torn open in front of them and the stuffing pulled out as part of a purported search.

201.    Despite the previous delay in implementing the False Confession Agreement, and the doubts raised by what Mr Al Sadeq had been told by the prosecutor, Mr and Mrs Al Sadeq were initially hoping that the move to the Villa Prison would be a precursor to the release of Mr Al Sadeq, as agreed in the False Confession Agreement.

*Moral damage*

298.    Furthermore, Mr Al Sadeq has suffered moral damage as a result of the wrongs committed against him, including (*inter alia*) damage to his reputation (*inter alia*, by the fact of his detention and prosecution, and as a result of the publication of the False Confession Statements on the Anti-Massaad Website) for which he also seeks and is entitled to compensation.

Interest

299.    Mr Al Sadeq also seeks interest pursuant to section 35A of the Senior Courts Act 1981 at such rate and for such period as the court shall see fit.


**AND THE CLAIMANT CLAIMS:**

  i.     Damages for breach of Article 282 of the UAE Civil Code;
  ii.    Damages for abuse of right under Article 106 of the UAE Civil Code;
  iii.   Such accounts or enquiries as the Court may see fit;
  iv.    Further or other relief;
  v.     Interest;
  vi.    Costs.


**EDWARD FITZGERALD QC**

**JOHN BRISBY QC**

**ALASTAIR TOMSON**

**NICHOLAS WRIGHT**

**31 March 2020**

**STATEMENT OF TRUTH**

The Claimant believes the facts stated in this Particulars of Claim are true. I am duly authorised by the Claimant to sign this statement.

**Full name:**    Bambos Tsiattalou

**Signed:**    ....................................

            Claimant's legal representative

**Dated:**    31 March 2020

PLAINTIFF'S EXHIBIT 6

BRYAN SCHRODER
United States Attorney
JONAS M WALKER
STEVEN SKROCKI
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 W. 7th Avenue, #9, Room 253
Anchorage, AK 99513-7567
Phone: (907) 271-5071
Fax: (907) 271-6011
E-mail: jonas.walker@usdoj.gov

DEBORAH L. CONNOR
Chief, Money Laundering and Asset Recovery Section (MLARS)
WOO S. LEE
Deputy Chief, International Unit
MICHAEL OLMSTED
Senior Trial Attorney, International Unit
Criminal Division
United States Department of Justice
1400 New York Avenue, N.W., 10th Floor
Washington, D.C. 20530
Telephone: (202) 514-1263
Email: Woo.Lee@usdoj.gov

Attorneys for Plaintiff:
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br>Plaintiff | ) | Civil No. **3:20-cv-00126-JMK** |
| | ) | |
| v. | ) | |
| | ) | |
| FUNDS IN THE AMOUNT OF<br>73,293,750 AED (APPROXIMATELY<br>$20 MILLION) IN THE POSSESSION<br>AND CONTROL OF RAS AL<br>KHAIMAH INVESTMENT AUTHORITY<br>(RAKIA) | ) | |

and                                    )
                                       )
ALL CLAIMS FILED AND ASSERTED          )
BY VI2 PARTNERS GMBH AGAINST           )
RAS AL KHAIMAH INVESTMENT              )
AUTHORITY GEORGIA LLC IN CASE          )
NO. 2b/4319-17 PENDING BEFORE          )
THE TBILISI COURT OF APPEALS,          )
REPUBLIC OF GEORGIA AND                )
PROCEEDS THEREOF,                      )
                                       )
               Defendant *in rem*.     )

## COMPLAINT FOR FORFEITURE IN REM

The United States of America, by its undersigned attorneys, brings this Complaint for Forfeiture *in Rem* and alleges as follows in accordance with Rule G(2) of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions (the "Supplemental Rules").

## NATURE OF THE ACTION

1.     The plaintiff is the United States of America.

2.     The defendants in this action (the "Defendant *Res"*) are funds in the amount of approximately 73,293,750 AED (the "Defendant Funds") in the custody of the Ras Al Khaimah Investment Authority ("RAKIA") in the United Arab Emirates ("UAE") as well as a legal claim (the "Defendant Claim") for the Defendant Funds filed and asserted by VI2 Partners GmbH ("VI2") in *VI2 Partners GmbH v. Ras Al Khaimah Investment Authority Georgia LLC* (Case No. 2b/4319-17), which is currently pending before the Tbilisi Court of Appeals in the Republic of Georgia (the "Georgia Action"). The Defendant Funds were deposited by VI2's predecessors in interest while seeking to purchase a hotel in Tbilisi, Georgia, from its owner, the Ras Al Khaimah

2

Investment Authority Georgia LLC. The Georgia Action was filed by VI2 on or about February 19, 2016, seeking a return of the Defendant Funds and damages when the purchase of the hotel did not occur.

3.     The only persons believed by the government to have an interest that may be affected by this action are VI2 and Ras Al Khaimah Investment Authority Georgia LLC, which is a wholly-owned subsidiary of RAKIA.

## NATURE OF THE ACTION

4.     This is a civil action *in rem* to forfeit assets involved in and traceable to an international conspiracy to launder funds traceable to violations of the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1705, and a scheme to defraud financial institutions in the Republic of Korea ("Korea"). The United States of America seeks the forfeiture of the Defendant *Res* pursuant to 18 U.S.C. § 981(a)(1)(C), on the ground that it was derived from violations of U.S. and Korean law, and pursuant to 18 U.S.C. § 981(a)(1)(A) on the ground that the Defendant *Res* constitutes property involved in one or more money laundering offenses in violation of 18 U.S.C. §§ 1956 and/or 1957, and is property traceable to such property

## JURISDICTION AND VENUE

5.     This is a civil forfeiture action brought pursuant to 18 U.S.C. § § 981(A) and (C).

6.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1345 and 1355.

7.     Venue is proper in this district pursuant to 28 U.S.C. § § 1355(b)(1)(A) and 1355(b)(2) because acts and omissions giving rise to the forfeiture took place in the District of Alaska.

3

## BACKGROUND: RELEVANT INDIVIDUALS AND ENTITIES

8.      **Kenneth Zong** is a U.S. citizen who formed multiple companies registered in Korea, including KSI Ejder Korea Inc. and Anchore. On December 15, 2016, Kenneth Zong was indicted in the District of Alaska for conspiracy to violate IEEPA, money laundering and money laundering conspiracy. The indictment alleges, among other things, that Zong and others allegedly conspired to evade the prohibitions of IEEPA and the Iranian Transactions and Sanctions Regulations ("ITSR") by engaging in false, fictitious and fraudulent transactions which were designed to unlawfully convert and remove Iranian owned funds, equivalent to approximately $1 billion U.S. dollars ("USD"). These funds were held in Korean bank accounts and converted into more easily tradeable currencies, such as USDs and/or euros, by deceiving Korean banks and regulators into thinking the transactions were legitimate. On or about February 6, 2013, Zong was also convicted in Korea of violations of Korea's Foreign Exchange Transaction Act and customs laws in connection with his operation of KSI, and sentenced to two years imprisonment. Zong remains in Korea.

9.      **Pourya Nayebi** is an Iranian national and born on July 25, 1974. In 2011, Nayebi, along with **Houshang Hosseinpour** and **Houshang Farsoudeh** (collectively the "Uncharged Conspirators"), acquired the majority of shares in a licensed bank in the Republic of Georgia with direct correspondent ties to other international financial institutions through a Liechtenstein-based foundation. The Uncharged Conspirators used the Georgia financial institution to facilitate transactions for multiple Iranian banks, including Bank Melli, Mir Business Bank, Bank Saderat, and Bank Tejarat. On February 6, 2014, the U.S. Department of the Treasury designated the

4

Uncharged Conspirators as individuals subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382. In announcing this designation, the Treasury Department stated that they and others subject to U.S. sanctions played a key role in evading U.S. sanctions on Iran.

10. **Houshang Hosseinpour** is an Iranian national and born on March 21, 1967.

11. **Houshang Farsoudeh** is an Iranian national and born on October 10, 1968. On February 6, 2014, Farsoudeh was designated by the U.S. Department of the Treasury as an individual subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

12. **Anchore** is a legal entity registered in Seoul, Korea. It was originally formed by Kenneth Zong in 2009 as KSI Ejder Korea Inc. before Zong changed its name to Anchore in 2011.

13. **Orchidea Gulf Trading** ("**Orchidea Trading**") is an entity based in the United Arab Emirates and owned by the Uncharged Conspirators. On February 6, 2014, Orchidea Trading was designated by the U.S. Department of the Treasury as an entity subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

14. **MSL & Co.** ("**MSL**") is another entity controlled by the Uncharged Conspirators. MSL was originally based in the UAE. At an unknown date, MSL changed its name to European Oil Traders SA and moved its location to Niederglatt, Switzerland. On February 6, 2014, European Oil Traders was designated by the U.S. Department of the Treasury as an entity subject to U.S. sanctions pursuant to Executive Orders 13224 and 13382.

15. **Industrial Bank of Korea** ("**IBK**") is a financial institution in the Republic of Korea where the Central Bank of Iran maintained an account that at one time possessed a balance of over $1 billion USD (the "CBI Won Account").

5

16.     **Ras al Khaimah Investment Authority** ("**RAKIA**").  RAKIA is an industrial licensing and promotion agency owned by Ras al Khaimah intended to promote investments in the Emirate of Ras al Khaimah, one of the seven emirates that make up the UAE.  RAKIA is currently in possession of the equivalent of approximately $20 million of funds paid to RAKIA by the Uncharged Conspirators in connection with a failed attempt to purchase a hotel owned by RAKIA in the Tbilisi, Georgia (the "Tbilisi Hotel").

17.     **VI2 Partners GmbH** ("**VI2**") is an Austrian legal entity owned by Marc-Milo Lube, an Austrian national.  VI2 alleges in the Georgia Action it filed against RAKIA that it owns and acquired from the Uncharged Conspirators any interest and/or claim the Uncharged Conspirators formerly possessed against RAKIA in connection with their failed attempt to purchase the Tbilisi Hotel.

## EVIDENCE SUPPORTING FORFEITURE

18.     The Defendant *Res* represents the proceeds of more than $1 billion in Korean Won ("KRW") converted into U.S. dollars in or through U.S. financial institutions in violation of IEEPA.  The funds were then further transferred and laundered by Zong, a U.S. citizen—at the direction of the Uncharged Conspirators—through a web of shell company accounts at financial institutions in several jurisdictions, including the UAE.

## FACTS

### I.     U.S. AND KOREAN SANCTIONS ON IRAN

19.     U.S. law prohibits any U.S. person, including financial institutions inside the United States, from providing services directly or indirectly to Iran or the Government of Iran, in

6

the absence of a license from the U.S. Department of the Treasury, Office of Foreign Assets Control ("OFAC"). This prohibition includes the unlicensed processing of transactions through U.S. banks that are for the benefit of the Government of Iran, including any agency or instrumentality of the Government of Iran or any entity owned or controlled by the Government of Iran. The Central Bank of Iran ("CBI") is part of the Government of Iran and has been identified by OFAC as an entity owned or controlled by the Government of Iran since prior to 2000.

20.     The International Emergency Economic Powers Act (50 U.S.C. §§ 1701 et seq.) authorizes the President "to deal with any unusual and extraordinary threat, which has its source in whole or substantial part outside the United States, to the national security, foreign policy, or economy of the United States" by declaring a national emergency with respect to such threats, 50 U.S.C. § 1701(a), and to take steps to address such threats, including the authority to "investigate, regulate, or prohibit . . . any transactions in foreign exchange," "transfers of credit or payments between, by, through, or to any banking institution, to the extent that such transfers or payments involve any interest of any foreign country or a national thereof," and "the importing or exporting of currency or securities by any person, or with respect to any property, subject to the jurisdiction of the United States[,]" 50 U.S.C. § 1702(a)(1)(A).

21.     Beginning with Executive Order No. 12170, issued on November 14, 1979, the President found that "the situation in Iran constitutes an unusual and extraordinary threat to the national security, foreign policy and economy of the United States and … declare[d] a national emergency to deal with that threat." On March 15 and May 6, 1995, the President issued

7

Executive Orders Nos. 12957 and 12959, prohibiting, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, to Iran of any goods, technology, or services from the United States or by a United States person, and on August 19, 1997, issued Executive Order No. 13059 clarifying the previous orders (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transactions Regulations (renamed in 2012 the Iranian Transactions and Sanctions Regulations, or "ITSR") implementing the sanctions imposed by the Executive Orders.

22.     The ITSR, Title 31, Code of Federal Regulations, Section 560.204, prohibit, among other things, the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, of goods, technology, or services to Iran or the Government of Iran (with certain limited exceptions), including the exportation, reexportation, sale or supply of goods, technology or services to a third country knowing that such goods, technology or services are intended for Iran or the Government of Iran, without a license from OFAC. The ITSR provide that the transfer of funds, directly or indirectly, from the United States or by a U.S. person to Iran or the Government of Iran is a prohibited export, reexport, sale, or supply of services to Iran or the Government of Iran. See 31 C.F.R. § 560.427(a). The ITSR further prohibit transactions that evade or avoid, have the purpose of evading or avoiding, cause a violation of, or attempt to violate the ITSR. 31 C.F.R. § 560.203.

8

23.     OFAC also maintains the Foreign Sanctions Evaders List ("FSE List") to identify foreign persons sanctioned under Executive Order 13608, "Prohibiting Certain Transactions With and Suspending Entry Into the United States of Foreign Sanctions Evaders With Respect to Iran and Syria." This FSE List includes persons sanctioned pursuant to Executive Order 13608 for engaging in conduct relating to the evasion of United States economic and financial sanctions with respect to Iran or Syria.

24.     In 2010, Congress also enacted The Comprehensive Iran Sanctions Accountability and Divestment Act of 2010 ("CISADA"), which, among other things, authorized the imposition of sanctions against foreign financial institutions that engaged in transactions either facilitating Iran's nuclear or ballistic missiles programs, or with persons and entities designated under United Nations and U.S. sanctions against terrorism and weapons of mass destruction proliferation.

25.     In addition to U.S. sanctions, Korea also imposed its own bilateral sanctions on Iran beginning on or before 2011. The Korean government, in consultation with the United States Government, authorized IBK and another Korean bank to each establish a Korean won ("KRW")-denominated account belonging to the Central Bank of Iran.

26.     In 2011, the Central Bank of Iran maintained an account at IBK in Seoul containing the equivalent of over $1 billion in KRW (the "CBI Won Account"). The purpose of this account was to permit limited forms of trade between Korea-based entities and Iran, including the import of Iranian oil to Korea. The CBI Won Account at IBK was subject to several limitations. Among other things, the account could be used for transactions involving only certain, permissible types of goods, including crude oil exports from Iran. The CBI Won Account could also be used to

9

compensate Korean businesses who were owed compensation from Iran for certain types of limited and permissible commercial trade and sales actions. All other transactions – including transactions for weapons — were specifically prohibited. Additionally, transactions involving the CBI Won Account could not involve USD.

## II.  THE SCHEME TO FRAUDULENTLY CONVERT CBI ACCOUNT FUNDS

27.    Beginning on or before 2011 and continuing thereafter, Kenneth Zong and the Uncharged Conspirators, namely—Pourya Nayebi, Houshang Hosseinpour, and Houshang Farsoudeh – conspired to convert KRW held in the CBI Won Account into USD and other currencies, and to launder those funds in and through accounts held by multiple shell companies, including Orchidea Trading, in several jurisdictions, including the UAE.

28.    In furtherance of this scheme, Zong and his associates orchestrated a complex scheme to defraud Korean banks, including IBK. Zong and his associates fraudulently represented to IBK and other Korean banks that Anchore, a Korean company Zong controlled in Seoul, had sold hundreds of millions of dollars' worth of permitted commercial goods and services to Iran. In truth, no such transactions had ever taken place. Rather, these false representations were made to IBK in order to cause IBK to transfer funds from the CBI Won Account to Anchore's account at IBK, where Zong then—at the direction of the Uncharged Conspirators—wire transferred the proceeds of this deceptive and illegal scheme to multiple shell company accounts in several other jurisdictions, including the UAE.

29.    In total, between February 10, 2011 and July 20, 2011, Zong initiated over 88 transactions via IBK accounts, thereby causing $1,004,662,911.57 worth of Iranian funds to be

10

transferred by IBK's CBI Won Account to accounts Zong controlled, converted to USD, and transferred by IBK at Zong's direction to other accounts that Zong and his co-conspirators, the Uncharged Conspirators, controlled and/or for their benefit, all in violation of U.S. sanctions laws.

30.     As explained below, approximately $20 million of these funds were used by the Uncharged Conspirators in attempting to purchase the Tbilisi Hotel in the Republic of Georgia, and $10 million was transferred to bank accounts controlled by Zong and his relatives at financial institutions in Anchorage, Alaska.

A. ZONG REPRESENTED FALSELY TO IBK THAT KSI/ANCHORE SOLD MARBLE TILES TO IRAN IN ORDER TO WITHDRAW OVER $2 MILLION IN FUNDS FROM THE CBI WON ACCOUNT

31.     In or around July 2009, Kenneth Zong registered a company named KSI Ejder Korea Inc. ("KSI") in Seoul, Korea. On or about January 25, 2011, Zong opened a bank account at IBK in KSI's name. In or around February 2011, Zong changed KSI's name to Anchore.

32.     Beginning in at least January 2011, Zong and the Uncharged Conspirators manufactured a host of commercial documents fraudulently representing that Anchore acquired $2 million worth of marble tiles and other construction supplies from MSL and sold and exported these goods to Farsoodeh and Partnership ("Farsoodeh"), an Iranian company located on Kish Island in Iran.

33.     In truth, Anchore never sold or delivered any marble tiles or construction materials to Farsoodeh. Nor did Anchore acquire any marble or construction materials from MSL. In fact, Zong and the Uncharged Conspirators fabricated and backdated all of the above commercial documents to give the appearance that Anchore was engaged in legitimate commercial

11

transactions with Farsoodeh and MSL. Zong emailed an associate of the Uncharged Conspirators on or about February 1, 2011, explaining:

> Let's do this way.
> UAE company issues an OFFER SHEET to KSI EJDER KOREA INC then I will issue a Commercial INVOICE to Farsoodeh & Partnership Co. based on UAE Offer sheet. OFFER sheet must be back dated Jan 17, 2010 and description of commodity is various different kinds of Italian Marbel Tile, finished in UAE (which country ?) Offer sheet must be lower amount than INVOICE amount. Invoice amount shall be KRW2,650,000,000.- OFFER price should be USD2,303,347.80 (or similar). it shows KSI EJDER makes a little profit, Again this is just paper works for to get approval from Korea Central bank.
> Regards/ken"

34. Between January 27 and 28, 2011, within three days of opening the Anchore account at IBK, Zong presented the above fraudulent commercial contracts and invoices to IBK in order to justify and receive authorization to accept two monetary transfers from the CBI Won Account—one for ₩2,000,000,000 KRW and a second for ₩650,000,000 KRW—to Anchore's account at IBK. The transfers were executed by IBK after Zong presented the fraudulent invoices and contracts to IBK and Iranian financial institutions, in turn, tendered payments requests to IBK to transfer CBI Won Account funds to pay Anchore's invoices.

## B. ZONG REPRESENTED FALSELY TO IBK THAT ANCHORE SOLD HUNDREDS OF MILLIONS OF DOLLARS IN ADDITIONAL CONSTRUCTION MATERIALS TO IRAN TO WITHDRAW THE EQUIVALENT OF OVER $1 BILLION FROM THE CBI WON ACCOUNT

35. In or around May 2011, Zong tendered additional fraudulent documents to IBK and the Korean government in order to obtain hundreds of millions of dollars in additional transfers from the CBI Won Account. Specifically, Anchore represented fraudulently that it possessed a

12

contract dated February 2011 to supply Farsoodeh with additional construction materials, including "Heavy duty Galvazined Steel, Custom pre-colored Window & [W]ood frame[s]."

36. In or around May 2011, Anchore also submitted an application to the Korean government requesting permission to engage in this type of trade with Iran. According to Zong, the value of the materials to be supplied to Iran was $15,605,704,000. In reality, however, Anchore never acquired nor exported any such construction materials to Iran.

37. In order to supply construction materials to Farsoodeh, Zong claimed that he would purchase these materials from Orchidea Trading, a UAE entity controlled by the Uncharged Conspirators—the same individuals who also owned Farsoodeh.

38. Notwithstanding the fact that Anchore never sold any construction materials to Farsoodeh, and Anchore acquired no materials from Orchidea Trading, Zong requested that IBK utilize funds in the CBI Won Account to pay him the equivalent of hundreds of millions of dollars in compensation.

39. Based upon fraudulent commercial invoices and contracts Zong presented to IBK, the equivalent of more than $1 billion in KRW was transferred from the CBI Won Account to Anchore's account at IBK between February and July 2011.

40. Zong deceived IBK regarding the transactions. Zong concealed material facts, for example, that Orchidea Trading, where the vast majority of the CBI Won Account funds were sent, was controlled by the same individuals that owned Farsoodeh—namely, the Uncharged Conspirators.

13

a. For instance, in manufacturing fraudulent contracts between Anchore and Orchidea, an associate of the Uncharged Conspirators ("Iranian Associate A") advised Zong to remove any references to Farsoodeh in Anchore's contracts with Orchidea in order to avoid "problems" with Orchidea's banks in the UAE. On or about June 6, 2011, Zong received an email from Iranian Associate A stating:

> We can only make the [contract] direct with Anchore and Orchidea. As if we involve any Irani company like Farsoodeh in our contract then our banks in UAE will creat problems for us. So isnt this possible that we do contracts same as before. One contract between Farsoodeh and Anchore, and second one between Orchidea and Anchore[?]"

b. Similarly, Houshang Hosseinpour also reiterated to Zong the importance of not disclosing how Zong would utilize the CBI Won Account funds once they were released to him by IBK. In an email to Zong, Hosseinpour wrote: "Iran now is bad situation. If any swift will come back to iran.our road will be close." Hosseinpour copied Orchidea Trading's email address on this email. In a later email, Hosseinpour confirmed to Zong, "we got green light from Iran."

41. Upon receiving these funds, Zong caused some of these funds to be exchanged for U.S. dollars and wired—at the direction of the Uncharged Conspirators—to nearly four dozen different persons and entities in several jurisdictions, including, among other places, the United States, the UAE, Switzerland, Canada and Bahrain. The funds were directed as follows:

a. Approximately $863 million was sent to accounts maintained in the name of Orchidea Trading at Emirates Bank in the UAE;

b. Approximately $131,000,000 was transferred cumulatively to other shell company accounts in the U.A.E.;

14

c. $10,564,572 was transferred cumulatively to twenty different individuals and four companies in the United States, including Alaska;

d. Approximately €469,978 EUR (approximately $668,825 equivalent) was transferred cumulatively to three companies in Italy;

e. €299,653 EUR (approximately $426,436 equivalent) was transferred cumulatively to six companies in Germany;

f. €233,580 EUR (approximately $332,407 equivalent) was transferred cumulatively to two companies in Switzerland;

g. €97,000 EUR (approximately $138,040 equivalent) was transferred cumulatively to a company in Austria;

h. €56,000 EUR (approximately $79,693 equivalent) was transferred cumulatively to an individual and one company in France;

i. €32,480 EUR (approximately $46,222 equivalent) was transferred cumulatively to a company in the Netherlands;

j. $40,000 was transferred cumulatively to an individual and one company in Canada; and

k. $30,000 was transferred cumulatively to two individuals in Bahrain.

42.     As compensation for participating in this fraudulent scheme to funnel the equivalent of more than $1 billion from the CBI Won Account to overseas accounts controlled by or for the benefit of the Uncharged Conspirators, Zong received an amount equivalent to approximately $10 to 17 million as compensation. Approximately $10 million of these funds were wired and deposited by Zong in a financial institution in Anchorage, Alaska.

//

//

15

**C.** **APPROXIMATELY $20 MILLION IN FUNDS TRACEABLE TO THE CBI WON ACCOUNT WERE UTILIZED TO ATTEMPT TO PURCHASE THE TBILISI HOTEL**

43.     As described below, the Uncharged Conspirators used $20 million in funds traceable to the fraudulently procured CBI Won Account funds in attempting to purchase the Tbilisi Hotel in Georgia from RAKIA. The Uncharged Conspirators paid the equivalent of approximately $20 million to RAKIA, the Tbilisi Hotel's owner.

44.     Between October 2011 and March 2012, Houshang Hosseinpour, among others, engaged in discussions with RAKIA to purchase the Tbilisi Hotel. On or about March 1, 2012, New York Exchange LLC, an entity owned by the Uncharged Conspirators and whose chairman was Houshang Hosseinpour, and RAK Hotel, a subsidiary of RAKIA, entered into a share purchase agreement ("SPA"). Rak Hotel agreed in the SPA to sell the Tbilisi Hotel to New York Exchange LLC for approximately $62.5 million.

45.     Pursuant to the SPA, New York Exchange LLC agreed to make an initial deposit equivalent to approximately $20 million with RAKIA. Between on or about October 12, 2011, and March 28, 2011, the Uncharged Conspirators tendered to RAKIA a series of checks drawn on multiple accounts maintained in the UAE in the names of various shell companies they controlled, including Orchidea Trading, New York General Trading LLC[1] and Tansam General Trading (New York General Trading LLC's former name). Specifically, RAKIA deposited the

---

[1] On February 6, 2014, New York General Trading LLC was designated by the U.S. Department of the Treasury as being subject to sanctions and was placed on OFAC's FSE List. In announcing the designation, the Treasury Department stated that New York General Trading LLC was an entity owned and/or controlled by the Uncharged Conspirators and was one of several front companies used "to deceive the international community ... by generating false invoices in connection with transactions involving designated Iranian banks."

16

following checks it received from the Uncharged Conspirators in connection with the SPA:  (i) an Orchidea Trading check dated October 12, 2011, for 2.2 million AED; (ii) an Orchidea Trading check dated October 17, 2011, for 2 million AED; (iii) a check drawn on a New York General Trading LLC account dated October 19, 2011, for 10,478,000 AED; (iv) a check drawn on a New York General Trading LLC account dated November 16, 2011, for 8,257,500 AED; (v) a check drawn on a New York General Trading LLC account dated December 14, 2011, for 11,453,125 AED; (vi) a check drawn on a New York General Trading LLC account dated December 28, 2011, for 11,453,125 AED;  (vii) an Orchidea Trading check dated March 19, 2012, for 725,000 AED; (viii) an Orchidea Trading check dated March 28, 2012, for 13 million AED; and (ix) an Orchidea Trading check dated March 28, 2012, for 13.25 million AED.

46.     Upon receiving these checks, RAKIA deposited the funds into its account at the Commercial Bank of Dubai in the UAE. Those funds comprise the Defendant Funds in this action.

47.     After negotiations between the Uncharged Conspirators and RAKIA terminated without being able to successfully conclude a final purchase agreement for the Tbilisi Hotel, VI2 Partners GmbH ("VI2"), an Austrian legal entity owned by Marc-Milo Lube, filed civil claims (the "Defendant Claim") against RAKIA (the "Georgia Action") in the Tbilisi City Court seeking, among other things, the return of all funds provided to RAKIA by Orchidea Trading, New York General Trading LLC and Tansam General Trading in connection with the SPA as well as additional damages allegedly caused by RAKIA.  In filing its action, VI2 asserted that it had acquired the cause of action from Orchidea Trading, New York General Trading LLC and Tansam General Trading pursuant to a claim purchase agreement.

17

48.     The Defendant Claim was filed by VI2 on or about February 19, 2016.  After the Tbilisi Court issued a ruling in VI2's favor, RAKIA appealed the decision of the Tbilisi City Court to the Tbilisi Court of Appeal.

## FIRST CLAIM FOR RELIEF

49.     Paragraphs 1 through 49 above are incorporated by reference as if fully set forth herein.

50.     The Defendant Funds and Defendant Claim (collectively, the "Defendant *Res*") is property that constitutes, and is derived from, proceeds traceable to one or more violations of IEEPA and foreign bank fraud, which are specified unlawful activities under 18 U.S.C. §§ 1956(c)(6)(B)(iii), 18 U.S.C. §§ 1956(c)(7)(A), 1956(c)(7)(B)(iv) and/or 1956(c)(7)(D).

51.     The Defendant *Res* is, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

## SECOND CLAIM FOR RELIEF

52.     Paragraphs 1 through 52 above are incorporated by reference as if fully set forth herein.

53.     The Defendant *Res* is involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1957 and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the Defendant *Res* was involved in or is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such

18

transactions in criminally derived property of a value greater than $10,000 that was derived from specified unlawful activities, namely: IEEPA and foreign bank fraud.

54.     The Defendant *Res* is, therefore, subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

## THIRD CLAIM FOR RELIEF

55.     Paragraphs 1 through 55 above are incorporated by reference as if fully set forth herein.

56.     The Defendant *Res* is involved in, or is traceable to property involved in, one or more transactions, or attempted transactions in violation of section 18 U.S.C. § 1956(a)(1)(B)(i) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h). Specifically, the Defendant Asset is involved in and is traceable to property involved in one or more financial transactions, attempted transactions, and a conspiracy to conduct or attempt to conduct such transactions involving the proceeds of specified unlawful activity, that is: (i) violations of IEEPA (50 U.S.C. §§ 1701-1705); and (ii) a foreign offense involving fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)); and were designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of the specified unlawful activities in violation of 18 U.S.C. § 1956(a)(1)(B)(i).

57.     The Defendant *Res* is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

//

//

19

## FOURTH CLAIM FOR RELIEF

58.     Paragraphs 1 through 57 above are incorporated by reference as if fully set forth herein.

59.     The Defendant *Res* was involved in, or is traceable to property involved in, one or more transactions or attempted transactions in violation of section 18 U.S.C. § 1956(a)(2)(B) and a conspiracy to commit such offenses in violation of section 18 U.S.C. § 1956(h).  Specifically, the Defendant Asset was involved in and are traceable to funds that were and were attempted to be, transported, transmitted, or transferred, and a conspiracy to transport, transmit, or transfer, to a place in the United States from or through a place outside the United States, with the knowledge that the funds involved in the transportation, transmission, or transfer represented the proceeds of some form of unlawful activity and knowledge that such transportation, transmission, or transfer was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activities, that is: (i) violations of IEEPA (50 U.S.C. §§ 1701-1705); and (ii) a foreign offense involving fraud by or against a foreign bank (18 U.S.C. § 1956(c)(7)(B)(iii)).

60.     The Defendant *Res* is therefore subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

WHEREFORE, plaintiff United States of America prays that:

(a)     due process issue to enforce the forfeiture of the Defendant *Res*;

(b)     due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed;

(c)     this Court decree forfeiture of the Defendant *Res* to the United States of America for disposition according to law; and

(d)     for such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Dated: June 3, 2020                    Respectfully submitted,

BRYAN SCHRODER
United States Attorney
DEBORAH L. CONNOR
Chief
Money Laundering & Asset Recovery Section
U.S. Department of Justice

By:     _____

JONAS WALKER
STEVEN SKROCKI
Assistant U.S. Attorney
District of Alaska
WOO S. LEE
Deputy Chief, MLARS
MICHAEL OLMSTED
Sr. Trial Attorney, MLARS
U.S. Department of Justice

Attorneys for Plaintiff
UNITED STATES OF AMERICA

Subscribed before me on June 3, 2020, in Anchorage, Alaska.

_____
Jennifer Lotz, Notary
My commission expires: with office

21

# VERIFICATION

I, Benjamin R. Mattson, hereby verify and declare under penalty of perjury that I am a Special Agent with the Federal Bureau of Investigation, that I have read the foregoing Verified Complaint for Forfeiture *In Rem* and know the contents thereof, and that the matters contained in the Verified Complaint are true to the best of my knowledge and belief.

The sources of my knowledge and information and the grounds of my belief are official files and records of the United States, publicly available files and historical information, information supplied to me by other law enforcement officers, experts, and other witnesses, as well as my investigation in this case, together with others, as a Special Agent of the Federal Bureau of Investigation.

I hereby declare under penalty of perjury that the foregoing is true and correct. Executed June 3, 2020, at Anchorage, Alaska.

Benjamin R. Mattson
Special Agent
Federal Bureau of Investigation

Subscribed before me on June 3, 2020, in Anchorage, Alaska.

Jennifer Lotz, Notary
My commission expires: with office



22

PLAINTIFF'S EXHIBIT 7

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

WHITMAN & COMPANY, INC.,

               Plaintiff,

          v.

LONGVIEW PARTNERS (GUERNSEY)
LIMITED, LONGVIEW PARTNERS LLP,
LONGVIEW PARTNERS (UK) LIMITED,
LONGVIEW PARTNERS LP, and
LONGVIEW PARTNERS LIMITED,

               Defendants.

Civil Action No. 1:14-cv-12047-GAO

### AMENDED COMPLAINT

       This civil action is for damages sustained by Plaintiff Whitman & Company, Inc., as a result of multiple breaches of the contract at issue in this case, as well as the Defendants' collective, knowing and intentional efforts, in concert with one another, to act unfairly and deceptively towards Whitman in violation of M.G.L. ch. 93A, and to retain funds that are owed to Whitman.

### PARTIES

       1.     Plaintiff Whitman & Company, Inc. ("Whitman") is a domestic corporation organized and existing under the laws of the Commonwealth of Massachusetts.  Whitman maintains its principal place of business at 11 Oak Street, #46, Wellesley, Massachusetts, 02482.

       2.     Longview Partners LLP ("Longview") is a foreign entity organized and existing under the laws of the United Kingdom.  Longview maintains its principal place of business at Thames Court, 1 Queenhithe, City of London, EC4V 3RL, United Kingdom.  On information

and belief, Longview was previously known as Longview Partners LP.[1]   On information and

belief, Longview also goes by the name "Longview London."  Longview is a global equity asset

manager, and invests funds that have been entrusted to Longview by, among other clients,

institutional investors based in the United States.  Longview is a registered investment advisor

with the U.S. Securities and Exchange Commission ("SEC").

3.      Longview Partners (Guernsey) Limited ("Longview Guernsey") is a foreign entity

organized and existing under the laws of Guernsey.  Longview Guernsey maintains its principal

pace of business at P.O. Box 559, Sarnia House, Le Truchot, St Peter Port, Guernsey, GY1 6JG.

Longview Guernsey is on information and belief, is responsible for management and compliance

oversight.  Longview Guernsey delegates investment management responsibilities to Longview

while retaining reporting and administrative functions, as well as oversight of Longview.

Longview Guernsey is also a registered investment advisor with the SEC.  On information and

belief, the Agency Fees that Longview Guernsey owes under the Agreement are earned as

revenue by Longview or another Defendant.  On information and belief,  because the Defendants

have overlapping and common principals, those individuals are able to move funds from one

Defendant to another, in any manner they deem appropriate.

4.      Longview Partners (UK) Limited ("Longview UK") is a UK registered company.

Longview UK also maintains its principal place of business at Thames Court, 1 Queenhithe, City

of London, EC4V 3RL, United Kingdom.  On information and belief, Longview UK was

---

[1] To the extent Longview is not the successor to Longview Partners LP, as set forth below Longview Partners LP is also named as a Defendant in this action.

previously known as Longview Partners Limited.[2]  Longview UK is wholly owned by Longview Guernsey and, on information and belief, serves as the managing member of Longview.

5.      Longview Partners LP ("Longview LP") is (or was) a foreign entity organized and existing under the laws of the United Kingdom.  Longview LP (like Longview and Longview UK) maintains (or maintained) its principal place of business at Thames Court, 1 Queenhithe, City of London, EC4V 3RL, United Kingdom.  On information and belief, Longview LP transferred some or all of its business to Longview on or about July 3, 2012.  Longview LP is (or was) a registered investment advisor with the SEC.

6.      Longview Partners Limited ("Longview Ltd.") was a foreign entity organized and existing under the laws of the United Kingdom.  On information and belief, Longview Ltd. changed its name to Longview Partners (UK) Limited on July 3, 2012.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action under 28 U.S.C. § 1332(a)(2) because this action is between citizens of a State and of foreign states, and the amount in controversy greatly exceeds the sum or value of $75,000.

8.      Longview Guernsey, Longview LP, Longview UK, Longview Ltd. and Longview (collectively, "Defendants") are subject to personal jurisdiction in Massachusetts because they either entered into the contract at issue in this case with Whitman in Massachusetts or, through their common and overlapping principals, transacted business with Whitman, and perhaps others, in Massachusetts.

---

[2] To the extent Longview UK is not the successor to Longview Partners Limited, as set forth below Longview Partners Limited is also named as a Defendant in this action.

9.      Venue is proper in this district because Whitman has a principal place of business in Massachusetts, and the Defendants entered into the contract at issue or transacted business related to this dispute with Whitman in Massachusetts.

## STATEMENT OF FACTS

10.     On January 1, 2006, Whitman entered into an Exclusive Agency Agreement (the "Agreement") with Longview Guernsey, which is the contract under which Whitman's contract claims arise in this case.

11.     On January 31, 2007, the Agreement was amended to substitute Whitman as the sole contracting party following the death of R. Eugene Whitman, President of Whitman & Co. A copy of the Agreement, as amended, is attached hereto as Exhibit A and is incorporated herein.  Unless otherwise noted, all capitalized terms herein have the same definition as set forth in the Agreement.

12.     Pursuant to Section 1 of the Agreement, Whitman served as the exclusive marketing agent for Longview Guernsey, its affiliate Longview LP and Longview LP's successor entity Longview in the United States, Canada and Bermuda (the "Territory") during the term of the Agreement (from January 1, 2006 through December 31, 2010).

13.     In this position, Whitman was responsible for performing Agency Services, including introducing prospective investors (principally U.S.-based institutional investors) to Longview's investment management and advisory services, arranging meetings between Longview Guernsey, Longview LP and/or Longview and Prospective Clients, providing follow-up to all meetings and such additional assistance to Longview Guernsey and/or the other Defendants as might be needed.

14.     As the exclusive provider of Agency Services to the Defendants, Whitman was the only entity or person who could be considered an introducer of Prospective Clients located

within the Territory under the Agreement.  Thus, as the exclusive marketing agent for

Defendants, all introductions to Clients located in the Territory, including, specifically, the

United States, were solely made by Whitman.  Accordingly, any investment made by any such

entity, that was introduced by Whitman, triggered Agency Fees due to Whitman under the

Agreement.

15.     Pursuant to Section 4 of the Agreement, Longview Guernsey is required to pay

Whitman Agency Fees over the course of a five year period, which commences "on the date(s)

on which such Clients place assets under the management of Longview."  The Agency Fees due

to Whitman are calculated as a percentage of the Management Fees received by Longview LP

and/or Longview as follows:

        25% of Management Fees Received for 1st year of Management
        20% of Management Fees Received for 2nd year of Management
        15% of Management Fees Received for 3rd year of Management
        15% of Management Fees Received for 4th year of Management
        10% of Management Fees Received for 5th year of Management

16.     These Agency Fees are "due and payable to Whitman within 30 days after the

receipt by Longview of the Management Fees on which such Agency Fees are based."

17.     In the event that a Client "commit[s] assets to Longview on more than one

occasion, the Agency Fee with respect to each such commitment shall be separately calculated in

accordance with the five-year schedule."

18.     Moreover, pursuant to section 4 of the Agreement, any introduction by Whitman

during the term of the Agreement, which later results in a Client investment with Longview or

another Defendant after the expiration of the Agreement, nevertheless triggers Agency Fees

owed to Whitman over the succeeding five years following each investment by the Client.

19.     Under the terms of the Agreement, Whitman introduced the Defendants to at least

seven (7) current Clients and one (1) Prospective Client.

20.     In addition, there may be additional institutional investor Prospective Clients who were introduced to Longview by Whitman, and who, without Whitman's knowledge, have subsequently invested funds with Longview.  Any such Client investments with Longview have triggered (or would trigger) Agency Fees due to Whitman.

**Current Longview Clients Introduced By Whitman (of which Whitman is aware)**

**A.     Pfizer**

21.     On or around June 8, 2006, Whitman introduced Pfizer, Inc. ("Pfizer") to Defendants.  This introduction was initially made through one of Pfizer's officers.

22.     Between 2009 and 2012, Pfizer invested a total of $199,933,060 with Longview or one or more other Defendants.

23.     Pursuant to the Agreement, Longview Guernsey made Agency Fee payments that Defendants calculated were due to Whitman through the second quarter of fiscal year 2013.

24.     However, in violation of the Agreement, Longview Guernsey failed to make the required quarterly Agency Fee payment for the third quarter of fiscal year 2013, and has failed to remit any further required quarterly payments.  Such unpaid amounts are due and owing and there is no basis for Longview Guernsey or any of the other Defendants to have stopped making the required Agency Fee payments that are due to Whitman.

25.     Following Longview Guernsey's cessation of payments owed to Whitman, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claims or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

26.     On February 5, 2014, the Defendants, acting through their agent, provided written notice to Whitman that Longview Guernsey (and  Longview) did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Pfizer's investments.

27.     In the February 5th communication, Defendants cited a separate negotiation with a Longview client as a purported basis for Longview Guernsey's decision to cease making the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

28.     By letter dated March 26, 2014, Whitman made further written demand on Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to Pfizer.

**B.     Deseret Mutual**

29.     On September 10, 2007, Whitman introduced Deseret Mutual Insurance Company ("Deseret Mutual") to Defendants through a Deseret Mutual officer.

30.     Between 2009 and 2012, Deseret Mutual invested a total of $34.5 million with Longview or one or more of the other Defendants.

31.     Pursuant to the Agreement, Longview Guernsey made Agency Fee payments that Defendants calculated were due to Whitman through the second quarter of fiscal year 2013.

32.     However, in violation of the Agreement, Longview Guernsey failed to make the required quarterly Agency Fee payment for the third quarter of fiscal year 2013, and has failed to remit any further required quarterly payments.  Such unpaid amounts are due and owing and

there is no basis for Longview Guernsey or any of the other Defendants to have stopped making the required Agency Fee payments that are due to Whitman in connection with Deseret Mutual's investments.

33.    Following Longview Guernsey's cessation of payments owed to Whitman, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

34.    On February 5, 2014, the Defendants provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

35.    In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to cease making the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

36.    By letter dated March 26, 2014, Whitman made further written demand on the Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to Deseret Mutual.

C.     **Utah Retirement Systems**

37.     On or about September 10, 2007, Whitman introduced Utah Retirement Systems to Defendants.  This introduction was made through two officers of Utah Retirement Systems.

38.     Between 2008 and 2012, Utah Retirement Systems made three investments totaling approximately $250 million with Longview or one or more of the other Defendants.

39.     Pursuant to the Agreement, Longview Guernsey made Agency Fee payments that Defendants calculated were due to Whitman through the second quarter of fiscal year 2013.

40.     However, in violation of the Agreement, Longview Guernsey failed to make the required quarterly Agency Fee payment for the third quarter of fiscal year 2013, and has failed to remit any further required quarterly payments.  Such unpaid amounts are due and owing and there is no basis for Longview Guernsey or any of the other Defendants to have stopped making the required Agency Fee payments that are due to Whitman in connection with Utah Retirement Systems' investments.

41.     Following Longview Guernsey's cessation of payments owed to Whitman, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

42.     On February 5, 2014, the Defendants (through their agent) provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

43.     In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to cease making the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

44.     By letter dated March 26, 2014, Whitman made further written demand on the Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to Utah Retirement Systems.

**D.     North Carolina Retirement Systems**

45.     Whitman also introduced Defendants to North Carolina Retirement Systems ("NCRS").

46.     That introduction involved several discussions with NCRS, including a meeting on November 13, 2006, in which employees of one or more of the Defendants met with a representative of NCRS in Chapel Hill, North Carolina.

47.     In June of 2007, NCRS made an initial investment of $250 million with Longview or one or more of the other Defendants.

48.     In November of 2011, NCRS made a second investment of over $584 million with Longview or one or more of the other Defendants.

49.     Pursuant to the Agreement, Longview Guernsey made Agency Fee payments that Defendants calculated were due to Whitman in connection with these investments through the second quarter of fiscal year 2013.

50.     However, in violation of the Agreement, Longview Guernsey failed to make the required quarterly Agency Fee payment for the third quarter of fiscal year 2013, and has failed to

remit any further required quarterly payments.  Such unpaid amounts are due and owing and there is no basis for Longview Guernsey or any of the other Defendants to have stopped making the required Agency Fee payments that are due to Whitman.

51.     Following Longview Guernsey's cessation of payments owed to Whitman, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

52.     On February 5, 2014, the Defendants (through their agent) provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

53.     In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to cease making the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

54.     By letter dated March 26, 2014, Whitman made further written demand on Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to NCRS.

### E.    **Maryland State Retirement and Pension System**

55.    In 2008, Whitman introduced Maryland Retirement Systems, now known as Maryland State Retirement and Pension System ("Maryland") to Defendants, through Maryland's newly-hired Chief Investment Officer.  In addition, Whitman had previously introduced this individual to Defendants back in November 2006, when he was an investment officer with the Minnesota State Board of Investment.  Whitman's communications with Maryland concerning Longview continued during 2008, including a meeting with one of the Maryland investment staff members with employees of one or more of the Defendants in London.

56.    Thereafter, following many communications between Maryland and one or more of the Defendants, on or about September 25, 2009, Maryland invested $200 million with Longview or one or more of the other Defendants.

57.    To date, Longview Guernsey has failed to make any Agency Fee payments to Whitman in connection with this introduction, which is in direct violation of the Agreement. Such amounts are due and owing to Whitman and there is no basis for Longview Guernsey or any of the other Defendants to have withheld the required Agency Fee payments that are due to Whitman in connection with Maryland's investment.

58.    Following Maryland's investment with Defendants, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

59.    On February 5, 2014, the Defendants (through their agent) provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional

payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

60.     In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to not make the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

61.     By letter dated March 26, 2014, Whitman made further written demand on Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to Maryland.

### F.     <u>Washington State Investment Board</u>

62.     On or about June 1, 2006, Whitman, through one of its agents, introduced an officer of the Washington State Investment Board ("WSIB") to Defendants and, as follow up, sent Longview marketing materials to the officer.

63.     Thereafter, and continuing into 2007, Whitman communicated on numerous occasions with representatives of WSIB, and Callan Associates, who served as an outside consultant to WSIB (among numerous other institutional investors).

64.     On July 6, 2007, Callan Associates notified Whitman and Defendants that Longview was selected to participate in a $250 million global equity growth search being conducted by WSIB.  In response, Longview submitted a proposal to WSIB but ultimately Longview was not selected by WSIB at that time.

65.     In August 2008, Whitman arranged additional meetings which led to another opportunity for Defendants with WSIB.

66.     On or about October 31, 2009, WSIB again met with employees of one or more of the Defendants in London.

67.     Following the October 2009 meeting and until well into 2010, Whitman communicated directly with WSIB and its consultants, including Callan Associates, about Longview as a potential investment manager for WSIB.

68.     On or about March 2, 2011, WSIB approved hiring Longview and subsequently invested approximately $1 billion with Longview or one or more of the other Defendants.

69.     To date, Longview Guernsey has failed to make any Agency Fee payments to Whitman in connection with this introduction, which is a direct violation of the Agreement. Such amounts are due and owing to Whitman and there is no basis for Longview Guernsey or any of the other Defendants to have withheld the required Agency Fee payments that are due to Whitman in connection with WSIB's investments.

70.     Following WSIB's investments with Defendants, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

71.     On February 5, 2014, the Defendants (through their agent) provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

72.     In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to not make the

required payments to Whitman under the Agreement.  Defendants each knew full well that this

cited "basis" for non-payment was frivolous and was simply part of their common plan and

scheme to coerce Whitman into reducing its claim or to drop it altogether.

73.     By letter dated March 26, 2014, Whitman made further written demand on

Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants

ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make

any of the payments owed with respect to WSIB.

### G.     Public Retirement System of Idaho

74.     On April 2, 2008, Whitman, through one of its agents, introduced an officer of the

Public Retirement System of Idaho ("PERSI") to Defendants.

75.     As a result of this conversation with Whitman, the PERSI officer added Longview

to PERSI's asset manager tracking system.

76.     Whitman had previously covered PERSI and its consultant, Callan Associates,

over a several year time frame, and continued to cover PERSI and Callan thereafter.

77.     On November 9, 2010, Longview was selected as a finalist in PERSI's global

equity search.

78.     On or about June 30, 2011, PERSI invested $250 million with Longview or one or

more of the other Defendants.

79.     To date, Longview Guernsey has failed to make any Agency Fee payments to

Whitman in direct violation of the Agreement.  Such amounts are due and owing to Whitman

and there is no basis for Longview Guernsey or any of the other Defendants to have withheld the

required Agency Fee payments that are due to Whitman in connection with PERSI's

investments.

80.     Following PERSI's investments with Defendants, Longview Guernsey and the other Defendants ignored Whitman's inquiries and requests for payment.  On information and belief, Defendants did so in an intentional and calculated effort to use their significantly larger financial bargaining power to coerce or induce Whitman into compromising its claim or to accept a lesser amount than the amount owed to Whitman by Longview Guernsey.

81.     On February 5, 2014, the Defendants (through their agent) provided written notice to Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman.

82.     In the February 5th communication, Defendants cited a separate negotiation with a Longview Client as a purported basis for Longview Guernsey's decision to not make the required payments to Whitman under the Agreement.  Defendants each knew full well that this cited "basis" for non-payment was frivolous and was simply part of their common plan and scheme to coerce Whitman into reducing its claim or to drop it altogether.

83.     By letter dated March 26, 2014, Whitman made further written demand on Longview Guernsey for payment of the amounts owed under the Agreement, which Defendants ignored.  Since this demand, Longview Guernsey and the other Defendants have refused to make any of the payments owed with respect to PERSI.

### Other Prospective Clients Introduced by Whitman

84.     To the extent there are other Prospective Clients under the Agreement who were introduced to Defendants by Whitman during the term of the Agreement, any investments by those entities with Longview (or one or more of the other Defendants) would trigger Agency Fee payments owed to Whitman.  Whitman reserves its right to amend (or seek leave to amend) this Complaint to add claims with respect to such additional Clients that are discovered.

## COUNT I

### BREACH OF CONTRACT (PFIZER)

85.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 84 above.

86.     The Agreement is a valid enforceable contract.

87.     Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to Pfizer.

88.     Pfizer invested funds with Defendants.

89.     Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman for Pfizer's investments since the third quarter of fiscal year 2013.

90.     By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Pfizer's investments with Longview.

91.     As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT II

### BREACH OF CONTRACT (DESERET MUTUAL)

92.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 91 above.

93.     The Agreement is a valid enforceable contract.

94.     Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to Deseret Mutual.

95.     Deseret Mutual invested funds with Defendants.

96.     Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman for Deseret Mutual's investments since the third quarter of fiscal year 2013.

97.     By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Deseret Mutual's investments with Defendants.

98.     As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT III

### BREACH OF CONTRACT (UTAH RETIREMENT SYSTEMS)

99.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 98 above.

100.     The Agreement is a valid enforceable contract.

101.     Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to Utah Retirement Systems.

102.     Utah Retirement Systems invested funds with Defendants.

103.     Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman for Utah Retirement Systems' investments since the third quarter of fiscal year 2013.

104.     By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Utah Retirement Systems' investments with Longview.

105.     As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT IV

### BREACH OF CONTRACT (NORTH CAROLINA RETIREMENT SYSTEMS)

106.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 105 above.

107.     The Agreement is a valid enforceable contract.

108.     Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to North Carolina Retirement Systems.

109.     North Carolina Retirement Systems invested funds with Defendants.

110.     Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman for North Carolina Retirement Systems' investments since the third quarter of fiscal year 2013.

111.     By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with North Carolina Retirement Systems' investments with Longview.

112.     As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT V

**BREACH OF CONTRACT (MARYLAND RETIREMENT AND PENSION SYSTEM)**

113.    Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 112 above.

114.    The Agreement is a valid enforceable contract.

115.    Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to Maryland State Retirement and Pension System.

116.    Maryland State Retirement and Pension System invested funds with Defendants.

117.    Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman to date for Maryland State Retirement and Pension System's investments.

118.    By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Maryland State Retirement and Pension System's investments with Longview.

119.    As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT VI

### BREACH OF CONTRACT (WASHINGTON STATE INVESTMENT BOARD)

120.    Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 119 above.

121.    The Agreement is a valid enforceable contract.

122.    Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to the Washington State Investment Board.

123.    The Washington State Investment Board invested funds with Defendants.

124.    Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman to date for Washington State Investment Board's investments.

125.    By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Washington State Investment Board's investments with Longview.

126.    As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT VII

### BREACH OF CONTRACT (PUBLIC RETIREMENT SYSTEM OF IDAHO)

127.    Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 126 above.

128.    The Agreement is a valid enforceable contract.

129.    Whitman performed its obligations under the Agreement by providing the Defendants with an introduction to the Public Retirement System of Idaho.

130.    The Public Retirement System of Idaho invested funds with Defendants.

131.    Despite Whitman's demands, Longview Guernsey has failed to make each of the contractually required Agency Fee payments owed to Whitman to date for the Public Retirement System of Idaho's investments.

132.    By written notice on February 5, 2014, the Defendants notified Whitman that Longview Guernsey and Longview did not intend to make any additional payments of Agency Fees due to Whitman under the Agreement, thereby clearly and unambiguously repudiating the Agreement as to future amounts due to Whitman in connection with Public Retirement System of Idaho's investments with Longview.

133.    As a result of these breaches by Longview Guernsey, Whitman has suffered and will continue to suffer damages, for which Longview Guernsey is liable to Whitman.

WHEREFORE, Whitman demands judgment against Longview Guernsey in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT VIII

### UNJUST ENRICHMENT

134.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 133 above.

135.     Whitman provided the Defendants with introductions to Pfizer, Deseret Mutual, Utah Retirement Systems, North Carolina Retirement Systems, Maryland State Retirement and Pension System, Washington State Investment Board, and Public Retirement System of Idaho, all of whom subsequently invested funds with Longview or one or more of the other Defendants, each of whom, in turn, earned handsome management fees.

136.     Accordingly, the Defendants received the benefit of Whitman's Agency Services, without fully compensating Whitman under the terms of the Agreement, to which they are third party beneficiaries.

137.     To the extent those Defendants (other than Longview Guernsey) have failed to transfer to Longview Guernsey the amounts owed to Whitman from those management fees, such Defendants should not be allowed to so prosper at Whitman's expense.

138.     Because the funds owed by Longview Guernsey to Whitman, which are readily determined under the terms of the Agreement, are sourced from the revenue earned by the other Defendants, those Defendants' failure to provide those funds to Longview Guernsey for payment to Whitman constitutes unjust enrichment.

WHEREFORE, Whitman demands judgment against each of the Defendants (other than Longview Guernsey) for unjust enrichment in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT IX

## VIOLATION OF M.G.L. ch. 93A, § 11

139.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 138 above.

140.     Over several years, Whitman has engaged in an extended course of commerce with the Defendants, which included the obligations owed to one another under the Agreement.

141.     With respect to any amounts due and owing from investments made by the Maryland State Retirement and Pension System, Washington State Investment Board, and Public Retirement System of Idaho, beginning at least as early as the first payment was due for each account, each of the Defendants, acting through their common and overlapping principals, acted in concert with one another in an unfair and deceptive effort to coerce Whitman into unfairly compromising or otherwise abandoning its rights to receive the amounts due to it under the Agreement.  With respect to any amounts due and owing from investments made by Pfizer, Deseret Mutual, Utah Retirement Systems and North Carolina Retirement Systems, beginning at least at the end of the of the second quarter of 2013, each of the Defendants, acting through their common and overlapping principals, acted in concert with one another in an unfair and deceptive effort to coerce Whitman into unfairly compromising or otherwise abandoning its rights to receive the amounts due to it under the Agreement.  Defendants have, since that time, ignored Whitman's good faith efforts to collect the amounts owed it and have relied upon knowingly frivolous grounds to withhold payment, as a wedge to coerce Whitman into accepting a substantially lesser settlement between the parties than was contracted for between the parties.

142.     Specifically, Defendants used a settlement with a Longview Client, to which Whitman was not a party, as an alleged "basis" to withhold payment from Whitman and exact a compromise as to the funds due and owing to Whitman under the terms of the Agreement.

143.     There is no good faith dispute as to the funds due and owing to Whitman and that Defendants' unrelated settlement with a Longview Client is not a good faith basis for withholding those funds.

144.     By using the undisputed funds due and owing to Whitman and the settlement with a Longview Client as wedges to coerce Whitman, Defendants engaged in conduct in disregard of known contractual arrangements with the intention of securing an unbargained-for-benefit for themselves.

145.     Such acts by Defendants occurred and impacted Whitman primarily and substantially in Massachusetts.

146.     As a result of the Defendants' foregoing unfair and deceptive business acts, Whitman has and will continue to suffer financial damages in the form of economic loss, for which each of the Defendants, jointly and severally, are liable to Whitman.

WHEREFORE, Whitman demands judgment against each of the Defendants in an amount to be determined at trial (which should be doubled or trebled due to Defendants' knowing and wilful conduct), plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## COUNT X

## CIVIL CONSPIRACY

147.     Whitman repeats, realleges, and incorporates by reference Paragraphs 1 through 146 above.

148.     Each of the Defendants, acting through their common and overlapping employees and principals, engaged in a knowing and joint scheme to engage in the above-described unfair and deceptive business practices while conducting business with Whitman.

149.     Each of the Defendants substantially assisted in this common, wrongful plan to engage in unfair and deceptive business practices by withholding funds and asserting either no basis or a knowingly frivolous basis for doing so, all as a wedge to try to coerce Whitman to accept a lesser payment than the amount due and owing, with the knowledge that such assistance was contributing to this common plan.

150.     The Defendants' above-described conduct, including disregarding the known contractual agreement between the parties, was intended to secure benefits for the Defendants and constituted an unfair or deceptive act or practice.

151.     As a result of the Defendants' concerted actions to commit unfair and deceptive business acts, Whitman has and will continue to suffer financial damages in the form of economic loss, for which each of the Defendants, jointly and severally, are liable to Whitman.

WHEREFORE, Whitman demands judgment against each of the Defendants in an amount to be determined at trial, plus interest, costs, expenses, including reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

## PRAYERS FOR RELIEF

**WHEREFORE,** Plaintiff Whitman respectfully requests that this Honorable Court:

1.     Enter judgment in favor of Whitman and against the Defendants on each Count of this Complaint, in an amount to be determined at trial, but currently estimated to total in excess of $10 million, in the aggregate (before accrued interest and doubling or trebling), for the known breaches, unfair and deceptive acts and civil conspiracy set forth herein;

2.     Award Whitman pre and post-judgment interest on the damage amounts, as well as its costs and permitted attorney's fees as against the Defendants; and

3.      Award Whitman such other and further relief as the Court may deem just and proper.

WHITMAN DEMANDS A JURY TRIAL ON ALL ISSUES SO TRIABLE

Dated:  August 5, 2014

Respectfully submitted,

By Its Attorneys,

/s/ *William L. Prickett*

William L. Prickett (BBO# 555341)
Anne V. Dunne (BBO# 681893)
SEYFARTH SHAW LLP
World Trade Center East
Two Seaport Lane, Suite 300
Boston, MA  02210-2028
Telephone:      (617) 946-4800
Facsimile:      (617) 946-4801

Counsel for Whitman & Company, Inc.

CERTIFICATE OF SERVICE

I, William L. Prickett, hereby certify that the above document was served upon the following counsel electronically, by ECF, this 5th day of August, 2014:

Patrick J. O'Toole, Jr., Esq.
WEIL, GOTSHAL & MANGES LLP
Weil, Gotshal & Manges LLP
100 Federal Street
Boston, MA 02110
(617) 772-8300


/s/  William L. Prickett
William L. Prickett

Exhibit A

**Longview Partners (Guernsey) Limited**
**No. 1 Le Truchot**
**St. Peter Port**
**Guernsey**
**Channel Islands**
**GY1 6HT**

January 1, 2006

R. Eugene Whitman
Whitman & Co., Inc.
74 Carisbroke Road
Wellesley, Massachusetts 02481

Re: Exclusive Agency Agreement

Dear Mr. Whitman:

This letter agreement (the "Agreement") confirms the terms and conditions under which Longview Partners (Guernsey) Ltd. ("the Manager") has retained R. Eugene Whitman ("Whitman") to serve as exclusive marketing agent in connection with the solicitation of prospective investment advisory clients for Longview Partners (Guernsey) Limited and Longview Partners LP, whose registered office is at Thames Court, 1 Queenhithe, London EC4V 3RL ("Longview"). It is understood that Longview will be offering investment advisory services ("Advisory Services") primarily to pension funds, insurance companies, savings and loan associations, commingled funds and endowment funds, as well as trust companies and investment managers serving such institutions (prior to its commitment of capital to the Advisory Services each such client being hereinafter referred to as a "Prospective Client" and after such commitment each such client being hereinafter referred to as a "Client"). The Advisory Services will consist of providing portfolio management services (on both a discretionary and non-discretionary basis) designed to invest Clients' funds under management in securities.

(1) Exclusive Agency Services: Beginning with the acceptance of this Agreement and continuing until the Termination Date (as defined in Paragraph 5 hereof), Whitman shall serve as exclusive marketing agent for the purpose of

2

offering the Advisory Services to Prospective Clients and Clients located in the United States, Canada and Bermuda (the "Designated Territory") and desiring to invest in securities. As exclusive agent, Whitman shall perform agency services ("Agency Services") consisting of marketing the Advisory Services and arranging meetings at which principals of the Manager and/or Longview will make presentations concerning the Advisory Services to Prospective Clients who, in Whitman's best judgment, will consider committing capital to the Advisory Services. It is understood that although Whitman will seek to arrange such meetings so as to minimize the need for air travel and otherwise reduce expenses, the parties recognize that the majority of Prospective Clients will desire to schedule meetings at their own offices. Whitman will provide follow up to all such presentation meetings and such additional assistance to the Manager and Longview in connection therewith as shall be agreed upon. The parties may add additional countries to the Designated Territory by mutual agreement.

(2)  <u>Non-Refundable Retainer:</u> In consideration of Whitman's agreement to provide Agency Services hereunder, the Manager agrees to pay Whitman a non-refundable retainer (the "Retainer") during each year or portion thereof in which this Agreement shall be in effect. For purposes of this Paragraph 2, the annual period with respect to which the Retainer is payable shall begin on January 1 and end on the December 31 next following. During the first two (2) years (<u>i.e.</u> the period ending December 31, 2007), the Retainer shall be in the aggregate amount of one hundred thousand dollars per year(U.S. $100,000) of which twenty five thousand dollars ($25,000) has been paid to Whitman on the execution of this Agreement. The remaining seventy five thousand dollars (U.S. $75,000) of the Retainer for the period ending on December 31, 2006 and the one hundred thousand for the year ended December 31, 2007 shall be payable in equal quarterly installments. The Retainer shall be payable to Whitman under all circumstances and whether or not funds of Clients are committed to the Advisory Services. Under no circumstances shall the Retainer be refunded to the Manager.

(3)  <u>Direct Expenses:</u> Promptly upon receipt of an invoice (and in all events within 14 business days after receipt of such invoice) therefore from Whitman, the Manager shall reimburse Whitman for all reasonable and necessary direct out of pocket expenses (not including salaries and other internal overhead) that Whitman may incur in providing Agency Services hereunder. While Whitman will exert reasonable efforts to minimize such direct expenses, the Manager recognizes that Whitman will be required to incur direct expenses which shall include:

(a)  travel and entertainment expenses associated with arranging and attending presentation meetings between the principals of the Manager and/or Longview and Prospective Clients; and

3

  (b) mail, overnight delivery, telephone and other telecommunications expenses associated generally with communicating with the Manager and Longview and Prospective Clients.

Whitman shall provide the Manager with such information and documentation as the Manager may reasonably request in order to verify such expenses.

  (4) _Agency Fee_: In addition to the Retainer, the Manager shall pay Whitman as an agency fee (the "Agency Fee") a percentage of all amounts received by Longview as management fees ("Management Fees") in respect of Advisory Service agreements entered into between Longview and Clients introduced to the Manager and/or Longview by Whitman. Subject to Paragraph 6, the Agency Fee shall be a percentage of Management fees received by Longview from Clients with respect to the five (5) year period commencing on the date(s) on which such Clients place assets under the management of Longview as follows:

Agency Fee Payable to Whitman
(Expressed as a percentage of the
Management Fees received by Longview
from Clients introduced to Longview by Whitman):

  25% of ManagementFees Received for 1st year of Management
  20% of ManagementFees Received for 2nd year of Management
  15% of ManagementFees Received for 3rd year of Management
  15% of ManagementFees Received for 4th year of Management
  10% of ManagementFees Received for 5th year of Management

  If a Client introduced to the Manager and/or Longview by Whitman shall commit assets to management by Longview on more than one occasion, the Agency Fee with respect to each such commitment shall be separately calculated in accordance with the five-year schedule set forth above.

  Agency Fees shall be (a) due and payable to Whitman within 30 days after the receipt by Longview of the Management Fees on which such Agency Fees are based and (b) reduced by the amounts previously paid to Whitman as Retainer pursuant to Paragraph 2 hereof. The Manager shall provide Whitman on a quarterly basis with copies of invoices sent to Clients by Longview and statements describing in reasonable detail the Management Fees collected by Longview relative to the prior calendar quarter.

  The parties acknowledge that should Whitman introduce certain Clients (the "Existing Clients") to the Manager and/or Longview prior to the date of this Agreement, and should such Existing Clients enter into Advisory Service agreements with Longview at any time, the Existing Clients

4

shall constitute "Clients" for purposes of this Agreement, and Whitman shall be entitled to receive Agency Fees with respect to Management Fees paid by the Existing Clients on the terms and conditions set forth above.

(5) Term; Termination: This Agreement shall be effective as of the date first above written and shall continue for an initial term (the "Initial Term") of three (3) years thereafter. At the end of the Initial Term this Agreement shall automatically be renewed for an additional two (2)-year term (the "Second Renewal Term") without further action by either party if by the end of the Initial Term Clients introduced by Whitman have capital under management by Longview in the aggregate amount of at least two hundred million dollars (U.S. $200,000,000).

In the event that this Agreement is subject to automatic renewal pursuant to the preceding Paragraph, the Manager and Whitman agree that while the provisions of paragraphs 2 and 4 shall continue to govern the payment of the Retainer and the Agency Fee, respectively, the parties may negotiate and agree on different investment minimums than those specified in the preceding Paragraph applicable to automatic renewals beginning after the Second Renewal Term and the Retainer in respect thereof may be adjusted as well pursuant to Paragraph 2 hereof.

In the event that this Agreement is not automatically renewed as provided in the second preceding Paragraph, it will nonetheless be renewed automatically for successive one(1)-year terms after the Initial Term (each, a "Renewal Term") unless prior to the date which is 30 days prior to the expiration of the Initial Term or any successive Renewal Term, either party delivers written notice of termination to the other parties. The Manager shall pay Whitman a Retainer in each Renewal Term of at least the annual amount specified in Paragraph 2 payable and subject to review in the manner provided therein. The effective date of termination of this Agreement for any reason shall be referred to herein as the "Termination Date".

(6) Consequences of Termination: On the Termination Date Whitman shall cease providing Agency Services on an exclusive basis hereunder and the Manager shall be entitled to appoint an additional marketing agent of its choosing. Whitman shall be entitled to receive any installments of the Retainer due to it as of the Termination Date. Whitman shall also be entitled to receive all Agency Fees thereafter accruing in respect of all Clients with capital committed to the Advisory Services on the Termination Date as well as all Clients and Prospective Clients with whom representatives of the Manager and/or Longview have met or communicated with prior to the Termination Date and in each case which have been introduced by Whitman; provided, however, that in the event Whitman shall terminate this Agreement, the Manager shall only be required to pay Whitman such Agency Fees as shall accrue during the three

5

(3)-year period following the Termination Date. Notwithstanding anything herein to the contrary, the provisions of this Paragraph 6 and the indemnification obligations of the parties contained in Paragraph 9 shall survive the Termination Date.

(7) Assignability and Benefits,Etc.: This Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and assigns; provided, however, that neither party may assign its rights under this Agreement without the other party's prior written consent. Any transfer of control of Longview shall not constitute an "assignment" requiring the prior written consent of Whitman as long as this Agreement and the commitments of Longview thereunder remain unchanged. Notwithstanding anything herein to the contrary, in performing its Agency Services hereunder Whitman shall at all times be an independent contractor of the Manager and nothing herein shall be construed as creating and/or evidencing any other relationship between the parties.

(8) Governing Law: This Agreement and the rights and obligations of the parties hereto shall be construed and enforced in accordance with, and governed by, the internal laws of The Commonwealth of Massachusetts without giving effect to conflict of laws provisions.

(9) Advisers Act Matters: The Manager hereby undertakes and agrees to conduct its activities and to cause Longview to conduct its activities in a manner consistent with the provisions of the Investment Advisers Act of 1940 (the "Advisers Act"), applicable U.S. state, Canadian other applicable laws and regulations (the "Laws and Regulations"). Whitman hereby undertakes and agrees to perform its duties under this Agreement in a manner consistent with the instructions of the Manager and/or Longview and the Laws and Regulations. Without limiting the foregoing, the Manager shall cause Longview, at the time required by these regulations, to cause the Prospective Client to be provided with (a) a current copy of any required written disclosure statement required by SEC Rule 204-3 under the Advisers Act and (b) a separate written disclosure statement which satisfies the requirements of SEC Rule 206(4)-3 under the Advisers Act. The Manager shall cause Longview promptly to provide Whitman with any amendments to the disclosure statements required to be prepared and provided by it under the Advisers Act.

(10) Each of the Manager Longview and Whitman represents and warrants to the other that neither it (nor Longview in the case of the Manager) or any of its directors, officers or shareholders is subject to any of the events or actions specified in Paragraph (a)(1)(ii) of

6

SEC Rule 205(4)-3 under the Advisers Act and none of the matters set forth in such Paragraph is applicable to it or any of its directors, officers or shareholders.

(11) Nothing contained in this Paragraph 9 shall limit or in any way derogate from the provisions of Paragraph 8.

(12) Discretion Re: Clients: Nothing in this Agreement shall require Longview to enter into any Advisory Service relationship with any Prospective Client or to maintain an Advisory Service relationship with any Client. Longview shall have the absolute right to reject any Client or Prospective Client.

Please sign this Agreement where indicated below to indicate your acceptance of and agreement to the terms and conditions thereof.

LONGVIEW PARTNERS (GUERNSEY) LIMITED

By _____          Date ____13\1\06____

Anthony Le Tissier
Managing Director


_____          Date ____13\1\06____

Philip R Corbet
Office Manager


AGREED TO AND ACCEPTED


_____          Date __13/1/06____
R. Eugene Whitman

WHITMAN & CO. INC

70 WALNUT STREET
WELLESLEY, MA 02481
(781) 239-8228

January 31, 2007

Longview Partners (Guernsey) Limited
No, 1 Lo Truchot
St. Peter Fort, Guernsey
Channel Islands GY1 6HT
Attn: Mr. Anthony Le Tissier, Managing Director

Dear Sir:

This is to confirm the amendment of the Exclusive Agency Agreement (the "Agreement") of January 1, 2006 between R. Eugene Whitman, as President of Whitman & Company, Inc. and Longview Partners (Guernsey) Ltd., to substitute Whitman & Company, Inc. as sole contracting party in view of the death of R. Eugene Whitman.

All other terms and conditions of the Agreement shall remain in full force and effect without modification.

If you are in agreement with the foregoing amendment, please so signify by signing and returning a copy of this letter.

Sincerely,

Whitman & Company, Inc.
By: _Ralph E. Whitman Jr._
Ralph E. Whitman, Jr., President

**AGREED TO AND ACCEPTED**

Longview Partners (Guernsey) Limited

By: _____
Anthony Le Tissier, Managing Director

_____
Philip R. Gaael, Office Manager

PLAINTIFF'S EXHIBIT 8

Companies    Documents    Forms

Ticker: AAPL

# Longview Partners (Guernsey) LTD

## SEC CIK #0001426092

SEC.report  ›   CIK  ›   Longview Partners (Guernsey) LTD

**Longview Partners (Guernsey) LTD** is registered with the U.S. Security and Exchange Commission and incorporated in the state of Guernsey. For financial reporting, their fiscal year ends on December 7th. This page includes all SEC registration details as well as a list of all documents (S-1, Prospecuts, Current Reports, 8-K, 10K, Annual Reports) filed by Longview Partners (Guernsey) LTD.

## Company Details

| | |
|---|---|
| Reporting File Number | 028-12889 |
| State of Incorporation | GUERNSEY |
| Fiscal Year End | 12-07 |
| Business Address | MILL COURT<br>LA CHARROTERIE<br>ST PETER PORT Y7 GY1 6JG |
| Business Phone | 00441481712414 |
| Mailing Address | MILL COURT<br>LA CHARROTERIE<br>ST PETER PORT Y7 GY1 6JG |
| LEI | 549300DA3UOE7P7RVS28<br>Longview Partners (Guernsey) Limited |

## —Documents

Email Notifications ?

| Form | Title | Date |
|------|-------|------|
| 13F-HR | Quarterly Report | 2020-02-13 16:54:43 |
| SC 13G | Ownership Acquisition Statement | 2020-02-11 08:51:32 |
| SC 13G/A | Ownership Acquisition Statement [Amended] | 2020-02-10 18:08:17 |
| SC 13G/A | Ownership Acquisition Statement [Amended] | 2020-02-10 18:07:25 |
| SC 13G | Ownership Acquisition Statement | 2020-02-10 18:06:07 |
| SC 13G | Ownership Acquisition Statement | 2020-02-10 17:58:45 |
| SC 13G/A | Ownership Acquisition Statement [Amended] | 2020-02-10 17:54:36 |
| 13F-HR | Quarterly Report | 2019-11-13 16:33:34 |
| 13F-HR | Quarterly Report | 2019-08-13 16:40:42 |
| SC 13G/A | Ownership Acquisition Statement [Amended] | 2019-07-10 06:21:32 |
| 13F-HR | Quarterly Report | 2019-05-14 17:51:17 |
| SC 13G | Ownership Acquisition Statement | 2019-02-14 09:24:31 |
| SC 13G | Ownership Acquisition Statement | 2019-02-14 09:23:21 |
| SC 13G | Ownership Acquisition Statement | 2019-02-14 09:22:29 |
| SC 13G | Ownership Acquisition Statement | 2019-02-14 09:21:28 |
| 13F-HR | Quarterly Report | 2019-02-13 17:02:53 |
| 13F-HR | Quarterly Report | 2018-10-19 12:07:00 |
| 13F-HR | Quarterly Report | 2018-08-01 17:04:42 |
| 13F-HR | Quarterly Report | 2018-04-16 13:32:12 |
| 13F-HR | Quarterly Report | 2018-02-06 10:36:22 |
| 13F-HR | Quarterly Report | 2017-10-30 09:32:05 |
| 13F-HR | Quarterly Report | 2017-07-26 15:28:40 |
| 13F-HR | Quarterly Report | 2017-05-08 17:01:34 |
| SC 13G | Ownership Acquisition Statement | 2017-02-14 13:20:41 |
| 13F-HR | Quarterly Report | 2017-02-10 15:48:13 |
| 13F-HR | Quarterly Report | 2016-11-07 09:24:41 |
| 13F-HR | Quarterly Report | 2016-07-29 13:02:23 |
| 13F-HR | Quarterly Report | 2016-04-19 20:17:54 |
| SC 13G | Ownership Acquisition Statement | 2016-02-16 09:34:17 |
| 13F-HR | Quarterly Report | 2016-01-29 16:43:29 |
| 13F-HR | Quarterly Report | 2015-10-30 19:45:50 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-09-18 08:47:03 |

| 13F-HR/A | Quarterly Report [Amended] | 2015-09-18 08:46:18 |
| 13F-HR | Quarterly Report | 2015-07-31 20:28:28 |
| 13F-HR | Quarterly Report | 2015-05-07 11:24:01 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-02-25 10:48:31 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-02-25 10:47:35 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-02-25 10:43:06 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-02-25 10:41:22 |
| 13F-HR/A | Quarterly Report [Amended] | 2015-02-25 10:40:10 |
| 13F-HR | Quarterly Report | 2015-02-06 17:02:36 |
| 13F-HR | Quarterly Report | 2014-11-05 17:43:23 |
| 13F-HR | Quarterly Report | 2014-08-01 17:09:51 |
| 13F-HR | Quarterly Report | 2014-05-01 06:50:45 |
| SC 13G/A | Ownership Acquisition Statement [Amended] | 2014-02-13 19:31:27 |
| 13F-HR | Quarterly Report | 2014-02-03 21:49:04 |
| 13F-HR | Quarterly Report | 2013-11-07 20:31:11 |
| 13F-HR | Quarterly Report | 2013-08-02 21:01:24 |
| 13F-HR | Quarterly Report | 2013-04-29 18:53:25 |
| SC 13G | Ownership Acquisition Statement | 2013-02-13 13:14:35 |

[ 2 ] Next->

0-50 of 72 Results

Page: 1 | 2 |

## Related SEC Filings - Longview Partners ��

| Longview Partners (Guernsey) LTD | 0001426092 |
| LONGVIEW PARTNERS B, L.P. of NEW YORK | 0001272163 |
| Longview Partners LLP of UNITED KINGDOM | 0001426919 |
| LONGVIEW PARTNERS LP of DELAWARE | 0001033253 |

© 2020 SEC.report | Contact | Privacy Policy | API
SEC CFR Title 17 of the Code of Federal Regulations.

PLAINTIFF'S EXHIBIT 9

LCN-2264873-100318

$6 Pot Stock Set to Dominate

As legalized pot goes mainstream, these little stocks are flagged to win it all.

theprofitbuzz.com  OPEN

>>FREE: 3 Superstar Stocks to Own for 2019<<


# Holdings Channel

| Enter Symbol | | See Who Holds It |



| HOME | ARTICLES | LATEST FILINGS | ALL FUNDS | STOCKS BEING BOUGHT | STOCKS BEING SOLD | INSIDER BUYING |

## Longview Partners Guernsey LTD Top Holdings

As of 09/30/2018

| Entity | Amount | Change 06/30/2018 to 09/30/2018 | Position Size ($ in 1000's) |
|---|---|---|---|
| HCA HEALTHCARE INC | 9,403,310 | − 139,050 | $1,308,188 |
| IQVIA HLDGS INC | 9,539,945 | − 144,020 | $1,237,712 |
| SCHEIN HENRY INC | 13,653,252 | − 191,200 | $1,160,936 |
| PFIZER INC | 25,016,984 | − 502,400 | $1,102,498 |
| FIDELITY NATL INFORMATION SV | 9,926,665 | − 136,090 | $1,082,701 |
| DOLLAR GEN CORP NEW | 9,779,103 | − 142,440 | $1,068,856 |
| UNITEDHEALTH GROUP INC | 4,015,918 | − 56,180 | $1,068,395 |
| EMERSON ELEC CO | 13,416,273 | − 182,100 | $1,027,418 |
| AON PLC | 6,663,527 | − 85,140 | $1,024,717 |
| ORACLE CORP | 19,420,249 | − 233,000 | $1,001,308 |
| STATE STR CORP | 11,202,851 | + 3,230,396 | $938,575 |
| BANK NEW YORK MELLON CORP | 17,773,813 | + 124,800 | $906,287 |
| WELLS FARGO CO NEW | 16,585,682 | − 232,000 | $871,743 |
| WILLIS TOWERS WATSON PUB LTD | 6,175,603 | + 44,291 | $870,389 |
| ZIMMER BIOMET HLDGS INC | 6,569,174 | − 1,179,720 | $863,649 |
| PARKER HANNIFIN CORP | 3,973,106 | − 50,106 | $730,773 |
| MEDTRONIC PLC | 6,866,595 | − 99,300 | $675,467 |
| GRAINGER W W INC | 1,713,779 | − 1,820,755 | $612,522 |
| OMNICOM GROUP INC | 6,970,601 | + 534,008 | $474,140 |
| US FOODS HLDG CORP | 14,785,138 | + 14,785,138 | $455,678 |
| SERVICEMASTER GLOBAL HLDGS I | 6,514,504 | − 2,370,050 | $404,095 |
| THERMO FISHER SCIENTIFIC INC | 1,513,063 | − 1,706,592 | $369,308 |
| TJX COS INC NEW | 2,791,168 | − 259,310 | $312,667 |
| ALLERGAN PLC | 1,550,661 | − 20,270 | $295,370 |
| ARROW ELECTRS INC | 2,865,099 | − 31,080 | $211,215 |

See Full List: All Stocks Held By Longview Partners Guernsey LTD
— Including:
  • Biggest new positions

## TD Ameritrade

### Get a recommendation with Essential Portfolios

An automated investing solution that monitors and rebalances, so you don't have to.

Start

LONGVIEW PARTNERS GUERNSEY LTD INFO

**Size ($ in 1000's)**
At 09/30/2018: $20,257,153
At 06/30/2018: $19,201,641

**Combined Holding Report Includes:**
Longview Partners Guernsey LTD
Longview Partners LLP

Longview Partners Guernsey LTD holdings changes, total fund size, and other information presented on HoldingsChannel.com was derived from Longview Partners Guernsey LTD 13F filings. Link to 13F filings: SEC filings

- Biggest exits
- Biggest increased positions
- Biggest decreased positions

See Details: Top 10 Stocks Held By Longview Partners Guernsey LTD



**Longview Partners Guernsey LTD Top Holdings 13F Filings** | **www.HoldingsChannel.com** | **Copyright © 2013 - 2018, All Rights Reserved**

Nothing in Holdings Channel is intended to be investment advice, nor does it represent the opinion of, counsel from, or recommendations by BNK Invest Inc. or any of its affiliates, subsidiaries or partners. None of the information contained herein constitutes a recommendation that any particular security, portfolio, transaction, or investment strategy is suitable for any specific person. All viewers agree that under no circumstances will BNK Invest, Inc., its subsidiaries, partners, officers, employees, affiliates, or agents be held liable for any loss or damage caused by your reliance on information obtained. By visiting, using or viewing this site, you agree to the following Full Disclaimer & Terms of Use and Privacy Policy. Video widget and market videos powered by Market News Video. Quote and option data delayed at least 15 minutes; stock quote data powered by Ticker Technologies, and Mergent. Contact Holdings Channel; Meet Our Editorial Staff. G+

PLAINTIFF'S EXHIBIT 10

# LONGVIEW PARTNERS (GUERNSEY) LIMITED

## Firm Overview

LONGVIEW PARTNERS (GUERNSEY) LIMITED is an SEC Registered Investment Adviser (RIA). The firm is based in ST. PETER PORT GUERNSEY. As of the firm's last SEC filing on April 27, 2018, the firm has 7 employees and has $26.5 Billion in Regulatory Assets Under Management (RAUM).



## Capital One® Savor® Card

Ad    Earn Unlimited Cash Back: ·

capitalone.com

Learn more

## Form ADV Summary as of April 27, 2018

### Address Information

**MAIN ADDRESS**
MILL COURT
LA CHARROTERIE
ST. PETER PORT GY1 6JG
GUERNSEY
44-1481-712414

## Adviser Information

**Legal Name**
LONGVIEW PARTNERS (GUERNSEY) LIMITED

**Business Name**
LONGVIEW PARTNERS (GUERNSEY) LIMITED

**Jurisdiction/Type**
Corporation

**Website(s)**
http://www.longview-partners.com/

**SEC Status**
Registered - Approved

**Registration Date**
2007-12-13

## Registration Information

**SEC Number**
801-68536

**CRD Number**
143875

**Public Reporting Company**
No

**CIK Number**

**LEI Number**
549300DA3UOE7P7RVS28

## Legal Structure and Domicile

**Legal Structure**

Corporation

**Legal Domicile Country**
Guernsey

**Legal Domicile State/Province**

## Key Figures Summary

**Regulatory Assets Under Management (RAUM)**
26,489,041,740.00

**Number of Employees**
7 (Advisory: 0)

**Number of Clients**
0

**Number of Accounts**
84

## Services, Fees, and Clients

**Services Offered**

- Portfolio Management - Pooled Investment Vehicles
- Portfolio Management - Business or Institutional Clients

**Fee Type Charged**

- Percentage of AUM
- Performance-based Fees

**Client Types**

- Individuals (non-High Net Worth)
- Individuals (High Net Worth Only)
- Banking or Thrift Institutions
- Registered Investment Companies
- Business Development Companies
- Pooled Investment Vehicles

- Pension and Profit Sharing Plans
- Charitable Organizations
- State or Municipal Government
- Other Investment Advisers
- Insurance Companies
- Sovereign Wealth Funds
- Corporation or Other Business

## Significant Red Flags

**Disclosure Reporting Pages (DRPs)**

- None

**Potential Conflicts**

- Transactions in Recommended Securities
- Recommend Owned Securities
- Recommend Underwritten Security
- Related Persons have Custody of Client Assets or Accounts
- Related Persons have Custody of Client Securities

⌃ Back to Top

## Trump Is Ending Another Obama

If you owe less than $679,650 on your home, use Congress
program itself is totally free and doesn't add any cost to yo
year. You'll be shocked when you see how much

**TAP YOUR AGE:** 18-25    26-35    36-45    46-55

### Recalculate Your House Payme

©2018  NMLS ID

## Funds

**LVP FUND LP**

Other Private Fund
Delaware
United States
GAV: $ 142,518,040 (reported: 2018-04-27)
2 Beneficial Owners
1% of clients invested
Directors/Managers: LONGVIEW PARTNERS USA LLC

⌃ Back to Top

## Books and Records Locations

**LONGVIEW PARTNERS LLP**
THAMES COURT
1 QUEENHITHE
LONDON EC4V 3RL
UNITED KINGDOM
Phone: +44 (0) 207 809 4100
Fax: +44 (0) 207 809 4199

**THE NORTHERN TRUST COMPANY**
50 SOUTH LASALLE STREET
CHICAGO Illinois 60603
UNITED STATES
Phone: +1 312 444 3336
Fax: +1 312 444 5431

⌃ Back to Top

**Paying Off Your House May Be Easier (**
If you owe less than $679,650 on your home, use Congre
program. The program itself is totally free and doesn't add
it expires this year. You'll be shocked when you see hov

TAP YOUR AGE:   18-25      26-35      36-45      46-55

NMLS ID 167283; 3306

©2018

RECALCULATE YOUR HOUSE PA

# Service Providers

## Administrators

**THE NORTHERN TRUST COMPANY**
CHICAGO, Illinois
United States

## Auditors

**DELOITTE**
CHICAGO, Illinois
United States

## Custodians

**THE NORTHERN TRUST COMPANY**
CHICAGO, Illinois
United States

⌃ Back to Top

# Control Persons

## Direct Owners

**ANDREW MICHAEL HENTON**
**CONTROL PERSON**
DIRECTOR (since 06/2016)
Ownership Percentage: Less than 5%

**ELIZABETH MARY KATE CAMPBELL**
**CONTROL PERSON**
DIRECTOR (since 09/2017)
Ownership Percentage: Less than 5%

**JAMES EDWARD DENNISTON BUCHANAN**
**CONTROL PERSON**

DIRECTOR (since 10/2015)
Ownership Percentage: Less than 5%

**MICHAEL JOSEPH HUNT**
**CONTROL PERSON**
MANAGING DIRECTOR (since 05/2016)
Ownership Percentage: Less than 5%

**NORTHILL LONGVIEW HOLDINGS (GUERNSEY) LIMITED**
**CONTROL PERSON**
OWNER (since 06/2014)
Ownership Percentage: More than 50% but less than 75%

**PANAYIOTIS CHRISTAKIS PAPAGEORGIOU**
**CONTROL PERSON**
DIRECTOR (since 01/2018)
Ownership Percentage: Less than 5%

**RAMZI YOUSSEF RISHANI**
OWNER (since 10/2001)
Ownership Percentage: More than 10% but less than 25%

**RICHARD JOHN CROWDER**
**CONTROL PERSON**
DIRECTOR (since 12/2016)
Ownership Percentage: Less than 5%

**STUART JAMES TOSTEVIN**
**CONTROL PERSON**
COMPLIANCE OFFICER (since 10/2014)
Ownership Percentage: Less than 5%

## Indirect Owners

**DONATA BERTARELLI NORTHILL DISCRETIONARY TRUST (ACTING THROUGH ITS TRUSTEE, NC T LIMITED)**
**CONTROL PERSON**
OWNER (since 05/2011)
Owned through: NORTHILL CAPITAL HOLDINGS LIMITED
Ownership Percentage: More than 25% but less than 50%

**DONATA GUICHARD-BERTARELLI**
**CONTROL PERSON**

LIMITED PARTNER (since 01/2011)
Owned through: LANDMARK LP
Ownership Percentage: More than 25% but less than 50%

**ERNESTO BERTARELLI NORTHILL DISCRETIONARY TRUST (ACTING THROUGH ITS TRUSTEE NC T LIMITED)**
**CONTROL PERSON**
OWNER (since 05/2011)
Owned through: NORTHILL CAPITAL HOLDINGS LIMITED
Ownership Percentage: More than 50% but less than 75%

**ERNESTO SILVIO MAURIZIO BERTARELLI**
**CONTROL PERSON**
LIMITED PARTNER (since 01/2011)
Owned through: LANDMARK LP
Ownership Percentage: More than 50% but less than 75%

**LANDMARK LP**
**CONTROL PERSON**
LIMITED PARTNER (since 01/2011)
Owned through: NORTHILL INVEST LP
Ownership Percentage: 75% or more

**LM (GP) LIMITED**
**CONTROL PERSON**
GENERAL PARTNER (since 11/2008)
Owned through: LANDMARK LP
Ownership Percentage: Other

**NC PT LIMITED**
**CONTROL PERSON**
TRUSTEE (since 05/2011)
Owned through: NORTHILL PURPOSE TRUST
Ownership Percentage: Other

**NC T LIMITED**
**CONTROL PERSON**
TRUSTEE (since 05/2011)
Owned through: ERNESTO BERTARELLI NORTHILL DISCRETIONARY TRUST
Ownership Percentage: Other

**NC T LIMITED**
**CONTROL PERSON**

TRUSTEE (since 05/2011)
Owned through: DONATA BERTARELLI NORTHILL DISCRETIONARY TRUST
Ownership Percentage: Other

**NORTHILL CAPITAL (JERSEY) L.P.**
**CONTROL PERSON**
LIMITED PARTNER (since 01/2011)
Owned through: NORTHILL JERSEY HOLDINGS L.P.
Ownership Percentage: 75% or more

**NORTHILL CAPITAL HOLDINGS LIMITED**
**CONTROL PERSON**
GENERAL PARTNER (since 06/2012)
Owned through: NORTHILL CAPITAL (JERSEY) LP
Ownership Percentage: Other

**NORTHILL CAPITAL HOLDINGS LIMITED**
**CONTROL PERSON**
GENERAL PARTNER (since 06/2012)
Owned through: NORTHILL JERSEY HOLDINGS LP
Ownership Percentage: Other

**NORTHILL INVEST LP**
**CONTROL PERSON**
LIMITED PARTNER (since 11/2015)
Owned through: NORTHILL CAPITAL JERSEY LP
Ownership Percentage: 75% or more

**NORTHILL JERSEY HOLDINGS, L.P.**
**CONTROL PERSON**
OWNER (since 03/2014)
Owned through: NORTHILL LONGVIEW HOLDINGS (GUERNSEY) LIMITED
Ownership Percentage: 75% or more

**NORTHILL PURPOSE TRUST**
**CONTROL PERSON**
OWNER (since 05/2011)
Owned through: NC T LIMITED
Ownership Percentage: 75% or more

**WAYPOINT GP LIMITED**
**CONTROL PERSON**

GENERAL PARTNER (since 11/2015)
Owned through: NORTHILL INVEST LP
Ownership Percentage: Other

⌃ Back to Top



Oil Extraction & Spill Clea

Ad  Alternative Assets. IRA/40

varab.vivakor.com

Learn more

## Relying Advisers

**LONGVIEW PARTNERS LLP**
**LONGVIEW PARTNERS USA LLC**

⌃ Back to Top

*Subject to our Terms of Use, all information provided in PredictiveOps is provided "as-is" without warranty and for informational purposes only. Predictive Inc. does not provide investment advice. Predictive Inc. is not an investment adviser and is not endorsed by or affiliated with any U.S. or non-U.S. regulatory agency.*

API | Features | Customer Stories | Signals | About Us | Contact Us | Terms of Use | Privacy |

Copyright © 2018 by Predictive Inc. All Rights Reserved.

PLAINTIFF'S EXHIBIT 11

USA Communications

**Mr Buchanan → Mr Frank, from the US**
20 July ?
Day 2, line 24, page 136 through 4, 137
Day 2 lines 4-6, page 145

**The Ruler → Mr Frank, from the US, Mr Buchanan and Mr Handjani**
About the instructions on going after Mr Azima.
Buchanan, Day 2 Lines 10-13, page 145

**Mr Gerrard → Mr del Rosso, USA**
"In early August 2016, I received a telephone call
from Neil Gerrard of Dechert. During that call, Neil
told me that Stuart Page had identified two links on the
internet which appeared to contain data relating to
Farhad Azima, an associate of Khater Massaad. I do not
know Stuart Page but I had heard of him because he works
in a similar industry to me."
Buchanan, Day 2, lines 17-25, page 186

**Mr Frank, USA → Mr Gerrard**
On 4 January with the View from the Window attached.
Day 3, line 18, page 7 through line 14, page 88
Day 3, line 24, page 83 through line 5, page 84

**Cynthia Beudjekian, an assistant to Dr Massaad → Mr Azima**
Sending an invitation to the New York Consulate, inviting Mr Azima to download the
invitation. This is considered to be the spear-phishing email.
Day 3, line 18, page 37 through line 10, page 38

**Mr Buchanan → Mr Frank from Karv Communications, USA**
About what had transpired at the meeting he had with Mr Azima in January and the implied
threat.
Day 3, lines 9-12, page 116

**Nick del Rosso of VMS, USA → Rich Garcia, NTi, USA**
9 August 2016
NTi was to download the material.
"Hi Rich, thanks for your time just now and good to find out about your services.
Will follow up through Chris.
Thanks, my contact info is below."
Buchanan, Day 3, line 13, page 181 through line 11, page 182 3

**Nick del Rosso, VMS, USA → Chris Swecker, NTi, USA**
Shows the "discovery" would have taken place as early as 5 August 2016.

"Chris,

I've spoken to Rich Garcia and agreed that you will instruct his company on this matter. I've told him that as recently as last week – we were advised by researchers that a deep web search indicated that data relating to Farhad Azima was on a site ..."

Then there's some details, Pirate Bay.

"... and we'd initially like to learn exactly what is there.  In addition, over this past weekend we were told that another site [Monover] also held either the same or additional information ..."

Buchanan, Day 3 line 15, page 182 through line 21, page 183


**Rich Garcia, NTi, USA → Chris Swecker, NTi, USA**

11 August 2016

"Chris - did this go out - it's time critical.

Thanks."

Buchanan, Day 3, line 23, page 183 through line 16, page 184

Buchanan, Day 3, line 23, page 184 through line 2, page 185


**Chris Swecker, NTi, USA → Rich Garcia, NTi, USA**

11 August 2016

"Just send it to Nick.  I will call Rich and ask him to expedite.  Chris."

Buchanan, Day 3, line 23, page 183 through line 16, page 184

Buchanan, Day 3, line 23, page 184 through line 2, page 185


**Nick del Rosso, VMS, USA → Chris Swecker, NTi, USA**

12 August 2016

"Chris,

An internet search ... on Farhad Azima came up with these two sites, so could you, additionally, ask NTi to look at them and see what they contain - I'm concerned about viruses, etc."

Buchanan, Day 3, line 23, page 183 through line 16, page 184

Buchanan, Day 3, line 23, page 184 through line 2, page 185


**Chris Swecker, NTi, USA → Rich Garcia, NTi, USA**

"Rich, here are two more sites Nick has learned about. Nick says to watch for malware but I am sure you already know that. Best, Chris."

Buchanan, Day 3, lines 5-15, page 185


**Rich Garcia, NTi, USA → Jessica Gray, NTi, USA**

13 August 2016

"Jess, note the phone line on the message – the attorney would like this on every email message and/or communication produced.Note the malware concerns.

Thanks."

Buchanan, Day 3, lines 16-24, page 185


**There were more exchanges 13 and 14 August 2016.**

Day 3, lines 6-8, page 187


**Mr Gerrard → Nick del Rosso, VMS, USA**

15 August 2016

"Nick,
I've had another call from Stuart who confirms again that there is a website on FA. He seems
to think it's been generated from a UAE source. I've asked for details.  He said he would try
and get them to me. Can you undertake a search for it?"
Buchanan, Day 3, lines 9-18, page 187

**Mr del Rosso, VMS, USA → Mr Gerrard**
"Hi Neil,
Okay - following up on our last conversation regarding Stuart's findings, I instructed NTi to
search and recover what may be on them; that's underway and I'm sure they'll try to analyse
where the sites came from.
If Stuart can provide you with the site addresses he is finding we may be able to avoid
duplicating efforts.  How does he know it was set up in the UAE?
I expect we'll get initial results this week.
Travel well.
Nick del Rosso."
Buchanan, Day 3, line 19, page 187 through line 5, page 188

**Mr Gerrard → Mr del Rosso, VMS, USA**
15 August 2016
"Okay, thanks. No idea why he says it emanates from the UAE. I will ask."
Buchanan, Day 3, lines 12-20, page 188

**Mr Gerrard →Mr del Rosso, VMS, USA**
With a different response that does not line up with a former email.
"Okay.Will ask him for details."
Buchanan, Day 3, lines 6-23, page 189


Trial testimony, Day 4, [Monday, 27 January 2020], James Buchanan and Neil Gerrard

**Mr Buchanan → Mr Gerrard, Mr Frank, and Mr Handjani**
16 August 2016
About the discovered material.
Day 4, line 6, page 6
Day 5, lines 6-7, page 164
Day 5, lines 3-8, page 165

**Mr Buchanan → Mr Frank of Karv Communications**
Mr Buchanan says he regularly contacted Mr Frank.
Day 4, lines 1-3, page 10

**Neither Mr Frank nor Mr Handjani → Mr Buchanan**
According to Mr Buchanan this is because they would have spoken about it later.
Day 4, lines 7-18, page 18

**Mr Buchanan →Air Vice-Marshal David Hobart**
To work with them on making submissions in the US. They spent "a great deal of time,
energy and money bringing all the parties together in Mr Azima's apartment in New York."
Buchanan, Day 4, line 22, page 126 through line 11, page 127

**Mr Azima → Mr Hobart, Mr Holmes, Mr Leppers and Mr Buchanan**
17 February 2016
"Dear Jamie,
As a follow up to our tel call, we are looking forward to <u>meeting in NYC on the 26th</u> I would like to summarise our discussion and as I have state previously the ISR aircraft are defense articles and as such ITAR controlled articles; technical data and services cannot be exported/shared to a foreign person without State Department approval.
In our meeting on the 26th we can discuss the path forward with regards to a DSP 5 or DSP 73. These licenses will need to be considered for both the marketing and the permanent or temporary export plan.After our meeting we will be in a position to initiate/select together a path forward with the State
Department.
State Department approval process is approximately 90-120 days from submittal."
Buchanan, Day 4, line 15, page 132 through line 6, page 133

**Mr Lepper → Mr Buchanan**
Implies they have the required US approvals, but that document pre-dates the email Mr Azima that approval is still being sought.
Day 4, lines 7-9, page 134

**Mr Azima → Mr Buchanan**
Five or six days after the email that allegedly misrepresented US Government being a client that approval was still being sought.
Day 4, lines 9-14, page 137

**Mr O'Toole from Miller & Chevalier → ?**
A draft memorandum of understanding was being circulated.
16 March 2016
Day 4, line 24, page 141 through line 5, page 142

**Mr Buchanan → Ms Goldstein at Dechert in the USA**
To get the order for the three months of emails needed so that Control Risks could obtain the deleted emails as requested.
Day 4, line 9, page 156 through line 4, page 157

**Mr Buchanan → Mr Frank from USA, Mr Handjani, Mr Gerrard**
16 August 2016
Refers to "Stuart" indicating familiarity.
Day 4, line 20, page 158 through line 25, page 160

**A meeting at the Waldorf Astoria**
Mr Azima talked about a northern client, the <u>CIA</u>, and a southern client, <u>Special Operations.</u>
Day 4, line 25, page 169 through line 8, page 171

**Mr Lepper → Mr Buchanan**
To obtain passport details for the visit to the secure military basis in the <u>United States.</u>
Day 4, line 14, page 171 through line 10, page 172

<u>Trial testimony, Day 5, [Tuesday, 28 January 2020], Neil Gerrard</u>

**Mr Gerrard attended a meeting in the US**
Day 5, line 25, page 87

**Mr Gerrard → Mr Swecker, former FBI**
To ask for a reputable company for downloading the hacked material.
Day 5, line 19, page 141 through line 7, page 142

**Mr Gerrard → Mr del Rosso, VMS, USA**
Day 5, line 19, page 141 through line 7, page 142

**Mr Gerrard and Mr Swecker, USA, were in communication**
Day 5, lines 6-22, page 143

First witness statement, James Buchanan, [25 June 2019]

**Mr Buchanan → Mr Azima**
23 September 2015
At Mr Azima's home in the Waldorf Towers in New York.
They discussed the HeavyLift claim and the money that Mr Azima felt was owed to him. Mr Azima also showed interest in acting as "honest broker" in the dispute with Dr Massaad.
Mr Buchanan's first witness statement, [25 June 2019], paragraphs 25-26, page 7

**Mr Buchanan → Mr Azima**
Requested confirmation of US Government approval and Mr Buchanan believed Mr Azima had proven this already.
Mr Buchanan's first witness statement, [25 June 2019], paragraph 74, page 27

**Mr Lepper → Mr Buchanan**
The required course of action for TAA approval and it had the US Department of State logo on it.
Mr Buchanan's first witness statement, [25 June 2019], paragraph 77, page 28

**Mr Lepper →Mr Buchanan**
12 February 2016
That they were still working on the approval process.
"I am still working the approval processes from the USG. As you know working with any government entity it may take some time and I will keep you informed of the process."
Mr Buchanan's first witness statement, [25 June 2019], paragraph 80, page 29

**Mr Azima → Mr Buchanan**
That some approvals had not yet been obtained, but were still being worked on.
Mr Buchanan's first witness statement, [25 June 2019], paragraph 81, page 29

**Dechert notes of meeting 26 February 2016**
"FA and WC said that they have talked to many potential clients - the "Northern Client" is interested, though the "Southern Client" would be more interested once the company has been set up. When pressed for more information about the "Northern Client" and "Southern Client," FA did not want to provide any names or additional information during the meeting...After the meeting FA and JB had lunch, and JB later said that FA told him that the "Northern Client" was the US Central Intelligence Agency, while the "Southern Client" was

US Special Ops in Jacksonville, Florida... WC said that they would go back to the potential customer - and FA interrupted to say "both customers, including the US Government customer" - to get a sense of their timeline. WC said that the US Government would be a launch customer."

Mr Buchanan's first witness statement, [25 June 2019], paragraph 82, page 29